# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

CHERYL GREENE, PERSONAL
REPRESENTATIVE OF THE ESTATE
OF DWAYNE GREENE, DECEASED,

      Case No. 2:18-cv-11008-MAG-DRG

    Plaintiff,

      HON. THOMAS J. LUDINGTON

v.

CRAWFORD COUNTY, SHERIFF KIRK
WAKEFIELD, RANDELL BAERLOCHER,
RENEE CHRISTMAN, KATIE TESSNER,
DONALD STEFFES, WILLIAM SBONEK,
TIMOTHY STEPHAN, JOEL AVALOS, DALE
SUITER, AMY JOHNSON, DAVID NIELSON,
LARRY FOSTER, SHON CHMIELEWSKI,
NORTHERN LAKES COMMUNITY MENTAL
HEALTH AUTHORITY, NANCI KARCZEWSKI
AND STACEY KAMINSKI, LPC, Individually and
Officially and Jointly and Severally,
    Defendants.

---

GEOFFREY N. FIEGER (P30441)
KEVIN C. RIDDLE (P57435)
FIEGER, FIEGER, KENNEY &
HARRINGTON, P.C.
Attorneys for Plaintiff
19390 West 10 Mile Road
Southfield, MI 48075
(248) 355-5555
g.fieger@fiegerlaw.com
k.riddle@fiegerlaw.com

G. GUS MORRIS (P32960)
CHRISTOPHER J. RAITI (P68600)
**McGRAW MORRIS P.C.**
Attorneys for Defendants
2075 W. Big Beaver Road, Ste. 750
Troy, MI 48084
(248) 502-4000
gmorris@mcgrawmorris.com
craiti@mcgrawmorris.com

---

{00806362.DOCX}

HAIDER A. KAZIM (P66146)
Cummings, McClorey, Davis
  & Acho, PLC
Attorney for Defs. Northern Lakes,
Nancy Karczewski, and Stacey
Kaminski, LPC
310 W. Front Street, Ste. 221
Traverse City, Michigan 49684-2279
(231) 922-1888
(231) 922-9888 (Fax)
hkazim@cmda-law.com

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF ERNEST CHIODO, M.D.

Plaintiff respectfully moves to exclude the testimony of Ernest Chiodo, M.D. Dr. Chiodo's testimony does not comply with Federal Rule of Evidence 702 or the standards provided in *Daubert v Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993).  Dr. Chiodo offers opinions outside his expertise and states opinions that are unsupported by sufficient facts and data and utilizes unreliable methods.

Plaintiff relies on her attached Memorandum in Support.

As Local Rule 7.1(a) required, Plaintiff conferred with defense counsel concerning this motion.  Defendants responded that they did not concur.

Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.


/s/ KEVIN C. RIDDLE
GEOFFREY N. FIEGER (P30441)
KEVIN C. RIDDLE (P57435)
FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.
Attorneys for Plaintiff
19390 West 10 Mile Road
Southfield, MI  48075
(248) 355-5555

Dated: November 26, 2019

### CERTIFICATE OF SERVICE

The undersigned certifies that on November 26, 2019 a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause by electronic filing with the efiling System which will send notification of such filing to the foregoing attorney of record. I declare under the penalty of perjury that the statement above is true to the best of my information, knowledge and belief.


/s/ Denise R. Rieck
Denise R. Rieck

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

CHERYL GREENE, PERSONAL
REPRESENTATIVE OF THE ESTATE
OF DWAYNE GREENE, DECEASED,

Case No. 2:18-cv-11008-MAG-DRG

     Plaintiff,

HON. THOMAS J. LUDINGTON

v.

CRAWFORD COUNTY, SHERIFF KIRK
WAKEFIELD, RANDELL BAERLOCHER,
RENEE CHRISTMAN, KATIE TESSNER,
DONALD STEFFES, WILLIAM SBONEK,
TIMOTHY STEPHAN, JOEL AVALOS, DALE
SUITER, AMY JOHNSON, DAVID NIELSON,
LARRY FOSTER, SHON CHMIELEWSKI,
NORTHERN LAKES COMMUNITY MENTAL
HEALTH AUTHORITY, NANCI KARCZEWSKI
AND STACEY KAMINSKI, LPC, Individually and
Officially and Jointly and Severally,
     Defendants.

---

GEOFFREY N. FIEGER (P30441)
KEVIN C. RIDDLE (P57435)
FIEGER, FIEGER, KENNEY &
HARRINGTON, P.C.
Attorneys for Plaintiff
19390 West 10 Mile Road
Southfield, MI 48075
(248) 355-5555
g.fieger@fiegerlaw.com
k.riddle@fiegerlaw.com

G. GUS MORRIS (P32960)
CHRISTOPHER J. RAITI (P68600)
**McGRAW MORRIS P.C.**
Attorneys for Defendants
2075 W. Big Beaver Road, Ste. 750
Troy, MI 48084
(248) 502-4000
gmorris@mcgrawmorris.com
craiti@mcgrawmorris.com

---

{00807623.DOCX}

HAIDER A. KAZIM (P66146)
Cummings, McClorey, Davis
 & Acho, PLC
Attorney for Defs. Northern Lakes,
Nancy Karczewski, and Stacey
Kaminski, LPC
310 W. Front Street, Ste. 221
Traverse City, Michigan 49684-2279
(231) 922-1888
(231) 922-9888 (Fax)
hkazim@cmda-law.com

## **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF ERNEST CHIODO, M.D.**

## STATEMENT OF ISSUES PRESENTED

I.     Should the Court exclude the testimony of Ernest Chiodo, M.D., where He offers opinions outside his area of qualification, ignores the testimony of eyewitnesses, draws conclusions that are unsupported by facts and data and does not utilized any generally accepted methodology?

**Plaintiffs answer:**    **"Yes"**

**Defendant answers:**  **"No"**

i

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

Fed R. Civ P. 26(a)(2)(B)

Fed R. Evid. 702

*EEOC v. Kaplan Higher Educ.  Corp.,*
    748 F.3d 749 (6th Cir. 2014)


*Kumho Tire Co. v Carmichael,*
    *526 U.S. 137 (1999)*

*Tamraz v Electric Co.,*
    620 F.3d 665 (6th Cir 2010)

ii

## INTRODUCTION

The title of "expert" is not a license to propound junk science, amateur legal opinions, and on-the-fly credibility judgments. Experts are instead meant to assist the jury by using their special expertise-paired with reliable principles and methods-to the facts at hand. See Fed. R. Evid. 702. So, even when a purposed expert might appear qualified , "Rule 702 imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable." *Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999). In other words, the Court must ensure that an "expert" doesn't take his title too far.

In short, Dr. Chiodo's testimony doesn't measure up, as it does not meet basic standards for admissibility. The testimony should therefore be excluded from trial under Federal Rule of Evidence 702. First, Dr. Chiodo is not qualified to offer the opinions he is. Second, his speculative *ipse dixit* opinions are not based on sufficient facts and data as he ignores the record and attempts to insert non-existent "facts" into the record. Lastly, his opinions are the product of an unreliable methodology.

Dr. Chiodo's opinions are:

- He is not convinced that Dwayne Greene's hallucinations were due to *delirium tremens*;

- Dwayne Greene's death was due to alcoholic cardiomyopathy – not *delirium tremens*; and

- Dwayne Greene's death was due to not having an implantable defibrillator and not failure to obtain medical treatment.  Exhibit 2

Dr. Chiodo's opinions above can be characterized as follows: 1) the diagnosis of schizophrenia should have been considered to explain the hallucinations (as opposed to *delirium tremens*) even there is no documentation of schizophrenia, no mental health history, no diagnosis of schizophrenia at any point in his life,  the symptoms emerge earlier in life and would have been constantly present by the mid-20s[1], it was known Dwayne Greene was going through severe alcohol withdrawal and the differential diagnosis for *delirium tremens* does not include schizophrenia; 2) the hallucinations could have been from chronic marijuana use even though there is no record evidence to support this; 3) the cause of death was alcoholic cardiomyopathy in spite of Dwayne never having any symptoms demonstrative of alcoholic cardiomyopathy, was going through severe alcohol withdrawal and *delirium tremens* and Chiodo did not utilize any generally accepted methodology and 4) Dwayne Greene died due to not having an implantable defibrillator even though there is not any record of a prior need for this and the condition is reversible.

When Chiodo hears hoofbeats he thinks zebras and questions why everyone else hasn't thought zebras.  Every medical expert in the case, except for Dr. Chiodo,

---

[1] See Exhibit 1, Addendum of Gerald Shiener ("It would be highly unlikely to the point of virtual impossibility for Dwayne Green to have suffered from schizophrenia and not have it diagnosed".)

has come to the conclusion that Dwayne Greene suffered from *delirium tremens* and did not receive medical treatment resulting in his death.  This was confirmed by physicians with board certifications in Forensic Pathology[2], Internal Medicine and Addiction Medicine[3], Internal Medicine and Corrections Medicine[4], Forensic Psychiatry[5], Forensic Psychiatry and Addiction Medicine[6].  Additionally, the fact that Dwayne was going through *delirium tremens* was confirmed by Nursing

---

[2] Exhibit 3, Report of Dr. Werner Spitz ("clearly Dwayne Greene was exhibiting DTs"; Exhibit 3, Supplemental Report of Dr. Werner Spitz (he "died of *delirium tremens*"); Exhibit 4, Declaration of Stephen Cohle, M.D. ("I performed the Cardiac Pathology on the heart of Dwayne Greene . . . if I were to certify cause of death in this case, I would have certified it as *delirium tremens*".)

[3] Exhibit 5, Report of Herbert Malinoff, M.D at p. 18. ("It is clear from my review of the case material and medical material presented that Mr. Greene not only suffered from alcohol use disorder/alcoholism but also was observed over the course of four days in the Crawford County Jail to suffer all of the stages that I have described of alcohol withdrawal up to and including *delirium tremens* with eventually vascular collapse and Mr. Greene's unfortunate demise");

[4] Exhibit 6, Report and Supplemental Report of Dr. Bates ("Dwayne Greene . . . died from an anoxic and ischemic brain injury suffered after cardiac arrest due to the complications of alcohol withdrawal and *delirium tremens*".  4/2/19 Report, p. 3; "the truth of the matter is that the antecedent cause of death was alcohol withdrawal complicated by *delirium tremens*", 8/3/19 report, p. 3; "Schizophrenia is not even included in the differential diagnosis for *Delirium Tremens*".  Id. at 3

[5] Exhibit 7, Report of Dr. Pozios, M.D. ("Alcohol withdrawal delirium is a medical condition that requires medical treatment"); ("Corrections officers were aware that Mr. Greene, beginning on December 6, 2017, and continuing until he was found unresponsive on December 8, 2017, was confused and hallucinating as a result of alcohol withdrawal").  Id. at 4, 11

[6] See Exhibit 8, Report of Dr. Gerald Shiener, p. 5 -"Mr. Greene was suffering from *delirium tremens*"; "no appropriate treatment was provided and the lack of appropriate treatment was the cause of death".

experts[7] who hold the Certified Correctional Health Professional designation[8]. When the prevailing medical community hears hoofbeats they look for horses. Chiodo insists that they should look for zebras instead. In fact, Chiodo ignores the entirety of the testimonial evidence, documentary evidence and the fact that Dwayne Greene was high risk for *delirium tremens*.[9]

Additionally, Dr. Chiodo's methodology is unreliable. First, **he seeks to invoke two separate disease processes to explain all observed phenomena**. See Exhibit 1, p. 5. Second, Chiodo's methodology did not consider the circumstances of death. See Exhibit 4, Declaration of Stephen D. Cohle, M.D. As a result, Chiodo's testimony is inadmissible under FRE 702(c). By ignoring the record and trying to "create facts", Chiodo has not provided a reliable methodology.

## CHIODO IS NOT QUALIFIED TO PROVIDE RELIABLE EXPERT OPINIONS IN THIS CASE UNDER FRE 702(a)

---

[7] Exhibit 9, Report of Rebecca Luethy, R.N., p. 9, 5 ("Throughout DG's stay at the jail, Corrections Officers noted no fewer than 40 times, the signs of severe alcohol withdrawal: hallucinations, delirium, disorientation, agitation, insomnia, delusions and hyperthermia"); Exhibit 10, Report of Terry Fillman, R.N ("It is my expert opinion that correctional officers knew . . . Mr. Greene was demonstrating life-threatening *Delirium Tremens*. . ." p. 2).

[8] The designation shows demonstrated competence in the delivery of healthcare in a correctional environment.

[9] See Exhibit 11, Report of Dennis Simpson – Mr. Greene demonstrated elevated risk for severe alcohol syndrome and risk factors associated with delirium tremens. Id. at 7. The peer-reviewed literature shows that he was demonstrating objective signs of *delirium tremens*. "The presence of hallucinations alone is the pathognomic indicator of the onset of delirium tremens and requires immediate medical attention" Id. at 8.

Dr. Chiodo is not qualified to offer the opinions he has in this case. His cv is attached to Exhibit 2. Dr. Chiodo is a lawyer. He holds himself out an as expert in virtually every field imaginable. He is a master of none of his proclaimed subject matters. See Exhibit 12 for a detailed list of all the subject matters Chiodo claims he is a subject matter expert in. The scope and breadth of his litigation related opinions is amazing. His cv is replete with references to occupational medicine and toxic tort litigation. Subject matters not relevant to this litigation

First, Defendants admit that Dr. Chiodo has not performed an autopsy in the last twenty years. Exhibit 13, Response to Request for Admission #3. Dr. Chiodo has not published in the field of Forensic Pathology. Id. at Response to Request for Admission #7. Both of these admissions are especially relevant when Chiodo wades into the area of Forensic Pathology which he does throughout his Report. The only autopsies that Dr. Chiodo performed were under Dr. Werner Spitz as a medical student. Id. at Response to Request For Admission #1; Exhibit 14, p. 11, *Egan v Golden*.   Apparently, that did not go well for Chiodo. See Exhibit 15, p. 3.

Second, Dr. Chido is not board certified in Psychiatry nor Addiction Medicine. Exhibit 13, Response to Request for Admission #5, #10. He has never published in the field of Psychiatry nor Addiction Medicine. Id. at Request for Admission #8, #9. These admissions are especially relevant when Chiodo wades into the area of Psychiatry and his supposition that Dwayne Greene may have had

undiagnosed and undocumented schizophrenia.  Additionally, these admissions

would also be germane to his opinions regarding the cause of the hallucinations

being related to severe alcohol withdrawal versus schizophrenia.

Third, Defendants admit that Dr. Chiodo has no hospital privileges.  Id. at

Response to Request For Admission #6.   This is especially relevant due to the fact

that his opinions are all litigation related – that's his "main activity, and it's very

lucrative".  Exhibit 15, p. 2.  According to him, "to be a really good forensic

expert, you have to have a law degree or become a jailhouse lawyer."  Id.

Chiodo spends 90% of his professional time as an expert witness and has

practiced medicine for "not that many years."  *Alvarez v Police Board of City of*

*Chicago,* 2018 IL App (1st) 170855-U at 3 (Exhibit 16).  He declares that he

renders his opinions as a former senior public health official, which he was for

only two years; however, apparently that was primarily a legal job according to at

least one interview he gave.  See Exhibit 15, p. 4.  His medicine may not be up to

snuff, but he is impressed with his "gift of gab".  See Exhibit 15, p.3.

"Before an expert may give an opinion, the witness must be qualified to do

so." *Lim v. Miller Park Co.,*  526 B.R. 202, 216 (E.D. Mich. 2015). [A] person ,

although qualified as an expert in one area of expertise, may be precluded from

offering opinions beyond that are of expertise[.]. *See Wellman v Norfolk & Western*

*Railway Co.*, 98 F.Supp.2d 919 (2000).

Dr. Chiodo's background will not assist the trier of fact to understand the evidence or determine a fact in issue in this case.  He is not qualified to offer opinions in the areas in which he has waded.  As a result, pursuant to FRE 702(a) his testimony must be precluded.

## PRIOR JUDICIAL BODIES HAVE REJECTED CHIODO'S FLAWED METHODOLOGY AND FOUND HE DID NOT HAVE SUFFICIENT FACTS OR DATA

In order to understand what Chiodo has done in this case, it is important to look at other decisions which have found he has "inserted a fact not in the record" and "discounted actual facts and evidence".  Dr. Chiodo's testimony has been repeatedly rejected by judicial bodies.  His methodology includes stretching into areas which he is not qualified, ignoring record evidence and inserting "facts" into the record which don't exist to support an opinion.

Dr. Chiodo has previously been precluded from offering opinions on allergy/immunology due to lack of qualifications in the field and flawed methodology.  *Simon v Select Comfort Retail Corp*, 2016 WL 160643 (E.D. Missouri).  In *Simon*, supra, just like this case, Chiodo tried to stretch his numerous degrees into areas that he is not board certified in, doesn't treat patients and has no expertise in.

Dr. Chiodo also has been precluded from offering opinions as an expert in biomechanics as his opinion was "scientifically unreliable and based on

insufficient facts or data". Exhibit 17, *Barnard v Atlantic Subs LLC*, et al., ("*it is Chiodo's application of that law of physics to speculative and unsupported facts derived from the use of unreliable principles and methods that requires striking his opinion*").

In *Davidian v Festin, et al*, Nineteenth Judicial Circuit For The Indian River County, Case No. 31-2-12-CA-000838, the Circuit Court found he used a "flawed methodology", "***inserted a fact not in evidence***", the "opinion was ***not based on*** scientific , ***sufficient fact or data***", it was "not the product of reliable principles or methods" and Chiodo did "not reliably apply these principles or methods to the facts in the case". Exhibit 18, pp. 9-11; 153- 156. The Court found that "he ***discounted actual facts and evidence*** which was the testimony of the crash participants." Id. at 153. In this case, Chiodo's methodology is to ***ignore*** the testimonial and documentary records. The Court also found that ***Chiodo inserted a fact not evidence to support his opinions***. Id. at 154. In this case, Chiodo is also inserting facts not in the record to muddy the waters and support is otherwise *ipse dixit* opinions. He is also ignoring actual facts and evidence. As a result, his testimony is inadmissible under FRE 702(b) and (c). See also Exhibit 48 precluding Chiodo testimony in part due to Daubert.

In his deposition in the *Davidian* case, Chiodo's flawed methodology included disparaging one witness' powers of observation because he was "a very,

very old man". Exhibit 19, p. 43.  In our case, Chiodo waved his magic wand to excuse the observations of the Corrections Officers.  See Exhibit 2, p. 18. Chiodo's contempt for the legal process goes so far as to threaten ethics complaints against attorneys that challenge his methodology.  Id. at 81-82.

When an attorney friend of Dr. Chiodo was facing disciplinary proceedings for misappropriating approximately $63,000 of client money, Dr. Chiodo attempted to bring the Chiodo methodology of changing facts and offering speculative possibilities to the rescue.    Dr. Chiodo blamed the drug that the lawyer was taking for causing "cognitive impairment" that resulted in reducing the lawyer's ability to accurately calculate mathematical sums such that the Lawyer erred in calculating his contingent fee. Exhibit 20, Appendix I to Order Increasing Discipline From A 45-Day Suspension to Disbarment, pp. 6-7.    This was rejected, "The panel does not find Chiodo's report or testimony credible . . . . Id.  In order to provide the opinion, Dr. Chiodo's methodology once again ignored record evidence and changed facts– *namely that the calculations were done correctly*. Id. at 7.

### DR. CHIODO IGNORES THE FACTS AND DATA REGARING DWAYNE GREENE'S INCARCERATION MAKING HIS OPINION INADMISSIBLE UNDER FRE 702(B)

Dr. Chiodo's speculative *ipse dixit* opinions are not supported by sufficient facts and data under FRE 702(b) to be reliable and therefore must be excluded.

The records which he ignores is extensive and set forth below.

Dwayne's drinking had spiraled out of control after a traumatic event involving a significant other.  Exhibit 21, p. 76-77.  An attempt at Inpatient Rehabilitation from February, 2017, revealed "ETOH" dependency and ***no psych history*** (Exhibit 22, pp 2-3).  His Mental Health Status was "**Normal**".  Id. at 3. During this treatment he was prescribed "Ativan" [Lorazepam], a benzodiazapene used for treatment of alcohol withdrawal.  Id. at 8-9; Exhibit 11 at 4-5.  As a result, he did not report any visual or auditory hallucinations.  Id. at 11-27.   Chiodo ignored all of the foregoing facts and data.

Dwayne Greene was previously booked on August 5, 2017, in the Crawford County jail.  Exhibit 23.    The August, 2017, medical screening, completed by defendant Tessner, showed ***no history of mental health issues, good mental state and no prior psychiatric care***.  Exhibit 24.  He bonded out in approximately 36 hours.

Prior to 12/4/17, his friends and co-workers knew that Dwayne was in dire need of going to supervised alcohol rehabilitation.  Exhibit 25, Jason Pyonk p. 10; Exhibit 26, Robert Hunter, pp. 17-18, 20-21, 24.  Dwayne was drinking close to a fifth a day near the end.  Exhibit 27, p. 26.  Dwayne was accepted into Sacred Heart's detox program to do supervised alcohol withdrawal in December, 2017. Id. at 27; Exhibit 28.  Dwayne was drinking near the end to stop the shakes.

Exhibit 27 at 32.  See Exhibit 38, pp. 11, 13.

On December 4, 2017, Dwayne Greene, age 32, presented to the Crawford

County Circuit Court for a plea hearing arising out of the OUIL 3 from August,

2017.  A PBT was performed at that time and Mr. Greene was found to have a .194

BAC after waiting 3-1/2 hours in Court.  Exhibit 29, pp. 10-13.  At that time, Mr.

Greene's attorney put the following statement on the record:

> Mr. Greene has an appointment on Wednesday at Sacred Heart
> 3:00 o'clock.  He's told me that he's tried to quit on his own
> before, and he's had seizures.  He will get violently ill in the
> jail going cold turkey.   . .and then just in two more days he
> would go to an inpatient facility where they would be able to
> help him medical to actually ease the withdrawal symptoms.

Id. at 11-12.  Mr. Greene then asked to be placed in the "medical ward".  Id. The

Court responded "I'm going to trust that the jail staff is going to do what they're

trained to do, which is, if they see a problem, they're going to address it

immediately . . .that doesn't mean that that I feel you don't need treatment . .

Id. at 10-14.

Mr. Greene entered the Crawford County jail on December 4, 2017;

however, no medical screening was performed.  See Exhibit 30; Exhibit 31,

Tessner at 15-16.   Ms. Tessner testified that she knew on the 4th that Mr. Greene

was likely to experience alcohol withdrawal based on his past booking.  Id. at 21-

22.  Mr. Greene began tremoring on 12/5/17.  Id. at 24-25.  Tessner knew that

Greene did not see a nurse on the 4th and wouldn't be seen until the 8th.  Id. at 22.

The jail staff [CO Christman] began documenting in earnest on 12/6/17, Dwayne's

difficulty with alcohol withdrawal (Exhibit 32).  Chiodo ignores each of the

observations of the Corrections Officers[10].

```
12/06/17 13:40 GREENE/DWAYNE IN D-01 ACTING ERRATIC, APPEARS TO BE HELLU-C
12/06/17 13:40 INATING, AND TO BE DETOXING.
```

Early in the morning of 12/7/17, a Request for a Mental Health Evaluation was

made to Northern Lakes Coummunity Mental Health Authority.  The jail continued

to document Dwayne's difficulty prior to that Evaluation.

```
12/07/17 06:20 INMATE DWAYNE GREENE IS STILL SHOWING SIGNS THAT HE IS STILL
12/07/17 06:20 GOING THROUGH WITHDRAWELS FORM ALCOHOL.  HE HAS TRIED TO
12/07/17 06:20 LEAVE THE CELL, ASKING FOR HAMMER AND NAILS, THINKING HIS
12/07/17 06:20 MOTHER IS SPEAKING TO HIM, HE PERIODICALLY YELLS OUT OR
12/07/17 06:20 BANGS DOOR, FLOOR AND WALLS.  HE IS COMPLIANT AND PLEASANT
12/07/17 06:20 WHEN SPEAKING TO HIM, BUT IS CONFUSED AND DOES NOT COMPREHEND
12/07/17 06:20 THAT HE IS HERE IN THE JAIL.  WE WILL CONTIUNUE TO MONITOR
12/07/17 06:20 HIM CLOSELY
```

Nanci Karczewski, a LLPC since 2001, from Northern Lakes Community Mental

Health Authority evaluated Greene on 12/7/17 at around 2:00 p.m..  Below are her

handwritten notes which contradict Chiodo (Exhibit 33).



---

[10] He also ignores the peer-reviewed literature provided by Dennis Simpson, Director of the Specialty Program in Alcohol and Drug Abuse at Western Michigan University which detail the signs and symptoms of delirium tremens and the timing of such.

{00807520.DOCX}                    12

Excerpts of her typewritten report (Exhibit 34) are below:

**Referral Source:**     Law Enforcement
**Details:**     Jail C.O.s requested a CMH contact for Dwayne since they were reporting that he is going through the DTs for alcohol withdrawal.

**Clinical Intervention:**     Attempted to assess Dwayne.  Very difficult process due to his delusional behavior while going through the DTs.

Ms. Karczewski testified about the delusional behaviors Dwayne was displaying.  Exhibit 35, p. 31-37.  She confirmed he was going through the "DTs".  Id. at 49.  She provided this information to the Sheriff who confirmed he was aware that it was happening.  Id. at 50-51.  Mr. Greene did not see a medical professional and became unresponsive on the morning of 12/8/17 after going into cardiac arrest.  Chiodo ignores the observations of Karczewski.

Attached as Exhibit 36 are text messages between CO Tessner and Corporate Christman.   Below are some of the relevant text messages that show that based on their own observations Mr. Green was going through "dt's".

**12/7/17 7:48 PM**

Hey lady.  Busy couple days.  Wanted to give you a heads up that Greene is still going through the d.t.'s. has not slept nor ate much.  Hallucinations.  Etc.  Cmh seen and spoke to him.  She said he is showing classic signs of withdrawal.  Hopefully by the time you're there he will have decided to sleep.  He has been monitored closely.  Jamie Shaw got some time.  Till I think 12/20.  She has already started to d.t.  I am so totally exhausted.  Left a couple things in your box to look at.  Nothing big.  Also sort of moved

Chiodo has ignored the testimony of each of the Corrections Officers

demonstrating that he lacks sufficient facts and data under FRE 702(b).  Below is

some of the significant testimony that Chiodo has ignored.

Corporal Renee Christman has been with the Crawford County Sheriff's

Department for 19 years as a Corrections Officer.  Exhibit 37, p. 8.  She worked

December 6 from 5:47 a.m. to 6:05 p.m. and December 7 from 5:47 a.m. to 6:05

p.m.  Id. at 8.  She understood on the 6th and 7th that alcohol withdrawal was a

medical condition.  Id. at 10.  Her understanding as to the custom and practice with

respect to providing medical assistance to inmates undergoing alcohol withdrawal

was simply to monitor them, make sure they get fluids, don't harm themselves and

try to keep them calm.  Id. at 10-11.  The text messages were all messages

downloaded from her phone.  Id. at 17-18.  They are Exhibit 1 to her deposition.

She observed Greene have hallucinations about a crack in the ceiling and wanting

to fix it, talking to people that weren't there, winding up an imaginary cord, trying

to fix things in his cell.  Id. at 19-20.  At the time that she wrote the text messages there was nothing in the file indicating Greene had a psychiatric history.  Id. at 21. On December 7, at 6:20 a.m., Christman **knew** that Greene was going through alcohol withdrawal.  Id. at 25.  She read CC11 into the record [Exhibit 32].  At the time she made the note in the log she was not aware of any psychiatric history[11]. Id. at 25.  She knew that alcohol withdrawal was a medical condition which she described as a "physical condition".  Id. at 25.  It was her conclusion that Greene was confused and does not understand that he is here in the jail.  Id. at 27.   She is sure that she told CMH that Greene hadn't slept.  Id. at 31.  She never observed Greene sleep.  Id. at 31.  ***She understood it <u>was not</u> a mental health issue after meeting with CMH[12]***.  Id. at 33.  She knew it was a "physical issue".  Id. at 31. She observed what she thought was confusion, disrobing, hallucinations, yelling, lack of sleep.  Id. at 40.  Greene told her he was hot.  Id. at 42.  Based on her observations over the course of the 6th and 7th, Greene was hallucinating more.  Id. at 52.  He was hallucinating progressively more frequent.  Id. at 52.  She observed the length and intensity of the hallucinations become more progressive[13].  Id. at 53.

---

[11] Neither is Chiodo.
[12] This testimony is in direct contradiction to Chiodo's opinion "it was the responsibility of the mental health contractor to recognize and evaluate the likely causes of Mr. Dwayne Greene's mental condition."  Exhibit 2, pp. 18-19.  Another example of Chiodo waving off eyewitness testimony with his magic wand.
[13] Chiodo does not explain how schizophrenia hallucinations would become more progressive the longer that Greene, coincidentally abstained from alcohol.

She observed him reaching for things through the food chute that were not there.
Id. at 64. She was presented with numerous photographs where Greene was
reaching for objects that weren't there and which he did not have his corrections
uniform on. Id. at 65. Foster told her that Greene was having hallucinations. Id.
at 68. She wrote that Greene fluctuated between realizing he was in jail and not
knowing he was in jail. Id. at 73. She made clear to Captain Baerlocher that
Greene was going through alcohol withdrawal. Id. at 74. She believed he knew
based on the discussions. Id. at 74-75. It was communicated to Baerlocher that
Greene was having hallucinations. Id. at 75. She brought to Baerlocher's attention
that Greene was confused. Id. at 75. She made the determination that Greene
could wait until the 8th to see a nurse. Id. at 91-92. At the time that she made the
determination that Greene could wait until the 8th she knew he had hallucinations,
confusion, had indicated that he was too hot, hadn't seen Greene sleep, was erratic
and agitated. Id. at 93. She made a conscious decision that Greene could wait
until the 8th to see the nurse. Id. at 136.

Nurse Jeanne Hufnagel was the nurse at the Crawford County jail for
approximately ten years. Her contract ended on December 1, 2017; however, she
did work the morning of December 8, 2017. She testified that one of the potential
complications of untreated delirium tremens is death. Exhibit 39, p. 34. There was
no physician supervising the medical care of inmates; instead the jail relied on the

walk in clinic or the inmate's individual physician.  Id. at 42.  She did not have

autonomy to administer medications that hadn't previously been prescribed to an

inmate.  Id. at 43.  The jail did not allow medications to assist inmates going

through alcohol withdrawal.  Id. at 47.   She couldn't treat anything when it came

to alcohol withdrawal, it was mostly observe and see if anything was happening.

Id. at 58.   She would rely upon the corrections officers to gauge the worsening of

the symptoms.  Id. at 62.  She believed that corrections officers were well-versed in

the symptoms of alcohol withdrawal and she relied upon them to decide when to

call her.  Id. at 69.  She testified that the corrections officers were trained and

instructed regarding the constellation of symptoms as a person was going through

alcohol withdrawal.  Id. at 86.

Nurse Denise Devolder was the contracted nurse during Dwayne's

incarceration.  She testified that there are no medical programs at the Crawford

County jail.  Exhibit 40, pp. 19-20.  Based on her training that pre-dated Dwayne's

death it was clear that there was no medical treatment for alcohol withdrawal

provided by the jail.  Id. at 24.

Sheriff Kirk Wakefield testified that he was aware of and blessed the custom

and practice that persons undergoing alcohol withdrawal are to remain in

observation until they can see the jail nurse.  Exhibit 41, p. 12.  He testified that the

policy or procedure for inmates suffering from *delirium tremens* was to observe

them until the proper medical people can look at them.  Id. at 34.

Dale Suiter has been a Corrections Officer for nine years.  Exhibit 42, p. 7.

He worked December 7 beginning at 5:52 p.m. to December 8 at 6:01 a.m.  He

understood the signs and symptoms of alcohol withdrawal to include tremors,

sweating, convulsions, hallucinations – both auditory and visual.  Id. at 10.  He

understood Delirium Tremens as a symptom of alcohol withdrawal.  Id. at 11.   He

was aware that Greene was having hallucinations.  Id. at 26.  There was

information contained within the log prior to his shift that Greene was confused.

Id. at 27.  The Mental Health First Aid Training he received indicates that "severe

alcohol withdrawal may lead to a medical emergency."  Id. at 27.  It also says

"seek medical help if the person displays symptoms of severe alcohol withdrawal"

such as "delirium tremens, a state of confusion and visual hallucinations."  Id. at

27.  He was aware of that information prior to the start of his shift on December 7.

Id. at 27-28.  The training also indicates that alcohol withdrawal should be done

under professional supervision.  Id. at 28.  He understood on his shift that alcohol

withdrawal is a medical issue.  Id. at 38.

Corrections Officer Donald Steffes has been with the Crawford County

Sheriff's Department as a Corrections Officer for 19-1/2 years.  Exhibit 43, p. 7.

He agreed that alcohol withdrawal is a medical condition.  Id. at 15.  He would

have been in possession of the information that severe alcohol withdrawal may

lead to a medical emergency and seek help if a person displaces symptoms of

severe alcohol withdrawal such as delirium tremens – a state of confusion and

visual hallucinations prior to December 7, 2017.  Id. at 17.  He was aware of the

information in the Mental Health First Aid USA book that alcohol withdrawal

should be done under professional supervision before 12.7/2017.  Id. at 18.  He did

not take any steps to make sure Dwayne Greene was doing his alcohol withdrawal

under professional supervision.  Id. at 19.  He testified that if he had observed an

inmate experiencing the symptoms that Corporal Christman documented in the jail

daily log on 12.7/2017 at 6:20 a.m. he would have called 911.  Id. at 76.

Corrections Officer Timothy Stephan has been a Corrections Officer for 19

years with Crawford County.  Exhibit 44, p. 6.  He attended the Mental Health

First Aid Training put on by Northern Lakes at Camp Grayling.  Id. at 7.  He

worked with Corporal Christman on December 6 and December 7.  Id. at 14.  He

was aware prior to December 7, 2017, that alcohol withdrawal should be done

under professional supervision.  Id. at 16-17.  He was aware prior to December 7,

2017,  to call an ambulance or seek medical help if the person had delirium

tremens – a state of confusion and visual hallucinations.  Id. at 17.

Corrections Officer Joel Avalos has been with Crawford County since 2006

as a Corrections Officer.  Exhibit 45, pp. 6-7.  He worked December 4 and

December 5 until about 6:00 p.m.  Id. at 7-8.  He also worked the first shift on

December 8, 2017.  Id. at 8.  He asked Dwayne Greene when he put him away if

anything had changed medically and Greene said no.  Id. at 12.  Avalos would

have been referring to the prior booking that Greene had with respect to if anything

changed medically.  Id. at 15.  He agrees that alcohol withdrawal is a medical

issue.  Id. at 16It was his understanding on the 4th that the nurse wouldn't be back

until the 8th.  Id. at 17.   He knew the nurse didn't see Greene on the 4th.  Id. at 17.

He was not aware of any plan in place for Greene to be looked at by a medical

professional before the 8th.  Id. at 17.  He did not implement any plan to have

Greene do his alcohol withdrawal under professional supervision – in spite of his

Mental Health First Aid Training.  Id. at 17-18.  There is no other person at the jail

professionally trained to supervise alcohol withdrawal.  Id. at 20.  If the nurse isn't

in there is no other person trained to supervise alcohol withdrawal.  Id. at 20-21.

He agreed that severe alcohol withdrawal can be a medical emergency.  Id. at 34.

An inmate in severe alcohol withdrawal requires medical attention.   Id. at 34-35.

Avalos would have called medical if he knew Greene was going through alcohol

withdrawal, had observed him trying to leave his cell, asking for hammer and nails,

thinking his mother is speaking to him, periodically yelling out or banging door

[Christman log notes].  Id. at 51-52.  He would have been concerned enough to

have Greene see the nurse if he was told Greene hadn't slept anytime on the 7th or

8th.  Id. at 53.

{00807520.DOCX}                          20

Inmate Marvin Townsend observed Dwayne Greene on 12/6/17.  He

remembered asking Officer Foster "what was going on with him" and Officer

Foster responded "he was on alcohol".  Exhibit 46, p. 10.  Terry McCleery was

placed in the cell next to Dwayne Greene on the night of 12/6 through the early

morning hours of 12/7.  Exhibit 47, pp. 6-8.  He asked jail staff what was wrong

with Dwayne Greene when he entered the cell and the response was "that's what

happens when you drink your whole life and you're detoxing from drinking."  Id.

at 8.  The CO said "I'm real sorry for what's going to happen here."  Id. at 8-9.  He

detailed the horror of what Dwayne went through on the night of 12/6.  Id. at 9-16.

## DR. CHIODO'S TESTIMONY DOES NOT SATISFY FEDERAL RULE OF EVIDENCE 702

Under *Daubert*, "the trial judge must ensure that any and all scientific

testimony or evidence admitted that is not only relevant, but reliable." *In re Bayer*

*Healthcare & Merial Ltd. Flea Control Prod. Mktg & Sales Practices Litig.,* 752

F.3d 1065, 178 (6th Cir. 2014).  Federal Rule of Evidence 702 gives the trial court

the relevant standards performing that gatekeeping function:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of
> an opinion or otherwise if: (a) the expert's scientific, technical,
> or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony is
> the product of reliable principles and methods; and (d) the expert has
> reliably applied the principles and methods to the facts of the case.

*Dabuert* and the cases that follow it in turn list factors for the Court to consider

in applying Rule 702, such as "whether the theory or technique enjoys general acceptance in a relevant scientific community." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006).    In the end, none of these standards are exclusive; the test is flexible, and reliability is the touchstone. See *EEOC v. Kaplan Higher Educ. Corp.,* 748 F3d 749, 752 (6th Cir. 2014).    For several reasons, Dr. Chiodo's proposed testimony does not satisfy Rule 702 or the principles espoused in *Daubert*.

1. *Dr. Chiodo offers testimony beyond his area of expertise, which he is Unqualified to give.*

Dr. Chiodo goes way beyond his areas of expertise for the reasons set forth above.  He is unqualified to provide the opinions he is providing.  FRE 702(a) supports precluding his testimony.

2. *Dr. Chiodo's opinions are unsupported by sufficient facts and data.*

The Court has recognized that a hypothetical theory unsupported by factual evidence should be excluded. *Tamraz v Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010.  This is exactly what Chiodo does – throws out hypothetical theories unsupported by factual evidence and record evidence.

"Trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable. " *Milward v. Acuity Specialty Prods. Grp., Inc.,*  639, F.3d 11, 15 (1st Cir. 2011).  And in any case involving expert testimony, "a court may

conclude that there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Further, in evaluating the expert's work, the Court may also discount, at least to some degree, "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work[.]" *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F3d 426, 434-35 (6th Cir. 2007). There is too great a gap between Chiodo's hypothetical theories and the data in the case – it is a "yawning gap".

3.  *Dr. Chiodo's opinions are not the product of reliable methods or principles*

Nowhere in Dr. Chiodo's report does he provide any insight how he determined that undocumented, undiagnosed schizophrenia was a likely cause that needed to be ruled out. Dr. Shiener, a Board Certified Forensic Psychiatrist has indicated that it would be a "virtual impossibility for Dwayne Greene to have suffered from Schizophrenia and not have it diagnosed, or not have any suspicion or consideration of the existence of that illness by age 32, The symptoms emerge at a much earlier period in life, and by mid-20s the symptoms are constantly present." Exhibit 1. So what methodology did Chiodo utilize to offer the opinion? It is unclear other than he possesses a computer and knows how to google. Even googling *delirium tremens* would have revealed the fact to him that schizophrenia is not included in the differential diagnosis for *delirium tremens*. Exhibit 6, 8/3/18 Report,

p. 3.

It is also not clear what methodology Chiodo used in order to determine that Greene coincidentally suffered from two separate disease processes: schizophrenia and alcoholic cardiomyopathy. The most direct conclusion is likely the most correct conclusion. Exhibit 1, p. 5. The doctor's job is formulating a diagnostic impression is to determine a single pathophysiologic process to explain all the phenomena, signs and symptoms seen in the presenting patient. Id. Chiodo attempts to explain a simple pathophysiologic process with multiple separate disease processes. Chiodo's methodology does not explain why this is reliable, whether it is generally accepted, nor the rate of error in doing so.

Additionally, there is no record evidence that Greene was exhibiting any symptoms of alcoholic cardiomyopathy such as shortness of breath, fatigue or edema. Exhibit 6, 8/3/19 Report, p. 3. The Forensic Pathologist who examined the heart would have certified cause of death as "*delirium tremens*". Why does Chiodo think he is in a better position? He hasn't examined tissue slides nor the heart.

Finally, it is clear that Chiodo did not utilize a methodology that takes into account the circumstances of death when formulating his opinion. See Exhibit 4-"consider the history and events leading up to the death, consider past medical history, the scene of death and ancillary testing such as toxicology." There is no consideration of the history and events leading up to the death in Chiodo's opinion

– he just ignores it.  Just like his prior testimony, Chiodo "discounted actual facts and evidence" while "inserting a fact not in evidence".    In sum, reliable data must drive an expert's opinion, but Dr. Chiodo does not have such data here and his methodology is unreliable.

## CONCLUSION

It "does not mean that a witness is an expert simply because he claims to be." *Pride v. BIC Corp.,* 218 F3d 566, 577 (6th Cir. 2000).  Here, Dr. Chiodo offers amateur legal conclusions, credibility judgment, opinions outside his area of expertise, and half-baked analysis on ill-informed data.  That doesn't meet Rule 702 or *Daubert*, and a jury should not hear it.

Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.

/s/ KEVIN C. RIDDLE
GEOFFREY N. FIEGER (P30441)
KEVIN C. RIDDLE (P57435)
FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.
Attorneys for Plaintiff
19390 West 10 Mile Road
Southfield, MI  48075
(248) 355-5555

Dated: November 26, 2019