# EXHIBIT 6

# In the Matter of Greene vs Crawford County

## Response to Defense Expert Opinions

Johnny Bates MD MMM CPE CHPIMS CCHP-P

8-3-2019

At its core, this is a relatively simple case of untreated delirium tremens. I don't even use the wording unrecognized, because it is clear from the depositions and written documents associated with this case that everyone recognized Mr. Greene was withdrawing from alcohol. The jail staff detention officers knew it and the mental health professional knew it as well. Dr. Chiodo the defense expert tries to muddy the waters up by throwing in extraneous information that really is not germane to the death of Mr. Greene. I am involved almost daily in the care of patients with substance use disorders especially alcohol. Our company provides medical care to over 12,000 inmates in six states. I previously worked the emergency room for over fifteen years where delirium tremens was a not infrequent occurrence. My experience alone tells me this was not an acute case of schizophrenia. Additionally, the literature does not support such a contention.

The sad part of this case is that Mr. Greene and his attorney, foretold the events that would eventually transpire and take the life of Mr. Greene. **"Judge, our position would be not to revoke his bond. Mr. Greene has an appointment on Wednesday at Sacred Heart 3:00 o'clock. He's told me that he's tried to quit on his own before, and he's had seizures. He will get violently ill in the jail going cold turkey. He does have a ride home. There's no issue of him presenting a public safety risk. He wouldn't be driving and then just in two more days he would go to an inpatient facility where they would be able to help him medically to actually ease the withdrawal symptoms."** (Jury Status Conference Dec. 4, 2017 pg.12) **THE COURT: Well I'm going to trust the jail staff is going to do what they're trained to do, which is, if they see a problem, they're going to address it immediately, but I'm absolutely not going to cut you free on a bond.** (Jury Status Conference Dec. 4, 2017 pg.13) It should be noted here that the attorney and Mr. Greene were not abdicating for treatment of underlying schizophrenia or that he was likely to suffer some untoward effect from not getting his anti-psychotics. The reason being that Mr. Greene did not have schizophrenia nor was he likely to suffer an acute episode of schizophrenia. ==It cannot be stated clearly enough that observation is **not** a form of treatment for severe alcohol withdrawal like Mr. Greene experienced.== No amount of observation was enough for someone with the level of withdrawal that Mr. Greene was experiencing. Mr. Greene was never referred out for the treatment that would have saved his life.

The defendant's expert makes the ludicrous argument that this may have been schizophrenia. It is true that alcoholism is associated with

schizophrenia but only because schizophrenics drink alcohol as a way of coping with their symptoms. There is no evidence to support a diagnosis of schizophrenia in Mr. Greene. Mr. Greene suffered from alcohol withdrawal and delirium tremens not schizophrenia.  Schizophrenia is not even included in the differential diagnosis for Delirium Tremens. (http://knowledge.statpearls.com/chapter/0/20326/)

To further distract from a rather simple case of untreated Delirium Tremens, the defendant's expert raises the issue of an undiagnosed cardiomyopathy recognized only at autopsy.  He apparently had not been symptomatic with it prior to his death. There is no evidence he had any of the signs of heart failure including shortness of breath, fatigue, edema or atrial fibrillation prior to December 8, 2017.  Alcohol has a direct toxic effect on the heart, and this speaks to the volume of alcohol that Mr. Greene must have been drinking.
The risk of developing a cardiomyopathy is related to the amount of alcohol consumed and the length of time. People usually develop it after 5 to 15 years of heavy drinking.
(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4177522/)

The defendant's expert decries that an ICD was not placed by the patient's physician. An ICD probably would not have been needed as this condition is reversible.

**The natural history of patients with alcoholic cardiomyopathy depends greatly on each patient's ability to cease alcohol consumption completely. Multiple case reports and small retrospective and prospective studies have clearly documented marked improvement in or, in some patients, normalization of cardiac function with abstinence. The following reports and studies provide impressive data on the utility of abstinence and the confirmation of alcohol consumption as a cause of DC. (https://emedicine.medscape.com/article/152379-overview#a5)**

The truth of the matter is that the antecedent cause of death was alcohol withdrawal complicated by delirium tremens. It is well known that the risk of not treating delirium tremens has a twenty percent mortality rate. Treating the delirium tremens drops that to less than five percent and most likely even lower. Delirium tremens kills by overstimulation of the nervous system many times leading to cardiovascular collapse.  This occurs in individuals with normal hearts as well as those with diseased hearts.  This didn't have to happen to Mr. Greene.  Mr. Greene would have in all likelihood survived if he had been referred for appropriate treatment.

We know that Mr. Greene was seeking help and from the court transcripts that he was scheduled to go into a treatment program the week he died. We know that he was not afforded the opportunity to seek appropriate treatment for his alcoholism because of his untimely death. We also know that his death in all likelihood was preventable.

# RULE 26 REPORT
# April 2, 2019

Greene vs Crawford County et., al.

Johnny E. Bates MD MMM CPE CCHP CCHP-P
johnny.bates@qchcweb.net

**Introduction:** I have been retained by the law firm Fieger, Fieger, Kenny and Harring, in the matter of Greene v. Crawford County et., al. My opinions are submitted on behalf of the plaintiff.

**Qualifications to Render These Expert Opinions:** My opinions are based on my skill, knowledge, training, education, expertise, and experience that are set forth in the attached curriculum vitae (see Appendix A) as well as my specific qualifications set forth in Section IV of this report.

**Ongoing Discovery.** I am submitting this report on the specific matters set out below in connection with this litigation. I understand that this case is in ongoing discovery and as such, I reserve the right to amend and modify this report including its summaries, opinions and all other elements.

**Compensation.** I am being compensated at the rate of $500 per hour for all activities related to this case.

**Documents Reviewed:**

1) Deposition of Joanie E. Blamer Corporate Representative of Northern Lakes Community Mental Health Authority
2) Defendant Crawford County's Responses to Plantiff's First Request for Admissions to Crawford County, Sheriff Kirk Wakefield, Randell Baerlocher, Renee Christman, Katie Tessner, Donald Steffes, William Sbonek, Timothy Stephan, Joel Avalos, Dale Suitor, Amy Johnson, David Nielson, Larry Foster, and Shon Chmielewski
3) Jail Logs and Note from Mental Health Evaluation
4) Corrections Inmate Health Care Policy
5) Corrections Inmate Mental Health Care Policy
6) Corrections Inmate Admission Policy
7) Corrections Inmate Cell Check Policy
8) Death Certificate
9) Postmortem Examination Results and Autopsy Photo Review
10) Grayling Dept. Of Public Safety Record
11) Mobile Medical Response EMS report
12) Defendants Arrest Record 8-5-17
13) Incident Report of 12-8-17
14) Jail Booking System Daily Log Inquiry
15) Jail Crisis Screening Contact and Mental Health Service Request
16) Munson Health Care Part I and II
17) Northern Lakes Policies Jail Services
18) Jail Video Log
19) Report of Dennis Simpson Ed.D
20) Deposition of Shon Chmielewski
21) Deposition of William Denno

22) Deposition of Stacey Kaminski
23) Deposition of Nancy Karcewski
24) Deposition of Terry McCleery
25) Deposition of Wade Schmidt, Jr.
26) Deposition of Dale Suitor
27) Deposition of Marvin Townsend
28) Deposition of Randell Baerlocher
29) Deposition of Renee Christman
30) Deposition of Katie Tessner
31) Deposition of Amy Johnson
32) Deposition of Larry Foster
33) Deposition of Sheriff Kirk Wakefield
34) Deposition of Donald Steffes
35) Deposition of Timothy Stephan

**EXPERT OPINION 1:** Dwayne A. Greene (Age 32) years died on 12/12/2017 from an anoxic and ischemic brain injury suffered after cardiac arrest (12/8/2017) due to the complications of acute alcohol withdrawal and delirium tremens. (Autopsy performed 12/12/2017 and resulted on 3/13/2018). I am also of the opinion that the death of Mr. Greene was unnecessary and resulted as the systemic failure of the Crawford County Jail and its employees and contractors. This case embodies and is an example of systemic deliberate indifference. The untreated mortality rate for delirium tremens is 5-15%; with appropriate care, the mortality rate drops to 5% (https://emedicine.medscape.com/article/166032-overview#a7). Mr. Greene was never given the care that he deserved and his constitutional right to such care was denied.

**EXPERT OPINION 2: System failure number 1:** The Crawford County Jail failed to have an appropriate policy and monitoring tool for inmates experiencing alcohol withdrawals. It appears that when it came to medical policies there was no bona fide source of policy but rather a generic template that did not set out exactly what should occur in the instance of various medical conditions. It also seems that the customs and practice of the jail didn't involve following protocols at all. I will address this later in this report. The nurses, who, to my knowledge were independent contractors, were not practicing in accordance with protocol and the care was spotty at best. Based on the testimony that I reviewed, it appears that the nurse only came in twice weekly and was rarely called back to the jail. One of my responsibilities is to develop protocols and procedures in conjunction with corrections to prevent the kind of system failures that occurred with Mr. Greene. No attempt was made to develop a protocol for inmates in withdrawal except for monitoring, which offers no treatment at all. If the jail had been interested in preventing delirium tremens and the eventual death of Mr. Greene they could have simply googled alcohol withdrawal protocols and come across several good resources from which they could have developed a protocol specific to the operations of the Crawford County Jail. The

Federal Bureau of Prisons has an excellent guideline that could have been adopted by the Crawford County Jail. https://www.bop.gov/resources/pdfs/detoxification.pdf

There are two recognized tools that would have aided the detention staff in assessing inmates with alcohol withdrawal. I hope that they will immediately do so for as we shall see this problem has not been addressed even after the death of Mr. Greene. The first is the $CIWA_{ar}$ score it is quite simple and does not require a lot of time to complete. http://www.regionstrauma.org/blogs/ciwa.pdf In the summary of this document I will apply the CIWA score to Mr. Greene and show how it would have made a difference in the outcome. The use of the Prediction of Alcohol Withdrawal Severity Score can be used to predict those likely to go into withdrawal. It too is quite simple to administer. https://evidencebasedpractice.osumc.edu/Documents/Guidelines/AlcoholWithdrawal.pdf

It is quite problematic that inmates are only assessed by jail staff at intake. Alcohol withdrawal is variable both in the timing of onset and the severity. Without the guidance of an alcohol withdrawal monitoring tool, the individual conducting the intake doesn't have any meaningful information to guide further decisions about an inmate who may experience alcohol withdrawals. It will be seen from the testimony in the depositions that nothing has been done to further prevent a tragedy like this from occurring again.

At a minimum, a CIWA score should be calculated on every inmate with the potential to withdraw from alcohol and, depending on that score, monitoring should continue for several days. The Crawford County jail failed to meet even the minimum standard here. For a policy or procedure to be effective, it must be followed. As we shall see, this was not always the case.

EXPERT OPINION 2: **The systemic failure 2** starts with the Sheriff Kirk Wakefield. The Sheriff as the ranking law enforcement authority for the County. As the overseer of the jail, the Sheriff had a duty to ensure that his facility met the needs of the inmates housed in the county jail. In his deposition, the Sheriff admits that he is the final authority for the operations of and policies at the jail. (Wakefield deposition pg. 17) The Sheriff, as the final authority, directed his jail administrator and a detective to look at the case his comments concerning this review are quite telling. "What I recall is, you know, they followed their procedure and they did what they were supposed to do. I'm good with that." (Wakefield deposition pg.27) The response from the Sheriff seems woefully inadequate considering that an inmate died and would necessitate at least an assumption that if the procedures were followed, and the patient still died, perhaps there should be some policy and procedure changes. The sheriff, as the overseer of the facility, was also ultimately responsible for training. It seems that training was not taken seriously by the following exerts from the sheriff's deposition:

"Well, every year undersheriff puts out a memo everybody needs to sit down and read the policies and procedures, okay, and to know all the policies and procedures by heart I think would be pretty much impossible" (Wakefield deposition pg. 30)

"Yes and being such a small agency is—I can't send everybody to training, okay. It's a hit-and-miss thing, so what you do is you use your resources. You rely on the people that have been to training to bring that information back and pass it onto the others." (Wakefield deposition pg. 30)

This as the sheriff implies is a hit or miss thing and as a result of his deliberate indifference in seeing that his staff were properly trained resulted in the death of Mr. Greene. In all the depositions of the officers I reviewed and including the sheriff's on testimony I believe it is safe to say there was no systematic and formalized educational system at the Crawford County facility.

The sheriff relates the policy of the Crawford County Jail as he knew it to be on page 34 of his deposition. "Well, that –up until this incident that word I was not familiar with and I guess the way I would put it is people come in and out of jail all the time with alcohol issues and drug issues and we observe them until – if there's an issue we observe them until the proper medical people can take a look at them. I mean—"

The sheriff on page 39 of his deposition makes the prophetic statement, "If you don't follow training you die sometimes." This seems to acknowledge what he fails to admit elsewhere is his deposition that training is useful and as he acknowledges can prevent unnecessary deaths. As I will continue to show throughout this report there was systemic deliberate indifference that led to the death of Mr. Greene starting with the ultimate authority Sheriff Wakefield.

**Systemic failure number 3** involves the jail administrator Randell Baerlocher. Mr. Baerlocher is still uninformed and has failed to implement policies at the Crawford County Jail to prevent this from happening again. "I had a new nurse, so I discussed it with her, so I learned a little bit from her from the side of it, so she was aware of things to be concerned with. I also discussed it at a couple of different jail administrator's meetings. One of them included District 2, which I chair, here in Northern Michigan, 17 jail administrators. I'm not sure how many that day were in attendance, but we discussed it a little bit, what their policies were or might be – have been, what we might have done wrong or what they did different with us. Also, I discussed this in District 3 jail administrator's meeting which is in Missaukee County which included the counties to the south of us. I got mixed – I got mixed reviews. I mean, most – I only found one county that had a policy of how staff was going to handle these things." I find this unconscionable. He seems to indicate that because no one else has a policy, that makes things ok they shouldn't have one either. This again speaks to the ongoing deliberate indifference and the risk to future inmates entering the Crawford County Facility. In his deposition page 31 Baerlocher admits that there was no policy for guidance for the employees with respect to determining whether someone is going through withdrawal. This is despite the sheriff's testimony that "people come in and out of jail all the time with alcohol issues and drug issues and we observe them until — ". If this issue arose frequently and was of concern that it should have warranted a policy and procedure especially because access to nursing care was extremely limited. It also seems that instead of referring medical issues such as withdrawal to medical in any kind of emergent way,

they chose to punt this to mental health. (Baerlocher pg. 31 and pg.32). In his deposition, he admits that they had clues as to what was really going on with Mr. Greene and chose to delay care by getting a mental health consult. "In this case maybe we had some clues, we had some clues, but lots of times – and it can be a combination of things, not just alcohol or not just drugs. It can be mental instabilities the reason they are going through these physical conditions." He seems to be making a distinction between Mr. Greene, for whom I am quite sure they knew the cause of his condition, (that he was withdrawing from alcohol) and those where they are not quite so sure. This also speaks to the deliberate indifference and the lack of care afforded to Mr. Greene. Mr. Baerlocher further supports my contention with the following admission: "We had some clues because the corrections officer doing the inmate screening – or the intake screening had made some notes I see in my review that he suffered from severe alcoholism or both on an earlier intake and then on – that would been on an earlier intake I thing when he came in for drunk driving, so that was a clue that he had a severe alcohol problem." There is a prevailing problem with the Crawford County Jail and this case where there seems to be a pervasive passing of the buck. The sheriff to the jail administrator and the jail administrator to his supervisors. (Baerlocher deposition pg.41) The next admission confirms what the sheriff had previously stated and leaves me in fear for current and future inmates at the Crawford County Jail. "It's an everyday occurrence in the jail just about when it comes to people withdrawing from alcohol or drugs or having mental health issues that require a constant observation and decision-making." (Baerlocher deposition pg. 41) In none of these depositions does it mention referral for treatment as would be the standard of practice in this or any other jail. **Observation is not treatment and, in fact, the very first signs of severe alcohol withdrawal should be treated not observed**. Mr. Greene deserved to be placed on a CWIA scoring system and monitored using this from his intake forward. http://www.regionstrauma.org/blogs/ciwa.pdf

It appears at some point that the correctional staff, except for Corporal Christman, received training that clearly laid out delirium tremens and the fact that it was a true medical emergency and that an ambulance should be called. (Baerlocher deposition pg. 48) This again speaks to the systemic deliberate indifference exhibited that they knew this to be a common problem and they knew from their training as they admit that it could be life-threating but never took the time to incorporate policies and procedures to protect these vulnerable individuals.

I have alluded to this more than once of the ongoing danger that exists at Crawford County jail. It cannot be reflected more than by the jail administrator himself. "Q. What is the procedure at – the policy or procedure at Crawford County for ensuring that individuals showing signs of withdrawal are monitored by qualified healthcare professionals? A. We don't have one." (Baerlocher deposition pg. 69)

The reliance on mental health to discern between medical and mental health conditions is completely outside their scope of practice. The fact that they knew Mr. Greene suffered from severe alcoholism and was exhibiting all the signs of withdrawal from their training just 7 weeks earlier indicates to me that they used mental health as a delaying technique to keep from calling

the nurse or sending the patient offsite. (Baerlocher deposition pg.76) This is further evidence by the fact that the mental health professional Karczewski informed the Mr. Baerlocher that Mr. Greene was suffering from alcohol withdrawal which I believe by his on admission as reference earlier he already knew.

It seems that Mr. Baerlocher at times is separated from reality. "I don't recall exactly along the way that I received these reports. My report was that he was progressing – progressing in a positive way." Nothing could be further from the truth from all the testimony and records obtained in this case Mr. Greene had a rapid downhill decline and was neglected up to the point of his cardiac arrest. Again, without belaboring the point the following admission by Mr. Baerlocher is quite telling and terrifying "Q. If one of your corrections officers observed an out-of-the-ordinary alcohol withdrawal wouldn't you anticipate that they would come you if they were properly trained to bring it to your attention? A. **I'm not sure this was out of the ordinary. At what point it was out of the ordinary, I don't know."** This worrisome attitude continues when asked specifically if the policy and procedures have changed since the death of Mr. Greene. After a long-convoluted answer by Mr. Baerlocher the answer is sadly no. "I think the call now would be made to the nurse or a response to the emergency room, if appropriate, if somebody – somebody demonstrated these same symptoms." First this is not a policy at most it is a wish and second an emergency response is indicated long before the patient gets into this kind of withdrawal. As we have discussed previously the only way to monitor these patients is with a CWIA scoring system and appropriate treatment based on those scores.

**System failure number 4** The reliance upon mental health to act as a medical provider which they are not licensed nor trained to do. Here the Jail did not follow its on policy regarding Medical Authority Policy and Mental Health Policy. (Please see respective policies) (Baerlocher deposition pg.109) In further illustration of this point Mr. Baerlocher answers the question posed to him "Q. Let me ask you this: Is it your belief that your corrections officers were seeking Ms. Karczewski's recommendation to call an ambulance before they would call an ambulance. A. I don't think call an ambulance, not to call an ambulance. I do think that they were seeking as a better practice with CMH and the workers that come service the jail some guidance as to what to do in many medical cases." This again is clearly a violation of their policy and of the medical practice act and scopes of service for the various disciplines. The violation of their health care policy is further demonstrated in this exchange with counsel. "Q. Do you believe she was a licensed health care professional? A. I don't recall what her licensing was but – I don't believe she a healthcare professional, no." (Baerlocher deposition pg. 59) In earlier questioning Mr. Baerlocher clearly admitted that the understood the policies and would take action if anyone deviated from the policy. When asked about the policy related to medical care Mr. Baerlocher answered in the affirmative to the following questions. "Q. Have you been trained on how to implement this policy? A. **I understand the policy**. Q. So it says, all medical, psychiatric and dental matters

involving medical judgement are sole providence of the responsible physician, dentist or other qualified health professional, correct? A. **Correct**." Policy violations and failure to follow policy is dictated by the sheriff as we have seen earlier in this document. The sheriff admits in his deposition (Wakefield deposition pg. 56) that the policy required a medical healthcare professional. Despite the fact the sheriff testified in his deposition that he was good with the report from the jail administrator and detective it is abundantly clear that this report if given could not have been accurate as we have shown the **pervasive violation of their healthcare policy**.

The jail staff and administration failed to act knowing of his severe alcoholism and allowing him to suffer for days from the ill-effects of delirium tremens, which would eventually take his life. They knew or should have known from the training they had received just a scant 7 weeks earlier that this inmate was in extremis and in need of emergency medical treatment. (Baerlocher Training Files pg.45)

**System failure number 5** It was the policy of the Crawford County Jail as it is with most jails to perform an intake physical at the time the inmate is taken into custody. The jail violated its on policy as a complete intake was not performed on Mr. Greene. (Baerlocher deposition pg. 127-129). Had a complete intake been done Mr. Greene (from the statements made in open court by his attorney) would have had the opportunity to prewarn them of his propensity to have severe alcohol withdrawal. Sadly, though I'm not sure this would have made any real difference as the policy or practice was simply to observe and not treat the observed findings. Due to his history a CIWA score should have been calculated and continued every shift until the score stabilized below treatment thresholds.

**Systemic failure number 6** involves Crawford County. According to the testimony of Baerlocher pg. 53 the nurses for the Crawford county jail were contracted by the county. The county therefore should exercise oversight of the nurses at the facility and if they take on such responsibility should provide protocols and policy and procedure for those nurses. In so doing it should have been the policy of Crawford County for the nurse to be immediately notified for anyone demonstrating anything other than minor withdrawal and to immediately assess the inmate using the CIWA score. This clearly was not the case. It appears that the coordination between health care and the jail staff was not effective and was not dictated by protocol or procedure but a lack institutional practice.

**SUMMARY:** This report would not be complete without discussing how Mr. Greene should have been handled and how his care would have been different if there had been any real policy and

procedure for monitoring alcoholics. The first thing that should have transpired is the nurses should review daily the previous intakes, and see those inmates requiring further evaluation and treatment. If for instance the intake performed by the jail staff indicated diabetes the nurse should then immediately check the patient's blood sugar and start the inmate on their medications. Even in this case with the time elapsed between nurses visits one could easily go into diabetic ketoacidosis. In this case the patient was a known alcoholic and had a history of severe withdrawal. His intake should have led to the immediate evaluation by the nurse and the monitoring as described below.

Let's start with the PAWS score:

| Part A: Threshold Criteria | Score 1 Point |
|---|---|
| 1. A) Have you consumed any amount of alcohol (i.e. been drinking) within the last 30 days? | 1 |
| 1. B) Did the patient have a "+" BAL on admission? | YES |
| Part B: Patient Interview | |
| 2. Have you been recently drunk (intoxicated) (within the past 30 days)? | 1 |
| 3. Have you ever been treated for an alcohol use disorder (i.e. rehabilitation treatment/ treatment for alcoholism)? This means in-patient or out-patient treatment programs or AA attendance | 1 |
| 4. Have you ever experienced any previous episodes of alcohol withdrawal, regardless of severity? | 1 |
| 5. Have you ever experienced blackouts? | |
| 6. Have you ever experienced alcohol withdrawal seizures? | 1 |
| 7. Have you ever experienced delirium tremens or DTs? | |
| 8. Have you combined alcohol or other "downers" like benzodiazepines or barbiturates, during the last 90 days? | |
| Part C: Based on Clinical Evidence | |
| 9. Was the patient's blood alcohol level (BAL) on presentation ≥200? | |
| 10. Is there evidence of increased autonomic activity? (e.g. HR>120 bpm, tremor, sweating, agitation, nausea) | |

It can be seen from the answers that were easily obtainable from Mr. Greene that he would have scored a 5 on the PAWSS which places him at moderate to high risk for withdrawal symptoms. This would have alerted the jail staff to the possibility that he might have a severe withdrawal to alcohol, and this would have precluded the mental health question. with the exception of the very last question, doesn't require any clinical skills.


Having completed the PAWSS and being identified as moderate to high risk, the procedure or protocol should have been to start immediate CIWA scoring. Because the intake was not completed, and the inmate was not seen by a nurse, we cannot fully assess what his CIWA score

would have been. We can look at the symptoms as described by the officers and see where the CIWA scoring system might have benefited them. There are 10 questions on the CIWA scale.

We will go through the categories.

1) Nausea scale (0-7)
2) Tremors (0-7)
3) Anxiety (0-7)
4) Agitation (0-7)
5) Paroxysmal Sweats (0-7)
6) Orientation (0-4)
7) Tactile Disturbances (0-7)
8) Auditory Disturbances (0-7)
9) Visual Disturbances (0-7)
10) Headache (0-7)

The scoring system helps you assess the need for treatment and how well the patient is responding to treatment. The scoring system is as follows:

Scale for Scoring: Total Score =   0 – 9: absent or minimal withdrawal

10 – 19: mild to moderate withdrawal

20+ : severe withdrawal

As can be seen, this is not particularly difficult, and guidance is given as to what the scoring system gradations mean i.e.,

Visual Disturbances (0 - 7) 0 - not present;   1 - very mild sensitivity;   2 - mild sensitivity;   3 - moderate sensitivity;   4 - moderate hallucinations;   5 - severe hallucinations;   6 - extremely severe hallucinations;   7 - continuous hallucinations

It is easy to see from the deposition testimony and records that Mr. Greene was oriented and conversational and not hallucinating at intake and on the 5th. On the 6th is when Mr. Greene's CIWA score would begin to climb. He is having insomnia and hallucinating. "The hallucinations of the typical DT patient are different from those of alcoholic hallucinosis and, indeed, from any other kind of hallucinations. They are unique. The hallucinations of the DT patient are like this: the patient thinks he is in some other physical location and he is interacting with that location. For example, a DT patient could be fiddling with the wall at the back of his cell and when you ask what he is doing, he will say, "I'm just trying to get this microwave to work." In his mind, he is at home in his kitchen. Or he might be continuously trying to open the door of his cell, but in his delirium, he is at the store and just trying to get the door of

the store open. DT patients are immersed in another time and place and are interacting with that environment." https://www.correctionsone.com/correctional-healthcare/articles/482386187-7-facts-about-alcohol-withdrawal-in-corrections/. He is also becoming agitated. From this point on I cannot find a point at which the patient was not actively hallucinating. I think it could be safely said that his score late the evening on the 6th would have been at least 14 just based upon the auditory and visual hallucinations. This is not taking into consideration the agitation which had also became apparent. Its at this point that treatment becomes imperative.

Indications for PRN medication:   a.  Total CIWA-AR score 8 or higher if ordered PRN only (Symptom-triggered method).   b.  Total CIWA-Ar score 15 or higher if on Scheduled medication. (Scheduled + prn method) Consider transfer to ICU for any of the following: Total score above 35, q1h assess. x more than 8hrs required, more than 4 mg/hr lorazepam x 3hr or 20 mg/hr diazepam x 3hr required, or resp. distress. http://www.regionstrauma.org/blogs/ciwa.pdf

This protocol nor any other existed nor exists today. It's sad that so little effort was put forth to save Mr. Greene but was even more disheartening is that nothing has been learned from his death at Crawford County. It appears that the custom and practice of the jail was to let inmates withdraw without any policy or procedure to protect them from the risks of withdrawal. The failures listed above and the fact that alcohol withdrawal by their own admission occurred routinely in the jail and has not been addressed since the death of Mr. Greene one must determine that they meet the requirements of deliberate indifference.

*Johnny Bates* MD

88 Salser Lane  Phone: (205) 382-2619
Columbiana, AL 35051  Email: johnny.bates@qchcweb.net

# Johnny Edward Bates "Rusty" MD MMM CPE CCHP CCHP-P CPHIMS

| | |
|---|---|
| Biographical | DOB: 4/26/1956<br>Spouse: Patricia<br>Children: Kameron, Bron, Karea |
| Personal Profile | I enjoy challenges both inside and outside the work environment. I have prepared myself for the rigors of medical management through the use of didactic training and a comprehensive experience base. |
| College | University of Alabama Birmingham<br>Degree: BS 1979 |
| Medical School | University of Alabama School of Medicine<br>Birmingham, Alabama<br>Degree: MD 1983 |
| Internship | University of Texas Medical Branch<br>Galveston, Texas<br>Dates: 4/1/1983 to 3/30/1984 |
| Residency | University of Texas Medical Branch<br>Galveston, Texas<br>Dates: 4/1/1984 to 3/30/1986 |
| Masters Programs | Hines School of Public Policy<br>Carnegie-Mellon University<br>Degree: Masters of Medical Management<br>Graduated: 2002<br><br>University of Texas Health and Science Center<br>Pursuing Degree: Masters in Health Informatics |
| Board Certification | American Board of Internal Medicine<br>Effective Date: 9/16/1987 Exp: N/A<br>Certificate Number: 11073 |
| Other Certifications | Certified Correctional Healthcare Professional (CCHP),<br>Certified Correctional Healthcare Professional-Physician (CCHP-P) |

|  |  |
|---|---|
|  | National Commission Correctional Healthcare |
|  | Certified Physician Executive<br>American College of Physician Executives |
|  | Certified Professional in Health Information and Management Systems<br>Healthcare Information and Management Systems Society |
|  | Advanced Trauma Life Support<br>American College of Surgeons |
|  | Advanced Cardiac Life Support<br>American Heart Association |
| Work History | Quality Correctional Health Care<br>Birmingham, AL<br>8/2005-Present<br>CEO, President |
|  | North Mississippi Medical Center-Hamilton<br>Hamilton, AL<br>Dates: 8/1990-Present<br>Internal Medicine and Emergency Medicine |
|  | Citizens Baptist Medical Center<br>Talladega, AL<br>Dates: 2006-Present<br>Emergency Medicine |
|  | NaphCare, Inc<br>Birmingham, AL<br>Dates: 10/2003 to 8/2005<br>Corporate Medical Director & Chief Medical Information Officer |
|  | Hamilton A & I<br>Hamilton, AL<br>Dates: 1992 to 4/2004<br>Medical Director Aged and Infirmed Prison |
|  | Marion County Nursing Home<br>Hamilton, AL<br>Dates: 8/1990 to 4/2004 |

|  |  |
|---|---|
|  | Johnny E. Bates, MDPC<br>Fayette, AL<br>Dates: 4/1986 to 2/1990<br>Private Practice of Internal Medicine |
| Professorships | Carnegie-Mellon University<br>Pittsburg, PA<br>Adjunct Professor Hines School<br>Course of Instruction: Intro to Medical Informatics<br>Dates: 2004 to Present |
| Professional Leadership | Patient Safety and Quality Outcomes Committee<br>Healthcare Information and Management Systems Society<br>Dates: 2005 to 2008<br><br>Alabama Medical Licensure Commission<br>Montgomery, AL<br>Dates: 2000 to 2010<br><br>Board of Directors NMHS<br>Dates: 1999 to 2004<br><br>Chief of Staff Marion County Medical Center<br>Dates: 1999 to 2002<br><br>Board of Directors Info Solutions<br>Blue Cross Blue Shield of Alabama<br>Electronic Health Records |
| Professional Associations | American Medical Association<br>American Medical Informatics Association<br>American College of Physician Executives<br>American College of Physicians<br>Healthcare Information and Management Society<br>Microsoft Healthcare Users Group<br>American Correctional Health Services Association |
| Other Skills | I am a pilot and professional programmer having written many commercial applications. |
| Publications | Abstracts:<br>Bates JE, Bessman JD, Gardner FH. *Red Cell Precursors, Aplastic Anemia are Macrocytic Before Hemoglobin Formation.* Clinical Investigation, January 1986. |

Bates JE, Bessman, JD, Gardner FH. *Comparison of a Microcomputer Program to Physician Performance in the Diagnosis of Iron Deficiency Anema.* Clinical Investigation, January 1986.

Articles:
Johnny E. Bates, MD CPE MMM, Cynthia Phelps, PhD, and Craig W. Johnson, PhD. *The Physician's Perception of Medical Error and its Application to the Development of an Educational Training Tool* AMIA Annual Journal Symposium Proceedings 2003

Bates, JE, Bessman JD, BCDE: Evaluation of BCDE: *A Microcomputer Program to Analyze Automated Blood Counts and Differentials.* AJCP, September 1987.

McClure S, Bates JE, Harrison R, Gilmer PR, Bessman JD. *The Diff-IF: Use of a Microcomputer Analysis to Triage Blood Specimens for Microscopic Evaluation.* AJCP, August 1988.

Bates JE, Bessman JD, Randolph J. *Worms in a Physician's Office.* CNP, September 1989.

Software

BCDE: Published by Lea & Febiger, 1988
BCDET: Published by Lea & Febiger, 1998
VIPAR: Voice activation system for Nursing

Poster Presentation:
The Physician's Perception of Medical Error and its Application to the Development of an Educational Training Tool. AMIA National Conference 2003.

References

Available Upon Request.