# EXHIBIT 43

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

### NORTHERN DIVISION

CHERYL GREENE, PERSONAL
REPRESENTATIVE OF THE ESTATE

OF DWAYNE GREENE, DECEASED,

Case No. 2:18-cv-11008-MAG-DRG

     Plaintiff,

HON. THOMAS J. LUDINGTON

v.


CRAWFORD COUNTY, SHERIFF KIRK
WAKEFIELD, RANDELL BAERLOCHER,
RENEE CHRISTMAN, KATIE TESSNER,
DONALD STEFFES, WILLIAM SBONEK,
TIMOTHY STEPHAN, JOEL AVALOS, DALE
SUITER, AMY JOHNSON, DAVID NIELSON,
LARRY FOSTER, SHON CHMIELEWSKI,
NORTHERN LAKES COMMUNITY MENTAL
HEALTH AUTHORITY, NANCI KARCZEWSKI
AND STACEY KAMINSKI, LPC, Individually and
Officially and Jointly and Severally,


     Defendants.

## DECLARATION OF MICHAEL A. BERG

1. Pursuant to 28 USC §1746, I declare the following.

2. My name is Michael A. Berg. I am over eighteen years of age and have personal knowledge of the facts stated herein:

3. I understand that the Crawford County defendants have challenged certain of my opinions in the above captioned matter. I understand that Defendants claim certain of my opinions should be precluded because: 1) "Mr. Berg is not qualified to offer opinions on causation" and that "such an opinion is not based on Mr. Berg's own stated expertise in the field of corrections"; and 2) "Mr. Berg's report . . . is replete with legal conclusions invading the province of the jury."

I. **Qualifications, Knowledge, Skill, Experience, Training and Education**

4. I have been in the Corrections field since 1972. A copy of my curriculum vitae is attached hereto.

5. I joined the Office of the Sheriff, Jacksonville, Florida in September 1972, as a Correctional Officer for the Jails and Prisons Division.

6. During the 1972-1974 time period I held the position of Correctional Officer and then Work Furlough Investigator. One of my

responsibilities at that time was to bring the Community alcohol and drug treatment programs into the Fairfield Correctional Institution. I was one of two persons responsible for development of the first Duval County community correctional treatment program at that time. Substance abuse treatment was part of this program. Medical professionals were part of this program.

7.    In November 1974, I was appointed to the position of Facility Supervisor of Fairfield Correctional Institution. I held that position until approximately April, 1977. In that position, I directed all aspects of the Fairfield Correctional Institution. This included all educational and treatment programs. These programs included alcohol and drug treatment programs. During this same time, I participated in one of the first correctional substance abuse training programs developed for correctional administrators.

8.    In April 1977, I was appointed to the position of Chief of Jails for the Jails and Prison Division of the Duval County, Office of the Sheriff. By this appointment, I assumed total responsibility for the day to day operation of the Duval County Jail, the Duval County Jail Annex, and the inmate facilities of University Medical Center of Jacksonville with a combined total of seven hundred seventy-five (775) inmates, a staff of three hundred ten (310), and a budget of eleven and one half million dollars ($11,500,000). The alcohol detoxification program was part of inmate healthcare. The program included

physician supervision.  Nurses were on site 24 hours per day.  New arrival inmates were assessed for alcohol intoxication immediately and if determined at risk for withdrawal they were transferred to University Medical Center. Detoxification units were established within the jail to monitor withdrawal. Medication administration was part of this program.  I was also responsible for training and/or supervising training of Corrections Officers in conjunction with the health care providers to identify the signs and symptoms of alcohol withdrawal.  It was recognized during this time period that untreated substance abuse withdrawal was dangerous.

9.     During my tenure as a correctional administrator with the Jacksonville Sheriff's Office in Duval County Florida, I developed and implemented comprehensive classification systems that were integrated with every aspect of the system operation. These classification systems were established to wholly coordinate with the operations of medical health services, mental health services, intake activities and housing unit security. These classification system processes particularly focused on arrest and intake information, criminal history information, past and current medical and mental health information to include injuries, illnesses, communicable diseases, mental health and alcohol and drug addiction and detoxification issues. Information garnished in the aforementioned subjects was shared entirely with

every appropriate unit of the facility in an effort to enhance the care, custody and control of each inmate incarcerated therein. Further, these classification processes were scrupulously aligned with Florida Model Jail Standards and those of the American Correctional Association. These processes would later comply with the provisions of the National Commission of Correctional Health Care. Upon Duval County seeking, at a later date, privatization for inmate health services, I oversaw the drafting of these contracts to ensure that all the provisions of the established classification system were preserved by the chosen, for profit, health care provider. These inclusions would also encompass outside specialty areas such as mental health counseling and detoxification programs. I was also responsible for managing the performance and contract compliance of health care providers, including medical, mental health, pharmaceutical and dental, including detoxification programs.

10.     In February of 1987, I was appointed Deputy Director of the Jails and Prisons Division. By this appointment, I assumed total responsibility of the daily operation of the Jails and Prisons Division which included the Duval County Jail, the Duval County Jail Annex, Fairfield Correctional Institute, the Community Corrections Divisions and the James I. Montgomery Correctional Institution. With this appointment, I was responsible for the total operation and services of three (3) major divisions, nearly seven hundred and fifty (750)

employees and approximately three thousand (3,000) inmates.    In this position, I was also responsible for an annual budget of nearly forty-one million dollars ($41,000,000). As Deputy Director of Jails and Prisons, I was the leading member of the Sheriff's team that designed and administered the financing and construction of three (3) major correctional facilities in 1988, 1989 and 1990. These facilities are the three hundred (300) bed Catherine Street facility, the four hundred thirty-two (432) bed North Unit of the Prisons Division, and the new downtown Pre-Trial Detention Facility, which can house up to two thousand one hundred and eighty-nine (2,189) inmates.    These facilities represent a cost of eighty-one million dollars ($81,000,000) and approximately two thousand nine hundred (2,900) new inmate beds.    During this time, my responsibilities included oversight for the Correctional Health Care programs for the aforementioned facilities as well as ensuring proper training programs for Correctional Officers on the issues of inmate health care, which included detoxification programs and substance abuse issues.

11.    On September 16, 1997, I retired from the Jacksonville Sheriff's Office after twenty-five (25) years of service to join the Florida Department of Corrections. In July 1995, I had also opened the criminal justice consultant firm of Berg and Associates, which I currently operate.

12.   In November 1997, I was appointed by Secretary Harry K. Singletary, Jr., as Executive Assistant (Chief of Staff) to the Secretary for the Florida Department of Corrections. In January 1999, I continued to serve Secretary Michael W. Moore as Executive Assistant to the Secretary (Chief of Staff) for the Florida Department of Corrections. My responsibilities included daily operational aspects of the agency.  These would have included all aspects of the Department of Corrections, security, inmate healthcare, training and human resources, classification and community programs.  With regard to classification, I oversaw all the programs within the Florida Department of Corrections.  These classification programs were developed within the agency but were inclusive of all of the provisions of the newly developed system known as "Objective Classification". This system was unified with such specialty units as health services, mental health services, socialization programs and education as well as a full range of substance abuse treatment programming, including social detoxification programming.  Through these experiences, I am confident that in the corrections arena, there are no more important focuses than mental health treatment and substance abuse treatment as noted from a health care standpoint. A comprehensive classification process ensures that these and other equally important correctional issues occur appropriately and timely.

{00819877.DOCX}

13.     In June, 1999, I was promoted to the position of Bureau Chief of Staff Development for the Florida Department of Corrections.  In this position, I was responsible for all training in the State of Florida for correctional personnel at all levels, inclusive of health services, programmatic staff and classification staff.

14.     In October 2001, I was selected to be the Assistant to the Director of Institutions for the Florida Department of Corrections. In this position I assisted in the management of all institutional operational matters, to include security, classification, programs, services, health care and emergency action planning.

15.     In February 2003, I was selected to be the Assistant to the Assistant Secretary of Institutions for the Florida Department of Corrections. In June 2006, my position was modified to be the Assistant to the Deputy Assistant Secretary of Institutions for the Florida Department of Corrections.  I assisted in the management of all institutional operational matters to include, security, classification, programs, services, health care and emergency action planning. In July 2010, I retired from the Florida Department of Corrections.

16.     I have obtained several Certifications which demonstrate competency in subject matters that I am offering opinions in this case.  I was certified by the State of Florida, Criminal Justice Standards and Training

Commission, Corrections Certification.  This Certification involved appropriate proficiency in all areas of basic correctional operational activities, including areas that I have offered opinions on in this case.

17.   I was certified by the State of Florida, Criminal Justice Standards and Training Commission, Law Enforcement.  This Certification involved appropriate proficiency in all areas of basic law enforcement operational activities, including areas related to the opinions that I am offering in this case, specifically, alcohol and drug recognition, substance abuse recognition, and dealing with intoxicated individuals training.

18.   I was certified by the State of Florida, Criminal Justice Standards and Training Commission, Training.  This Certification involved appropriate proficiency in all areas of criminal justice training, i.e. curriculum development, delivery, visual aids, scenario development and testing. This Certification involved areas that I am offering opinions in this case.

19.   I was certified by the National Institute of Corrections as a Registered Consultant.  This Certification demonstrated that I was an individual experienced sufficiently enough to provide technical service assistance in the corrections area.

20.   My work through Berg and Associates includes non-litigation related work.  An example of this work was my appointment as a Federal

Court Appointed Monitor for the Nassau County Jail from 1997 to 2001 to monitor compliance with Court's Order.  Some of my non-litigation related work is set forth in Exhibit B to my curriculum vitae in the Section entitled "Other Facility Design/Programming and Transition Projects".  Some of the work included "How To Open New Institutions" [HONI], "Planning on New Institutions" [PONI], Systems Assessments, Operational Reviews, Management Reviews and Programming.

21.     During my numerous years as a correctional administrator, I have assembled a wealth of knowledge and experience in the overall operation(s) of correctional facilities.  I am particularly knowledgeable regarding the use of private – for profit -health care providers.  I am equally experienced in the management of substance abuse programs and detoxification issues.  I am also aware of all other operational responsibilities necessary to manage a correctional facility that completely provides for the care, custody and control of its inmate population.

## II.      UNDERLYING DATA, SUPPORTING LITERATURE AND WIDELY-ACCEPTED METHODOLOGY

22.     In formulating my opinions in this case, I used widely accepted methodologies designed to produce reliable results.  The Methodology is set

forth in my June 8, 2019, Report at pages 3-4. The Report is attached hereto and incorporated by reference. If called to testify, I would testify to the matters set forth in my Report. I reviewed the extensive materials that were provided and which were listed in my Report. I also reviewed my extensive library of corrections standards, literature and background information. My opinions are based on successful methodology in the corrections business that has been successful in correctional facilities. My opinions are based on many years of experience in the corrections field and my hands-on application of correctional best practices. My opinions in this case are directly related to factual failures found in this case and my application of best practices experience to these failures. The methods that I applied in formulating my opinions in this case are the same methods that are used in jail settings that adhere to best practices and therefore are non-litigation related.

23.    Additionally, I reviewed the expert reports of Dr. Gerald Shiener, M.D.; Dr. Johnny Bates, M.D., Dr. Werner Spitz, M.D., Dr. Herbert Malinoff, M.D., Dr. Vasilis Pozios, Rebecca Luethy, R.N. and Terry Fillman, R.N. and have relied upon their medical reports. This is the type of information reasonably relied upon by experts in my field.

24.    Each of the Medical Doctors specifically provided the medical opinion as to what caused Dwayne Greene's death and what could have

prevented it.  I am not offering medical opinions but simply linking the extensive failures at the Crawford County jail from a policy and practice viewpoint as a Jail Administrator and former Corrections Officer to those opinions provided by the foregoing Medical Doctors based on my education, experience and training as a Corrections professional.

25.    In formulating my opinions, I spent an extensive amount of time reviewing the video of Dwayne Greene's incarceration.  My observations of viewing the video is contained on pages 49-50 of my Report.

26.    In formulating my opinions, I reviewed amongst other material the transcript of the Jury Status Conference where Dwayne Greene requested medical, the ramifications of unassisted alcohol detoxification for him were articulated and the Court provided assurance regarding the Jail's competence. Below are the relevant portions:

> MR. SOMMERFELD: Judge, our position would be to not revoke his bond. Mr. Greene has an appointment on Wednesday at Sacred Heart 3:00 o'clock. He's told me that
>
> he's tried to quit on his own before, and he's had seizures. He will get violently ill in the jail going cold turkey. He does have a ride home. They are willing to bring him home. There's no issue of him presenting a public safety ris- -- risk. He wouldn't be driving and -- and then just in two more days he would go to an inpatient facility where they would be able to help him medically to actually ease the withdrawal symptoms.

THE DEFENDANT: Okay. So are you going to be able to put me in the medical ward or something cuz I'm —

THE COURT: Well, I'm going to — I'm going to trust that the jail staff is going to do what they're trained to do, which is, if they see a problem, they're going to address it immediately, but I'm absolutely not going to cut you free on a bond. You're here, and you were using alcohol in violation of the bond conditions. You showed up to court drunk. And that's just not acceptable.

27.     In formulating my opinions, I have relied amongst other material, generally accepted and peer-reviewed standards. Those standards are set forth in pages eleven to eighteen of my Report. Several standards that are relevant have been promulgated by the American Correctional Association. These standards are minimum basic standards. Successful correctional agencies use them, whether they are accredited or not. Having been accredited by the ACA at both the local and state level, I am extremely familiar with the process. According to the American Correctional Association's Accreditation Policy Manual:

Perhaps one of the American Correctional Association's greatest contributions to the field of corrections has been the development of a national accreditation process. ACA performance standards and expected practices address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to provide an environment that safeguards the life, health, and safety of the public, staff and offenders while at the same time providing the necessary education, work, religious, and rehabilitative opportunities that enable an offender to prepare for successful reintegration into the community. Performance standards and expected practices set by ACA reflect best practices and current relevant policies and procedures and function as a management tool for over 1,500 correctional agencies in the United States.

This Accreditation Policy Manual is offered as a foundation of policy and procedure that will enable correctional programs to achieve their goals of providing the highest levels of effectiveness and efficiency while accomplishing proven and meaningful positive outcomes. It will provide guidance to participating programs, field auditors, and other interested parties.

28.     One of the standards I have relied upon is the *Standards for Adult Correctional Institutions*, 4th edition, published by the American Correctional Association in January, 2003.  This is the type of information reasonably relied upon by experts in my field.  Relevant sections are attached to this Affidavit. The American Correctional Association's website touts that is the "oldest association specifically for practitioners in the corrections profession."  One of the several provisions relevant to this case is on "Detoxification".  Crawford County did not comply with the standard below:

## Detoxification

**4-4376**
**(Ref. 3-4370)**   (MANDATORY) Detoxification is done only under medical supervision in accordance with local, state, and federal laws. Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs is conducted under medical supervision when performed at the facility or is conducted in a hospital or community detoxification center. Specific guidelines are followed for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs. Offenders experiencing severe, life-threatening intoxication (an overdose), or withdrawal are transferred under appropriate security conditions to a facility where specialized care is available.

29.    In formulating my opinions, another one of the standards I have I relied upon *Performance-Based Standards for Adult Local Detention Facilities*, 4th edition, published by the American Correctional Association in June, 2004. This is the type of information reasonably relied upon by experts in my field. Relevant sections are attached to this Affidavit. Below are two relevant sections – one related to "Health Screens" and one related to "Detoxification". Crawford County complied with neither:

# Health Screens

**4-ALDF-4C-22**
**(Ref. 3-ALDF-4E-19)** (MANDATORY) Intake medical screening for inmates commences upon the inmate's arrival at the facility and is performed by health-trained or qualified health care personnel. All findings are recorded on a screening form approved by the health authority. The screening includes at least the following:

Inquiry into:

* any past history of serious infectious or communicable illness, and any treatment or symptoms and medications

* current illness and health problems, including communicable diseases

* dental problems

* use of alcohol and other drugs, including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use, and history of any problems that may have occurred after ceasing use

## Detoxification

4-ALDF-4C-36
(Ref. 3-ALDF-4E-39) (MANDATORY) Detoxification is done only under medical supervision in accordance with local, state, and federal laws. Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs is conducted under medical supervision when performed at the facility or is conducted in a hospital or community detoxification center. Specific guidelines are followed for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs. Inmates experiencing severe, life-threatening intoxication (an overdose) or withdrawal are transferred under appropriate security conditions to a facility where specialized care is available.

*Comment*: None.

*Protocols*: Written policy and procedure. Community contract agreements.
*Process Indicators*: Health records. Transfer records. Interviews.

30.    In formulating my opinions, another one of the standards I have I relied upon is *Core Jail Standards* published by the American Correctional Association in October, 2009.  This is the type of information reasonably relied upon by experts in my field. Relevant sections are attached to this Affidavit. Mackinac County was the first jail in the United States to receive accreditation

under this standard.  Below is a relevant section which Crawford County did not comply with:

## Social Detoxification

### 1-CORE-4C-14        (Mandatory) (Ref. 4-ALDF-4C-36)

Specific criteria are established for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center. A medical clearance from a health care provider is required upon re-entry to the facility.

Comment: None.

Protocols: Written policy and procedure.

Process Indicators: Transfer records.

31.   The American Correctional Association standards are so generally accepted in the Corrections Community that governmental entities have adopted the standard in regulations.  By way of example, below are relevant sections from the State of Nebraska's Administrative Regulation:

| NEBRASKA | ADMINISTRATIVE REGULATION | | |
|----------|---------------------------|---|---|
| Good Life. Great Mission. | **SUBSTANCE ABUSE TREATMENT PROGRAMMING, DETOXIFICATION & CHEMICAL DEPENDENCY** | | |
| DEPT OF CORRECTIONAL SERVICES | REVISION DATE **September 30, 2017** | NUMBER **115.09** | PAGE **1 of 9** |
| | STATEMENT OF AVAILABILITY **\*This Administrative Regulation is to be made available in law libraries or other inmate resource centers.** | | |

## GENERAL

It is the policy of NDCS to ensure the availability of appropriate treatment and programming for inmates in need of gradual detoxification and for inmates with chemical abuse/dependence problems. Pursuant to applicable American Correctional Association (ACA) standards and Nebraska Department of Health & Human Services / Community standards, it is the policy of NDCS to provide the opportunity for substance abuse programming for all inmates clinically identified and referred for treatment/intervention while providing incentives for targeted treatment programs to increase motivation and success.

I.   DETOXIFICATION

A.   Definition:  Detoxification is the process by which an individual is gradually withdrawn from a drug or alcohol by administering decreasing doses either of the same substance upon which the person is physiologically dependent, or one that is cross-tolerant to it, or a drug which has been demonstrated to be effective on the basis of medical research and/or other chemical dependent medical attention.

B.   Gradual detoxification from alcohol, opiates, barbiturates, hypnotics, other stimulants and sedative hypnotic drugs is conducted under direct medical supervision and in accordance with local, state and federal laws.

C.   Detoxification is performed at the facility medical unit, hospital or other secure location designated by the Chief Medical Officer and Warden or in a community hospital or detoxification center. Refer to AR 115.04, *Health Education and Access to Health Services* regarding Individual Treatment Plans.

D.   Newly committed inmates in need of detoxification will be provided the appropriate services by the NDCS Health Services Section.

32.   In formulating my opinions, I have relied upon information and standards from the National Commission on Correctional Health Care.  The National Commission on Correctional Health Care website provides information as to its purpose:

> In the 1976 landmark decision of *Estelle v. Gamble*, the Supreme Court ruled that prisoners have a right to be free of "deliberate indifference to their serious health care needs." Although there has been some fine-tuning, the legal landscape has remained largely unchanged.

{00819877.DOCX}                               20

In the hundreds of cases published since *Estelle*, three basic rights have emerged: the right to access to care, the right to care that is ordered, and the right to a professional medical judgment. . . .

Correctional facilities interested in quality improvement have adopted policies and procedures, using NCCHC's standards as a guide, that provide constitutional care to inmates and that protect them from litigation.

33.     In formulating my opinions, I have I relied upon is the *Standards for Health Services in Jails* published in 2014 by the National Commission on Correctional Health Care. This is the type of information reasonably relied upon by experts in my field and is generally accepted.  It has been subject to peer-review.  Relevant sections are attached to this Affidavit.  Below is a relevant standard which Crawford County did not comply with:

## PATIENTS WITH ALCOHOL AND OTHER DRUG PROBLEMS

### Standard

Patients with alcohol or other drug (AOD) problems are assessed and properly managed by a physician or, where permitted by law, other qualified health care professionals.

Discussion

The intent of this standard is that inmates who are intoxicated or undergoing withdrawal are appropriately managed.

Significant percentages of inmates admitted to correctional institutions have a history of alcohol and/or other drug abuse. Newly incarcerated individuals may enter intoxicated or develop symptoms of alcohol or other drug withdrawal. The withdrawal may be mild, moderate, or severe. Alcohol withdrawal is the abstinence syndrome with the highest mortality rate, although withdrawal from opiates and depressant drugs (e.g., benzodiazepines) may be, on occasion, life-threatening. Barbiturate withdrawal

34.   This same standard requires that severe alcohol withdrawal must never be managed outside a hospital, which of course Crawford County failed to comply with.

Detoxification and withdrawal are best managed by a physician or other medical professional with appropriate training and experience. As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times. Clinical management should also include the use of validated withdrawal assessment instruments, such as the Clinical Opiate Withdrawal Scale or the Objective Opiate Withdrawal Scale in cases of opiate withdrawal, and the Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised in the case of alcohol withdrawal.

35.    Additionally, the generally accepted standard requires training for correctional officers on the signs and symptoms of withdrawal.

· Training for correctional officers includes recognizing the signs and symptoms of intoxication and withdrawal (see C-04 Health Training for Correctional Officers). Intoxication and withdrawal also increase the potential for suicide, a factor that is to be incorporated into the staff training on suicide prevention (see G-05 Suicide Prevention Program).

36.    This same standard requires protocols for the management of alcohol withdrawal which Crawford County did not comply with:

INTOXICATION AND WITHDRAWAL

Standard

Protocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives, or opioids.

37.     In formulating my opinions, another one of the peer-reviewed literature I have I relied upon is *The Federal Bureau of Prisons Clinical Guidance: Detoxification of Chemically Dependent Inmates* published in February, 2014.  This is the type of information reasonably relied upon by experts in my field.  It provides:

## 6. Alcohol Withdrawal

### Diagnosis of Alcohol Use Disorders

#### Screening

As the initial step in diagnosing alcohol use disorders, all incoming inmates should be screened for a history of alcohol use. Inmates presenting with alcohol intoxication should be presumed to have alcohol use disorder until proven otherwise. Despite the difficulty in obtaining an accurate history from an intoxicated inmate, a full assessment should be attempted.

38.     This publication from the Federal Bureau of Prisons also provides that "Withdrawal Delirium", *delirium tremens*", usually begins 48-72 hours after the last drink.  It also states "if allowed to progress, delirium can result in changes in consciousness, marked autonomic instability, electrolyte imbalances, hallucinations and death."  This publication provides a detailed set of instructions for "Patient Evaluation" and "Treatment of Alcohol Withdrawal".  Treatment includes Thiamine Replacement and Benzodiazapene Therapy.  This standard also provides detailed instructions for use of CIWA.  This tool is often used by Corrections Officers to document an inmate's signs and symptoms of alcohol withdrawal.

39.     In formulating my opinions, one of the peer-reviewed correctional literature I relied upon was the "Jail Officers Training Manual" published in 1980 by the National Institute of Corrections and the National Sheriff's Association.  It provides the following relevant information:

## ALCOHOL WITHDRAWAL SYNDROMES

An intoxicated person who is admitted to the jail often requires medical treatment. Heavy, long-time drinkers withdrawing from alcohol may suffer from the DTs (delirium tremens). The mortality rate for persons suffering from the DTs who do not receive proper medical treatment ranges from five to fifteen percent. Alcohol withdrawal can be more serious than withdrawal from many dangerous narcotics.

There are four alcohol withdrawal syndromes: tremulousness and hallucinations, seizures, auditory hallucinosis, and delirium tremens.

40.     This same Corrections reference discusses in detail *Delirium Tremens*.  It states that the "Treatment" is to transfer the inmate to a hospital immediately.  Below is information contained within this Corrections publication regarding *Delirium Tremens*.  This is the type of information that was known in the Corrections community in 1980.

*DTs (Delirium Tremens)*

This is an extremely dangerous medical condition with a mortality rate of from five to 15 percent. DTs usually occur within 72 to 96 hours after the inmate has had his last drink.

The symptoms of delirium tremens are:

- Profound confusion and disorientation;
- Delusions;
- Vivid hallucinations;
- Tremor;
- Agitation;
- Autonomic overactivity (increased pulse and breathing);
- Pallor;
- Sweating;
- Possible terror or confusion;

41.   The National Sheriff's Association made the following statement in 1980 in the above referenced publication.  The statement demonstrates that Crawford County had a pre-1980 way of thinking about alcohol withdrawal in corrections:

> The former practice of housing intoxicated people in "drunk tanks" to "dry out" is disappearing from use because too many deaths have resulted from such careless procedures. Until intoxicated people can be handled in appropriate community facilities, jail staff members should carefully document *all* treatment provided to intoxicated inmates.

42.    In formulating my opinions, I considered the extensive deposition testimony and documents.  By way of example only, below is some of the information I considered from the Jail Daily Log entries by Corporal Christman:

```
12/06/17 13:40 GREENE/DWAYNE IN D-01 ACTING ERRACTIC, APPEARS TO BE HELLU-C
12/06/17 13:40 INATING, AND TO BE DETOXING.


12/07/17 06:20 INMATE DWAYNE GREENE IS STILL SHOWING SIGNS THAT HE IS STILL
12/07/17 06:20 GOING THROUGH WITHDRAWELS FORM ALCOHOL.  HE HAS TRIED TO
12/07/17 06:20 LEAVE THE CELL, ASKING FOR HAMMER AND NAILS, THINKING HIS
12/07/17 06:20 MOTHER IS SPEAKING TO HIM, HE PERIODICALLY YELLS OUT OR
12/07/17 06:20 BANGS DOOR, FLOOR AND WALLS.  HE IS COMPLIANT AND PLEASANT
12/07/17 06:20 WHEN SPEAKING TO HIM,BUT IS CONFUSED AND DOES NOT COMPREHEND
12/07/17 06:20 THAT HE IS HERE IN THE JAIL.  WE WILL CONTIUNUE TO MONITOR
12/07/17 06:20 HIM CLOSELY
```

43.    I also considered documents from Northern Lakes involvement with Dwayne Greene.



**MENTAL HEALTH RECEIPT**

12.7.17    2:00 PM

...w/ Dwayne. He is delusional while experiencing alcohol withdrawal. Dwayne admits to significant alcoholism so is struggling w/ DTs. Does not appear to be high to himself.

**Referral Source:**    Law Enforcement
**Details:**    Jail C.O.s requested a CMH contact for Dwayne since they were reporting that he is going through the DTs for alcohol withdrawal.

**Clinical Intervention:**    Attempted to assess Dwayne.  Very difficult process due to his delusional behavior while going through the DTs.

44.   In formulating my opinions in this case, I also considered the private text message communications between Corporals Tessner and Christman.



45.   The methodology that I used in formulating my opinions considered the training provided to the Corrections Officers. I considered the Mental Health First Aid USA Training provided by Northern Lakes and testified to by Joanie Blamer. I also considered the information below contained within the book each Correction Officer received.

SEVERE ALCOHOL WITHDRAWAL MAY
LEAD TO A MEDICAL EMERGENCY
Seek medical help if the person displays symptoms
of severe alcohol withdrawal, such as

- Delirium tremens (a state of confusion
  and visual hallucinations)

>> Withdrawal management. If the person
   is dependent on alcohol, they will have
   to withdraw from alcohol before other
   approaches are tried. This should be done
   under professional supervision. However,

46.    In analyzing the training programs at the jail and compliance with

those training programs, I attempted to determine if any training was offered

by Crawford County for its Correctional Officers that supplemented and/or

supplanted the Mental Health First Aid USA training.  I determined that no

such training was provided but that the actual practice, based on testimony,

was that the actual practice contradicted the training provided above and the

Jail Administration and Corrections Officers ignored the above training both in

actual practice and with respect to Dwayne Greene.

47.    The methodology that I used in formulating my opinions

considered the Michigan Administrative Rules for Jails and Lockups and

application of those Rules.  By way of example only, as a former Correctional

Administrator, I attempted to confirm that Crawford County's Katie Tessner

completed the Health Screening as required by R 791.731 for Dwayne Greene

which would have provided her information regarding use of alcohol and the

potential for withdrawal.  My review of the testimony and records confirms

that she did not.

**R 791.731        Health screening.**

A facility shall establish and maintain written policy, procedure, and practice that require medical, dental, and mental health screening to be performed on all inmates by a trained staff member designated by the facility administrator.  All findings are recorded on a form approved by the facility's designated health authority.  The screening includes at least all of the following:

(a)    Inquiry into all of the following:
(i)    Current illness and health problems, including venereal diseases and other infectious diseases.
(ii)   Dental problems.
(iii)  Mental health problems.
(iv)   Use of alcohol and other drugs, including all of the following information:
    (A)    The type of types of drugs used.
    (B)    Mode of use.
    (C)    Amounts used.
    (D)    Frequency used.
    (E)    Date or time of last use.
    (F)    History of any problems that may have occurred after ceasing use, for example, convulsions.

48.    In formulating my opinions in this case, I also considered the

section from the Administrative Rules regarding "Inmate Rights" and the

actual practice of the Crawford County jail with respect to alcohol detoxification.  In considering the foregoing, I attempted to find a practice of the Crawford County jail that protected inmates undergoing alcohol withdrawal from personal injury but was unable to do so.

### R 791.718      Inmate rights.

A facility shall establish and maintain written policy, procedure, and practice that protects inmates from all of the following that would constitute a civil or criminal violation:

    (a)    Personal abuse.
    (b)    Corporal punishment.
    (c)    Personal injury.

49.     Additionally, as part of the generally accepted methodology, I also considered R 791.728 and attempted to determine who the "responsible physician" whose medical judgment was used on Dwayne Greene.  I was unable as a former Jail Administrator to determine who the responsible physician whose medical judgment was used on Dwayne Greene.  Below is the relevant section.

R 791.728        Health care.

A facility shall establish and maintain written policy, procedure, and practice which provide that all medical, psychiatric, and dental inmate matters involving medical judgment are the sole province of the responsible physician, dentist or other qualified health professional.

50.     In formulating my opinions, I also considered sections J-A-01 and J-A-02 from the *Standards for Health Services in Jails* published by the National Commission on Correctional Health Care.  Defendants did not provide Dwayne Greene with "Access to Care" as defined in the standard.  Below are relevant sections from J-A-01:

J-A-01
essential

1.1

**ACCESS TO CARE**

**Standard**

Inmates have *access to care* to meet their serious medical, dental, and mental health needs.

**Compliance Indicator**

The responsible health authority (RHA) identifies and eliminates any barriers to inmates receiving health care.

**Definition**

*Access to care* means that, in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered.

51.     In formulating my opinions, I also considered the Discussion in J-A-01 from the *Standards for Health Services in Jails*.  In light of the materials reviewed, I determined that there were unreasonable barriers to health care. The relevant section provides as follows:

> **Discussion**
>
> This standard intends to ensure that inmates have access to care to meet their serious health needs and is the principle on which all National Commission on Correctional Health Care standards are based. It is also the basic principle established by the U.S. Supreme Court in the 1976 landmark case *Estelle v. Gamble*.
>
> Unreasonable barriers to inmates' access to health services are to be avoided. Examples of unreasonable barriers include the following:
>
> 4. Having an understaffed, underfunded, or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs

52.     In formulating opinions, I also considered J-A-02 from *Standards for Health Services in Jails*.  The standard provides the definition of "responsible physician" as a "designated MD or DO who has the final authority at a given facility regarding clinical issues".  It also provides that "when the responsible health authority [RHA]" is "someone other than a physician, final

clinical judgments rest with a single, designated, licensed, responsible

physician." I could not find any "responsible physician" for Crawford County

that satisfies this standard. Below is the discussion from this section:

**Discussion**

This standard seeks to ensure a coordinated health care system. The RHA functions to assure that health services are organized, adequate, and efficient. If this designated authority is not a physician, the responsible physician supervises the clinical aspects of health care.

A single, designated responsible physician (an MD or DO) is required in all instances. The responsible physician supervises clinical judgments regarding the care provided to inmates at the facility. This includes establishing and implementing policies for the clinical aspects of the program; monitoring the appropriateness, timeliness, and responsiveness of care and treatment; and reviewing the recommendations for treatment made by health care clinicians in the community.

53. In formulating my opinions, I also considered whether the

"responsible physician" determined that Dwayne Greene's health care needs

were beyond the resources available in the Crawford County Jail. The

Standards for Adult Correctional Institutions, 4th edition, mandates Referral

when such a situation arises. The relevant section is set forth below. I

determined that since no "responsible physician" evaluated Dwayne Greene,

Crawford County did not comply with this section.

## Referrals

4-4348
(Ref. 3-4360)

Offenders who need health care beyond the resources available in the facility, as determined by the responsible physician, are transferred under appropriate security provisions to a facility where such care is on call or available 24 hours per day. A written list of referral sources includes emergency and routine care. The list is reviewed and updated annually.

*Comment:* Treatment of an offender's condition should not be limited by the resources and services available within a facility. Health care staff should collaborate with security personnel in determining conditions of transportation and necessary security precautions when an offender needs to be transported to another facility or provider.

54. In formulating my opinions, I also considered the American Correctional Association's Core Standards set forth below. In doing so, I attempted to determine how Dwayne Greene was provided timely access to medical care. I was unable to find any timely access to medical care and ultimately determined he was denied timely access to medical care.

1-CORE-4C-01      (Mandatory) (Ref. 4-ALDF-4C-01, 4C-02, 4C-03)
At the time of orientation all inmates are informed about procedures to access health services. There is a process for all inmates to access health care services on a daily basis by means of sick call, inmate request or staff referral. When the necessary medical, dental, mental health, or substance abuse care is not available at the facility, inmates are referred to and given timely access to the needed clinical services in another appropriate health care facility. Inmates may also request access to traditional healing practitioners for medicinal services.

### Continuity of Care/Referrals

1-CORE-4C-02      (Ref. 4-ALDF-4C-04, 4C-05)
The designated health care provider will provide for continuity of care for inmates from admission to transfer or discharge from facility.

55.    In formulating my opinions, I also considered section 4C from the ACA Performance Based Standards.  I attempted to determine that Dwayne Greene's continuum of health care services was unimpeded and show that he received those services in a timely and efficient manner.  I was unable to do so and my inquiry showed that in fact his receipt of health care access was impeded and he did not receive those services in a timely and efficient manner.  Below is the standard.

### PERFORMANCE STANDARD: Continuum of Health Care Services

4C.   **Inmates maintain good health. Inmates have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner.**

56.    The methodology used in formulating my opinions, also considered the American Bar Association Standards for Criminal Justice, Third Edition, Treatment of Prisoners.  It is the type of information reasonably relied upon by experts in my field.  The Introduction details the purpose of the document:

These *Standards on the Treatment of Prisoners*, over five years in the drafting, were approved by the American Bar Association House of Delegates in February 2010. Based on constitutional and statutory law, a variety of relevant correctional policies and professional standards, the deep expertise of the many people who assisted with the drafting, and the extensive contributions and comments of dozens of additional experts and groups, they set out principles and functional parameters to guide the operation of American jails and prisons, in order to help the nation's criminal justice policy-makers, correctional administrators, legislators, judges, and advocates protect prisoner's rights while promoting the safety, humaneness, and effectiveness of our correctional facilities.

57.    I considered Standard 23-2.1 "Intake Screening", set forth below,

and attempted to determine how Crawford County complied with this

Standard.  I ultimately determined that it did not.

**(b)  Correctional authorities should screen each prisoner as soon as possible upon the prisoner's admission to a correctional facility to identify issues requiring immediate assessment or attention, such as illness, communicable diseases, mental health problems, drug or alcohol intoxication or withdrawal, ongoing medical treatment, risk of suicide, or special education eligibility. Medical and mental health screening should:**

**(ii)    be performed either by a qualified health care professional or by specially trained correctional staff; and**

(c)  Correctional authorities should take appropriate responsive measures without delay when intake screening identifies a need for immediate comprehensive assessment or for new or continuing medication or other treatment, suicide prevention measures, or housing that takes account of a prisoner's special needs.

58.    I also considered Standard 23-6.2 and attempted to determine how Crawford County and Northern Lakes complied with this standard. Ultimately, I determined based on my review of the extensive materials that they did not.

### Standard 23-6.2    Response to prisoner health care needs

(a)  Correctional authorities should implement a system that allows each prisoner, regardless of security classification, to communicate health care needs in a timely and confidential manner to qualified health care professionals, who should evaluate the situation and assess its urgency. Provision should be made for prisoners who face literacy, language, or other communication barriers to be able to communicate their health needs. No correctional staff member should impede or unreasonably delay a prisoner's access to health care staff or treatment.

(b)  A prisoner suffering from a serious or potentially life-threatening illness or injury, or from significant pain, should be referred immediately to a qualified medical professional in accordance with written guidelines. Complaints of dental pain should be referred to a qualified dental professional, and necessary treatment begun promptly.

(c)  When appropriate, health care complaints should be evaluated and treated by specialists. A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care.

59.    In the business of corrections, the central points that will ensure that security failures don't occur are intake processing, classification and health services.  These sections are a critical part of any correctional facility

operation.  Acceptable correctional classification systems incorporate all known facts regarding an inmate to make security housing arrangements, and where necessary appropriate treatment plans.

### III.   Opinions And Basis

60.    I am not offering any medical opinions.  Throughout my report I only address matters of health care from the perspective and responsibility of a corrections administrator. While correctional administrators and personnel are not normally educated in the field of medicine, they are expected to understand the premise and how they apply to the inmate the population every hour of every day.  Correctional professionals must know what to do on issues of health care, medication, mental health, substance abuse, physical disorders, mental disorders, classification determinations and specialized housing.  My opinions are based in part on what a corrections administrator is required to be proficient in as they relate to the operation of correctional facilities.  My opinions are also based in part on what is expected of Correctional Officers and health care providers in a correctional setting.

61.    The opinions that I have expressed in my Report (pages 30-31) are as follows:

(A)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office was deliberately indifferent to the condition of Dwayne Greene at the time of intake and throughout his incarceration.

(B)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Jail Intake form, Booking form, the Medical Screen form, the Mental Health Screen form, the Suicide Prevention form and the Classification form were all inadequate for determining the specialized care that any given inmate may need, especially Mr. Greene. Additionally, the completion of these forms, by jail personnel, was totally lacking and incomplete.  Specifically, forms were not completed, prior booking information was not used, known facts and available information was not considered and none of the questions asked were provided any detailed explanation about the answers given.

(C)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office Policies and Procedures were not comprehensive enough to address the specific issues experienced by Mr. Greene. Further, the policies that were available were not followed as I will enumerate later in this report.

(D)     It is my opinion to a reasonable degree of professional certainty that the medical care afforded Mr. Greene was non-existent and not at all appropriate for his known health issues. Additionally, Northern Lakes CMH authority had a responsibility to ensure that the Crawford County Jail staff understood the seriousness of untreated alcohol withdrawals and to ensure that they understood that Mr. Greene needed immediate medical attention. While I am not a medical professional, I am a professional corrections administrator of many years that has monitored the performance of health care providers throughout my career.

(E)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office did not adequately manage the performance of their health care provider.

(F)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office sections of Court Security, Intake, Booking, Classification, Medical and Mental Health Screen and

Security, failed to share information about Mr. Greene's condition to the extent that would have ensured he received the care and classification status he needed.

(G)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office Classification Unit never properly established and monitored the treatment and housing assignment of Dwayne Greene. In fact, I cannot determine where an objective classification system is ever utilized.

(H)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office jail security staff failed to adequately monitor the deteriorating condition of Mr. Greene. As a result, he did not receive the lifesaving medical care he needed.

(I) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office training was inadequate. I have based this opinion on the fact that numerous failures of staff performance occurred during the Greene incarceration. Had training been comprehensive in addressing the known events that can and do occur within a jail, many of the failures in the Greene incident would not have happened. In fact, no Crawford County Sheriff's Office correctional staff indicated that they had ever been trained on how to recognize the signs and symptoms of alcohol withdrawals, delirium tremens, or the medical dangers of untreated alcohol withdrawals. This testimony is particularly disturbing in that all but one of named defendants had been through the training entitled Mental Health First Aid.

(J) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office personnel failed to share known and vital information about Dwayne Greene's alcohol use and withdrawal symptoms that would have assisted with his medical care which, in fact, was non-existent.

(K)     It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office had no acceptable protocols or plan for caring for detoxing inmates.

(L)      It is my opinion to a reasonable degree of professional certainty that the supervisors of Crawford County Sheriff's Office, and health care providers, and Northern Lakes CMH, at all levels, failed to monitor the performance of their subordinates as it pertained to the treatment and care of Dwayne Greene. The factual failures of Intake, Booking, Classification, Medical Screen, Security and Medical/Mental health support this opinion.

62.    Additionally, throughout my Report I identified the conduct of individual corrections officers and those of Northern Lakes as documented in testimony and documents.  In my report on pages 33-36, 40 and 42-46, I discuss the individual Corrections Officers, Jail Administrators and Northern Lakes employees as well as their contributions to the failures.  It is clear that the Crawford County Corrections Officers, administration and Ms. Karczewski ignored Mr. Greene's clear and known information that he would need medical assistance.

63.    I reviewed the deposition testimony of each of the witnesses whose testimony was taken in this case.  The testimony was relevant to the formulation of my opinions.  By way of example only, the following testimony from Corporal Katie Tessner was relevant to my opinions:

> Did you know on the 4th that Dwayne Greene was likely to experience alcohol withdrawal based on your experience?
>
> A.  **Based on his past booking, yes.**

*        *        *        *        *

Q.   All right.  And did you know on the 4th that the --
     prior to you completing Dwayne Greene's booking that
     the nurses had left without seeing him?

A.   Yes.

Q.   Did you know on the 4th that the nurses wouldn't be
     back until the 8th?

A.   **It was assumed, yes.  I mean, everything could change
     but --**

Q.   All right.  So on the 4th did you -- did you note
     anywhere that Dwayne Greene was likely to not see any
     nurses until Friday the 8th?

A.   **No, it was assumed by staff.  We knew that the nurses,
     again, theoretically were going to be there on the 8th
     barring anything unforeseen and that's when he would
     be seen if he stayed.**

64.   Additionally, by way of example only, the following testimony of

Corrections Officer Donald Steffes was relevant to my opinions:

Q.   This is the last question here:  Mr. Kazim asked you
     about Corporal Christman's note on the 7th of December
     at 6:20 a.m.  Did you see where it says, Inmate Dwayne
     Greene is still showing signs that he is still going
     through withdrawal from alcohol.  He's tried to leave
     his cell asking for a hammer and nails thinking his
     mother is speaking to him.  He periodically yells out
     or bangs door, floor and walls.  He is complaint and
     pleasant when speaking to him, but is confused and
     does not comprehend that he is here in the jail; do
     you see that?

A.   I do.

Q.   If you had an inmate that was experiencing those
     symptoms in your custody you would have called 911,
     wouldn't you?

A.   If I had seen that behavior, yes, I would have.


     *          *          *          *          *          *

Did you make a medical determination as to whether Dwayne Greene needed medical assistance?

**A.** **I did not make a medical determination. I made a personal determination that he did not need emergency medical treatment just like I'm making with everybody in this room right now.**

Q. Maybe I need medical assistance?

**A.** **You don't need emergency medical assistance.**

Q. Just so we have an understanding. All of us are sitting in a room here in chairs, none of us are hallucination from what you can observe?

**A.** **Not that I'm aware of.**

Q. Not that you're aware of. None of us are having auditory hallucinations that you're aware of?

**A.** **Correct.**

Q. None of us appear to be complaining about being overheated; is that true?

**A.** **Correct.**

Q. None of us are yelling; is that right?

**A.** **Correct.**

Q. All right. None of us -- although depositions are fairly contentious, none of us appear to be agitated?

**A.** **Correct.**

65.   Additionally, by way of example only, the following testimony of

Corrections Officer Joel Avalos was relevant to my opinions:

Q.   Is there any policy or procedure that you're aware of
     from the Crawford County Sheriff's Department that
     provides that alcohol withdrawal is to be done under
     medical supervision?

A.   No.


     *          *          *          *          *


Q.   So, and was it the understanding -- was it your
     understanding on the 4th that the nurse wouldn't be
     back until the 8th?

A.   Correct.

Q.   So was there any plan put in place for Dwayne Greene
     to be looked at by any medical professional before the
     8th?

               MR. RAITI:  If you know.

               THE WITNESS:  I'm not aware of any.


     *          *          *          *          *


Q.   I've asked you to assume that you knew Mr. Greene was
     going through alcohol withdrawal.  Based upon that
     knowledge if you had observed him trying to leave the
     cell, asking for hammer and nails, thinking his mother
     is speaking to him, periodically yelling out or
     banging door, floor and walls, what action would you
     have taken, if any?

A.   I would have called medical.

66.   The testimony of Corporal Renee Christman is filled with information relevant to my opinions.  By way of example only, the following testimony is relevant:

Q.   At the time you made the determination that he could wait until the next day to see the nurse you knew he was having hallucinations; is that right?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Confusion?

A.   Yes.

Q.   All right.  He had told you he was too hot, correct?

A.   Once.

Q.   Once.  You hadn't seen him sleep, correct?

A.   Correct.

Q.   You knew -- you described him as erratic, correct?

A.   Yes.

Q.   Agitated?

A.   Yes, which is common with anybody de-toxing in all the experience I've had through the years.

\*            \*            \*            \*            \*            \*

Q.   So when you made your determination that she could --
     he could wait to see the nurse until the 8th of
     December you were following the custom and practice of
     the Crawford County Sheriff's Department, correct?

**A.   Yes.**

\*          \*          \*          \*          \*          \*

Q.   It would have been your practice, would it not, that
     when you had an inmate who was experiencing the type
     of withdrawal that Dwayne Greene was experiencing
     which you documented on the 7th to bring that to the
     attention of Captain Baerlocher, correct?

**A.   Yes.**

Q.   And you did, in fact, didn't you?

**A.   Yes.**

\*          \*          \*          \*          \*          \*

Q.   So on the 6th and the 7th of 2017 your decisions to
     observe Dwayne Greene were driven by the custom and
     practice; is that right?

**A.   That is correct.**

Q.   And were your decisions on the 6th and 7th to observe
     Dwayne Greene also driven by the policies and
     procedures of Crawford County?

**A.   Yes.**

{00819877.DOCX}                          49

   *       *       *       *       *       *

Q.   Did Captain Baerlocher -- did you make clear to
Captain Baerlocher that he was -- Dwayne Greene was
going through alcohol withdrawal?

**A.   Yeah, we discussed that.**

Q.   And Captain Baerlocher knew that, didn't he, based on

your discussions with him?

**A.   I believe so.**

Q.   Did Captain Baerlocher -- was it communicated to
Captain Baerlocher that Dwayne Greene was having
hallucinations?

**A.   I believe so.**

67.   Additionally, by way of example only, the following testimony of

Correction Officer Dale Suiter was relevant to my opinions:

You knew he was going through alcohol
withdrawal because that was the history, correct?

**A.   Yes.**

Q.   And you knew that Officer Foster indicated to you that
     he was having hallucinations, correct?

A.   **Yes.**

Q.   And the daily jail log indicated confusion, right?

A.   **Yes.**

Q.   All right.  All right.  So you were aware of this
     training that you received from -- and the information
     you received from the training prior to December 7th
     of 2017, correct?

A.   **Yes.**

Q.   So do you agree with me -- and you also agree with me
     you didn't call an ambulance, correct?

A.   **No, I did not.**

Q.   And you also agree with me that the Northern Lakes
     Community Mental Health training is the only training
     you've had on the consequences of alcohol withdrawal,
     correct?

A.   **Yes.**

68.   Additionally, by way of example only, the following testimony of

Correction Officer Timothy Stephan was relevant to my opinions:

Q.   If someone is confused and does not comprehend that he
     is there in the jail does that indicate to you that a
     person needs medical attention?

A.   **Yes.**

Q.   If someone, according to the training that you
     received, is -- has that -- is confused and doesn't
     understand where they are and has hallucinations do
     you agree that that person requires medical attention?

A.   **Yes, that's why we have a nurse.**

Q.   It's your understanding that Community Mental Health
     is not authorized by the policies of Crawford County
     Sheriff's Department to provide medical care, correct?

A.   To my knowledge, yes.

\*           \*           \*           \*           \*           \*

Q.   And would it have been your practice at the time to
     not call 911 in spite of what you learned in October
     of 2017?

                    THE WITNESS:  Yes.

69.     The testimony of Jail Captain Randell Baerlocher is filled with

information relevant to my opinions insofar as policies, procedures, practice

and his own involvement.  By way of example only, the following testimony of

was relevant to my opinions:

Q.   Was it the policy of Crawford County that inmates
     experiencing severe alcohol withdrawal were to be
     observed in the drunk tank, if you will, without any
     referral for medical?

A.   Yes.  There is one thing to that.  There is policy
     that if somebody comes in over a .30 they are --
     before they are allowed to be housed at the Crawford
     County Jail it's required that they go to hospital.

     \*           \*           \*           \*           \*           \*

Q.   So it's your testimony, sir, is it not, that no
     licensed healthcare professional ever saw Dwayne
     Greene while he was in the custody of the Crawford
     County Jail?

A.   **I don't believe they did, no.**

\*       \*         \*          \*          \*          \*

Q.   Yeah.  What is the procedure at -- the policy or
     procedure at Crawford County for ensuring that
     individuals showing signs of withdrawal are monitored
     by qualified healthcare professionals?

A.   **We don't have one.**

\*         \*          \*          \*          \*          \*

          Do you have an understanding as to what
     your nurses do for persons experiencing severe alcohol
     withdrawal when they are there?

A.   **I don't know that.**

\*         \*          \*          \*          \*          \*

Q.   Are you suggesting that you use Community Mental
     Health -- Northern Lakes Community Mental Health to
     help you identify medical issues?

A.   **We have.**

Q.   Okay.

A.   **They have along the way in doing their evaluations.**

Q.   And is that consistent with your health care policy at

the jail?

A.    I would say no.  It's a resource, but no.

\*           \*           \*           \*           \*           \*

70.    Additionally, by way of example only, the following testimony of

Sheriff Kirk Wakefield was relevant to my opinions:

Q.    There's been some testimony that it was the custom and
       practice of the Crawford County jail to have persons
       who are undergoing alcohol withdrawal to remain in the
       observation area until they can see the jail nurse.
       Are you aware of that custom and practice?

A.    Yeah.  Basically, yes.

Q.    Is that a custom and practice that you blessed?

A.    Sure.

\*           \*           \*           \*           \*           \*

So my question to you is:  Do you think
there may be something wrong with the procedures and
the customs and practices of the Crawford County Jail
when someone who is experiencing those observable
symptoms of alcohol withdrawal doesn't get to see a
medical professional?

THE WITNESS:  I think I understand the
question but I wasn't there and I'm sure she did what
she was trained to do.

71.    Additionally, by way of example only, the following testimony of

Nanci Karczewski was relevant to my opinions:

Q.    So you were initially told he was going through the
       DTs, right?
A.    Uh-huh.

Q.    And your evaluation confirmed that to you?
A.    Correct.
Q.    All right.  What about the evaluation confirmed to you
       that he was going through the DTs?
A.    His behaviors.

    *          *          *          *          *          *

    Q.    When you referenced DTs you were referring to delirium
           tremens?
    A.    Correct.

    *          *          *          *          *          *

Q.    So then you had a conversation at some point with
       Crawford County staff; is that right?
A.    Correct.
Q.    Who was part of that conversation?
A.    Well, from what I'm seeing here on my assessment Mr.
       Baerlocher was there.
Q.    Did you indicate to him at that time that you had
       confirmed he was going through delirium tremens?
A.    I think I probably did, yes.
Q.    And what was his response?

A.   He was aware that that was happening.

*          *          *          *          *

Q.   Earlier you testified that you spoke with Kevin
     Baerlocher following your assessment of Mr. Greene,
     correct?
A.   Correct.
Q.   And you said at that point I believe if, you know, I
     believe your testimony was that you told Captain
     Baerlocher that Greene was going through delirium
     tremens.  Do you recall that testimony?
A.   I don't recall.
Q.   If you said that is it fair to say that really what
     you said was he was going through the DTs?
A.   Correct.
Q.   So you didn't actually use the term delirium tremens?

A.   Correct.

72.   I reviewed each of the policies authored by Crawford County in

formulating my opinions.

73.   Each of the opinions above are supported by testimony,

documents, standards, peer-reviewed literature and my education, experience

and training.  The methodology I used in formulating my opinions was

exhaustive.

74.    A correctional administrator is required to be familiar with every aspect of their institutional operation to include statutory and constitutional requirements, correctional case law, standards, contractual arrangements, programs, health services, mental health services, dental, pharmaceuticals, substance abuse treatments and classification programs.  A corrections administrator is expected to be familiar with the constitutional requirements for operating a constitutional jail.  According to a publication from September, 2007, by the U.S. Department of Justice, National Institute of Corrections, entitled *Jails and the Constitution: An Overview*:

> Those who run jails need to know courts continue to look over their shoulders and that the United States Constitution shapes or limits decisions in many areas. State constitutions and state laws do the same.  Those who fund jails may not need to know the detailed requirements of the law to the degree of jail administrators, but still must recognize that the price of running a substandard facility can be very substantial.

75.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

MICHAEL A. BERG

Executed this 26th day of December, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHERYL GREENE, PERSONAL REPRESENTATIVE
OF THE ESTATE OF DWAYNE GREENE, DECEASED,

       Plaintiff,

v.

CRAWFORD COUNTY, SHERIFF KIRK WAKEFIELD,
RANDELL BAERLOCHER, RENEE CHRISTMAN,
KATIE TESSNER, DONALD STEFFES, Jr., WILLIAM
SBONEK, TIMOTHY STEPHAN, JOEL AVALOS,
DALE SUITER II, AMY JOHNSON, DAVID NIELSON,
LARRY FOSTER, Jr., SHON CHMIELEWSKI, NORTHERN
LAKES COMMUNITY MENTAL HEALTH AUTHORITY,
NANCI KARCZEWSKI AND STACEY KAMINSKI, LPC,
Individually and Officially and Jointly and Severally,

       Defendants.

Case No. 18-CV-11008-MAG-DRG
Hon. Thomas J. Ludington

---

## EXPERT REPORT OF MICHAEL A. BERG

## I.    INTRODUCTION AND QUALIFICATIONS OF THE EXPERT

I, Michael Berg, am an independent consultant in the field of corrections with over forty-four years of experience in criminal justice management, primarily in the area of corrections.

My general qualifications as an expert in the field of corrections are set forth in my Professional Resume, attached hereto as "Berg Exhibit A." My Professional Profile is attached hereto as "Berg Exhibit B." In addition to these general qualifications, I have direct experience with management and security at the Jacksonville, Florida, Department of Corrections, and the Florida Department of Corrections.

I began my corrections career in 1972 as a Correctional Officer with the Office of the Sheriff, Jacksonville, Florida. From that position, I quickly advanced to become a Work Release Counselor and on to the Facility Supervisor of the Fairfield Correctional Facility and Work Release Center. I was again promoted in 1977 and 1987 as Chief of Jails and Deputy Director of Jails and Prisons respectfully. The position of Deputy Director was the chief administrative officer in charge of the Sheriff's Correctional Divisions. As Deputy Director of the Jacksonville Sheriff's Office Jails and Prisons Division, I assumed total responsibility for the daily operation of the Sheriff's Correctional Divisions to include the Duval County Jail and the Duval County Jail Annex, later to become the Pretrial Detention Facility, the Community Corrections Division, and the Montgomery Correctional Institution. Included with this appointment was administrative and operational

responsibility of three corrections divisions, seven hundred and fifty (750) employees and approximately three thousand (3,000) inmates and an annual budget of nearly forty-one million (41,000,000) dollars. In 1997, I retired from the Office of the Sheriff after twenty-five (25) years of service. Later in 1997, I joined the Florida Department of Corrections as Chief of Staff to the Department Secretary. I served in this capacity under two Secretaries. While with the Florida Department of Corrections, I also served as Bureau Chief of Staff Development overseeing all department education and training as well as all curriculum and policy development and implementation. I also served as Executive Assistant to the Assistant Deputy Secretary of Institutions. In this capacity, I served under four Assistant Deputy Secretaries. In 2010, I retired from the Florida Department of Corrections after twelve and a half (12 ½) years of service.

During my career, I also served as a Commissioner for the Governor's State of Florida Criminal Justice Standards and Training Commission for twenty-five (25) years under five (5) governors.

I have experience in the administrative and operational management of small, medium, and large jails and prisons. My experience includes all areas of correctional and criminal justice-related administrative issues from arrest to release. I am also experienced in correctional budget management, criminal justice training, correctional litigation, jail and prison design, inmate work and treatment programs, jail and prison staffing plans, and correctional operational policy and procedure development. I have provided technical assistance to both large and small correctional departments. I have performed as a consultant, technical assistance provider, expert witness and criminal justice equipment representative.

These experiences qualify me to understand, review, and evaluate correctional operational issues involved within correctional administration, pre and post-trial facilities, staffing, training, and supervision. I can also provide opinions on matters of correctional Housing Conditions, Classification Programs, Institutional Health and Safety Concerns, Fire Safety, Health Care Considerations, Policy Development, Correctional Standards and Statutory Regulations, Correspondence Control, Use of Force, Inmate Violence, Security Threat Groups, Inmate Grievance Systems, Religious Freedoms, Out of Cell Time Programs, Overcrowding Issues, and Training and Supervision. Further, my experience allows me to assess operational matters involving intake, booking, health/medical assessments, classification, holding, and housing assignments. I am also very capable in evaluating policies and procedures, post orders and compliance with applicable standards and constitutional/statutory guidelines. I am also very familiar with the management of private service providers in the areas of health/medical services, food service, maintenance service, phone service, and so forth.

All of these experiences have assisted me in my review of the Dwayne Greene matter, and further have given me the ability to establish the opinions I have presented in the following report.

II.     TESTIMONY AS AN EXPERT WITNESS AT TRIAL OR DEPOSITION

I have been qualified as an expert witness in the field of corrections and have testified as such on forty-nine occasions, thirty in the last four years in state and federal courts, including providing opinions on use of force, wrongful death, correctional classification, security, housing assignments, detox programs, alternative programs, overcrowding and population issues, housing conditions, training and supervision, private for profit contracts for medical and mental health services, food service, correspondence matters, due process issues, ADA accommodations, and immigrant detainee constitutional rights. A listing of cases for which I have been retained within the proceeding four years is attached hereto as "Berg Exhibit B." I also served as the court appointed monitor in the Nassau County, Florida jail case in 1997 through 2001.

III.    METHODOLOGY

My approach to preparing my expert testimony and forming my opinions is very systematic and consistent, designed to produce reliable results, such that similar inputs (i.e. facts and evidence in a particular case) will produce similar outputs as far as my opinions and the basis for them. While every case is, of course, different, the types of cases in which I offer my services usually involve similar broad themes including, as noted; intake, medical screen, mental health screen, classification and housing of inmates and protocols for monitoring and frequent evaluations of inmates.

My methodology requires examining these themes, in light of the facts and evidence, in a consistent manner, irrespective of the system or level of facility at issue. That is, my evaluation is based upon the fundamental concept that the duties owed by corrections personnel and medical professionals to the inmates in their facilities do not vary from state to state, or between state and federal facilities - rather, consistent, identifiable, and authoritative standards apply across the business. Thus, similar strengths or deficiencies observed in a state or county facility in Michigan (as here), or in a facility outside of Michigan, will yield similar opinions regarding the compliance of that agency with industry standards, statutory law and constitutional provisions.

In addition, many of the standards of care applicable to the corrections business are, in large part, based on the United States Constitution (and on parallel provisions of many state statutes), as well as federal statutes. The industry publications upon which I rely to identify "best practices" (see Section B) similarly treat corrections uniformly as a nationwide industry, and the "best practices" advocated do not vary according to whether the facility is federal, state or county, or according to the state in which the facility is located. While each state, of course, has its own statutes and regulations governing corrections facilities, every state must operate within the confines of the United States Constitution and, in my experience, this requirement results in comparable statutory schemes (and application and enforcement of those schemes) across states.

Thus, my evaluation and opinions are reliably formed by examining the unique facts and evidence of a particular case through the stable and constant lens of uniform correctional laws and standards. My experience demonstrates that, given a particular set of facts and evidence, my analysis and methodology will yield the same opinions without regard to the venue of the litigation or the party by which I have been retained.

In addition, I employ a systematic approach to examining the facts and evidence provided to me for each project. As background, I work, at all times, to maintain current familiarity with the publications from which information regarding the "best practices" and industry standards may be drawn (see Section B). I also review court decisions impacting industry laws and standards for the issues my consultancy addresses. Corrections involves a great deal of complex specialized knowledge, and I always strive to maintain up-to-date knowledge of the business.

When I receive a new project, I first organize the materials provided to me by category (e.g., court documents; deposition transcripts; agency records). Within each category I then arrange the materials chronologically, to identify any gaps for which I need to request additional materials. If I need to request a significant amount of additional materials, I will request the material that I feel is necessary as soon as possible. In this way, I ensure that my work is based on all the sufficient facts and data I need to support my opinions.

I then begin to examine the various parts of the file with an eye toward identifying strengths or deficiencies of the overall systems in place at the facility. Once I have an understanding of how the agency operates, I study how various individuals acted, reacted, or failed to act before, during, and after the specific incident. Comparing the systems and actions to the uniform industry standards and "best practices," I begin to form opinions as to whether each facet of the agency (and each act or omission by the people involved) conforms to those standards. I also address these acts or omissions with an eye on compliance to applicable state statutes and constitutional law. As I formulate these opinions, I intentionally review the materials for counterexamples—that is, if I see a system that appears to be deficient, I look for individual components or individuals within it that function properly. Likewise, if I see a system that appears to be compliant with standards and laws, I look for parts that fall short. In this way, I avoid becoming prematurely attached to a particular opinion, and therefore reach final conclusions and opinions that I can confidently state to a reasonable degree of professional certainty as an expert in corrections.

This methodology, reliably applied, produces four specific benefits: (1) my opinions are based on my specialized knowledge, developed over a career in corrections, and maintained through ongoing education and reading of current industry materials; (2) my opinions, and the basis for them, are based on sufficient facts and data such that I avoid "cherry-picking" or one-sided analysis; (3) my opinions are formed through the application of reliable principles and methods, reliably applied as described above to the materials, such that the opinions themselves are reliable, irrespective of the agency in question or the party retaining me; and (4) my opinions will help the jury (or judge, in a bench trial) to understand the evidence and determine the facts in issue.

## IV.    COMPENSATION

I am compensated at a rate of $1500.00 for the initial review of a case, $150.00 per hour for in-office work, report writing, travel and inspections and $1500.00 per day for deposition and court days. Attached you will find hereto the Fee Schedule "Berg Exhibit C."

## V.   MATERIALS REVIEWED IN FORMULATING OPINION

### A. Case Specific Material Reviewed

From the review of all of the case specific material listed below I have been able to formulate the opinions present within the following report. This factual material has been incorporated into my opinions as it is specifically appropriate.

- Complaint: Cheryl Greene, Personal Representative of The Estate of Dwayne Greene, Deceased v. Crawford County, Sheriff Kirk Wakefield, et al., in the United States District Court, Eastern District of Michigan Southern Division
- Greene v. Crawford County, Defendant Responses To Plaintiff's First Interrogatories To Defendants Crawford County; Avalos, Baerlocher, Chmielewski, Christman, Johnson, Nielson, Sbonek, Steffes, Stephan, Suiter, II., Tessner, and Wakefield, 12/17/2018
- Greene v. Crawford County, Defendant Responses To Plaintiff's First Requests To Produce To Defendants Crawford County; Avalos, Baerlocher, Chmielewski, Christman, Foster, Johnson, Nielson, Sbonek, Steffes, Stephan, Suiter, Tessner, and Wakefield, 12/17/2018
- Greene v. Crawford County, Defendants Wakefield and Crawford County's Reponses To Plaintiff's First Request For Production of Documents
- Joanie Blamer, Northern Lakes Community Mental Health, Notice of Taking Deposition, February 14, 2019, Haider A. Kazim
- Plaintiff's Notice of Deposition Duces Tecum of Northern Lakes Community Mental Health Authority Corporate Representative, February 6, 2019
- Greene v. Crawford County, Defendant Northern Lakes Community Mental Health Authority, Nanci Karczewski and Stacey Kaminski's Supplemental Answers To Plaintiff's First Request To Produce, January 24, 2019
- Greene v. Crawford County, Defendant Northern Lakes Community Mental Health Authority, Nanci Karczewski and Stacey Kaminski's Answers To Plaintiff's Second Request To Produce, January 24, 2019
- Greene v. Crawford County. Defendant Crawford County's Responses to Plaintiff's Second Request For Production of Documents, February 15, 2019, McGraw-Morris, P.C.
- Judicial Admission, Chapter 5 of The Michigan Mental Health Code, September 26, 2014
- Involuntary Substance Use Treatment, 2014 Public Act 200, Effective: June 24, 2014, Amendments Chapter 2A of the Michigan Mental Health Code, September 26, 2014
- Greene v. Crawford County. Case Depositions and Exhibits
  - Stacey Kaminski, LPC, CADC
  - Nanci Karczewski, LLPC
  - Joanie E. Blamer
  - Randell Baerlocher
  - Katie Tessner
  - Joel Avalos
  - Amy Johnson
  - Renee Christman
  - Larry Foster, Jr.
  - Dale Suiter, II
  - Timothy Stephan

000608

- o   Donald Steffes, Jr.
- o   John McDonald
- o   Shon Chmielewski
- o   Sheriff Kirk Wakefield
- o   Terry McCleery
- o   Marvin Townsend
- o   Wade Schmidt, Jr.
- o   William Denno
- o   Steven Detmer
- o   David Nielson
- o   William Sbonek
- o   Jeanne Hufnagel
- o   Shawn Kraycs
- o   Cheryl Greene
- o   John Greene
- o   Jessica Munger
- Text messages between Katie Tessner and Renee Christman, 12/7-8-9/2017
- Crawford County Jail Policies and Procedures
  - o   Corrections Inmate Admission Policy, Number 95-002
  - o   Corrections Inmate Classification Policy, Number 95-004
  - o   Corrections Inmate Rights Policy, Number 95-013
  - o   Corrections Inmate Administration Medication Policy, Number 01-051
  - o   Corrections Inmate Participation In Research Policy, Number 01-080
  - o   Corrections Inmate Health Appraisal Policy, Number 01-081
  - o   Corrections Inmate Cell Check Policy, Number 01-082
  - o   Corrections Inmate Health Care Policy, Number 01-088
  - o   Inmate Mental Health Services Policy, Number 12-103
  - o   Blank: Acknowledgement of Receipt of Copy of Rules and Regulations, Policies and Procedures Handbook
  - o   Blank: State of Understanding (Rules and Regulations, Policies and Procedures Handbook)
  - o   Blank: Revision Responsibility Policy Handbook
  - o   Blank: Crawford County Jail Medical/Mental Health Refusal Pre-Booking Information
  - o   Blank: Crawford County Jail Booking Admission Report
  - o   Blank: Crawford County Sheriff's Office Health Screen and Appraisal
- Crawford County Sheriff's Office, Main Jail Housing Plan, July 26, 2006
- Crawford County Sheriff's Office Arrest Report and Citation, 08/05/2017, Dwayne Greene
- Crawford County Sheriff's Office Arrest Incident Report, Criminal History, Dwayne Alan Greene
- Crawford County Sheriff's Office, Incident Report, Traffic Stop 20-2458-17, 08/10/2017, Dwayne Greene
- Crawford County Jail Booking, Admission Report, 08/05/2017, Dwayne Alan Greene
- Crawford County Sheriff's Office, Defendant's Jail Record, 12/04/2017, Dwayne Alan Greene

- State of Michigan, In the 46th Circuit Court for the County of Crawford, People of the State of Michigan vs. Dwayne Greene, Case No. 17-4226-F4, December 4, 2017
- FOIA Request by Dorais Richard to Crawford County Prosecutor's Office, February 14, 2018
- Crawford County Office of the Administrator, Response to FOIA Request by Dorais Richard from Paul C. Compo, FOIA Coordinator, February 21, 2018
- State of Michigan, Subpoena to Munson Medical Center for All Medical Records and Reports Pertaining to Dwayne Alan Greene, D.O.B. 6/26/1985, After Arriving by Ambulance on 12/8/17, Through 12/12/17, When He Passed Away, January 9, 2018, Case No. 17-4226-FH
- Proof of Service, Subpoena from State of Michigan to Munson Medical Center, 1-18-18, 1:50PM, Case No. 17-4226-FH
- Proof of Service, Subpoena from State of Michigan to MH Grayling Hospital, 12-29-17, 2:25PM, Case No. 17-4226-FH
- Proof of Service, Subpoena from State of Michigan to Northern Lakes CMA, 12-28-17, 4:05PM, Case No. 17-4226-FH
- Crawford County, Case Register of Actions, Dwayne Alan Greene, 08/29/19
- Crawford County Clerk, Bond for Dwayne Greene, December 3, 2017, Case No. 17-4226-FH
- State of Michigan, 87th District Court, People of the State of Michigan v. Dwayne Greene, Pretrial Statement Plea Offer, 12/4/17, Case No. 17-4226-FH
- State of Michigan Judicial Circuit Court, Advice of Rights (Circuit Court Plea), Dwayne Greene, 12/4/17, Case No. 17-4226-FH
- State of Michigan, Crawford County, 46th Circuit Trial Court, Proof of Service and Notice to Appear from The People of Michigan to Dwayne Alan Greene, 12/6/17, Case No. 17-4226-FH
- State of Michigan Judicial Circuit Court, Crawford County, Amended Bond for Dwayne Greene, December 4, 2017, Case No. 17-4226-FH
- State of Michigan, 46th Circuit Court, Civil Division, Crawford County, Jury Status Conference Order, 10/2/17, Case No. 17-4226-FH
- State of Michigan, Crawford County, 46th Circuit Trial Court, Proof of Service and Notice to Appear in Court for Dwayne Alan Greene, 10/4/17, Case No. 17-4226-FH
- 46th Circuit Court, Crawford County, Circuit Division, Notice of Hearing and Pretrial Order, Dwayne Alan Greene, 8/30/17, Case No. 17-4226-FH
- State of Michigan, Crawford County, 87th Judicial District, 46th Circuit Court, Felony Information, Dwayne Alan Greene, 8/17/17, Case No. 17-4226-FH
- State of Michigan in the 46th Circuit Court for the County of Crawford, People of the State of Michigan vs. Dwayne Alan Greene, Plaintiff's Witness List, Plaintiff's Exhibit List, 8/17/17, Case No. 17-4226-FH
- State of Michigan in the 46th Circuit Court for the County of Crawford, People of the State of Michigan vs. Dwayne Alan Greene, Disclosure Demand for Information from Dwayne Alan Greene/Counsel of Defendant, 8/17/17, Case No. 17-4226-FH
- State of Michigan, 87th Judicial District, 46th Judicial Circuit, Bind Over/Transfer After Preliminary Examination, Felony, People of the State of Michigan vs. Dwayne Alan Greene, 8/29/17, Case No. 17-13256-FD

- State of Michigan in the 87th District Court for the County of Crawford, People of the State of Michigan v. Dwayne Greene, Preliminary Examination Waiver, 8/29/17, Case No. 17-13256-FD
- State of Michigan, 87-C District Court, People of the State of Michigan v. Dwayne Greene, Notice to Appear, 8/25/17, Case No. 17-13256-FD
- State of Michigan in the 87-C District Court for the County of Crawford, People of the State of Michigan vs. Dwayne Alan Greene, Stipulation for Change of Felony Pre-Trial Date and Time, signed by Donald E. Sommerfeld, Jr. on 08/24/2017, Case No. 17-13256-FY
- State of Michigan in the 87-C District Court, Crawford, County, People of the State of Michigan vs. Dwayne Alan Greene, Appearance, Jury Demand, Demand for Speedy Trial, Discovery MCR 6.201, to Crawford County Clerk of Court, Prosecuting Attorney from Donald E. Sommerfeld, Jr. 08/21/2017, Case No. 17-13256-FY
- State of Michigan in the 87-C District Court, Crawford, County, People of the State of Michigan vs. Dwayne Alan Greene, Proof of Service, Appearance, Jury Demand, Demand for Speedy Trial, Discovery MCR 6.201, to Crawford County Clerk of Court, Prosecuting Attorney from Donald E. Sommerfeld, Jr. 08/21/2017, Case No. 17-13256-FY
- Notice of Hearing and Scheduling Order, served to Donald E. Sommerfeld, Jr., 08/16/2017, Case No. 17-13256-FD-1
- State of Michigan, Judicial District, Judicial Circuit, People of the State of Michigan v. Dwayne Greene, Request for Court-Appointed Attorney and Order for Dwayne Greene, 8/16/17, Case No. 17-13256-FD
- Surety Bail Bond, Bond Bonding Agency, Inc., Bond Number: BBA25 No. 62670 for Dwayne Alan Greene, 01/01/18
- State of Michigan, 87th Judicial District, Judicial Circuit, People of the State of Michigan vs. Dwayne Alan Greene, Bond for Dwayne Alan Greene, 08/07/2017
- State of Michigan, 87th Judicial District, 46th Judicial Circuit, Felony Warrant for Dwayne Alan Greene, 8/15/17, Case No. 2017000600, District: 17-13256-FD
- State of Michigan, 87th Judicial District, 46th Judicial Circuit, Return for Dwayne Alan Greene, Case No. 17-13256-FD, Police: 20-2458-17, District: 17-13256-FD
- State of Michigan, 87th Judicial District, 46th Judicial Circuit, Complaint, Felony, for Dwayne Alan Greene, 8/15/17, Case No. 2017000600, District: 17-13256-FD
- Crawford County Jail, Staff Rotation Schedule, December 2017
- Crawford County Sheriff's Office, Jail Booking System, Inmate Roster by Cell – December 4-8, 2017
- Mental Health Service Request, 12-07-2017, Dwayne Alan Greene, Notes; Nanci Karczewski
- Northern Lakes, Community Mental Health, Jail Crisis Screening Contact, 12/07/2017, Dwayne Greene
- Mental Health Service Request, 9/6/16, Michael Keiser, Notes; Pamela Fisher, MALPC
- Michael Keiser Supplemental Petition To Application For Hospitalization and Order For Examination
- Michael Keiser, Petition/Application For Hospitalization
- Ex-Parte Motion And Order To Revoke Bond, Michael Robert Keiser
- September 8, 2016 Correspondence from Captain Randy Baerlocher to the 87-C District Court regarding Michael Keiser

- Medical Screening Report Michael Keiser
- Michael Robert Keiser, Arrest Report, Clare City Police Department, Incident No: 16-000657, 10/05/2016
- Michael Keiser, Crawford County Sheriff's Office, Daily Log Report – Adult 9/6/16, 9/7/16, 9/20/16, 9/27/16
- Crawford County Sheriff's Office, Jail Incident Report, Dwayne Alan Greene, Incident #102-17, 12/08/2017, 07:27 hours
- Crawford County Sheriff's Office, Jail Incident Report, Dwayne Alan Greene, Incident #103-17, 12/08/2017, 07:27 hours
- Crawford County Sheriff's Office, Jail Booking System Daily Jail Log Inquiry 12/04/2017
- Crawford County Jail Booking Area Activity Log, December 4th through 8th, 2017
- Crawford County Jail Floor Plan
- Crawford County Sheriff's Office, Incident Report, Report 17-0003707
- Grayling Department of Public Safety Incident No. 17-001221, 12/08/2017
- Munson Health Care, Grayling Hospital Medical Records Dwayne Greene
- State of Michigan, County of Ground Traverse, Department of Community Health, Certification of Death, December 14, 2017, Dwayne Alan Greene
- Dwayne A. Greene, Postmortem Examination Report, March 13, 2018, Elizabeth A. Douglas, M.D.
- Kevin Riddle Request for Information From Northern Lakes Community Mental Health Authority, February 26, 2018
- Northern Lakes Community Mental Health response to Mr. Riddle's FOIA Request For Information, March 16, 2018
- Crawford County Inter-Agency Agreement Regarding Mental Health Services for Persons with Serious Mental Illness Who Are In Or At Risk Of Becoming Involved In The Criminal Justice System
- Community Mental Health Services Request Guidelines
- Northern Lakes Policies, Part 107 – Supports and Services – NLCMHA Provided Subpart E, Law Enforcement/Jail Services, Policy No. 107.501, Jail Services
- Northern Lakes Policies, Part 107 – Supports and Services – NLCMHA Provided, Subpart C, Emergency Services, Policy No. 107.301, Emergency Services
- Legislative Analysis, Jails Revise Criteria for Double Bunking; Classification of Inmates, House Bill 4071
- Sacred Heart Rehabilitation Center, December 27, 2017 correspondence with regard to Dwayne Greene
- Crawford County's response to the Kevin Riddle FOIA February 14, 2018, February 21, 2018 in regard to all medical records and reports pertaining to Dwayne Alan Greene
- Numerous videos, photographs, and audio recordings pertaining to the Dwayne Greene death
- Administrative Rules for Jail and Lockups, Michigan Department of Corrections, County Jail Services Unit
    - R791.701 Definitions
    - R791.705 Medical Treatment
    - R791.718 Inmate Rights
    - R791.728 Health Care
    - R791.730 Pharmaceuticals

000612

- o R791.731 Health Screening
- o R791.732 Health Appraisals
- o R791.734 Detoxification Cells
- o R791.735 Holding Cells
- o R791.736 Staffing
- o R791.738 Inmate Classification
- Department of Corrections, County Jail Services Unit, Jails and Lockups
- Michigan Legislature, Section 791.262, Corrections Code of 1953 (Excerpt) Act 232 of 1953
- State of Michigan, Department of Corrections, January 16, 2016, July 14, 2017 and May 29, 2018 Inspections of the Crawford County Jail
- Crawford County Sheriff's Office Personnel Training Records
  - o Joel Avalos
  - o Randell Baerlocher
  - o Shon Chmielewski
  - o Renee Christman
  - o Larry Foster, Jr.
  - o David Nielson
  - o Will Sbonek
  - o Donald Steffes
  - o Timothy Stephan
  - o Dale Suiter, II.
  - o Katie Tessner
  - o Kirk Wakefield
  - o Northern Lakes CMH Authority, Training History by Employee
    - o Karczewski, Nanci E.
    - o Kaminski, Stacey M.
    - o Joanie Blamer
  - o Mental Health First Aid – USA, Training Curriculum and Manual
  - o Mental Health First Aid, Chapter 6, Substance Use Disorders
  - o Mental Health First Aid, Chapter 8, First Aid for Mental Health Crisis
  - o Mental Health First Aid – USA, Adult Curriculum Supplement
- Summary Opinion, Greene v. Crawford County, Dennis Simpson, Ed. D, Christopher A. Briggs, MA, LLP, CAADC, March 26, 2019
- Rule 26 Report, Greene vs. Crawford County, Dr. Johnny E. Bates, MD, MMM, CPE, CCHP, CCHP-P, April 2, 2019
- Opinions, Case Chronology and Clinical Notations, Summary of Medical Records, Depositions, Reports and other Documents, Greene v. Crawford County, Rebecca E. Luethy, RN, MSN, CNS, CCHP, April 1, 2019
- Expert Report, Greene v. Crawford County, Dr. Werner U. Spitz, MD, FCAP, April 3, 2019
- Expert Report, Greene v. Crawford County, Dr. Gerald A. Shiener, MD, April 4, 2019
- Expert Report, Greene v. Crawford County, Herbert Lewis Malinoff, M.D., FACP, FASAM
- Expert Report, Greene v. Crawford County, Vasilis K. Pozios, M.D.
- Expert Report, Greene v. Crawford County, Terry S. Fillman, RN, MBA, CCHP

- Expert Report, Greene v. Crawford County, Gerald N. Papazian, LPC, LLPC Clinical Supervisor
- Expert Report, Greene v. Crawford County, Joseph M. Lothschutz, CPA

## B. Applicable Case Specific Standards

Standards utilized in the corrections industry are considered to be powerful guidelines for operating a constitutional facility. While an agency is not required to comply with all of these standards, they are considered to be the "Best Practices" for the business. Only the Michigan Administrative Rules for Jail and Lockups, Michigan Department of Corrections, County Jail Services Unit, are considered to be statutorily mandatory. In my report I have applied these standards in the establishment of my opinions.

- Administrative Rules for Jail and Lockups, Michigan Department of Corrections, County Jail Services Unit
  - o R791.701 Definitions
  - o R791.705 Medical Treatment
  - o R791.718 Inmate Rights
  - o R791.728 Health Care
  - o R791.730 Pharmaceuticals
  - o R791.731 Health Screening
  - o R791.732 Health Appraisals
  - o R791.734 Detoxification Cells
  - o R791.735 Holding Cells
  - o R791.736 Staffing
  - o R791.738 Inmate Classification

- **American Correctional Association Standards for Adult Correctional Institutions, 4th Edition**
  - o **Part One, Administration and Management**
    - ▪ Section A: General Administration
      - Purpose and Mission
      - Policy and Goal Formulation
      - Policy and Procedure Manuals
    - ▪ Section C: Personnel
      - Personal Policy Manual
      - Staffing Requirements
      - Personnel Files
      - Code of Ethics
      - Rules and Regulations
    - ▪ Section D: Training and Staff Development
      - Training Plan
      - Training Evaluations
      - Training Requirements
      - Administrative Staff
      - Correctional Officers
      - Specialist Employees

000614

- o **Part Three, Institutional Operations**
  - Section A: Security and Control
    - Security Manual
    - Control Center
    - Correctional Officer Assignments
    - Patrols and Inspections
  - Section D: Special Management
    - General Policy and Practice
    - Admission and Review of Status
    - Supervision
    - Administrative Segregation/Protective Custody
  - Section E: Inmate Rights
    - Protection from Harm
- o **Part Four: Institutional Services**
  - Section A: Reception and Orientation
    - Admission
    - Reception and Orientation
    - New Inmates
  - Section B: Classification
    - Classification Plans
    - Classification Status Reviews
    - Special Needs Inmates
  - Section E: Health Care
    - Continuum of Health Care Services; Performance Standard 1A
      - o Access to Care
      - o Clinical Services
      - o Continuity of Care
      - o Treatment Plan
      - o Infirmary Care
      - o Chronic Care
      - o Health Screens
      - o Health Appraisal
      - o Mental Health Program
      - o Mental Health Screen
      - o Mental Health Appraisal
      - o Mental Health Evaluations
      - o Detoxification
      - o Management of Chemical Dependency
      - o Pharmaceuticals
    - Staff Training; Performance Standard 2A
      - o Health Authority
      - o Provision of Treatment
      - o Employee Orientation
      - o Offender Assistants
    - Offender Treatment; Performance Standard 3A
      - o Special Needs

000615

- o Segregation
- Safety and Sanitation; Performance Standard 6A
  - o Injury Prevention
- **Section F: Social Services**
  - Counseling
  - Substance Abuse Programs
- o **Appendices**
  - Appendix A, Classification Guidelines
  - Appendix B, Guidelines for Institution Security Levels
  - Appendix E, Health Care Outcome Measures Worksheet

- o **American Correctional Association, Performance Based Standards for Adult Local Detention Facilities, Fourth Edition**
  - o **Part Two: Security**
    - Section A: Protection from Harm; Performance Standard 2A
      - Control
      - Staffing
      - Reception
      - Classification and Segregation
      - Special Management Inmates
  - o **Part Four: Care**
    - Section C: Continuum of Health Care Services; Performance Standard 4C
      - Access to Care
      - Clinical Services
      - Continuity of Care
      - Referrals
      - Treatment Plan
      - Infirmary Care
      - Chronic Care
      - Health Screens
      - Health Appraisal
      - Periodic Examinations
      - Mental Health Program
      - Mental Health Screen
      - Mental Health Appraisal
      - Mental Health Referrals
      - Detoxification
      - Management of Chemical Dependency
      - Pharmaceuticals
      - Special Needs Inmates
    - Section D: Health Services Staff; Performance Standard 4D
      - Health Authority
      - Provision of Treatment

{00722407.DOCX}                                13 | P a g e

000616

- o **Part Five: Program and Activity**
  - ▪ Section A: Performance Standard 5A: Inmate Opportunities for Improvement
    - • Expected Practices
      - o Counseling
      - o Substance Abuse Programs
- o **Part Six: Justice**
  - ▪ Section A: Inmate Rights; Performance Standard 6A
    - • Protection from Abuse
- o **Part Seven: Administration and Management**
  - ▪ Legal Status; Performance Standard 7A
    - • Legal Issues
  - ▪ Section B: Recruitment, Retention & Promotion; Performance Standard 7B
    - • Training and Staff Development
  - ▪ Section C: Staff Ethics; Performance Standard 7C
    - • Code of Ethics
  - ▪ Section D: Facility Administration; Performance Standard 7D
    - • Mission
    - • Policies and Procedures
- o **Appendices**
  - ▪ Appendix A: Classification Guidelines
  - ▪ Appendix B: Guidelines for Institutional Security Levels
  - ▪ Appendix F: Health Care Outcome Measures Worksheet

- ▪ **American Correctional Association Core Jail Standards**
  - o **II. Security:**
    - ▪ Performance Standard: Protection from Harm 2A
    - ▪ Expected Practices
      - • 1-CORE – 2A – 01 Control
      - • 1-CORE – 2A – 02 Correctional Officers' Posts
      - • 1-CORE – 2A – 03 Personal Contact Between Staff and Inmates
      - • 1-CORE – 2A – 09 Staffing
    - ▪ Intake/Admissions
      - • 1-CORE – 2A – 13 Legal Commitment and Medical Review
      - • 1-CORE – 2A – 14 Admission
    - ▪ Health Screening
    - ▪ Suicide Screening
    - ▪ Alcohol and Drug Screening
    - ▪ Assignment to Initial Housing Area Based on Their Immediate Needs and Security
    - ▪ Classification and Separation
      - • 1-CORE – 2A – 16 Objective Classification System
      - • 1-CORE – 2A – 17 Separation in Classification

000617

- Special Management Inmates
  - 1-CORE – 2A – 21 Segregation for Protection
  - 1-CORE – 2A – 22 Health Care
  - 1-CORE – 2A – 24 Observation of Special Management Inmates
- o **IV. Care:**
  - Performance Standard: Continuum of Health Care Services 4C
  - Expected Practices
    - 1-CORE – 4C – 01 Access to Care/Clinical Services
    - 1-CORE – 4C – 02 Continuity of Care/Referrals
    - 1-CORE – 4C – 07 Chronic Care
    - 1-CORE – 4C – 09 Health Screens
      - o Mental Health
      - o Current Medications
      - o Health History
      - o Suicide Assessment
      - o Detoxification
      - o Observation Level of Behavior
      - o Referral Plan
      - o Process for Medical Disposition, Medical, Mental, Detoxification
    - 1-CORE – 4C – 10 Intra-System Transfer and Health Screening
    - 1-CORE – 4C – 11 Health Appraisal
    - 1-CORE – 4C – 12 Access to Mental Health and Substance Abuse Service Programs
      - o Mental Health
      - o Referral
      - o Crisis Intervention
      - o Stabilization
    - 1-CORE – 4C – 14 Social Detoxification
    - 1-CORE – 4C – 15 Pharmaceuticals
  - Performance Standard: Health Services Staff 4D
  - Expected Practices: Health Authority
    - 1-CORE – 4D – 03 Provision of Treatment
    - 1-CORE – 4D – 18 Health Records
- o **VI. Justice:**
  - Performance Standard: Inmate Rights 6A
  - Expected Practices
    - 1-CORE – 6A – 06 Protection from Abuse
  - Performance Standard: Inmate Rights Fair Treatment 6B
    - 1-CORE – 6B – 03 Disabled Inmates
- o **VII. Administration and Management:**
  - Performance Standard: Recruitment, Retention and Promotion; 7B Staff, contractors and volunteers demonstrate competency in their assignments
  - Expected Practices
    - 1-CORE – 7B – 02 Training and Staff Development
    - 1-CORE – 7B – 03 Pre-Service and Annual Training

{00722407.DOCX}                          15 | P a g e

000618

- 1-CORE – 7B – 04 Training Prior to Assuming Duties
- 1-CORE – 7B – 05 In-Service Training
- Performance Standard: Facility Administration 7D
  - 1-CORE – 7D – 04 Inmate Records
- **American Correctional Association, 2014 Standards Supplement**
  - Core Jail Standards (CORE), 1st Edition
  - Performance – Based Standards for Correctional Health Care in Adult Correctional Institutions (HC) 1st Edition
  - Appendix A: Guidelines for Institution Security Levels
  - Appendix B: Classification Guidelines
  - Appendix E: ACA Health Care Outcome Measures, Technical Guidance Health Care Outcome Measures
- **American Bar Association, Standards for Criminal Justice, Third Edition, Treatment of Prisoners**
  - **Part I, General Principles**
    - Standard 23 – 1.1 General Principles Governing Imprisonment
    - Standard 23 – 1.2 Treatment of Prisoners
  - **Part II, Intake and Classification**
    - Standard 23 – 2.1 Intake Screening
    - Standard 23 – 2.2 Classification System
    - Standard 23 – 2.3 Classification Procedures
    - Standard 23 – 2.4 Special Classification Issue
    - Standard 23 – 2.5 Health Care Assessment
    - Standard 23 – 2.6 Rationales for Segregated Housing
    - Standard 23 – 2.8 Segregated Housing and Mental Health
  - **Part V, Personal Security**
    - Standard 23 – 5.1 Personal Security and Protection from Harm
    - Standard 23 – 5.5 Protection of Vulnerable Prisoners
  - **Part VI, Health Care**
    - Standard 23 – 6.1 General Principles Governing Health Care
    - Standard 23 – 6.2 Response to Prisoners' Health Care Needs
    - Standard 23 – 6.3 Control and Distribution of Prescription Drugs
    - Standard 23 – 6.5 Continuity of Care
    - Standard 23 – 6.11 Services for Prisoners with Mental Disabilities
    - Standard 23 – 6.12 Prisoners with Chronic or Communicable Diseases
  - **Part VII, Personal Dignity**
    - Standard 23 – 7.1 Respect for Prisoners
    - Standard 23 – 7.2 Prisoners with Disabilities and Other Special Needs
  - **Part X, Administration and Staffing**
    - Standard 23 – 10.1 Professionalism
    - Standard 23 – 10.2 Personnel Policy and Practice
    - Standard 23 – 10.3 Training
    - Standard 23 – 10.4 Accountability of Staff

000619

- o **Part XI, Accountability and Oversight**
  - Standard 23 – 11.1 Internal Accountability
  - Standard 23 – 11.2 External Regulation and Investigation
  - Standard 23 – 11.3 External Monitoring and Inspection
  - Standard 23 – 11.4 Legislative Oversight and Accountability

- **National Commission on Correctional Health Care, Standards for Health Services In Jails, 2014**
  - o Section A: Governance and Administration
    - J – A – 01 Access to Care
    - J – A – 02 Responsible Health Authority
    - J – A – 05 Policies and Procedures
    - J – A – 08 Communication On Patients' Health Needs
  - o Section C: Personnel and Training
    - J – C – 04 Health Training for Correctional Officers
    - J – C – 05 Medication Administration Training
    - J – C – 08 Health Care Liaison
    - J – C – 09 Orientation for Health Staff
  - o Section D: Health Care Services and Support
    - J – D – 01 Pharmaceutical Operations
    - J – D – 02 Medication Services
    - J – D – 05 Hospital and Specialty Care
  - o Section E: Patient Care and Treatment
    - J – E – 02 Receiving Screening
    - J – E – 04 Initial Health Assessment
    - J – E – 05 Mental Health Screening and Evaluation
    - J – E – 09 Segregated Inmates
    - J – E – 12 Continuity and Coordination of Care During Incarceration
  - o Section G: Special Needs and Services
    - J – G – 01 Chronic Disease Services
    - J – G – 02 Patients with Special Health Needs
    - J – G – 03 Infirmary Care
    - J – G – 04 Basic Mental Health Services
    - J – G – 06 Patients with Alcohol and Other Drug Problems
    - J – G – 07 Intoxication and Withdrawal
  - o Section I: Medical – Legal Issues
    - J – I – 02 Emergency Psychotropic Medication
- International Covenant on Civil and Political Rights (ICCPR) Article 7, Article 10 and Article 14
- International Human Rights Law – Right to Legal Access and Due Process; Right to Liberty; Freedom from Arbitrary Detention; Prohibition on Torture and Cruel, Inhumane or Degrading Treatment
- Standard Minimum Rules for Treatment of Prisoners; Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955 and approved by the Economic and Social Council by its Resolutions 663c (XXIV) of July 31, 1957 and 2076 (LXII) of May 13, 1977

- United Nations Human Rights Commission Standard Minimum Rules for the Treatment of Prisoners

## C. Relevant Scholarly Articles and Research Studies

During my review of the Greene matter, I spent a portion of my preparation time researching scholarly articles and studies that were related to the factual events surrounding this incident. While not every article or study is directly applicable to the findings in the Greene matter, I have listed them as a record of my research. Information found that was useful and supportive of my opinions is high-lighted in my report. It should also be mentioned that articles from the publication "Prison Legal News" are considered informative material that are also a strong basis for applicable case law. Although I am not a trained lawyer, I have always found this material helpful for operating a correctional facility. With material of this nature and my years of experience I have developed "other specialized knowledge" to address these matters

- Sheriff's Guide to Effective Jail Operations, U.S. Department of Justice, National Institute of Corrections
- Jail and the Constitution; An Overview, U.S. Department of Justice, National Institute of Corrections
- Inmate Behavior Management: The Key to a Safe and Secure Jail, U.S. Department of Justice, National Institute of Corrections
- Causes and Prevention of Violence in Prisons, Ross Homel and Carleen Thompson, Griffith University, 2005
- National Institute of Corrections, Desk Guide Ch.11 Mental Health, Lisa Boesky, PhD.
- Prisons and Prisoners' Right: An Overview, law.cornell.edu/wex/prisoners'rights
- Jailhouse Lawyer's Manual, View a Previous Edition of the JLM, Columbia Human Rights Law Review, 2016, Chapter 24, Your Right to be Free From Assault by Prison Guards and Other Prisoners
- Jail Standards and Inspection Programs, Resource and Implementation Guide, U.S. Department of Justice, National Institute of Corrections
- National Institute for Jail Operations, The First Resource for Jails, Effective Inmate Supervision: The Foundation for Jail Safety and Security, Rod Miller
- Don't Confuse Observation with Inmate Supervision, Rod Miller, CRS, August 2009, National Institute of Corrections
- The Foundation for Safety and Security, Effective Inmate Supervision, Sight Lines Have Limits, by Rod Miller, National Institute for Jail Operations, 2016
- Inmate Supervision and Management, National Institute of Corrections, Corrections from the Field, 2016
- Staff/Inmate Ratios in Jails, NIC Information Center, Tom Reid, 2012
- Know Your Rights: Prison and Jail Conditions, Law Office of the Southern Center for Human Rights, September 2010
- Know Your Rights: Disciplinary Sanctions and Punishment; November 2015, ACLU National Prison Project
- Challenging the Conditions of Prisons and Jails, A Report on Section 1983 Litigation, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics

- Jail Vulnerability Assessment: A Systems Approach to Improve Safety and Security, December 2008, U.S. Department of Justice, National Institute of Corrections, Rod Miller and John E. Wetzel
- Punitive Conditions of Prison Confinement; An Analysis of Pugh v. Locke and     Federal Court Supervision of State Penal Administration Under the Eighth Amendment, American University – Washington College of Law; May 01, 1977, Ira Robbins
- National Institute of Corrections; Objective Jail Classification Systems: A Guide for Jail Administrators
- Texas Department of Criminal Justice, Correctional Institutions Division; The Advantages of an Objective Classification System
- Northpointe, Institute for Public Management, Inc.; Classification Implementation Manual for Smaller Jails
- The Importance of Inmate Classification in Small Jail, by Tim Brennan, Ph.D. and David Wells, Northpoint
- Jail Classification: Improving Link to Intermediate Sanctions, Dave Wells and Dr. Tim Brennan, Corrections Today Magazine, February 1995, Northpointe
- Corrections.com; A Look at Subjective and Objective Classification
- The National Sheriff's Association; Jail Classification and Discipline
- National Institution of Corrections; Internal Prison Classification Systems, Case Studies in their Development and Implementation
- National Institution of Corrections; Comprehensive Objective Prison Classification, Participant Manual
- National Institution of Corrections; Objective Prison Classification, A Guide for Correctional Agencies
- National Institution of Corrections; Classification of High-Risk and Special Management Prisoners, A National Assessment of Current Practices
- Native American and Alaskan Technical Assistance Project; Project Guide: Objective Classification Analysis
- National Institute of Corrections, Revalidating External Prison Classification Systems; The Experience of Ten States and Model for Classification Reform
- National Institute of Corrections, Prison Classification Peer Training and Strategy Session: What's Happening with Prison Classification Systems? September 6-7, 2000 Proceeding, February 15, 2001, by Patricia L. Hardyman, PhD., and Terri Adams-Fuller, M.D.
- National Institute of Corrections, Findings in Prison Classification and Risk Assessment, by James Austin, PhD., June 25, 2003
- Guidelines for Implementing An Objective Classification System in Jails, Northpointe, Institute for Public Management, Inc., by Tim Brennan, PhD., and Dave Wells, President
- The Immigration Detention Risk Assessment, Georgetown Immigration Law Journal, Fall 2014, by Mark Noperi and Robert Koulish
- RCA Custody Classification Determination, Report RCA Baltimore Data
- INS, Detention Standard, Detainee Classification System, February 11, 2002
- INS, Detainee Classification System, Classification Reassessment Form Instructions, February 11, 2002
- ICE, PBNDS, 2011, As Modified by February 2013 Errata, 2.2 Custody Classification Systems
- The Origin of "deliberate indifference", Cases in Correctional Health Ultra Risk Advisor

{00722407.DOCX}                    19 | P a g e

000622

- Duhaime's Law Dictionary, Deliberate Indifference definition
- Elements of Change, Evidenced-Based Practices Implementation for Capacity (EPIC), Office of Research & Statistics, Division of Criminal Justice, Colorado Department of Public Safety, Volume 16/Number 1, May 2012
- Evidence-Based Practices; A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems; April 16, 2010, National Institute of Corrections
- Correctional Best Practices; "What Works in Corrections," Using Evidence to Inform Decision-Making
- Real or perceived issue: Correspondence from DOJ to Los Angeles County Counsel re: Mental Health Care and Suicide Prevention Practices in Los Angeles County Jails, June 4, 2014, Jonathan Smith and Andre Birotte, Jr.
- National Sheriff's Association, Institute for Jail Operations; Inmate Deaths Raise Questions About Jail Detox Procedures
- Detoxification of Chemically Dependent Inmates; Federal Bureau of Prisons Clinical Practice Guidelines, February 2014
- National Commission on Correctional Health Care; Opioid Detoxification Guideline
- Alcoholism and Drug Abuse Weekly, Opioid Withdrawal Deaths In Jails: Preventable If Medical Standards Are Followed, July 25, 2016, Alison Knopf
- Legal Defense Trust Training Bulletin: Understanding the Dynamics of Sudden In-Custody Deaths, Michael P. Stone, Riverside Sheriff's Association, April 2006, Vol. IX/Issue No. 4
- Man's Alcohol Withdrawal Death in Jail Could Have Been Avoided, Family Says, by Victoria Kim, 06/08/16
- Treatment of Alcohol Withdrawal, Hugh Myrick, M.D., and Raymond F. Anton, M.D., Alcohol Health & Research World, Vol. 22, No. 1, 1998
- Rehabs.com: How Improperly Detoxing Can Kill You, April 26, 2013
- Complications of Alcohol Withdrawal: Pathophysiological Insights, Louis A. Trevisan, M.D., Nashaat Boutros, M.D., Ismene L Petrakis, M.D., and John H. Krystal, M.D., Alcohol Health & Research World, Vol. 22, No. 1, 1998
- Wikipedia: Alcohol withdrawal syndrome
- Wikipedia: Delirium Tremens
- Alcohol Abuse and Alcoholism: What are the Differences; Medically reviewed by Timothy J. Legg, PhD, CRNP on May 12, 2017; Written by Rose Kivi, Elizabeth Boskey, PhD and Ana Gotter, Healthline Medicine 2005
- Annals of Family Medicine, Defining Comorbidity: Implications for Understanding Health and Health Services; Jose M. Valderas, MD, PhD, MPH, Barbra Starfield, MD, MPH, Bonnie Sibbald, MSc, PhD, Chris Salisbury, MB, ChB, MSc, FRCGP, Martin Roland, CBE, DM, FRCGP, FRCP, FMedSci, 2009, July
- Revised Psychiatric Diagnosis Manual DSM-V, by Rick Nauert, PhD, Scientifically Reviewed, Oct 2015
- In-Custody Acute Alcohol Withdrawal, by Pamela Kulbarsh, July 10, 2013
- Punished for Addiction: Women Prisoners Dying From Lack of Treatment, Zoe Greenberg and Sharona Coutts, Rewire News, April 1, 2015
- What would you do in this situation? Comparing clinical judgement., by Catherine Knox, Essentials of Correctional Nursing, June 10, 2015

- Death Without Detox: Opiate and Opioid Withdrawal in U.S. Jails, by Nadia Sheikh, 07-11-16
- Alcohol Withdrawal: Jail Nurse Alert, by Lorry Schoenly
- U.S. Jails Are Killing People Going Through Opioid Withdrawals, by Jeremy Galloway, The Influence, 03/29/2016, Updated Dec 06, 2017
- Alcohol and Opiate Withdrawal in U.S. Jails, by Kevin Fiscella, M.D., M.P.H., Naomi Pless, M.D., Sean Meldrum, M.S., and Paul Fiscella, J.D., American Journal of Public Health, September 2004
- How to recognize opiate withdrawal in inmates, by Lorry Schoenly, PhD., RN, CCHP, CorrectionsOne.com, Oct. 16, 2015
- Is It Possible to Detox While Incarcerated? The River Source Addiction Treatment Blog
- Go to Jail. Die From Drug Withdrawal. Welcome to the Criminal Justice System., Julia Lurie, Mother Jones, Feb. 5, 2017
- Federal Bureau of Prisons Clinical Guidance: Detoxification of Chemically Dependent Inmates, February 2014
- Safe Detox in a Jail Setting: A Corrections Guide, Nancy Wolf, PMHNP/FNP-C, M. Gail Hill, PhD., CRNP, University of Alabama, Birmingham, 11/09
- CIWA Scale for Alcoholism, By Jennifer Chait 2006-2019
- Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised (CIWA-AR)
- Alcohol Withdrawal Assessment Scoring Guidelines (CIWA-AR)
- CIWA-AR for Alcohol Withdrawal, Objectifies Alcohol Withdrawal Severity to Help Guide Therapy, MDCALC, 2005 – 2019
- Clinical Institute Withdrawal Assessment for Alcohol – Revised might be an unreliable tool in the management of alcohol withdrawal, Dr. Erin Knight, MD, CCFP, ISAM
- The "Prediction of Alcohol Withdrawal Severity Scale" (PAWSS): systematic literature review and pilot study of a new scale for the prediction of complicated alcohol withdrawal syndrome, Maldonado, Sher, Ashouri, Hills-Evans, Swendsen, Lolak, Miller, 2019
- PAWSS tool identifies alcohol withdrawal syndrome risk, by Sharon Worcester, June 8, 2016
- PAWSS – A New Tool Determine Risk of Severe Alcohol Withdrawal, 9/26/ 2016
- Prediction of Alcohol Withdrawal Severity Scale (PAWSS), Maldonado, 2014
- Preventing death: Hamilton County addicted inmates now get meds for opioid withdrawal, Terry DeMio, Enquirer.com, May 23, 2018
- Detoxification (Housing units), Bernalillo County Sheriff's Office Policy
- Detoxification Program, Bernalillo County Metropolitan Detention Center, Correctional Medical Services, William M. Shannon, M.D.
- Medical Policy and Procedure Manual, Residents with Alcohol and Other Drug Problems, Policy Number: J-G-07, LaSalle Corrections Southeast
- Medical Policy and Procedure Manual, Intoxication and Withdrawal, Policy Number: J-G-05, LaSalle Corrections Southeast
- 7 Facts About Alcohol Withdrawal in Corrections, Jail Medicine, CorrectionOne.com, Jeff Keller, March 19, 2019
- Recent Ohio Inmate Deaths Demonstrate Dangers of Drug, Alcohol Withdrawal in Jail, CorrectionsOne.com, Dean Narciso, The Columbus Dispatch, March 27, 2019

- No Immunity for Detainee's Death Due to Alcohol Withdrawal; $1.23 Million Settlement on Remand, Prison Legal News, January 2014
- New York Prisoner Awarded Almost $16 Million Due to Poor Medical Treatment, by Christopher Zoukis, Prison Legal News, January 2014
- Deliberate Indifference Medical Claim Accrues Upon Discovery of Injury and its Cause, Prison Legal News, February 2014
- Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare, by Greg Dober, Prison Legal News, March 2014
- $2.25 Million Jury Verdict against LCS in Texas Prisoner Death Suit, by Matt Clarke, Prison Legal News, April 2014
- Eighth Circuit: No Qualified Immunity for Detainee's Overdose Death, by Mark Wilson, Prison Legal News, July 2014
- Seventh Circuit: No Qualified Immunity for Diabetic Detainee's Death, by Mark Wilson, Prison Legal News, July 2014
- Failure to Treat Tuberculosis Suit Survives Summary Judgment, Settles for $1.4 Million, by Derek Gilna, Prison Legal News, August 2014
- $750,000 Settlement for Washington State Prisoner's Wrongful Death, by Carrie Wilkinson, Prison Legal News, October 2014
- Georgia Jail Pays $937,500 in Wrongful Death Settlement, Prison Legal News, May 2015
- California Pays $585,000 to Settle Suit by Prisoner Who Lost Eye Due to Poor Medical Care, by Michael Brodheim, Prison Legal News, May 2015
- Virginia Must Improve Prison Medical Care Under Proposed Class-action Settlement
- Illinois Prisoner Receives $12 Million Jury Award in Medical Neglect Suit, by Matt Clarke, Prison Legal News, March 2015
- $290,000 Judgment for Failure to Treat Ruptured Appendix Affirmed, by David Reutter, Prison Legal News, September 2015
- $1.15 Million for Florida Pretrial Detainee's Death, by David M. Reutter, Prison Legal News, August 2015
- 1.56 Million Settlement for Texas Jail Death Due to Drug Withdrawal, by Matt Clarke, Prison Legal News, May 2015
- Pennsylvania Detainee's Estate Claims Financial Incentive Motive for Denial of Medical Care; $325,000 Settlement, by David Reutter, Prison Legal News, November 2015
- San Diego Deputies Faulted for Jail Death, by Christopher Zoukis, Prison Legal News, August 2015
- West Virginia City Settles Suit Over Jail Prisoner's Death for $460,000, by Matt Clarke, Prison Legal News, August 2015
- $12,500 Settlement for Pennsylvania Prisoner Denied Medication, by David Reutter, Prison Legal News, April 2015
- Overdose, Taser, and Restraint Chair Combine to Kill Washington Prisoner, Prison Legal News, April 2015
- $1.75 Million Settlement in Michigan Detainee's Heroin Withdrawal Death, by David M. Reutter, Prison Legal News, June 2015
- $1.35 Million Award in Montana Jail Prisoner's Alcohol Withdrawal Death, by David M. Reutter, Prison Legal News, June 2015

- New Mexico Jail Pays $500,000 for Prisoner's Death, by Derek Gilna, Prison Legal News, July 2015
- $400,000 Settlement in Suit Over Minnesota Prisoner's Death Due to Medical Neglect, by Matt Clarke, Prison Legal News, July 2015
- Jailhouse Medicine: A Private Contractor Flourishes Despite Controversy Over Prisoner Deaths, by Brian Joseph, FairWarning, July 15, 2015
- $1 Million for Medical Neglect Death of Wisconsin Jail Prisoner, by David M. Reutter, Prison Legal News, June 2015
- New Mexico County Jail Pays 1.5 Million to Mentally Ill Prisoner, by Derek Gilna, Prison Legal News, October 2015
- Pennsylvania Detainee's Estate Claims Financial Incentive Motive for Denial of Medical Care; $325,000 Settlement, by David Reutter, Prison Legal News, November 2015
- Oregon: Medical Neglect of Diabetic Detainee Nets $260,000 Settlement, by Mark Wilson, Prison Legal News, November 2015
- Oregon Mental Patient's Death Nets $1.4 Million, by Mark Wilson, Prison Legal News, May 2015
- Minnesota County Jail Pays $1 Million in Medical Neglect Case, by Lonnie Burton, Prison Legal News, December 2015
- Tragic Death at Washington Jail Results in Changes, $1.3 Million Settlement, by Lonnie Burton, Prison Legal News, January 2016
- Georgia: $453,000 Jury Verdict against Private Jail Medical Contractor, by David Reutter, Prison Legal News, January 2016
- Connecticut Prisoner Obtains Settlement in Civil Rights Case, by Derek Gilna, Prison Legal News, January 2016
- $130,000 Settlement in Minnesota Prisoner's Medical Negligence Suit, by Matt Clarke, Prison Legal News, January 2016
- Ohio Prisoner's Estate Awarded $350,000, by Derek Gilna, Prison Legal News, January 2016
- Seventh Circuit Reject's Prisoner's 1983 Claim but Criticizes Controlling Precedent, by Derek Gilna, Prison Legal News, January 2016
- Civil Rights Advocates Laud Healthcare Settlement with Arizona Prison System, by Joe Watson and Derek Gilna, Prison Legal News, February 2016
- Defense Verdict in Kentucky Prisoner's Death; Appellate Court Reverses, by David Reutter, Prison Legal News, April 2016
- Louisiana Jail Detainee's Death Leads to FBI Investigation, Charges, Prison Legal News, February 2016
- Excited Delirium Syndrome: Medical Condition or Cover-Up?, by David M. Reutter, Prison Legal News, April 2016
- $3.5 Million for South Carolina Prisoner's Death Due to Deliberate Indifference, Prison Legal News, April 2016
- $550,000 Jury Award for Failure to Treat Prisoner's Broken Jaw, Prison Legal News, April 2016
- $11.3 Million Jury Award for Former Colorado Jail Prisoner, by Matt Clarke, Prison Legal News, April 2016
- $81,200 for North Carolina Prisoner's Estate in Breach of Duty Suit, Prison Legal News, September 2016

- Settlements in St. Louis Jail Detainee's Heroin Withdrawal Death, by David Reutter, Prison Legal News, March 2016
- Federal Lawsuit Claims Negligence Caused Pennsylvania Prisoner's Heroin Overdose Death, by Christopher Zoukis, Prison Legal News, April 2016
- Settlement in California Jail Suit Includes $4.8 Million in Attorney Fees, Costs, by Derek Gilna, Prison Legal News, April 2016
- Hawaii Prisoner Awarded $7.2 Million after Losing His Fingers and Feet, by Christopher Zoukis, Prison Legal News, August 2016
- Untreated Intoxication Death at Massachusetts Jail Results in $232,500 Settlement, Prison Legal News, September 2016
- Private Jail Contractor's Insurance Excludes Coverage of Detainee's Death, Prison Legal News, December 2016
- New Mexico County Officials Settle Jail Prisoner's Suit for $750,000, Prison Legal News, December 2016
- $500,000 in Settlements after Utah Prisoner Dies when Medical Technician Doesn't Show up for Work, by Christopher Zoukis, Prison Legal News, December 2016
- San Diego County Settles Prisoner Overdose Death for $2.3 Million, by Derek Gilna, Prison Legal News, July 2017
- Correctional Medical Care Pays $425,000 Settlement in Prisoner's Opiate Withdrawal Death, Prison Legal News, January 2017
- California County Settles Class-action Lawsuit Over Jail Medical and Mental Health Care, by Matt Clarke, Prison Legal News, January 2017
- $325,002 Award to Michigan Prisoner Denied Medical Care for Joint Pain, Prison Legal News, January 2017
- New York: Nearly $10 Million in Settlements Over Denial of Medical Care at Rikers Island, Prison Legal News, January 2017
- $60,000 for Nevada Prisoner Forced to Remove His Own Teeth, by Derek Gilna, Prison Legal News, March 2017
- Utah Attorney Plans Wrongful Death Suit Against County Jail, Prison Legal News, June 2017
- $285,000 Settlement in Wrongful Death Suit Against Ohio Jail, Prison Legal News, November 2017
- Florida Prisoners Denied Hernia Surgery Reach $2.1 Million Settlement, by David M. Reutter, Prison Legal News, November 2017
- Washington State Pays $6.5 Million to Family of Diabetic Prisoner Who Died, Prison Legal News, November 2017
- Prisoners Not Required to Take Unspecified Steps to Exhaust Administrative Remedies, Prison Legal News, February 2017
- NY State Prisoner Settles Case Over DOC's Denial of Hepatitis C Treatment, by Derek Gilna, Prison Legal News, April 2017
- $175,000 Settlement for BOP's Deliberate Indifference to Mentally Ill Prisoner, by Derek Gilna, Prison Legal News, April 2017
- Drug Addicts Suffer Preventable Deaths in U.S. Jails, by Christopher Zoukis, Prison Legal News, January 2018
- $300,000 Settlement in Suit Over Death of Intoxicated Man Abandoned by Deputies, by Matt Clarke, Criminal Legal News, May 2018

- Did You Know? Facts from the National Center for Jail Operations, Sheriff & Deputy, November/December 2017
- Turning Conflict into Conversation: Redefine your response to conflict to better meet interpersonal needs, by Kimberly A. Miller, Ph.D., Sheriff & Deputy, March/April 2018
- Heroin-Addicted Offenders and Sobriety Upon Release from Jail, by Rebecca Foster, pgs. 20-24, American Jails Magazine, January/February 2018
- The affliction of addiction: Opportunities for chaplains in the face of substance use disorders, by Sylvia Moseley, Corrections Today, September/October 2017
- On Every Corner, by Dr. Marion Boss and Marc O'Neill, Corrections Today, September/October 2017
- Epicenter of the Epidemic: Opioids and Jails, by Marc F. Stern and Ned Newlin, American Jails Magazine, May/June 2018
- Management Techniques for Opioid-Dependent Inmates, by Kevin Fiscella and Brent Gibson, American Jails Magazine, May/June 2018
- Inmates not always treated for addiction, mental illness, by Kyle Campbell, Capital News Service, April 19, 2013
- Corrections Division Information, Eaton County Jail, Eaton County, Michigan

## D. Related Case Summaries and Briefs

Here again, in the preparation of the Greene report I have reviewed known case law that may be similar to the factual events of this case. Corrections administrators must be familiar with these legal findings if they are ever to operate a constitutional facility. As I have indicated earlier, I am not a lawyer but as a corrections administrator I find the knowledge derived from these case briefs extremely helpful in correctional management. While not every case listed is applicable to the findings in the Greene matter, I have listed them as a record of the research done to prepare my opinions here. The cases summarized in the reports of "Prison Legal News" and the AELE Monthly Law Journal are among these recorded cases

- Kingsley v. Hendrickson, No. 14-6368 (U.S. 2015)
- Sandin v. Conner, 515 U.S. 472 (1995)
- Farmer v. Brennan, 511 U.S. 825 (1994)
- Helling v. McKinney, 509 U.S. 25 (1993)
- Hudson v. McMillan, 503 U.S. 1 (1992)
- Graham v. Conner, 490 U.S. 386 (1989)
- Turner v. Safley, 482 U.S. 78 (1987)
- Bell v. Wolfish, 441 U.S. 520 (1979)
- Estelle v. Gamble, 429 U.S. 97 (1976)
- Mathews v. Eldridge, 424 U.S. 319 (1976)
- Wolff v. McDonnell, 418 U.S. 539 (1974)
- Palko v. Connecticut, 302 U.S. 319 (1937)
- Lance Jett, Plaintiff – Appellant v. M. Penner, D. Peterson, and Cheryl K. Pililer, Warden – Defendants – Appellees, Case No. 04-15882 (2006) 9th Circuit
- Martinez v. Garden, No. 05-4019, 2005 U.S. App Lexis 27179 (10th Circuit)
- Belbachir v. County of McHenry, #13-1002, 726, F. 3rd 975 (7th Cir.) 2013
- Belbachir v. County of McHenry, #06-C-1392, U.S. Dist. Court (ND. Ill.)

- Pittman, Hamilton v. County of Madison, Illinois, 7th Circuit, #12-3233, 2014
- Johnson v. Connor, Case No. 12-15228, 203 U.S. App, Lexis 13831 (11th Cir.)
- Barkes v. First Corr. Med., Inc., 12-3074 U.S. App. Lexis 17261 (3rd Cir.)
- Buechel v. United States, #13-2278, 2014 U.S. App. Lexis 4260 (7th Cir.)
- Kuhne v. F1 Dept. of Corrections, #12-13387, 2014 U.S. App. Lexis 2460, 24 Fla., L. Weekly Fed. C. 1013 (11th Cir.)
- Kindle v. Kent Herrinian, No. 13-2234, United States Court of Appeals, Sixth Circuit, Decided: August 18, 2015
- Chase v. Correctional Medical Care, U.S.D.C. (N.D. NY), Case No. 1:14-cv-00474-DNH-TWD
- Konscler v. Schuylkill County, U.S.D.C. (M D. Penn.), Case No. 3:15-cv-00588-JMM
- Hernandez v. County of Monterey, U.S.D.C. (N.D. Cal.), Case No. 5:13-cv-02354-PSG
- Bankhead v. Gregg County, U.S.D.C. (E.D. Tex.), Case No. 2:11-cv-00279-JRG
- Kenney v. Montgomery County, U.S.D.C. (E.D. Penn.), Case No. 2:13-cv-02590-EGS
- Victorianne v. County of San Diego, U.S.D.C. (S.D. Cal.), Case No. 3:14-cv-02170-WQH-BLM
- Thompson v. King, 730 F.3d 742 (8th Cir. 2013)
- Yokosuk v. City of Bluefield, U.S.D.C. (S.D. WV), Case No. 1:12-cv-00229
- Jackson v. County of Allegheny, U.S.D.C. (W.D. Penn.), Case No. 2:10-cv-01756-MPK
- Jackson v. County of Allegheny, U.S.D.C. (W.D. Penn.), Case No. 2:12-cv-01813-CB-MPK
- Swiridowsky-Muckle v. Siopes, U.S.D.C. (D. Mass.), Case No. 1:15-cv-11777-RGS
- Fulton v. Macon County, U.S.D.C. (E.D. Ky.), Case No. 2:15-cv-00031-WOB-JGW
- Keller v. County of Kalamazoo, U.S.D.C. (W.D. Mich.), Case No. 1:12-cv-00843-PLM
- Stickler v. Blaine County Human Rights Commission, No. 0105014403
- Blaine County Hill County v. Human Rights Commission, DA-16-0076
- Scullark v. Garin, U.S.D.C. (D. MN), Case No. 0:12-cv-01505-RHK-FLN
- Smith v. Lenawee County, U.S.D.C. (E.D. Mich.), Case No. 2:09-cv-10648-DML-MJH
- Estate of Leonard v. Racine County, U.S.D.C. (E.D. Wisc.), Case No. 2:09-cv-00699-LA
- Crisp v. N.C. Dept. of Public Safety/Adult Corrections, North Carolina Industrial Commission, I.C. No. TA-23089
- Youell v. Correctional Medical Services, U.S.D.C. (E.D. Missouri), Case No. 4:10-cv-01180-TIA
- McConnell v. Butler County, U.S.D.C. (S.D. Ohio), Case No. 1:13-cv-00210-MRB
- Troche v. Crabtree, 814 F.3d 795 (6th Cir. 2016)
- Currie v. Chhabra, 728 F. 3rd, 626, (7th Cir. 2013)
- Satterwhite v. Dy, No. 2:2011cv00528, 2013 U.S. Dist. Lexis 9178 (W.D. Wash.) Jan. 23, 2013
- Devbrow v. Kalu, 705, F. 3rd, 765 (7th Cir. 2013)
- Garcia v. LCS Corrections Services, USDC, (S.D. Tex), Case No. 2:11-CV-00004
- Soria v. Washington DOC, Thurston County Superior Court (WA), Case No. 13-2-02598-9
- Fox v. Barnes, U.S.D.C. (N.D. Ill.), Case No. 1:09-CV-05453
- Rodrigue v. Grayson, 557 Fed. Appx. 341 (5th Cir. 2014)
- Millner v. Multnomah County, U.S.D.C. (D. Or.), Case No. 3:13-cv-01689-MO

- Green v. Chavez, U.S.D.C. (D. NM.), Case No. 1:12-cv-01260-MCA-KBM
- DeGraw v. Gualtieri, U.S.D.C. (M.D. Fla.), Case No. 8:11-cv-00720-EAK-MAP
- Lucero v. Nguyen, U.S.D.C. (C.D. Cal.), Case No. 2:09-CV-02151-AGR
- Schuler v. Otterblad, U.S.D.C. (D. Minn.), Case No. 0:13-CV-01151-SRN-TNL
- Sanzo v. Cox, U.S.D.C. (D. Nev.), Case No. 3:14-cv-00030-RCJ-WGC
- Garcia v. LCS Corrections Services, USDC, (S.D. Tex), Case No. 2:11-CV-00004
- Estrada v. Crowther, U.S.D.C. (D. Utah), Case No. 2:15-cv-00433-DS
- Persin v. State of Hawaii, First Circuit Court (HI), Case No. 1CC131001571
- Morris v. Bland, U.S.D.C. (D. SC), Case No. 5:12-cv-03177-RMG
- Perry v. Roy, U.S.D.C. (D. Mass.), Case No. 1:10-cv-10769-FDS
- McGill v. Correctional Healthcare Companies, U.S.D.C. (D. Co.), Case No. 1:13-cv-01080-RBJ-BNB
- Corris v. Koenigsmann, U.S.D.C. (N.D. NY), Case No. 9:15-cv-01205-GTS-TWD
- Johnson-Hess v. United States, U.S.D.C. (D. Col.), Case No. 1:16-cv-00117-MEH
- Kensu v. Buskirk, U.S.D.C. (E.D. Mich.), Case No. 2:13-cv-10279-VAR-DRG; 2016 U.S. Dist. LEXIS 151329
- Echevarria v. City of New York, U.S.D.C. (S.D. NY), Case No. 1:13-cv-04921-RMB-RLE
- Copeland v. Jones, U.S.D.C. (N.D. Fla.), Case No. 4:15-cv-00452-RH-CAS
- Stahl v. State of Washington, Spokane County Superior Court (WA), Case No. 142000175
- Davis v. Carter, No. 5-1695, 2006 U.S. App. Lexis 16183 (7th Cir.)
- Plemmons v. Roberts, No. 05-3110, 439 F. 3rd 818 (8th Cir. 2006)
- Gordon v. Frank, No. 05-3981, 2006 U.S. App. Lexis 18299 (8th Cir.)
- Boyd v. Robeson County, No. COA03-1222, 621 S.E. 2d 1 (N.C. App. 2005)
- Vaughn v. Gray, #7-2921, 557 F. 3rd 904 (8th Cir. 2009)
- Jackson v. Lightsey, #13-7291, 2014 U.S. App. Lexis 23830 (4th Cir.)
- Pérez v. Fenoglio, #12-3084, 2015 U.S. App. Lexis 11672 (7th Cir.)
- Black v. State of New York, New York State Court of Claims, Claim No. 115567, UID 2012-018-305
- Cady v. Cumberland County Jail, #13-2040, 2014 U.S. App. Lexis 10416 (1st Cir.)
- Ortiz v. the City of Chicago, #04-C-7423, U.S. Dist. Ct. (N.D. Ill. Nov. 4, 2013)
- DeWitt v. Corizon, Inc., #13-2930, 2014 U.S. App. Lexis 14236 (7th Cir.)
- Nielsen v. Rabin, #12-4313, 746 F.3d 58 (2nd Cir. 2014)
- Diggs v. Ghosh, #16-1175, 850 F.3d 905 (7th Cir. 2017)
- Darrah v. Krisher, #15-4136, 2017 U.S. App. Lexis 13502, 2017 Fed. App. 0163P (6th Cir.)
- Shadrick v. Hopkins Cnty., #14-5603, 2015 U.S. App. Lexis 19386, 2015 Fed. App. 272P (6th Cir.)
- Lewis v. McLean, #16-1220, 2017 U.S. App. Lexis 13184 (7th Cir.)
- Kenny v. Montgomery County, U.S.D.C. (E.D. Penn.), Case No. 2:13-CV-02590-EGS
- Woods v. Madison County, Alabama, Case No. 5:2014cv01964
- Scroggins v. Davis, Case No. 07-15514 (11th Cir.)
- Walker v. Floyd County, (S.D. Ind.), Case No. 4:07-cv-00014-SEB-WGH
- Shearer v. Correctional Healthcare Companies; No. 1:13-CV-00548-KBM-ACT
- Gray v. County of Riverside, U.S.D.C. (C.D. Cal.), Case No. 5:13-cv-00444-VAP-OP

- Robinson v. Integrated Detention Health Services, U.S.D.C. (M.D. Georgia), Case No. 3:12-cv-00020-CAR
- Riddick v. State of Connecticut, U.S.D.C. (d. Conn.), Case No. 3:13-cv-656-SRU
- Thomas v. MN DOC, Washington County District Court (MN), Case No. 82-cv-13-3992
- Fraley-Arpan v. Ohio Department of Rehabilitation and Correction, Ohio Court of Claims, Case No. 2012-03412
- Czaja v. Fackler, 2016 Ky. App. Unpub. LEXIS 131 (Ky. Ct. App. 2016)
- Parsons v. Ryan, U.S.D.C. (D. Ariz.), Case No. 2:12-cv-00601-DKD
- Faziani v. Sierra County Board of County Commissioners, U.S.D.C. (D. N.M.), Case No. 2:14-cv-00592-MJB-CG
- Shields v. Ill. Dept. of Corr., 746 F.3d 782 (7th Cir. 2014), cert. denied
- Griffin v. City of New York, U.S.D.C. (S.D. NY), Case No. 1:14-cv-07329-NRB
- Connors v. Pohlmann, U.S.D.C. (E.D. La.), Case No. 2:15-cv-00101-CJB-JCW
- Judge Troxler of the United States Court of Appeals, Opinion on Distinguishing Deliberate Indifference From Negligence
- International Covenant on Civil and Political Rights (ICCPR) Article 7, Article 10, and Article 14
- International Human Rights Law – Right to Legal Access and Due Process; Right to Liberty; Freedom from Arbitrary Detention; Prohibition on Torture and Cruel, Inhumane, or Degrading Treatment
- Standard Minimum Rules for Treatment of Prisoners; Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955 and approved by the Economic and Social Council by its Resolutions 663c (XXIV) of July 31, 1957 and 2076 (LXII) of May 13, 1977
- United Nations Human Rights Commission Standard Minimum Rules for the Treatment of Prisoners
- AELE Monthly Law Journal, Civil Liability Law Section, February 2017, Civil Liability and Medical Care of Arrestees
- AELE Monthly Law Journal, Civil Liability Law Section, May 2013, Public Protection: Part One, The Physically Ill
- AELE Monthly Law Journal, Civil Liability Law Section, June 2013, Public Protection: Part Two, The Mentally Ill or Deranged
- AELE Monthly Law Journal, Jail and Prisoner Law Section, September 2007, Civil Liability For Inadequate Prisoner Medical Care – An Introduction
- AELE Monthly Law Journal, Jail and Prisoner Law Section, November 2009, Mental Health Care of Prisoners
- AELE Monthly Law Journal, Civil Liability Law Section, March 2013, Public Protection: Intoxicated Prisoners, Part 1
- AELE Monthly Law Journal, Civil Liability Law Section, April 2013, Public Protection: Intoxicated Prisoners, Part 2
- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, January 2014, Medical Care
- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, April 2014, Medical Care
- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, October 2014, Medical Care
- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, December 2014, Medical Care
- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, December 2015, Medical Care

- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, May 2017, Medical Care
- AELE Monthly Law Journal, Jail & Prisoner Law Bulletin, September 2017, Medical Care
- AELE Monthly Law Journal, Monthly Case Digest, February 2015, Medical Care
- AELE Monthly Law Journal, Monthly Case Digest, August 2015, Medical Care

In reviewing the above materials, and my many years of experience, I am able to establish the foundation of my professional opinion/s in the Dwayne Greene matter. Mr. Greene was made to suffer the anguish of unwarranted abuse and personal harm at the hands of those who had a constitutional obligation to protect him. As a result of this abusive indifference and disregard for Mr. Greene's serious and known medical issues by the personnel of the Crawford County Sheriff's Office and those of Northern Lakes Community Mental Health Authority, he was found unresponsive in a holding cell without the benefit of adequate medical care. Mr. Greene's federally protected constitutional right to be free from harm and cruel and unusual punishment was totally ignored. The factual events of this case support my opinion/s herein.

## VI.   **BASIS FOR OPINION**

As a result of the negligence, intentional disregard and obvious indifference found within the Dwayne Greene incident, his federally protected constitutional rights were violated by both the Crawford County Sheriff's Office and Northern Lakes Community Mental Health Authority. From the factual material provided, it is clear that these rights were ignored in a shocking manner as it pertains to his care, custody and control.  All of the material reviewed supports my professional conclusions.  As for the Crawford County Sheriff's Office medical provider, they were never involved with Mr. Greene as they were never present due to staff coverage shortages. All of the negligent acts expressed in this report are the direct fault of the Crawford County Sheriff's Office and their health care provider, Northern Lakes Community Mental Health Authority. This failure to provide acceptable care, custody and control violated the constitutional and statutory rights of Mr. Greene, and if allowed to continue will permit additional inmates to be exposed to the same dangerous failures. Because of the specialized nature and environment of corrections in today's world, correctional staff are expected to make decisions about numerous issues for which they have no formalized training. Failure to do so often results in liability litigation. Correctional personnel do not always have doctors, lawyers, and nurses on hand to consult with. Therefore, it becomes the responsibility of the facility administrator to provide clear policies and procedures, and comprehensive training and supervision to ensure that their staff performs properly. As an expert, I am capable of recognizing failures of the administration to provide these safeguards, i.e. policies, training, and supervision. I qualified this experience and its applicability to my opinions in the Introduction section of my report. In the Greene matter, had policies and procedures been clear, training been comprehensive and clear, and supervision available and aware, his obvious medical issues would have been recognized and he would have been treated properly. Corrections is a unique world, training and supervision must address this, or the Constitution of this country will.

All the conclusions identified in this report are expressed to a degree of professional certainty based upon my review of the available evidence and are analyzed using my specialized training, experience, and knowledge in the field of corrections, all of which are stated above and are more fully expressed in Exhibit A.

I reserve the right to amend or supplement the conclusions expressed in this report based on my review of additional material.

## VII.   OPINION

As I present the opinions which I have in the Greene matter, I start with a factual summary of the opinions I have. All of the conclusions identified in this report are expressed to a degree of professional certainty based upon my review of the available evidence and are analyzed using my specialized training, experience, and knowledge in the field of corrections. These opinions are:

(A) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office was deliberately indifferent to the condition of Dwayne Greene at the time of intake and throughout his incarceration.

(B) It is my opinion to a reasonable degree of professional certainty that the Crawford County Jail Intake form, Booking form, the Medical Screen form, the Mental Health Screen form, the Suicide Prevention form and the Classification form were all inadequate for determining the specialized care that any given inmate may need, especially Mr. Greene. Additionally, the completion of these forms, by jail personnel, was totally lacking and incomplete.  Specifically, forms were not completed, prior booking information was not used, known facts and available information was not considered and none of the questions asked were provided any detailed explanation about the answers given.

(C) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office Policies and Procedures were not comprehensive enough to address the specific issues experienced by Mr. Greene. Further, the policies that were available were not followed as I will enumerate later in this report.

(D) It is my opinion to a reasonable degree of professional certainty that the medical care afforded Mr. Greene was non-existent and not at all appropriate for his known health issues. Additionally, Northern Lakes CMH authority had a responsibility to ensure that the Crawford County Jail staff understood the seriousness of untreated alcohol withdrawals and to ensure that they understood that Mr. Greene needed immediate medical attention. While I am not a medical professional, I am a professional corrections administrator of many years that has monitored the performance of health care providers throughout my career.

(E) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office did not adequately manage the performance of their health care provider.

(F) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office sections of Court Security, Intake, Booking, Classification, Medical and Mental Health Screen and Security, failed to share information about Mr. Greene's condition to the extent that would have ensured he received the care and classification status he needed.

(G) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office Classification Unit never properly established and monitored the treatment and housing assignment of Dwayne Greene. In fact, I cannot determine where an objective classification system is ever utilized.

(H) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office jail security staff failed to adequately monitor the deteriorating condition of Mr. Greene. As a result, he did not receive the lifesaving medical care he needed.

(I) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office training was inadequate. I have based this opinion on the fact that numerous failures of staff performance occurred during the Greene incarceration. Had training been comprehensive in addressing the known events that can and do occur within a jail, many of the failures in the Greene incident would not have happened. In fact, no Crawford County Sheriff's Office correctional staff indicated that they had ever been trained on how to recognize the signs and symptoms of alcohol withdrawals, delirium tremens, or the medical dangers of untreated alcohol withdrawals. This testimony is particularly disturbing in that all but one of named defendants had been through the training entitled Mental Health First Aid.

(J) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office personnel failed to share known and vital information about Dwayne Greene's alcohol use and withdrawal symptoms that would have assisted with his medical care which, in fact, was non-existent.

(K) It is my opinion to a reasonable degree of professional certainty that the Crawford County Sheriff's Office had no acceptable protocols or plan for caring for detoxing inmates.

(L) It is my opinion to a reasonable degree of professional certainty that the supervisors of Crawford County Sheriff's Office, and health care providers, and Northern Lakes CMH, at all levels, failed to monitor the performance of their subordinates as it pertained to the treatment and care of Dwayne Greene. The factual failures of Intake, Booking, Classification, Medical Screen, Security and Medical/Mental health support this opinion.

I have been a correctional practitioner and consultant for more than forty-six years. During this time, I have served as a jail and prison manager at both the state and local level. I have also served on the Florida Governor's Commission for Criminal Justice Standards and Training for over twenty-four years. Subsequently, through my experiences with these assignments I have witnessed and/or reviewed every type of act that can be imagined in the criminal justice arena and I am confident that I can provide opinions in the Dwayne Greene matter.

As an expert in the field of corrections, it is imperative that I objectively consider the factual material offered by both the defense and the plaintiffs. It is further my responsibility to understand the operational constraints about which my opinion has been sought. I too, must rely upon what are considered established and acceptable correctional practices and standards, and the constitutional and statutory governances pertaining to them. In the matter of Dwayne Greene, I have done this and I am certain that the Crawford County Sheriff's Office did not provide what

they had documented through policy to be the appropriate operational procedures, which lead to the numerous violations of their own policies by their employees, as well as to the violations of statutory and constitutional governances. As a result of the Crawford County Jail staff's callous disregard to all of the aforementioned guidelines, Mr. Greene was wrongfully exposed to cruel and unusual punishment, inadequate medical care, non-existent alcohol withdrawal care, obvious indifference, and genuine disregard to his serious medical condition. As a result of these failures, Mr. Greene lost his life at the hands of those who had a constitutional, if not moral, obligation to protect him. Although few correctional administrators are formally trained on the law, it is imperative that they understand it in order to operate their facilities properly. The Constitution, statutory law, and case laws have to be a part of their knowledge and daily expertise. Failures involving reasonableness, disregard, indifference, and cruel and unusual punishment must be recognizable.

Further, in support of my opinions concerning the many failures of the Crawford County Sheriff's Office is the graphic, minute by minute surveillance video of Mr. Greene in his holding cell and that of the actions and non-actions of the jail and health care personnel. From these videos it is regrettably clear that Dwayne Greene's medical condition continues to worsen until he is found unresponsive in his holding cell. These failures also clearly depict the failure to provide care by the correctional staff and the health care personnel.

On December 4th, 2017, Dwayne Greene appeared before the 46th Circuit Court while under the influence of alcohol. As a result of his intoxication in open court, Judge Colin Hunter recessed the hearing to have Mr. Greene's blood alcohol level taken. The court recessed at 12:33 PM and Crawford County Sheriff's Office Bailiff Detmer transfers custody of Mr. Greene to Correctional Officer Katie Tessner. It is not known, at this point, if Bailiff Detmer provided Officer Tessner with any of the information made available pertaining to Mr. Greene from the first portion of the hearing. Although, in his deposition, Bailiff Detmer testified that if he had heard any significant information about Mr. Greene during that portion of the hearing, he would have passed it on. At 1:08 PM, Correctional Officer William Sbonek returns Mr. Greene to custody of Bailiff Detmer for the continuation of his hearing. At the hearing, Judge Hunter was informed of Mr. Greene's blood alcohol level and the hearing continues. Judge Hunter is also informed of Mr. Greene's attempts to quit drinking before and of the withdrawal symptoms he experienced at that time to include seizure like conditions. This information was provided to the court by Mr. Greene's attorney, Don Sommerfield. Mr. Sommerfield also advised the court that Mr. Greene was scheduled to be admitted at Sacred Heart for inpatient treatment for alcoholism in two days. Additionally, when Mr. Greene realized that he was not going to be released, he asked Judge Hunter, "Okay. So are you going to be able to put me in the medical ward or something cuz I'm - " Judge Hunter indicated, "I'm going to trust that the jail staff is going to do what they're trained to do, which is, if they see a problem, they're going to address it immediately, but I'm absolutely not going to cut you free on a bond." In the deposition of Jessica Munger, she testifies that she heard Dwayne ask the Judge if he was going to put him "in the medical ward or something cuz I'm –". Specifically, Ms. Munger testified "And I remember Dwayne asking the judge at least put him in the medical ward, and the judge stating in complete confidence in the jail to take care of him." Ms. Munger testified that she heard Dwayne say this from where she was seated at the back of the courtroom. All this information is said in the presence of Bailiff Detmer, a Sheriff's Office employee who worked for jail Captain Randell Baerlocher. At 1:27 PM, Judge Hunter concluded Mr. Greene's hearing and ordered him confined to the Crawford County Jail while his case was continued. Mr. Greene was returned to the custody of Correctional Officer Sbonek by Bailiff

Detmer and taken to the jail intake area where Officer Tessner would begin his booking process. According to the deposition of Officer Sbonek, he had no recollection of Bailiff Steven Detmer passing on any information about Mr. Greene's potential to experience alcohol withdrawals. Sbonek further indicated that if he had received that information that he would have shared it with Tessner. According to Bailiff Detmer's testimony, he indicates that he did not hear anything about withdrawals during the second portion of the hearing. Detmer further stated that if he had heard anything of that nature, he would have passed it on to Officer Sbonek. In a striking comparison, I must point out that Ms. Munger, who was seated in the back of the courtroom, clearly heard the withdrawal information said, while Bailiff Detmer standing at the front of the courtroom indicates that he did not. From a physical location, Detmer was closer to the Judge and Mr. Greene than was Ms. Munger. According to Officer Tessner, no information about what had been said or transpired in the Greene hearing was provided to her by either Officer Sbonek or Bailiff Detmer. This fact is established from the deposition testimony of Officer Tessner, where she indicates that she was given no information about Mr. Greene. It must be pointed out that in the deposition of Captain Baerlocher; he testified that Bailiff Detmer would be expected to share significant information of this nature with the jail intake officer for security purposes. Also, if Officer Tessner was provided with any information regarding the Greene hearing, she never recorded it on the jail Intake forms. This failure to share and record information would persist throughout the incarceration of Mr. Greene. During the intake process, the Crawford County Jail staff was well aware of Mr. Greene's alcohol abuse history from a review of his criminal history and previous jail booking documents. Unfortunately, jail booking staff ignored this vital information and simply handled Greene in a normal fashion and without concern for his serious medical issues. This disregard is even further displayed within the booking material completed on December 4th, 2017. Specifically, the Medical Screening Report where jail staff indicated that Greene is under the influence of alcohol but not suffering from withdrawals, even after being told by Greene that he would. On the Crawford County Jail Inmate Alcohol/Drug Usage Questionnaire it was clear that Corporal Katie Tessner did not bother to ask the questions about alcohol and drug usage. On the Inmate Screening/Classification form, also completed by Corporal Tessner, it is recorded that Greene's eyes were bloodshot, he was staggering, his speech was slurred, and he smelled of alcohol. Here again, these serious symptoms of alcoholism are ignored, and no appropriate medical referral is made for Mr. Greene. He is merely approved for general population and placed in holding cell D01 where he would remain until he is found unresponsive five days later without the benefit of any needed medical care. The Stress/Suicide Risk portion of the classification form was not completed. It should be mentioned that Mr. Greene's alcohol abuse is also recorded and readily available to Crawford County Jail personnel of December 4th, 2017 from previous arrests and intake classification documents. Apparently, these documents were never considered.

To further demonstrate the deliberate indifference of the Crawford County Jail staff I will point out their responses to case interrogations. As I address these responses one must keep in mind that Dwayne Greene is in plain view of jail staff and Northern Lakes personnel as he anguishes through the effects of alcohol withdrawals for five days in his holding cell until he was found unresponsive on December 8th, 2017.

- Joel Avalos – Had no discussion with other staff or Northern Lakes about a medical referral or that Mr. Greene was in serious condition with delirium tremens. ·
- Randall Baerlocher – Does not recall having any specific conversation between Corrections Officers regarding Dwayne Greene's condition, but does recall

speaking about the trauma of the subject incident and additional steps that could be taken to prevent a similar incident from occurring. Baerlocher also recalls speaking to Nanci Karczewski, of Northern Lakes, on December 7, 2017 about her visit with him but there was no discussion of Greene's delirium tremens (DT's) or the need for a medical referral. However, in Nanci Karczewski's deposition, she testified that she had spoken with Captain Baerlocher about Dwayne Greene experiencing Delirium Tremens (DT's).   Ms. Karczewski further testified that Captain Baerlocher replied that he was aware of that.

- Renee Christman – Does recall speaking to Nanci Karczewski of Northern Lakes on December 7th, 2017 about Mr. Greene showing signs of detoxing but there was no discussion of making a medical referral or the dangers of delirium tremens. Additionally, Christman shared text messages with correctional officer Katie Tessner about Mr. Greene having the "DT's." From the context of these texts no consideration was given to the thought that Mr. Greene should be referred to an appropriate medical facility. Officer Christman also discussed Greene with Officer Johnson, Officer Stephan, and Baerlocher. During these conversations Christman does not recall discussing medical referrals or delirium tremens.

- Amy Johnson – Recalls speaking to Nanci Karczewski of Northern Lakes on December 7th, 2017 about Mr. Greene's condition. During this conversation there was no discussion of making any medical referrals or Mr. Greene's delirium tremens. Officer Johnson states that while she may have spoken to other correctional staff about Greene, she does not recall the specifics. She does know that their conversations did not involve medical referrals or the condition of delirium tremens.

- David Nielson – Had no conversation about Dwayne Greene with Northern Lakes or other correctional officers.

- William Sbonek – Had no conversation about Dwayne Greene with Northern Lakes or other correctional officers.

- Donald Steffes, Jr. – Had no conversation about Dwayne Greene with Northern Lakes or other correctional officers.

- Timothy Stephan – Had no conversation about Dwayne Greene with Northern Lakes or other correctional officers.

- Dale Suiter, II – Had no conversation about Dwayne Greene with Northern Lakes or other correctional officers.

- Katie Tessner – Had no conversation with Northern personnel about Dwayne Greene's condition, medical referral, or his delirium tremens. Officer Tessner did, however, share text messages and conversation with other correctional staff that did not include any thought of a medical referral. Although, it is known that Tessner's text messages with Officer Christman discussed Mr. Greene's "DT's."

- Sheriff Kirk Wakefield – Had no conversation about Dwayne Greene's condition, a medical referral, or the dangers of delirium tremens with his jail personnel or his mental health contract provider, Northern Lakes.

It is clear that the Crawford County Jail correctional staff made no attempt to provide Dwayne Greene with the necessary medical care as he went through the dangerous stages of alcohol withdrawals. Only Officer Larry Foster, Jr. makes a Mental Health Service Request to Northern Lakes on December 7, 2017 because Mr. Greene is "talking to wall." In this request there is no

mention that Greene may be suffering from alcohol withdrawals or be experiencing a mental issue. In response to Officer Foster's Request, Nanci Karczewski of Northern Lakes visits with Mr. Greene and determines that he is delusional and experiencing alcohol withdrawal and struggling with DT's and psychosis. Renee Christman would later contact Northern Lakes Community Mental Health to ask them to speed up their response time to evaluate Mr. Greene due to his deteriorating condition as a result of his alcohol withdrawals. Ms. Karczewski reported her findings to Crawford County Jail Administrator Randall Baerlocher, but no follow up plan was established, nor was there any discussion of making an emergency medical referral by either Northern Lakes or the Crawford County Jail. Captain Baerlocher's response to Ms. Karczewski was that he was aware of the delirium tremens which Mr. Greene was experiencing.

While the Defendants did respond to the Plaintiff's First Request For Production, none of the material provided indicated that Crawford County or Northern Lakes was ever significantly concerned about Mr. Greene's deteriorating medical and mental health condition. This opinion is supported by the fact that Mr. Greene's delirium tremens, withdrawals, and psychosis is never taken as a serious health condition and no medical referral is made. This factual failure is established through the depositions of numerous Crawford County correctional staff. Specifically: Captain Randell Baerlocher testified in his deposition that he knew Greene had never been evaluated by a nurse nor were his vital signs ever taken. Additionally, Captain Baerlocher testified that he was also aware that Mr. Greene's medial screening form had not been completed by Officer Tessner on December 4th, 2017. Captain Baerlocher also said that he was aware of the fact that no one contacted any jail medical personnel about Greene's condition. Jail nurse Jeanne Hufnagel also testified in her deposition that no one from the Jail contacted her about Mr. Greene's condition. Captain Baerlocher also stated that he knew that Mr. Greene was not being monitored by any health care professional as he should have been. Baerlocher further testified that he did not know why the correctional officers did not call medical after Northern Lakes' Nanci Karczewski, LLPC said that Greene was not having a mental health issue but was going through DT's, yet Baerlocher did not contact medical either. Shockingly, Captain Baerlocher also testified that at the time of Greene's incarceration, he did not know the dangers of alcohol withdrawals (DT's). When asked if he knew what type of professional license Northern Lakes CMH and Nanci Karczewski held, Captain Baerlocher testified that he did not know.

In the deposition of Officer Larry Foster, Jr. he testified that he had never seen anyone detox as bad as Mr. Greene. Further, Foster said that if he knew then what he knows now, he would have called 911, but again, he did not call medical either.

In the deposition of Correctional Officer Amy Johnson, she testified that withdrawals are not medical issues until they "go bad". Additionally, Johnson testified that she didn't call 911 because she did not know he was that bad.

Officer Renee Christman testified that she normally calls Northern Lakes for withdrawals, not a medical person. Officer Christman also stated that she would only call 911 if Greene had a seizure. During her deposition, Officer Christman stated that she made her own determination that Mr. Greene was medically well enough to wait for the jail nurse to arrive on Monday, December 8th, 2017.

In the deposition of Timothy Stephan, he testified that if an inmate is delusional and going through delirium tremens or detoxing but still appears to be medically fine, there is no need to call an

000638

ambulance for medical assistance, in spite of the fact that he was well aware of the training he had that specifically called for these referrals.

As for Donald Steffes, Jr., it was evident from his deposition that he just did it his own way, in spite of training or policy. This attitude is clearly revealed when he testified that many times inmates are not really ill, they just want to get out of jail. Steffes said he had his own way of determining such. Steffes further declared that he used his own "risk assessment" to determine who needed to see medical or go to the hospital. Steffes based this position own his posture that he would make his own determination about the medical needs for any inmate. In the Greene matter, nothing is more reflective of callous disregard as the testimony of Mr. Steffes, Jr.

In Officer Dale Suiter's deposition, he testifies that while he had received information about Mr. Greene from Corporal Christman and Officer Foster and knew that Greene was confused, hallucinating and had not slept, he did not feel there was a need to contact medical or to call 911. Officer Suiter testified that he had received the Mental Health First Aid training and understood when to call 911, and that he understood the dangers of alcohol withdrawals. Suiter further testified that he should have followed the training guidelines that he had received but that Crawford County customs and practices about alcohol withdrawals drove his decisions.

Officer David Nielson testified that he was only trained to call CMH if an inmate appeared to show signs of withdrawals. He further stated he has never called medical.

In the deposition of Officer William Sbonek, he indicated that he did not know the signs or symptoms of alcohol withdrawals. Sbonek further testified that he should have known what the signs and symptoms of alcohol withdrawals were.

As for the testimony of Northern Lakes Nanci Karczewski, she indicated to jail personnel that Greene's behavior and condition was not a mental health matter, but instead was related to alcohol withdrawals and should be considered a medical issue but Ms. Karczewski provided no instructions for jail personnel to contact their own medical department, in spite of the fact that she understood what delirium tremens were.

Nurse Hufnagel testified that she was never asked to evaluate Mr. Greene during his incarceration within the Crawford County Jail.

From all of this testimony, it is clear that the Crawford County Jail personnel, at all levels, ignored Mr. Greene's clear and known information that he would need medical assistance. As for the foundation of the known information, let me point out that Greene was arrested on an alcohol related charge in August of 2017 and returned to court on that charge in December of 2017. At the follow-up hearing, Mr. Greene made his appearance in an intoxicated manner. Also, Greene's attorney advised the Judge that Mr. Greene has tried to quit in the past, but it resulted in seizures. The Judge was also informed that Mr. Greene was scheduled to be admitted at the Sacred Heart Rehabilitation Center later that week. In addition, Mr. Greene had told the Judge that he would need to be housed in a medical area if he was locked up because he would go through withdrawals. From the deposition of Officer Sbonek, he testifies that he does not recall that information being shared by Detmer. Bailiff Detmer testified he would have had he heard it said, and Officer Sbonek said he didn't recall Detmer passing on any information about Mr. Greene's condition. It would appear, from the testimony of Sbonek, Tessner and Detmer, that no medical referral was made following Mr. Greene's hearing, nor was any courtroom information shared with them. However,

from the testimony of Jessica Munger, Bailiff Detmer should have been aware of the dialog that took place in the Greene hearing and should have passed it on to Officer Sbonek. From the testimony involving Mr. Greene, Officer Tessner indicated that Bailiff Detmer shared no information with her. From an overall standpoint, it would appear that Mr. Greene's healthcare was of no concern to anyone involved with his incarceration and treatment. As a result of this egregious deliberate indifference to the health and safety of Mr. Greene, he was found unresponsive in a holding cell on December 8th, 2017 and died four days later of complications of chronic ethanol use. Had Mr. Greene been properly cared for, from a medical and mental health standpoint, his condition was completely treatable. Both the Crawford County Sheriff's Office and Northern Lakes Community Mental Health were well aware, or should have been, of the dangers of untreated alcohol withdrawals and yet they did nothing. Mr. Greene's death is a direct result of these inconceivable failures.

Policies and health care contracts were in place that could have directed the treatment of Dwayne Greene, but they were not utilized. In fact, it was the practice of Crawford County to hold intoxicated individuals like Mr. Greene in the booking area holding cells until they "sobered up" only. These dangerous customs and practices are also demonstrated in the care provided inmate Michael Keiser on or about, September 1, 2016, where he too suffered from alcohol withdrawals and went untreated – for nearly seven days. In the deposition of Nurse Hufnagel she stated that no treatment was provided to inmates experiencing alcohol withdrawals while she was employed by the Crawford County Sheriff's Office.

From Mr. Greene's demonstrated behavior while in the holding cell, it is extremely clear that he is experiencing life threatening alcohol withdrawal through hyperactive behavior, hallucinations, delirium tremens, yelling, and bizarre behavior – yet again, no medical referral is made here by Crawford County Jail personnel. Even more tragic is the fact that Mr. Greene is evaluated by Nanci Karczewski, LLPC, MHP, QMHP, from Northern Lakes Community Mental Health on December 7, 2017 where it is determined that he is going through "DT's from alcohol withdrawal." Ms. Karczewski also reports that Greene is rambling illogically, that he was not oriented to place and time, and that his thoughts were delusional and disorganized, as well as illogical. Yet, rather than make the proper health care referral Ms. Karczewski only stated "client (Crawford County) will request follow up contact." If jail staff feels there is a need or Dwayne requests contact with CMH, a contact visit will take place." Here again, no medical referral is made. To any intelligent person it was painfully clear that Dwayne Greene was suffering from serious medical issues related to the well-known alcohol withdrawals he was experiencing. It shocks the consciousness of a decent individual to think that nothing is done by Crawford County Officials to prevent Dwayne Greene's death. In the Summary Opinion of C. Dennis Simpson and Christopher Briggs, it is made clear that Mr. Greene was demonstrating numerous signs of alcohol withdrawal to include delirium tremens. However, no Crawford County or Northern Lakes personnel afforded these symptoms the medical emergency action which they knowingly deserved. Mr. Greene was experiencing a life-threatening event associated with alcohol withdrawals and should have been immediately transferred to the hospital where he could have been care for properly but tragically, he was not. All of the Crawford County Jail staff, with the exception of Officer Renee Christman, had been trained to recognize withdrawals and what action to take in the event that an inmate should begin experiencing such symptoms. Simpson and Briggs point out that jail personnel did not use the training that they had received pertaining to alcohol withdrawals and did not provide medical intervention that was needed.  Opinions similar to those of Simpson and Briggs are also found in the Expert Reports of Dr. Johnny E. Bates, M.D. and Rebecca E. Luethy, R.N.  Specifically, in the

Luethy findings and subsequent opinions, it is emphatically pointed out that the Crawford County Sheriff's Office purposefully ignored Dwayne Greene's withdrawal symptoms. Ms. Luethy indicates that Crawford County demonstrated a "blatant disregard" for Dwayne Greene's serious medical needs and "breached" the standards of care. Ms. Luethy further addresses Crawford County's failure to follow County and State policies regarding health care services. She also states that even though "jail staff were trained to identify and respond to life-threatening withdrawal symptoms; all ignored their training." In Dr. Bates's report, he too echoes these failures as well as providing opinions regarding the violations of Mr. Greene's constitutional right to be provided medical care. Dr. Bates also opines on policy and procedure failures, along with a strong opinion on Sheriff Wakefield and Captain Baerlocher's failure to adequately manage the Crawford County Jail. Dr. Bates also passionately points out the main operational failures within the Crawford County Jail and the inability of corrections to coordinate their services with one another. Dr. Bates envelopes his opinions with the "deliberate indifference" he feels Crawford County and their health care providers go about addressing the medical requirements of their inmate population. In the Report of Werner U. Spitz, MD, FCAP, a Forensic Pathologist, while he testifies to the medical complications that ultimately caused the death of Dwayne Greene, he also states in his Report, "Although corrections officers and mental health workers realized that Dwayne Alan Greene was experiencing alcohol withdrawal and exhibiting DT's, no one made any attempt to provide him the medical care he needed." Additionally, Dr. Spitz stated, "In the case of Mr. Greene, it seems that those who observed him realized that he was in need of treatment and yet no one did anything for his welfare, to help him and to keep him safe." Dr. Spitz concludes with, Mr. Greene's longevity could have been normal with medical help. In the Report from Dr. Gerald A. Shiener, MD, the tragic failures revealed in the Dwayne Greene matter are once again identified. In his report, Dr. Shiener points out that "Mr. Greene was recognized as suffering from Delirium Tremens. No appropriate treatment was provided, and the lack of appropriate treatment was the cause of death. Dr. Shiener goes on to state, "It is inconceivable that anyone with the barest minimum knowledge of recognition of Delirium Tremens, and understanding what the appropriate measures should be taken to prevent it or treat it once it begins could observe Mr. Green, know what was happening to him, and not act in a manner to address the progressive delirium and prevent his death." Additionally, Dr. Shiener opines that Mr. Greene, "His death was preventable, his death was foreseeable and based on the policy Manuals and the testimony of the jail personnel, the training that they received would have given them the knowledge to recognize and respond to this life-threatening medical condition. No attempt was made to do so." Dr. Shiener concludes his report by indicated that "Mr. Greene's death was not only foreseeable but was avoidable with proper treatment. It should also be pointed out that in the Report prepared by Gerald N. Papazian the same medical failures are also addressed. Gerald Papazian reports "Furthermore, there was not the slightest suggestion that medical advice had been given during the short tenure that Ms. Kaminski has been operational manager from June 2017 to present." Papazian also confirm that Ms. Karczewski had advised Captain Baerlocher, "that the delusional thoughts/behavior she observed with Mr. Dwayne Greene are the result of alcohol withdrawals, not a mental issue." Yet even after that, no medical care was sought by Crawford County Jail personnel. However, it must also be pointed out that other experts involved with the Greene matter felt that Ms. Karczewski had a responsibility to ensure that the Crawford County Jail staff understood the dangers of untreated alcohol withdrawals and ensured that something was done. In the report of Terry S. Fillman, RN, MBA, CCHP, it is opined that, "Based on my education, training, correctional healthcare experience, ongoing patient healthcare, educator for custody correctional staff including Correctional Healthcare and Jail Operations, and review of all listed documents, it is my expert

opinion that correctional officers knew of Mr. Dwayne Greene's serious medical needs, knew that Mr. Greene was demonstrating symptoms of life-threatening Delirium Tremens, failed to summon appropriate medical care, violated policies and procedures, and fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances. The collective correctional officers' documented actions and inactions at Crawford County Jail in Grayling Michigan failed to obtain qualified medical care for Mr. Greene for a condition that is easily treatable and could have been life-saving." Fillman further states that "Correctional officers were aware of Mr. Greene's serious medical need and did not summon appropriate medical care by qualified medical professionals. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances." Fillman goes on to say, "Correctional officers had the responsibility to refer Mr. Greene to appropriate medical personnel and only a licensed medical professional could have obtained Provider orders and delivered life-saving medications and treatment to Mr. Greene." Here too, as in Papazian's Report, Fillman suggests that Northern Lakes CMH's performance was acceptable given known licensure and standards. However, from a jail management standpoint, Ms. Nanci Karczewski had an obligation to ensure that jail officials understood that Mr. Greene needed immediate medical care. Dr. Vasilis K. Pozios, M.D., Forensic Psychiatrist concludes his report in the following manner, "Corrections officers, when they noticed Mr. Greene was exhibiting signs of alcohol withdrawal delirium and nursing staff was unavailable, should have sent Mr. Greene to the ER for an emergency medical evaluation, not requested a mental health assessment. Finally, the limited access to nursing staff and medical providers constituted grossly inadequate medical care on the part of Crawford County Jail, who is constitutionally required to provide medical care for its inmates." While Pozios strongly addresses the failures of the jail to provide medical care, he also implies that Northern Lakes had done all that they were responsible for. As a jail expert I would totally disagree. Northern Lakes had determined without question that Dwayne Greene was going through withdrawals and should have ensured that the Crawford County Jail staff clearly understood that what he needed was immediate medical attention. They did not, they only advise Baerlocher that Mr. Greene was experiencing DT's. The failure to properly treat Mr. Greene's medical needs is further echoed in the report of Dr. Herbert Lewis Malinoff, M.D., FACP, FASAM. Specifically, Dr. Malinoff provides his opinions of the Dwayne Greene treatment in the following manner, "Advanced alcohol withdrawal is, thus, an emergency medical health problem and not a mental health problem." He also opines, "In my opinion, the time to refer Mr. Greene for medical evaluation and medical attention was at the very time he was admitted to the jail and found to have a blood alcohol level of 0.194 mg percent." Dr. Malinoff goes on to state, "The deposition testimony of essentially all of the corrections officers' that had contact with Mr. Greene while incarcerated displays profound lack of understanding of the need for medical attention to a given inmate." Malinoff also states, "Based on the material reviewed these employees did have the training, experience, and, in my opinion, the knowledge to identify where an inmate was suffering from significant medical illness requiring urgent medical attention. Based on multiple testimonies, it was clear that a nurse was available on a 24-hour-per-day, seven-day a week basis but only visited the jail twice per week (Tuesdays and Fridays). This availability was not brought to bear on Mr. Dwayne Greene. In my opinion, a direct referral for medical care via the jail nurse as early as December 4[th] and 5[th] would have resulted in treatment that, in my opinion, would have prevented his death." Dr. Malinoff concludes his findings by saying "It is my opinion, that had Mr. Greene been referred for medical evaluation and treatment on an emergency basis on December 4[th] or 5[th], he would more likely than not be alive today," and "the jail should have referred Mr. Greene emergently for medical care." However, like

000642

Papazian, Fillman, and Pozios, Dr. Malinoff does not believe that Ms. Karczewski had any other responsibility to see that Mr. Greene received the medical care he needed. Tragically, this failure to become involved in the process of Mr. Greene receiving the medical care he needed contributed to the circumstances that ultimately lead to his death. It is exceptionally revealing when experts in the field of alcohol abuse disorders like Simpson, Briggs, Bates and Luethy, Spitz, Shiener, Papazian, Fillman, Pozios, and Malinoff, all have come to the same tragic opinion about Mr. Greene's medical care and death. That is to say that Mr. Greene's withdrawal symptoms were recognizable but no appropriate medical care was afforded him by the Crawford County Sheriff's Office. In unison, these experts all indicate that Mr. Greene's death could have been prevented with proper medical care. The knowledge and experiences I have accumulated over my many years of hands-on correctional management allows me to clearly understand the operational requirements needed in all of these areas to the degree that I can address them intelligently.

A woeful footnote to this egregious incident of indifference is the fact that Mr. Greene was scheduled to be admitted to Inpatient Detox and Residential Treatment within Sacred Heart Drug and Alcohol Rehabilitation Center on December 7th, 2017. As Mr. Greene was incarcerated, he never made it to this life saving intervention.

It is also sad to note that even though the Northern Lakes Community Mental Health Group had a contractual agreement with the Crawford County Sheriff's Office to treat inmates with "a substance use disorder" if it was being experienced in conjunction with another diagnosable serious mental illness. According to Nanci Karczewski, Dwayne Greene was experiencing psychosis; his thoughts were delusional and illogical, but they were related to his alcohol withdrawals and not a mental health issue. While these symptoms were clearly being experienced during the time Greene was in withdrawals, but Ms. Karczewski made no medical recommendation or referrals, in spite of the fact that she understood what delirium tremens were. Further, while Nanci Karczewski saw Mr. Greene on December 7th, 2017, she prepared no Jail Crisis Screening Contact form about the Greene visit until January 3rd, 2018. Consequently, Ms. Karczewski's supervisor, Stacey Kaminski, had no opportunity to review her findings, and support or disagree with them. This lack of report completion and supervisor review allowed Mr. Greene to go untreated for mental health issues and alcohol withdrawals. Like Crawford County, Northern Lakes demonstrated their own indifference for the safety and wellbeing of Mr. Greene by failing to provide the necessary health care.

In addition, Northern Lakes violated their own policies (107.301 Emergency Services and 107.501 Jail Services). Under Policy 107.301, Nanci Karczewski was responsible for "Responding to service needs directly when appropriate and/or referring the person to other agencies or persons or services when such action is appropriate to their service needs," and "Assuring the safety of the person served to the best of his or her ability." Also, under 107.301 Ms. Karczewski is directed that "When, in the judgement of the crisis worker, medical screening or stabilization is needed, that worker will facilitate referral to a medical center/hospital for emergency medical services," Nanci Karczewski nor Northern Lakes did any of this. They simply allowed Mr. Greene to go untreated. Policy 107.301 also allows, "The presence of alcohol or other mind-altering substances does not prohibit a mental health crisis evaluation but needs to be carefully assessed." With respect to Northern Lakes Policy Number 107.501 Jail Services, crisis workers are directed towards "linking individuals (Greene) to the array of community-based services they may require." Northern Lakes and Ms. Karczewski failed to do this as well. It is also shocking to note that in the depositions of Ms. Kaminski and Ms. Karczewski there is a great difference of opinions on policy.

000643

While Ms. Kaminski stated that Northern Lakes crisis workers could not make medical referrals, Ms. Karczewski said that crisis workers could make medical referrals and call for medical assistance. Additionally, Ms. Kaminski stated that crisis workers were not to talk to the jail staff about the inmate or the need for medical referrals, but Ms. Karczewski did talk to jail staff and firmly believed it was within policy to do so.

Within the Kaminski and Karczewski depositions there are a number of other stunning revelations. I will itemize them for brevity purposes;

- Ms. Kaminski – substance abuse and delirium tremens is a medical issue, not the responsibility of Northern Lakes
- Ms. Kaminski – Northern Lakes staff is not required to know about alcohol withdrawals or the manifestations of alcohol withdrawals
- Ms. Kaminski – was not familiar with Michael Keiser
- Ms. Karczewski – did not believe that Northern Lakes had a policy that in any way addressed an inmate going through alcohol withdrawals and related mental issues
- Ms. Karczewski – stated she made no medical or mental health recommendations to the jail staff
- Ms. Kaminski and Ms. Karczewski were not well versed on terminology such as "Delirium Tremens, Comorbidity, Alcohol Withdrawal Delirium" or the revised psychiatric manual (DSM-V) Diagnostic and Statistical Manual of Mental Disorder – version V

It should also be mentioned that the responses recorded in the Kaminski and Karczewski depositions were reflective of great confusion as to Northern Lakes' role at the Crawford County Jail, and in particular as it pertained to substance abusers with mental health issues. It is inconceivable to this corrections practitioner how a mental health provider and their respective jail administration could be the least bit unclear as to what the expected services to be provided were. Here again, a clear indicator of the callous disregard for the protection and health of the Crawford County inmate population.

Another factual finding in the death of Dwayne Greene is located within the pages of the Crawford County Sheriff's Office, Inmate Death Investigation. Here it is revealed that Officer Tessner, Baerlocher, Christman, Stephan, Foster, and Suiter all knew Mr. Greene was detoxing and going through serious alcohol withdrawals but none of them referred him to Medical so that he could receive the appropriate health care. Officer Foster does, however, request that Northern Lakes evaluate him just in case he had other mental issues. It goes without saying that any properly trained correctional officer should have been well-aware of the fact that Mr. Greene needed immediate medical care for his obvious and serious alcohol withdrawals. Tragically, no referral was made for Mr. Greene and the results were predictable.

Almost every published detoxification protocol for alcohol addiction withdrawals advise that significant symptoms and health hazards begin around 24 to 48 hours from the last use, although withdrawal medication can alter these reactions to a degree. These protocols also indicate clearly that early benchmarks of recovery are seen after four to five days of withdrawal treatment that is medically monitored. This period of time is considered minimal before the patient is considered even slightly out of the danger zone medically. After five days, treatments may be altered to a more normal pattern but still monitored to the degree necessary. Crawford County correctional and medical personnel should have been well aware of these basic treatment factors and ensured

{00722407.DOCX}                                        41 | P a g e

that Dwayne Greene received the treatment that he needed – they did not and as a result they all contributed to his needless death. The Simpson/Briggs Summary Opinion and the Expert Reports of Rebecca E. Luethy and Dr. Johnny E. Bates, Dr. Gerald A. Shiener, Dr. Werner U. Spitz, Mr. Gerald N. Papazian, Nurse Terry S. Fillman, Dr. Vasilis K. Pozios, and Dr. Herbert Lewis Malinoff generally supports these benchmarks and my opinion herein regarding the failures of Crawford County to provide needed medical care.

Crawford County Officials at all levels knew, or should have known, the life-threatening dangers of not properly detoxing an individual that is clearly suffering from alcoholism, but they did not react appropriately, and Mr. Greene is dead as a result. So, then an intelligent and moral person would ask "why did this happen?" and the only answer can be "callous disregard for human life and safety" as well as "reckless disregard" for the guaranteed constitutional and civil rights of Mr. Greene to be protected. Throughout Crawford County, this disregard at all levels cost Mr. Greene his life.

Crawford County Officials had a constitutional mandate to protect Dwayne Greene and provide him with care, custody, and control that was free from any form of cruel and unusual punishment; they did not! While these acts of omission show a gross lack of concern, they are also generally indicative of administrative failures in areas involving policies and procedures, as well as training and supervision. Had Crawford County Officials properly trained their employees and contract personnel, these individuals would have understood the severe medical problems that can occur during periods of detoxification. While all but one of the named Defendants had received the course entitled Mental Health First Aid, they testified that they did not have the knowledge or understanding to recognize or respond to the symptoms and dangers of alcohol withdrawals. Obviously, they did not train properly, or understand, because everyone from medical/mental health to security to classification failed to refer Mr. Greene to medical treatment and observation. Their failures cost Mr. Greene his life. Additionally, had policies and procedures been developed and clearly written, these same employees would have had specific and safe guidelines regarding administering to inmates that were detoxing or in withdrawals. Here too, Crawford County and their healthcare provider failed. In support of these opinions, I will emphasize the testimony of Crawford County personnel during their depositions in this matter. Specifically, in the deposition of Sheriff Kirk Wakefield, he indicated the following;

- Crawford County Sheriff Kirk Wakefield testified that he had no training on the signs and symptoms of alcohol withdrawals or delirium tremens
- Sheriff Wakefield also stated that he did not know if withdrawals were medical problems or mental health issues
- Sheriff Wakefield also testified that he didn't know what the jail policies were
- The Sheriff also stated that he had no part in the writing or training of policies and procedures
- Sheriff Wakefield testified he didn't know much about the jail operations
- Sheriff Wakefield testified that it would be a violation of Crawford County Sheriff's Office Policy 01-188, Corrections Inmate Health Care for a non-qualified, non-health care professional to make any determination about inmate medical matters. By policy, that responsibility is the sole province of the responsible physician, dentist or other qualified health professional.

Then Undersheriff Shawn Kraycs, now the Sheriff, testified that he relied on Captain Baerlocher to make all the jail decisions. Kraycs indicated that that was his method as undersheriff, and that is what it is now as sheriff.

Crawford County Jail Captain Randell Baerlocher indicated the following in his deposition;

- Crawford County had no training on Delirium Tremens and didn't know what it meant
- Baerlocher stated that Bailiff Detmer was expected to relay the contexts of the courtroom discussion about Mr. Greene to Officer Tessner and Sbonek; or any other assigned Intake Officer.
- Baerlocher didn't know that Greene should have been monitored by medical professionals during his withdrawals
- Captain Baerlocher testified that there is no training for correctional officers that includes signs and symptoms about alcohol withdrawals or Delirium Tremens
- Baerlocher indicated that there were no protocols for monitoring inmates with withdrawal symptoms
- Baerlocher did not know the policies and procedures had been replaced by dangerous customs and practices
- Captain Baerlocher testified that he did nothing to ensure policy compliance regarding the Greene matter and stated that jail staff are trained to make their own decisions

Officer Larry Foster, Jr. testified in his deposition that his training was lacking as it pertained to alcohol conditions. Officer Foster also stated that he did not recall any policy about how to address alcohol or substance abuse withdrawals.

Correctional Officer Amy Johnson testified in her deposition that she has received no training about alcohol withdrawals or Delirium Tremens.

- Johnson also stated that here were no policies that addressed alcohol withdrawals.

In the deposition of Renee Christman, she also testified that;

- There were no policies about handling inmates with withdrawals and DT issues
- Christman also stated she had received no training about the healthcare issues surrounding withdrawals and detoxing
- Officer Christman also stated she had not been trained on how to recognize the signs and symptoms of alcohol withdrawals or delirium tremens

Officer Joel Avalos testified during his deposition that;

- He had had no training about alcohol withdrawals
- Avalos stated that he knew of no Crawford County policies that addressed delirium tremens or withdrawals

Officer Katie Tessner testified that, she too, was not trained about withdrawals adequately;

- Officer Tessner also testified that there were no policies on what to do when no nurse is available
- Officer Tessner testified that there are no policies addressing the signs and symptoms of alcohol withdrawals

000646

In the deposition of Officer Dale Suiter II, he testified that he has received no training from Crawford County about the dangerous effects of withdrawal, nor was he trained to recognize the signs and symptoms of delirium tremens and alcohol withdrawals. Officer Suiter further testified that he was not trained on when to send a detoxing inmate to the hospital. Officer Suiter also stated that there were no Crawford County policies involving when an inmate should be sent to the hospital as a result of alcohol withdrawals.

In the deposition of Officer Timothy Stephan, he also indicated that he has received no training on the signs and symptoms of delirium tremens or withdrawals.

Additionally, Donald Steffes, Jr. also testified he did not recall any training on the signs and symptoms of alcohol withdrawals.

In the deposition of Officer David Nielson, he states he received no other training about alcohol withdrawals except Mental Health First Aid. He also was not familiar with any policy on how to handle inmates in withdrawals.

Officer Sbonek testified that he should have known the signs and symptoms of alcohol withdrawals, but he had forgotten. He too did not know if there was a policy about withdrawals.

In the deposition of Nanci Karczewski of Northern Lakes, she also indicated that, they too, did not have clear policies on what to do when addressing inmates with withdrawal issues that are experiencing delirium tremens.

Jail Nurse Jeanne Hufnagel testified that there was no formalized training at the Crawford County Jail on how to recognize signs and symptoms of withdrawals, or what should be done if they are present.

This testimony is pointed out to support my opinions herein that Crawford County and Northern Lakes failed to establish adequate policies and procedures for addressing inmates with alcohol, or substance abuse withdrawals and delirium tremens. Additionally, these entities failed to adequately train their personnel regarding withdrawals and how to address them.

It should also be noted that from the depositions listed above, everyone but Christman, had received Mental Health First Aid training from Northern Lakes Community Mental Health Authority, but only Officer Tessner and Officer Suiter had a vague recall of the contents of this training. It is my opinion that the Crawford County Jail staff was just addressing Mr. Greene's known issues in a reckless manner which they thought might work without regard for what common sense would compel a prudent correctional officer to do. This careless performance was directly associated with the death of Dwayne Greene.

In an overall sense, Crawford County did not only fail to properly provide adequate policies and procedures, comprehensive medical screening, and classification, they also failed to appropriately train and supervise their assigned correctional and medical staff. In support of this generalized opinion it is factually known that intake booking information was not utilized or shared, medical screening information was incomplete and not utilized or shared, and classification information was incomplete and not utilized or shared. No medical referral was initiated and only one mental health request was called for with no appropriate medical referral made. No appropriate inmate checks were performed on a regular basis. No appropriate housing assignment was made that

000647

would have placed Mr. Greene in a specialized medical observation cell where he could be monitored constantly as he went through withdrawals. In fact, Mr. Greene was never moved from the holding cells (D01 and D02) where he was assigned following booking. Most importantly, even as certain and convincing evidence is observed by Crawford County correctional staff and the Northern Lakes Community Mental Health specialist, no appropriate detoxification protocols are initiated. Mr. Greene is only left to suffer the anguish and pain of withdrawals by himself with no medical assistance. Even if this assistance was not readily available within the Crawford County Jail, the Sheriff's Office had an undisputed obligation to get Mr. Greene to a health care facility that could care for him, i.e.: a hospital or rehabilitation center. They did not make these accommodations; in fact, they did nothing. Mr. Greene had a constitutionally protected right to be free from harm, to be free from cruel and unusual punishment, and to be afforded the right to not be deprived of the securities, rights, privileges, liberties, and immunities secured by the Constitution. Further, Mr. Greene was deprived of the right to be afforded basic human needs and the right to have due process. As with the aforementioned rights, Mr. Greene was also denied access to proper medical detoxification. One must ask - how it is that in 2018, Sheriffs and Jail Administrators continue to ignore the constitutional and statutory rights of those in their charge? Over my many years as a correctional administrator, I became well versed on the dangers created by failures in all of these areas, i.e., health services, supervision, classification, security, use of force, communications, training, and constitutional violations. Having this knowledge provides me with the ability to formulate applicable opinions on the failures found in the Greene matter. Hereto these factual opinions are supported by the deposition testimony of Crawford County Jail staff and that of Northern Lakes. Specifically, this opinion support can be found in the depositions of Captain Baerlocher when he indicated that intoxicated inmates are just assigned to D1 or D2 ("drunk tank") until they reach a blood alcohol level of .00. Captain Baerlocher testified that he knew Mr. Greene was detoxing but made no medical referral. Captain Baerlocher also testified that he didn't know that a person should detox only under trained medical observation.

So too, Officer Johnson testified that Mr. Greene was experiencing the effects of withdrawals and demonstrating odd behavior but made no immediate medical referral. In fact, she did not consider alcohol withdrawals a medical issue.

Officer Renee Christman testified that she had never been trained as to when to call medical. Further, Officer Christman stated in her deposition that there was only one special observation category and that was for suicide risk.

Correctional Officer Joel Avalos testified that he would have called medical if he had been aware of what Officer Christman had logged at 6:20 AM on the 7th of December. Officer Avalos further stated that a prudent correctional officer should have called medical or 911, given what was known about him and what was being observed. Sadly, Officer Avalos did not call medical or 911 either because he did not read the Crawford County Jail Log.

Officer Tessner testified that she knew from the beginning that Mr. Greene would go through alcohol withdrawals. Officer Tessner also testified that she never received any courtroom information about Mr. Greene's alcohol issues from Bailiff Detmer or Officer Sbonek.

In the deposition of Officer Dale Suiter, he testifies that he was trained on when to contact medical or refer a detoxing inmate to the hospital. In spite of the fact that he recalled the Mental Health First Aid training, he still did not refer Greene to medical after he was made aware that Greene

was confused, hallucinating, agitated, yelling, screaming and had not slept or eaten. Officer Suiter does testify that he did not see Greene hallucinating, yelling or screaming.

Officer Steffes testified that if he had observed what Officer Christman had logged about Mr. Greene, he would have called 911.

Correctional Officer Larry Foster, Jr. did make the first request for CMH to evaluate Mr. Greene as a result of his behavior. However, in deposition, Officer Foster stated that he knew Greene was in withdrawals but that he did not contact medical. Foster also testified that he has never seen an individual detox as bad as Mr. Greene, not while he was an EMS paramedic or as a correctional officer. Yet, Officer Foster said in his deposition that if Greene's withdrawals had gotten bad enough, he was trained to call 911. One must ask – how bad does it have to get?

In the deposition of Officer David Nielson, he testified that he only knew that he was to call CMH when he felt that an inmate was experiencing alcohol withdrawals.

Officer William Sbonek testified that he should have known Mr. Greene was withdrawing but did not remember the policy or what to do.

In the deposition of Stacey Kaminski, LPC CAADC, she testified that Northern Lakes cannot make medical referrals on those that they evaluate for mental health reasons. Ms. Kaminski also testified that her staff is not required to know about the manifestations of alcohol withdrawals. Ms. Kaminski also stated that Nanci Karczewski should not have spoken to the Crawford County Jail staff about a medical referral for Mr. Greene.

In her testimony, Nanci Karczewski of Northern Lakes, countered Stacey Kaminski's testimony by stating that she could call for medical assistance. Ms. Karczewski testified that she provided no symptom information to the jail staff except that Mr. Greene was experiencing DT's. Ms. Karczewski testified that she provided no treatment recommendations to the jail staff. Further she indicated that she never did a follow up on evaluation on Mr. Greene.

Jail Nurse Jeanne Hufnagel testified that no treatment was given to inmates that were withdrawing while she was contracted there. Further, she stated that no formalized training was afforded correctional officers about alcohol withdrawals and what they should do about it.

Through all of this deposition information, it is clear that no professional assistance was afforded Mr. Greene in any manner. He was simply put in a drunk tank with absolutely no medical care.

In the deposition of Joanie Blamer of Northern Lakes, it is revealed that, during the Mental Health First Aid training, Crawford County correctional officers are instructed on when to call an ambulance. Ms. Blamer also testified that these officers are additionally instructed to recognize the signs and symptoms of withdrawals as well as what can occur if withdrawals go without medical treatment.

How can it be that the Crawford County Jail operated in total ignorance regarding alcohol withdrawals, signs and symptoms and the absence of knowledge about delirium tremens? Further, how can it be that there are no policies about these issues or the training to ensure that everyone understands the dangers? And, why are corrections personnel confused as to when to contact medical or their emergency medical service? Even more confusing is - why is this bewilderment found at every level of authority – the Sheriff, the Captain, the Corporals and the Correctional

Officers? Substance abuse is not a new issue found within jails, nor is the liability for failure to recognize it and treat it accordingly. The failures to appropriately address these issues have been litigated to the point of exhaustion. Every known standard in the corrections business addresses it. So, how did Crawford County and their healthcare provider miss that part – my opinion is that glaring and dangerous customs as well as practices coupled with deliberate indifference to the point of being tragic is the answer. In all of my experience, I have never been made so aware of such redundancy. This avoidable ignorance cost Dwayne Greene his life.

Correctional management in today's world is not a matter of confinement – it is a sophisticated profession that operates effectively under the sanctions of constitutional and statutory case law and industry standards that cover every aspect of the business. These same governances hold true for service providers like Northern Lakes Community Mental Health as well. Additionally, based on the type of service provided, more specific standards have also been developed, such as those of the National Commission on Health Care and Standards for Health Services in Jails. It is the absolute responsibility of every correctional agency management team and those of their chosen service providers to understand these provisions and operate in compliance. Failure to do this will result in systemic failures, one after another, within their correctional system. Even more serious is the fact that the constitutional rights of the facilities' inmate population will most assuredly be violated, and tragic events such as Dwayne Greene will occur. Acts of ignorance, deliberate indifference, and negligence, failure to provide due process, unreasonableness, excessive force, suicide, medical care, wrongful death and so forth have been litigated beyond belief. There is no excuse for today's correctional administration to not understand the provisions of constitutional law and statutory guidelines and standards. The safety and security of every inmate must be the primary concern of every correctional administrator in the business today, along with every established correctional service provider. From a factual standpoint the Crawford County Sheriff's Office and their health care provider do not seem to understand this, as the tragic and unreasonable death of Dwayne Greene occurred as they all looked on. These dangerous failures must be stopped immediately before other inmates are unreasonably exposed to unconstitutional conditions and treatment. Sadly, it is too late for Mr. Greene.

For correctional administrators and correctional healthcare providers, alcohol and drug withdrawals are a critical and dangerous condition experienced by many detainees. Not treating this serious medical episode can lead to deaths which could be easily preventable. Volumes upon volumes of research and studies are readily available regarding this condition and how to address it from a security and health care standpoint. Regrettably, for Dwayne Greene, no one from the Sheriff's Office or Northern Lakes or their medical personnel gave this potentially deadly condition any consideration whatsoever and the result is obvious. To demonstrate how available information about detoxification in jails is, I have provided a list of scholarly articles about this subject in my materials reviewed section of this report. However, I have listed below some of the more comprehensive ones:

- National Sheriff's Association, Institute for Jail Operations; Inmate Deaths Raise Questions About Jail Detox Procedures
- Detoxification of Chemically Dependent Inmates; Federal Bureau of Prisons Clinical Practice Guidelines, February 2014
- National Commission on Correctional Health Care; Opioid Detoxification Guideline
- Treatment of Alcohol Withdrawal, Hugh Myrick, M.D., and Raymond F. Anton, M.D., Alcohol Health & Research World, Vol. 22, No. 1, 1998

000650

- Complications of Alcohol Withdrawal: Pathophysiological Insights, Louis A. Trevisan, M.D., Nashaat Boutros, M.D., Ismene L Petrakis, M.D., and John H. Krystal, M.D., Alcohol Health & Research World, Vol. 22, No. 1, 1998
- Wikipedia: Alcohol withdrawal syndrome
- In-Custody Acute Alcohol Withdrawal, by Pamela Kulbarsh, July 10, 2013
- What would you do in this situation? Comparing clinical judgement., by Catherine Knox, Essentials of Correctional Nursing, June 10, 2015
- Safe Detox in a Jail Setting: A Corrections Guide, Nancy Wolf, PMHNP/FNP-C, M. Gail Hill, PhD., CRNP, University of Alabama, Birmingham, 11/09
- Detoxification Program, Bernalillo County Metropolitan Detention Center, Correctional Medical Services, William M. Shannon, M.D.
- How Improperly Detoxing Can Kill You, Posted April 26, 2013 in Detox by rehabs.com
- Wikipedia: Delirium Tremens
- Alcohol Abuse and Alcoholism: What are the Differences; Medically reviewed by Timothy J. Legg, PhD, CRNP on May 12, 2017; Written by Rose Kivi, Elizabeth Boskey, PhD and Ana Gotter, Healthline Medicine 2005
- Annals of Family Medicine, Defining Comorbidity: Implications for Understanding Health and Health Services; Jose M. Valderas, MD, PhD, MPH, Barbra Starfield, MD, MPH, Bonnie Sibbald, MSc, PhD, Chris Salisbury, MB, ChB, MSc, FRCGP, Martin Roland, CBE, DM, FRCGP, FRCP, FMedSci, 2009, July
- Revised Psychiatric Diagnosis Manual DSM-V, by Rick Nauert, PhD, Scientifically Reviewed, Oct 2015
- CIWA Scale for Alcoholism, By Jennifer Chait 2006-2019
- Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised (CIWA-AR)
- Alcohol Withdrawal Assessment Scoring Guidelines (CIWA-AR)
- CIWA-AR for Alcohol Withdrawal, Objectifies Alcohol Withdrawal Severity to Help Guide Therapy, MDCALC, 2005 – 2019
- The "Prediction of Alcohol Withdrawal Severity Scale" (PAWSS): systematic literature review and pilot study of a new scale for the prediction of complicated alcohol withdrawal syndrome, Maldonado, Sher, Ashouri, Hills-Evans, Swendsen, Lolak, Miller, 2019
- PAWSS                          tool identifies alcohol withdrawal syndrome risk, by Sharon Worcester, June 8, 2016
- PAWSS – A New Tool Determine Risk of Severe Alcohol Withdrawal, 9/26/ 2016
- Prediction of Alcohol Withdrawal Severity Scale (PAWSS), Maldonado, 2014

For Dwayne Greene, the withdrawal symptoms were extremely apparent. During my review of the Crawford County Jail surveillance video of Mr. Greene's holding cell, I observed nearly every minute of his detention and the progression of his alcohol withdrawals. Subsequently, I can only wonder how this life-threatening medical episode could go unnoticed and unattended to, but it did. Neither the Crawford County correctional staff nor the mental health specialist from Northern Lakes appears to have any comprehension of the dangers, nor do anything to intercede and stop the progression of the detoxification.  The obvious indifference to his immediate need for emergency medical care is so shocking that is approaches the realm of torture. There is no acceptable or reasonable excuse for this egregious performance.

While viewing this video, I kept an "Internal Accounting" of Mr. Greene's obvious and discernible deterioration. This account is as follows:

### DWAYNE GREENE SURVELLIENCE VIDEOS INTERVAL ACCOUNTING

**DAY ONE**

| | | | |
|---|---|---|---|
| 12/4/17 | | DWAYNE GREENE GOES THROUGH INTAKE | 12:37 PM |
| 12/4/17 | | DWAYNE GREENE PLACED IN HOLDING CELL D01 | |
| 12/4/17 | | NOTHING FURTHER NOTED UNTIL 12/5/17 10:00 AM | |

**DAY TWO**

| | | |
|---|---|---|
| 12/5/17 | 10:00 AM | NOT MUCH ACTIVITY |
| 12/5/17 | 11:30 AM | NOT MUCH ACTIVITY |
| 12/5/17 | 1:15 PM | NOT MUCH ACTIVITY |
| 12/5/17 | 4:20 PM | GREENE'S ACTIVITY IS INCREASING |
| 12/5/17 | 9:15 PM | NOT MUCH ACTIVITY |
| 12/5/17 | 10:35 PM | GREENE OUT TO SHOWER, CHANGE OUT TO UNIFORM |
| 12/5/17 | 11:35 PM | OUT OF VIEW FOR AWHILE |

**DAY THREE**

| | | |
|---|---|---|
| 12/6/17 | 12:03 AM | NOT MUCH ACTIVITY |
| 12/6/17 | 2:00 AM | WITHDRAWAL SYMPTOMS BEGINNING TO SHOW |
| 12/6/17 | 4:00 AM | WITHDRAWAL SYMPTOMS ARE PRESENT; WHY IS HE STILL IN HOLDING CELL? |
| 12/6/17 | 6:30 AM | ACTIVITY INCREASES – WITHDRAWAL SYMPTOMS |
| 12/6/17 | 8:15 AM | ACTIVITY CONTINUES – WITHDRAWAL SYMPTOMS |
| 12/6/17 | 9:45 AM | GREENE OUT FOR PHONE CALL |
| 12/6/17 | 10:00 AM | GREENE SIGNS A DOCUMENT |
| 12/6/17 | 12:20 PM | GREENE HANDS FOOD TRAY RIGHT BACK OUT – SYMPTOMS   CONTINUE |
| 12/6/17 | 1:00 PM | ACTIVITY INCREASES, APPEARS TO BE "WORKING" |
| 12/6/17 | 1:12 PM | CORRECTIONS OFFICER SPEAKS WITH GREENE |
| 12/6/17 | 3:30 PM | GREENE MOVED TO ADJACENT CELL WHILE HIS ORIGINAL CELL IS CLEANED. ALSO SPOKEN TO BY A CORRECTIONAL OFFICER |
| 12/6/17 | 5:05 PM | WITHDRAWAL SYMPTOMS  INCREASE AS WELL AS ACTIVITY. TRIES TO TURN CELL DOOR LOCK |
| 12/6/17 | 10:15 PM | GREENE IS VERY ACTIVE, WITHDRAWAL SYMPTOMS VERY CLEAR |

**DAY FOUR**

| | | |
|---|---|---|
| 12/7/17 | 12:30 AM | GREENE IS CLEARLY IN THE THROES OF WITHDRAWALS |

| | | |
|---|---|---|
| 12/7/17 | 1:44 AM | ACTIVITY INCREASES, GREENE DETOXING |
| 12/7/17 | 8:53 AM | DETOXING, EXTREMELY ACTIVE |
| 12/7/17 | 2:17 PM | SOCIAL WORKER SPEAKS WITH GREENE |
| 12/7/17 | 2:23 PM | SOCIAL WORKER ENDS CONVERSATION WITH GREENE |
| 12/7/17 | 2:26 PM | SOCIAL WORKER RETURNS TO GREENE'S CELL |
| 12/7/17 | 2:30 PM | SOCIAL WORKER DEPARTS AGAIN |
| 12/7/17 | 8:40 PM | DETOXING, VERY ACTIVE |
| 12/7/17 | 11:08 PM | ACTIVITY SLOWS DOWN |
| 12/7/17 | 11:25 PM | GREENE'S ACTIVITY PICKS UP AGAIN – WHY IS HE STILL IN HOLDING CELL? |

**DAY FIVE**

| | | |
|---|---|---|
| 12/8/17 | 12:10 AM | ACTIVITY SLOWS DOWN AND THEN PICKS BACK UP, CLEAR SIGNS OF WITHDRAWALS |
| 12/8/17 | 2:15 AM | WITHDRAWING, VERY ACTIVE |
| 12/8/17 | 5:15 AM | VERY ACTIVE, APPEARS TO BE "WORKING" AGAIN |
| 12/8/17 | 6:40 AM | SITTING ON FLOOR BUT STILL ACTIVE AND APPEARS TO BE "WORKING" |
| 12/8/17 | 7:28 AM | GREENE APPEARS TO BE COMPLETELY DISORIENTED. MOVING VERY SLOW THEN GOES OUT OF VIEW |
| 12/8/17 | 7:41 AM | GREENE STILL OUT OF VIEW |
| 12/8/17 | 7:44 AM | CORRECTIONAL OFFICER LOOKS INTO GREENE'S CELL AND IMMEDIATELY ENTERS |
| 12/8/17 | 7:45 AM | EMERGENCY RESPONSE BEGINS |

Greene's withdrawal symptoms follow what is normally expected for alcohol detoxification (24 – 72 hours). Greene's activities (withdrawal symptoms) begin to "ramp up" at approximately 48 hours after booking (12/4/17 @ 12:37 PM – 12/6/17 @ 12:20 PM). These symptoms continue to be obvious and ongoing through 72 hours (12/8/17 @ 12:10 AM) at which time they begin to slow and become erratic until approximately 12/8/17 @ 7:28 AM when Greene goes out of view, at which point he becomes unresponsive.

How anyone could be so intentionally neglectful is shocking, to say the least. The failure to respond to Dwayne Greene's worsening medical crises can only be described as torturous and inhumane. By all standards of constitutional and statutory law, and the provisions of International law regarding the treatment of prisoners, Crawford County is in violation and may be criminally at fault for Mr. Greene's death.

Correctional administrators must understand the law as it pertains to the operation of a correctional facility and the care of its inmates. In this regard there is no room for failure. While most correctional administrators are not lawyers, they have to understand the clear provisions of the Constitution, statutes, and case law. There is no other option – every hour of everyday a correctional administrator must interpret and understand the law while operating a detention facility. Terms like deliberate indifference, cruel and unusual punishment, negligence, egregious, non-negotiable, non-delegable, care, custody, and control, reckless disregard, objective reasonableness, and inhumane are operation considerations for every corrections administrator on

000653

a daily basis. To not understand these terms is a guarantee to operate an unconstitutional facility. Understanding the law is not just a "good thing" to do – it is an absolute responsibility. I must also point out while I am not trained in the law, I do understand the responsibilities that government agencies face when their failures and neglect are as glaring as any one individual's. Over the years I have become very familiar with these issues and can address them from a government official/correction administrator's standpoint. Jail administrators and governments must be mindful of these laws to protect their agency from needless litigation.  One has only to read the depositions of Sheriff Kirk Wakefield, Undersheriff Shawn Kraycs, and Captain Randell Baerlocher to understand how the Dwayne Greene and Michael Keiser detoxification incidents were allowed to happen within the Crawford County Jail. In September of 2016, Michael Keiser was also detained in a Crawford County drunk tank to go through detox without the aid of medical assistance for seven days before he was hospitalized. That being said, Sheriff Wakefield testified, in his deposition pertaining to Dewayne Greene, that he had no knowledge or training about alcohol withdrawals or how to recognize the signs and symptoms of detoxification or delirium tremens. The Sheriff additionally stated that he did not understand if withdrawals were a mental or medical issue. Shockingly, the Sheriff testified that he did not know what the policies and procedures of the Crawford County Jail were.  In short, by virtue of his testimony, the Sheriff revealed that he didn't know much at all.

Undersheriff Shawn Kraycs testified that he relied on Captain Baerlocher to run the jail and make all the decisions.

As for Captain Baerlocher, the Jail Commander, he too knew very little about alcohol withdrawals or the jail operation. Specifically, Captain Baerlocher testified that he didn't know what delirium tremens meant and Crawford County offered no training about it or withdrawals. Captain Baerlocher also stated that he didn't know what a substance abuse disorder was. Baerlocher testified that he didn't know how Northern Lakes Community Mental Health Authority was licensed or how Nanci Karczewski was licensed. Captain Baerlocher testified that he didn't know much about the details surrounding Dwayne Greene, or for that matter, how the jail actually operated. Captain Baerlocher also did not know that detoxing should be done only under medical observation. Baerlocher was also unaware that policies and procedures had been replaced by dangerous customs and practices. Baerlocher went on to testify that he did nothing to ensure policy compliance within the Crawford County jail, particularly as it pertained to Dwayne Greene. Captain Baerlocher also testified that no information about Mr. Greene was passed on to him by his jail staff. Yet, in the depositions of Officer Tessner and Officer Christman, they testified that they did inform him. It is also revealing that Captain Baerlocher is frequently viewed in the jail surveillance video speaking to other jail staff in front of Dwayne Greene's cell, making it difficult to understand how he couldn't have known what was taking place. Captain Baerlocher testified that Northern Lakes, a mental health agency, is often called about medical issues. Captain Baerlocher also testified that he did not understand why his correctional officers did not call a Crawford County jail nurse after Nanci Karczewski indicated that Mr. Greene was not mentally ill but was going through DT's. Needless to say, Sheriff Wakefield, Undersheriff Shawn Kraycs, and Captain Baerlocher manage the Crawford County Jail and are responsible for its operation and every inmate detained therein. So, in view of their sworn responses during their depositions, there is little wonder how the care of Mr. Greene became so lethal. As a correctional administrator of many years, the administration of the Crawford County Sheriff's Office Jail is simply shocking to me. Further, it is my professional opinion that if the operation of the Crawford County Jail does

not dramatically improve, other inmates will be exposed to the same unconstitutional and life-threatening conditions.

As to the known violations of Crawford County Sheriff's Office policies and procedures I will only address those that I have received to date. If in the future I am provided additional policies I intend to address those. However, from the policies I have reviewed to date I can opine to a reasonable degree of professional certainty that these regulatory documents were not adhered to in many areas and lacked specificity. From these failures it can be determined that in the areas where policy violations did occur, operating procedures were either just ignored or replaced by dangerous customs and practices. In any case, the unacceptable and unreasonable actions of the Crawford County jail staff were not in accordance, to any degree, as to what is considered correctional best practices and standards, as it pertained to:

- Corrections Inmate Admission Policy, No. 95-002
  Comment: From the booking and screening forms that I have reviewed it would appear that they were completed in a cursory and mindless manner. Officer Tessner had booked Dwayne Greene before and was aware of his alcohol abuse, yet on December 4th, 2017, she only completes portions of the intake documents makes no additional notations of specific observations or suggested referrals. This shortfall is found on the Initial Screening/Classification Form, the Medical Screening Report, and the Inmate Alcohol Drug Usage Questionnaire.

- Corrections Inmate Classification Policy, No. 95-004
  Comment: No classification plan was ever established for Greene. Additionally, no competent risk assessment was ever developed for Mr. Greene that would provide the protection and safety he needed. Classification forms were completed by the same correctional officer that did the booking forms and medical screening questions. These classification forms were incomplete and did not provide information that would have resulted in a proper referral to health services. What information that was gathered was not utilized or shared with other Crawford County Jail sections. According to policy, the Initial Classification was to establish the level of security and treatment the inmate needed. The classification process was also to establish an immediate temporary cell assignment along with a level of supervision needed and any emergency medical or mental health needed. None of this happened for Mr. Greene; he was simply placed in a holding cell to sober up. No medical attention was ever afforded Mr. Greene. Even though Dwayne Greene had a well-known history of alcohol abuse, no one of any level of authority takes that into consideration as it would pertain to the possibility of withdrawals, or subsequently makes a medical referral. The Crawford County Jail Classification Policy considered alcohol or drug withdrawal a special condition – Dwayne Greene is not provided any treatment that would reflect that policy. From my review of the Greene matter there is also no indication that the Jail Commander oversaw any of the classification functions as called for in policy. Sadly, for Mr. Greene there was no acceptable classification process afforded him. Only Officer Tessner's incomplete form completion and unacceptable screening is used as the classification phase for Mr. Greene. It is apparent that Crawford County had no specialized Classification section that would direct and oversee the security and treatment of their inmate population. Nothing in the Crawford County Classification Policy, 95-004, is reflected in the incarceration of Mr. Greene. Additionally, there was no specialized

classification training noted in the personnel files of the officers involved with the Greene admission.

- Corrections Inmate Rights Policy, No. 95-013
  Comment: Mr. Greene's right to basic medical care was denied. Further, Mr. Greene had a right to be free from harm and cruel and unusual punishment, but he was not. The Crawford County policy 95-013 Inmate's Rights was ignored, just as was the Constitution that it was to apply to.

- Corrections Inmate Health Appraisal Policy, No. 01-081
  Comment: No medical screening was ever preformed on Mr. Greene. Further, no appropriate health care was afforded to Mr. Greene. He was simply left in a holding cell to go through withdrawals without the benefit of the medical care necessary. This policy was completely inadequate. Additionally, Officer Tessner lacked the specialized training to perform this task.

- Inmate Mental Health Services Policy, No. 12-103
  Comment: Here too, Officer Tessner lacked the training to perform this task. Further, Officer Tessner made no referral to the medical and/or mental health units of the Crawford County Jail to ensure that Mr. Greene received the care he needed. This policy was completely ignored. Although Officer Larry Foster, Jr. did put in a request for Northern Lakes to evaluate Mr. Greene, in their response, Nanci Karczewski's only indicates that Greene is not having mental issues, he is experiencing DT's. After that, however, no medical evaluation or care is ever called for. "The prevention of injury or loss of life", was never a consideration of the Crawford County Jail personnel. Jail Nurse Jeanne Hufnagel is never contacted about Mr. Greene's intoxication level.

- Corrections Inmate Administration Medication Policy, No. 01-051
  Comment: While Mr. Greene never received any medication that would aid him with his withdrawal process, I would like to point out that a correctional officer is not trained to dispense prescription medications, but through the Dwayne Greene incident reports it is learned that Officer Tessner does, in fact, do this.

- Corrections Inmate Health Care Policy, No. 01-088
  Comment: Completely violated! The Crawford County Sheriff's Office health care personnel never evaluated Dwayne Greene.

Given the multiple failures found within the Dwayne Greene incident it is factually clear that Crawford County Jail policies and procedures were not followed. These policies were inadequate and lacked specificity. Further, there was obviously no supervisory oversight to policy compliance or corrective action for violations. The policies that were available had been replaced with dangerous customs and practices.

Through my experience, I have learned that policy review and updates on a frequent and regular basis are the only way a correctional administrator can ensure that these procedures are comprehensive and inclusive of operational issues that have become problematic. Correctional administrators must also ensure full policy compliance along with on-going policy training.

More specifically, as it pertains to intake and classification, it is evident that no effort was made to properly classify Mr. Greene in an appropriate manner, neither from a security perspective nor from a medical perspective. Instead, Mr. Greene was left to languish in the obvious and predictable conditions of detoxification and withdrawals. No Crawford County or Northern Lakes personnel ever interceded to provide the medical care necessary to prevent the death of Dwayne Greene. This opinion is shared by Dennis Simpson and Christopher Briggs in their Summary Opinion of the Dwayne Greene incident, and passionately outlined in the Expert Reports of Luethy, Bates, Spitz, Shiener, Papazian, Fillman, Pozios, and Malinoff concerning the Dwayne Greene matter.

Regarding medical services, nothing reflective of adequate medical care ever occurred for Mr. Greene. In fact, the clear symptoms of his withdrawals were never really noticed or addressed by Crawford County Jail personnel, security, or medical. Mr. Greene was just ignored and uncared for, clearly demonstrating the factual indifference of Crawford County.

As for the issues of administrative failure – had Crawford County Jail staff received adequate training, they would have understood the lifesaving importance of correctional classification, security, observation, and medical care: the result of which would have prevented the death of Dwayne Greene while in the custody of the Crawford County Jail. The neglect demonstrated in this wrongful death is the direct responsibility of all management levels of the Sheriff's Office from the Sheriff to the line level correctional officers. Policies, training, and supervision must improve now before any additional tragedies can occur. As for the failures of Crawford County to comply with the directives of the Michigan Administrative Rules for Jails and Lockups, I would provide the following:

- Medical Treatment R791.705
- Health Care R791.728
- Pharmaceuticals R791.730
- Health Screening R791.731
- Health Appraisals R791.732

  Comment: At Intake, it was clear that Mr. Greene had a potentially serious medical issue that needed immediate attention, yet no medical care was provided. In fact, no medical professional ever saw Mr. Greene except on one occasion and that was by a mental health care specialist that did nothing to ensure that Mr. Greene was referred to a health care provider that could address his withdrawal symptoms and provide necessary observation and medication. No medical plan was developed, no housing plan established, no medical history secured, no detoxification plan developed, no referrals were initiated, no observation levels determined. Nothing was done and because of these significant failures, Mr. Greene was found unresponsive in his cell and later died.

The Crawford County Sheriff's Office failed to properly manage the health care provided to the inmate population entrusted in their care. This responsibility is a non-negotiable and non-delegable duty of the Sheriff and his staff. Regardless of the entity providing the health care, mental health care, medication and detoxification protocols within a correctional facility, it ultimately remains the responsibility of the Sheriff and his/her administration to monitor the performance and the decisions they make on a case by case basis. From a healthcare standpoint, Crawford County officials, at all levels, should have been aware of what was occurring with Dwayne Greene

regarding his medical conditions, mental health issues, and medications, as well as withdrawal and detoxification needs. It is factually known that they did not.

During my numerous years as a correctional administrator, I have assembled a wealth of knowledge and experience in the overall operation/s of correctional facilities. I am particularly knowledgeable with the use of private – for profit – health care providers. I am equally experienced in the management of substance abuse programs and detoxification issues. I am also aware of all other operational responsibilities necessary to manage a constitutional correctional facility that completely provides for the care, custody, and control of its inmate population. Failure to do so represents gross negligence, deliberate indifference, and reckless disregard for the constitutional rights of the inmates incarcerated within. Administrative failures of this nature create life-threatening dangers that signify negligence at its very worst. Crawford County failed to provide such oversight regarding Dwayne Greene's health care and detoxification – and as a result, he is dead.

- Health Screening R791.731
- Inmate Classification R791.738
  Comment: Mr. Greene's health screening was done by the same correctional official, Corporal Tessner that booked him and classified him. Information provided through these processes and documents was incomplete and never utilized to properly care for Mr. Greene. Additionally, Corporal Tessner, who completed the intake process and health screening and classification, was not a health care professional in any way.  As for R791.738, there was no classification unit within the operation of the Crawford County Jail.

- Inmate Rights R791.718
  Comment: Dwayne Greene's constitutional and statutory rights were ignored at every juncture of his confinement in the Crawford County Jail.

- Detoxification Cell R791.734
- Holding Cells R791.735
  Comment: Dwayne Greene was never moved out of D01 and D02. He was confined to these holding cells for five days until he was found unresponsive. No appropriate detoxification cell was ever afforded Mr. Greene. Detoxification cells are specialized units where appropriate observation and health care can easily and safely be provided. The location in which Mr. Greene was held was completely inadequate.

- Staffing R791.736
  Comment: Staffing, as it pertains to both correctional and medical, was inadequate as Mr. Greene never received the specialized observation he needed, nor was he ever seen by medical personnel.

It is inconceivable to this corrections practitioner, how it is possible for any sheriff's office, correctional department or correctional health care provider to deliberately ignore the known deadly results of untreated detoxification, psychiatric disorders, and mental health issues. However, the factual events surrounding the death of Mr. Greene prove that all these correctional authorities, both security and medical did, and the result was completely predictable.

{00722407.DOCX}

Crawford County had a statutory obligation to follow the Michigan Administrative Rules for Jails and Lockups but as is factually known they did not in many governing areas, as mentioned above. I am forced to wonder who is inspecting the Crawford County Jail. I am forced to wonder this as a result of my review of three State of Michigan, Department of Corrections Inspections of the Crawford County Jail which I received regarding this matter. The dates of those inspections were January 16, 2017, July 14, 2017 and May 29, 2018. While the Dwayne Greene incident is wrought with operational failures, all of these Michigan DOC Inspections reflect a perfect score. This is absurd, at best! I, professionally, find issues with such areas as; Detoxification Cells, Staffing, Inmate Rights, Health Care, Health Screens, Health Appraisals and Inmate Classification. Had these inspections been completed with any degree of credibility, these inspectors would have had these same concerns. Perhaps the Michigan Department of Corrections is also indifferent to the care of Crawford County inmates.

Although I do not know if Crawford County is accredited by the American Correctional Association, the standards contained within their Correctional Standards Manuals are considered the minimum "Best Practices" for the corrections business. For the purpose of this report I have enumerated the standard and subsection that Crawford County is in conflict with. I will address Crawford County failures as if the standards were mandatory. I would also mention that Crawford County is additionally in violation of portions of the American Correctional Association Standards for Adult Correctional Institutions, 4th Edition, and those of the American Correctional Associations, Performance – Based Standards for Adult Local Detention Facilities, Fourth Edition. With respect to the Standards for Adult Correctional Institutions, I would specify:

- **American Correctional Association Standards for Adult Correctional Institutions, 4th Edition**
  - **Part One, Administration and Management**
    - Section A: General Administration
      - Purpose and Mission
      - Policy and Goal Formulation
      - Policy and Procedure Manuals

      Comment: Crawford County's policies were inadequate and lacked specificity. This is particularly true as it pertains to intake screening, medical screening, classification, medical and mental health care and housing unit security.

      Specifically; 4002, 4003, 4004, 4012, 4013, 4017
    - Section C: Personnel
      - Personal Policy Manual
      - Staffing Requirements
      - Personnel Files
      - Code of Ethics
      - Rules and Regulations

      Comment: Crawford County Sheriff's Office Policies make no mention of a Code of Ethics.

      Specifically; 4048, 4050, 4051, 4069
    - Section D: Training and Staff Development
      - Training Plan

- Training Evaluations
- Training Requirements
- Administrative Staff
- Correctional Officers
- Specialist Employees

Comment: From the number of violations revealed in the Greene incident it is obvious that departmental training was inadequate. Additionally, this opinion is supported by the fact that Crawford County staff had replaced established policy with dangerous customs and practices.

Specifically; 4073, 4083, 4084, 4085, 4086, 4089

o **Part Three, Institutional Operations**
  - Section A: Security and Control
    - Security Manual
    - Control Center
    - Correctional Officer Assignments
    - Patrols and Inspections
  - Section D: Special Management
    - General Policy and Practice
    - Admission and Review of Status
    - Supervision
    - Administrative Segregation/Protective Custody

Comment: Here too, it is clear that Crawford County was indifferent to the care and safety of their inmate population and in particular, Dwayne Greene. This opinion is based on the known fact that the Crawford County Sheriff's Department and their health services provider did not follow their own policies. These failures are found within actions that involved intake, medical, and mental health screening, classification, special housing, medical care, supervision, and training. Additionally, Mr. Greene was afforded no specialized medical housing or supervision. He was merely held in a drunk tank to sober up.

Specifically; 4133, 4140, 4174, 4177, 4180, 4183, 4249, 4251, 4253, 4257, 4260

  - Section E: Inmate Rights
    - Protection from Harm

Comment: Failures here are tragically clear and the death of Dwayne Greene is proof of such. Constitutional rights and statutory governances were simply ignored.

Specifically; 4281

o **Part Four: Institutional Services**
  - Section A: Reception and Orientation
    - Admission
    - Reception and Orientation
    - New Inmates
  - Section B: Classification
    - Classification Plans

- Classification Status Reviews
- Special Needs Inmates

Comment: Crawford County intake personnel, medical screeners, and the classification staff failed to share acquired security and medical information about Mr. Greene with other significant units. Classification is never involved, security staff ignored Mr. Greene's deteriorating condition, and CMH does not refer him to an adequate treatment facility or provide any care. While I am not trained in the medical field my many years of experience caring for detoxing individuals gives me the knowledge, I need to manage this very specialized health care condition through a competent health care provider.

Specifically; 4285, 4286, 4287, 4295, 4296, 4297, 4299, 4305

- Section E: Health Care
  - Continuum of Health Care Services; Performance Standard 1A
    - Access to Care
    - Clinical Services
    - Continuity of Care
    - Treatment Plan
    - Infirmary Care
    - Chronic Care
    - Health Screens
    - Health Appraisal
    - Mental Health Program
    - Mental Health Screen
    - Mental Health Appraisal
    - Mental Health Evaluations
    - Detoxification
    - Management of Chemical Dependency
    - Pharmaceuticals

Comment: Crawford County's intake health care screen was non-existent, and no referrals were made by the intake and booking officers to ensure that Mr. Greene received the health care he needed. Further, detoxification protocols were not available within the Crawford County Jail.

Specifically; 4344, 4347, 4348, 4350, 4362, 4365, 4368, 4369, 4370, 4376, 4377

- Staff Training; Performance Standard 2A
  - Health Authority
  - Provision of Treatment
  - Employee Orientation
  - Offender Assistants
- Offender Treatment; Performance Standard 3A
  - Special Needs
  - Segregation
- Safety and Sanitation; Performance Standard 6A
  - Injury Prevention

000661

- Section F: Social Services
  - Counseling
  - Substance Abuse Programs

Comment: For Dwayne Greene, none of these very specialized health care activities occur to any degree of completeness that would ensure he was housed in the proper location and afforded the care he required. Further, as it pertains to mental health and medical treatment, these considerations are never afforded to Mr. Greene in a comprehensive and professional manner. While the information was gathered and available, neither Security nor Medical use it to any degree. Even though it was known that Greene had detoxification issues and was mentally disordered, no care was provided to him and he was improperly housed. There could have been no confusion on the part of Crawford County officials as to the protections Mr. Greene needed and the dangers that would result from the indifference to these needs. The Eighth Amendment forbids jail and prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with deliberate indifference to their serious medical and mental health needs. Specifically: 4380, 4385, 4399, 4433, 4337

- Appendices
  - Appendix A, Classification Guidelines
  - Appendix B, Guidelines for Institution Security Levels
  - Appendix E, Health Care Outcome Measures Worksheet
- **American Correctional Association, Performance Based Standards for Adult Local Detention Facilities, Fourth Edition**

The violations and failures of the Crawford County Sheriff's Department to follow the ACA Performance Based Standards are categorically the same as those previously outlined in the Standards for Adult Correctional Institutions and while just as significant, failures will not be repeated here. These ACA Performance Based Standards are:

- **Part Two: Security**
  - Section A: Protection from Harm; Performance Standard 2A
    - Control
    - Staffing
    - Reception
    - Classification and Segregation
    - Special Management Inmates

Specifically; 2A.03, 2A.04, 2A.05, 2A.11, 2A.18, 2A.19, 2A.21, 2A.22, 2A.25, 2A.30, 2A.32, 2A.34, 2A.35, 2A.44, 2A.45, 2A.46, 2A.52, 2A.54, 2A.55
- **Part Four: Care**
  - Section C: Continuum of Health Care Services; Performance Standard 4C
    - Access to Care
    - Clinical Services
    - Continuity of Care

- Referrals
- Treatment Plan
- Infirmary Care
- Chronic Care
- Health Screens
- Health Appraisal
- Periodic Examinations
- Mental Health Program
- Mental Health Screen
- Mental Health Appraisal
- Mental Health Referrals
- Detoxification
- Management of Chemical Dependency
- Pharmaceuticals
- Special Needs Inmates
  Specifically; 4C.04, 4C.05, 4C.07, 4C.08, 4C.09, 4C.19, 4C.22, 4C.29, 4C.36, 4C.37, 4C.40
  - Section D: Health Services Staff; Performance Standard 4D
    - Health Authority
    - Provision of Treatment
    Specifically; 4D.02


- o **Part Five: Program and Activity**

  - Section A: Performance Standard 5A: Inmate Opportunities for Improvement
    - Expected Practices
      - o Counseling
      - o Substance Abuse Programs
      Specifically; 5A.03, 5A.04
- o **Part Six: Justice**
  - Section A: Inmate Rights; Performance Standard 6A
    - Protection from Abuse
    Specifically; 6A.07
- o **Part Seven: Administration and Management**
  - Legal Status; Performance Standard 7A
    - Legal Issues
    Specifically; 7A.01
  - Section B: Recruitment, Retention & Promotion; Performance Standard 7B
    - Training and Staff Development
    Specifically; 7B.01, 7B.05, 7B.06, 7B.08, 7B.09, 7B.10, 7B.11, 7B.12
  - Section C: Staff Ethics; Performance Standard 7C
    - Code of Ethics
    Specifically; 7C.02
  - Section D: Facility Administration; Performance Standard 7D

000663

- Mission
- Policies and Procedures
  Specifically; 7D.03, 7D.06
  o **Appendices**
  - Appendix A: Classification Guidelines
  - Appendix B: Guidelines for Institutional Security Levels
  - Appendix F: Health Care Outcome Measures Worksheet

The American Correctional Association minimal standards manual is entitled – American Correctional Association Core Jail Standards. Any correctional agency should, at a minimum, strive to at least meet these operational levels. Specifically, Crawford County demonstrated failures with the following core standards:

- **American Correctional Association Core Jail Standards**
  o **II. Security:**
  - Performance Standard: Protection from Harm 2A
  - Expected Practices
    - 1-CORE – 2A – 01 Control
    - 1-CORE – 2A – 02 Correctional Officers' Posts
    - 1-CORE – 2A – 03 Personal Contact Between Staff and Inmates
    - 1-CORE – 2A – 09 Staffing
  - Intake/Admissions
    - 1-CORE – 2A – 13 Legal Commitment and Medical Review
    - 1-CORE – 2A – 14 Admission
  - Health Screening
  - Suicide Screening
  - Alcohol and Drug Screening
  - Assignment to Initial Housing Area Based on Their Immediate Needs and Security
  - Classification and Separation
    - 1-CORE – 2A – 16 Objective Classification System
    - 1-CORE – 2A – 17 Separation in Classification
  - Special Management Inmates
    - 1-CORE – 2A – 21 Segregation for Protection
    - 1-CORE – 2A – 22 Health Care
    - 1-CORE – 2A – 24 Observation of Special Management Inmates
    Comment: As I have outlined in this report Crawford County failed to afford Mr. Greene with the classification status and housing assignment, he needed to receive the detoxification health care necessary to save his life. It should also be noted that no medical or trained classification personnel were available at the Crawford County Jail that could have identify and respond appropriately to Mr. Greene's detoxification issues.
  o **IV. Care:**
  - Performance Standard: Continuum of Health Care Services 4C
  - Expected Practices
    - 1-CORE – 4C – 01 Access to Care/Clinical Services
    - 1-CORE – 4C – 02 Continuity of Care/Referrals

000664

- 1-CORE – 4C – 07 Chronic Care
- 1-CORE – 4C – 09 Health Screens
  - Mental Health
  - Current Medications
  - Health History
  - Suicide Assessment
  - Detoxification
  - Observation Level of Behavior
  - Referral Plan
  - Process for Medical Disposition, Medical, Mental, Detoxification
- 1-CORE – 4C – 10 Intra-System Transfer and Health Screening
- 1-CORE – 4C – 11 Health Appraisal
- 1-CORE – 4C – 12 Access to Mental Health and Substance Abuse Service Programs
  - Mental Health
  - Referral
  - Crisis Intervention
  - Stabilization
- 1-CORE – 4C – 14 Social Detoxification
- 1-CORE – 4C – 15 Pharmaceuticals
- Performance Standard: Health Services Staff 4D
- Expected Practices: Health Authority
  - 1-CORE – 4D – 03 Provision of Treatment
  - 1-CORE – 4D – 18 Health Records

Comment: As Mr. Greene's physical condition continued to deteriorate throughout his incarceration at the Crawford County Jail, no security or medical personnel ever take any measures to see that he is afforded the necessary detoxification treatment he needs. Here again, while the medical screening was performed on Mr. Greene during the intake process, nothing else appropriate occurred. No medical plan was developed, no housing plan was developed, no medical history information was sought, no criminal history was secured, no medications were provided, no detoxification protocols were ordered, no referrals were initiated, no observation levels determined, and classification was apparently never involved. Due to these failures, Mr. Greene is no longer alive.

- **VI. Justice:**
  - Performance Standard: Inmate Rights 6A
  - Expected Practices
    - 1-CORE – 6A – 06 Protection from Abuse
  - Performance Standard: Inmate Rights Fair Treatment 6B
    - 1-CORE – 6B – 03 Disabled Inmates

Comment: No consideration was given to Mr. Greene's federally protected constitutional rights. Nor did Crawford County ever consider the failures of their staff's performance and provide additional and follow-up training that would have corrected the deadly results of unreasonable customs and practices. No one of authority in a supervisory position ever steps in to correct these failures and as a

result, safety and security is set aside for the convenience of operating without concern for policy.

- o   **VII. Administration and Management:**
  - ▪ Performance Standard: Recruitment, Retention and Promotion; 7B Staff, contractors and volunteers demonstrate competency in their assignments
  - ▪ Expected Practices
    - • 1-CORE – 7B – 02 Training and Staff Development
    - • 1-CORE – 7B – 03 Pre-Service and Annual Training

    - • 1-CORE – 7B – 04 Training Prior to Assuming Duties
    - • 1-CORE – 7B – 05 In-Service Training
  - ▪ Performance Standard: Facility Administration 7D
    - • 1-CORE – 7D – 04 Inmate Records
    Comment: Given the tragic death of Dwayne Greene, it is factually obvious that all core standards involving staff development and training were insufficient to protect the lives of the inmate detainees within the Crawford County Jail.

- •   **American Correctional Association, 2014 Standards Supplement**
  - o   Core Jail Standards (CORE), 1st Edition
  - o   Performance – Based Standards for Correctional Health Care in Adult Correctional Institutions (HC) 1st Edition
  - o   Appendix A: Guidelines for Institution Security Levels
  - o   Appendix B: Classification Guidelines
  - o   Appendix E: ACA Health Care Outcome Measures, Technical Guidance Health Care Outcome Measures

Here again, Crawford County has turned a blind eye to what are considered the basic national standards for effective and safe correctional facility operations. While these are only offered as the minimum basic standard, successful correctional agencies use them, whether they are accredited or not. Having been accredited by the ACA at both the local and state level, I am extremely familiar with the process and can speak to these issues in a knowledgeable and intellectual manner.

Given the irreprehensible and shocking failure of the Crawford County Sheriff's Office and their health care providers to provide the slightest of adequate medical, mental, and detoxification health care, it would go without specificity that these authorities would also be negligent in complying with the Provisions of the National Commission on Correctional Health Care, Standards for Health Services In Jails as categorically listed below. Because these are not mandated standards I will not comment on possible violations of these sections, I will only enumerate the areas of concern. Also, I will point out that I am not a medical doctor, a nurse, or a licensed social worker. I am, however, a correctional administrator with many years of experience managing correctional health care providers. I understand that ensuring that all inmates receive the appropriate health care is always the ultimate responsibility of the correctional agency. Correctional administrators must understand the care that is being afforded their inmate population on an on-going basis. From a health care standpoint, having knowledge of the provisions of NCCHC standards is critical to operating a constitutional jail.

- **National Commission on Correctional Health Care, Standards for Health Services In Jails, 2014**
  - o Section A: Governance and Administration
    - ▪ J – A – 01 Access to Care
    - ▪ J – A – 02 Responsible Health Authority
    - ▪ J – A – 05 Policies and Procedures
    - ▪ J – A – 08 Communication On Patients' Health Needs
  - o Section C: Personnel and Training
    - ▪ J – C – 04 Health Training for Correctional Officers
    - ▪ J – C – 05 Medication Administration Training
    - ▪ J – C – 08 Health Care Liaison
    - ▪ J – C – 09 Orientation for Health Staff
  - o Section D: Health Care Services and Support
    - ▪ J – D – 01 Pharmaceutical Operations
    - ▪ J – D – 02 Medication Services
    - ▪ J – D – 05 Hospital and Specialty Care
  - o Section E: Patient Care and Treatment
    - ▪ J – E – 02 Receiving Screening
    - ▪ J – E – 04 Initial Health Assessment
    - ▪ J – E – 05 Mental Health Screening and Evaluation
    - ▪ J – E – 09 Segregated Inmates
    - ▪ J – E – 12 Continuity and Coordination of Care During Incarceration
  - o Section G: Special Needs and Services
    - ▪ J – G – 01 Chronic Disease Services
    - ▪ J – G – 02 Patients with Special Health Needs
    - ▪ J – G – 03 Infirmary Care
    - ▪ J – G – 04 Basic Mental Health Services
    - ▪ J – G – 06 Patients with Alcohol and Other Drug Problems
    - ▪ J – G – 07 Intoxication and Withdrawal
  - o Section I: Medical – Legal Issues
    - ▪ J – I – 02 Emergency Psychotropic Medication

As with other standard violations addressed earlier in this report, these correctional health care provisions were also ignored as it related to Dwayne Greene. As Greene is no longer living, little if any, factual support is required here. Michigan Jail Standards and the American Correctional Association's Jail Standards track the standards of the National Commission on Correctional Health Care Standards, and as demonstrated with one association's standard so too is it evident that these failures are also present with the others due to the clear actions of complete and obvious indifference and disregard to the life of Mr. Greene.

The American Bar Association, Standards for Criminal Justice, Third Edition, Treatment of Prisoners were also available to Crawford County Officials to use to assist with the establishment of safe and constitutional jail policies and procedures. Although, like the violations already mentioned, I would suspect these officials did not reference these standards. For my report, I will highlight the ABA Standards that Crawford County has, in fact, ignored.

- **American Bar Association, Standards for Criminal Justice, Third Edition, Treatment of Prisoners**
  - **Part I, General Principles**
    - Standard 23 – 1.1 General Principles Governing Imprisonment
    - Standard 23 – 1.2 Treatment of Prisoners
  - **Part II, Intake and Classification**
    - Standard 23 – 2.1 Intake Screening
    - Standard 23 – 2.2 Classification System
    - Standard 23 – 2.3 Classification Procedures
    - Standard 23 – 2.4 Special Classification Issue
    - Standard 23 – 2.5 Health Care Assessment
    - Standard 23 – 2.6 Rationales for Segregated Housing
    - Standard 23 – 2.8 Segregated Housing and Mental Health
  - **Part III, Conditions of Confinement**
    - Standard 23 – 3.2 Conditions for Special Types of Prisoners
    - Standard 23 – 3.8 Segregated Housing
    - Standard 23 – 5.5 Protection of Vulnerable Prisoners
  - **Part V, Personal Security**
    - Standard 23 – 5.1 Personal Security and Protection from Harm
    - Standard 23 – 5.5 Protection of Vulnerable Prisoners
  - **Part VI, Health Care**
    - Standard 23 – 6.1 General Principles Governing Health Care
    - Standard 23 – 6.2 Response to Prisoners' Health Care Needs
    - Standard 23 – 6.3 Control and Distribution of Prescription Drugs
    - Standard 23 – 6.5 Continuity of Care
    - Standard 23 – 6.11 Services for Prisoners with Mental Disabilities
    - Standard 23 – 6.12 Prisoners with Chronic or Communicable Diseases
  - **Part VII, Personal Dignity**
    - Standard 23 – 7.1 Respect for Prisoners
    - Standard 23 – 7.2 Prisoners with Disabilities and Other Special Needs
  - **Part X, Administration and Staffing**
    - Standard 23 – 10.1 Professionalism
    - Standard 23 – 10.2 Personnel Policy and Practice
    - Standard 23 – 10.3 Training
    - Standard 23 – 10.4 Accountability of Staff
  - **Part XI, Accountability and Oversight**
    - Standard 23 – 11.1 Internal Accountability
    - Standard 23 – 11.2 External Regulation and Investigation
    - Standard 23 – 11.3 External Monitoring and Inspection
    - Standard 23 – 11.4 Legislative Oversight and Accountability

Utilization of the ABA Standards and specific information found within the AELE Monthly Law Journal (highlighted in the Materials Reviewed Section of this report) could have enabled Crawford County to have important knowledge to develop constitutional policies and procedures and applicable training that may well have prevented the incidents associated with the death of Mr. Greene from occurring. Sadly, without these scholarly, legal insights and their incorporation to policy, customs and practices will always, and did, prevail.

As I have indicated earlier in this report I am not formally trained in the law, but I do understand the importance of today's correctional administrators to be aware of the legal issues that surround the corrections business. Without this knowledge and the application of it to the operation, it is not possible to manage a constitutional jail. All of my experience as a correctional manager over the years has continuously reinforced this position.

Given the severity of the Crawford County Sheriff's Office failures that created the cruel and unusual and tortuous conditions imposed on Mr. Greene, I would additionally point out they have also ignored the provisions of International Law for the treatment of prisoners. Specifically, these governing laws are addressed in the following documents:

- International Covenant on Civil and Political Rights (ICCPR) Article 7, Article 10 and Article 14
- International Human Rights Law – Right to Legal Access and Due Process; Right to Liberty; Freedom from Arbitrary Detention; Prohibition on Torture and Cruel, Inhumane or Degrading Treatment
- Standard Minimum Rules for Treatment of Prisoners; Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955 and approved by the Economic and Social Council by its Resolutions 663c (XXIV) of July 31, 1957 and 2076 (LXII) of May 13, 1977
- United Nations Human Rights Commission Standard Minimum Rules for the Treatment of Prisoners

It is an often-overlooked fact that corrections in the United States is also subject to the provisions of International Law as it pertains to the treatment of prisoners.

At the Crawford County Sheriff's Office, if the policy violations, statutory violations, standards omission, and constitutional violations don't stop immediately, and appropriate policies and procedures developed, along with enhanced training delivery and more comprehensive supervisions instituted, additional inmates will be subject to unwarranted and unjustifiable cruelty, punishment, statutory and constitutional rights violations and the real possibility of being subject to inadequate and unacceptable health care of all forms, as a direct result of this deliberate indifference and callous disregard – both of which were occurring because customs and practices had superseded established policies, as deficient as they were. Crawford County Sheriff's Office officials should have known that the customs and practices within the jail had become dangerous and immediately corrected them. They did not, and Mr. Greene's federally protected constitutional rights were violated. If immediate steps are not taken to stop these practices, additional inmates will be exposed to the same unacceptable treatment. The Constitution that protects us all prohibits intentional, willful and wanton neglect that grossly and recklessly denies individuals of their constitutional rights. Additionally, treatment that is factually and legally unreasonable is also clearly considered a deprivation of constitutional rights. Mr. Greene was exposed to conditions and care that denied all of these fundamental provisions. In part, these failures and violations included: protection from harm, cruel and unusual punishment, denial of due process, denial of medical and mental health care, and the denial of basic human needs. In today's corrections business administrators must have a strong knowledge of the law as it pertains to correctional services matters. Nothing short of this will suffice. To ignore these laws is a certain way to operate an unconstitutional facility. All of my correctional experiences of forty years support this opinion.

000669

During these same years of experience, I have established a wealth of knowledge about the importance of comprehensive policies for every area of a correctional facility. This knowledge allows me to evaluate the deficiencies of Crawford County policies and procedures and speak to how these failures contributed to the death of Dwayne Greene.

Crawford County officials had a constitutional mandate to protect Mr. Greene and provide him with appropriate care, custody and control that protected him from harm; they did not and as a result he suffered the effects of detoxification and as a result, he died. While these acts of omission show a gross lack of concern, they are also clear indicators of administrative failures in operational areas such as policy and procedures and training and supervision. From an overall sense, Crawford County not only failed to provide adequate policies, training and supervision, they also failed to ensure comprehensive medical/mental health screening, or an objective classification system that was inclusive of all information required to make an informed decision about any inmates' housing assignment. In support of this generalized opinion, let me point out that it is factually known that courtroom information about Dwayne Greene's alcohol use and medical problems with withdrawal from quitting was not shared and not utilized,   intake/booking information was incomplete, not shared and not utilized; medical and mental health information was incomplete, not shared and not utilized; classification information was incomplete, not an accumulation of all other intake information, not shared and was not utilized.  Had policy and procedures been adhered to, medical care provided, and classification been effective, Mr. Greene may not have suffered the dangerous and deadly effects of withdrawals.

Given the number of failures in the Dwayne Greene matter, it is clear that training within the Crawford County Sheriff's Office is extremely deficient. Policies must be trained and retrained until the administration is certain that their personnel understand. Clear policies and procedures and training are only effective if they are understood and the staff performance is reflective of a definite comprehension. Without this demonstrated proficiency, customs and practices will always prevail. Training in the correctional setting must be meaningful and specific on how to respond in every known situation, circumstance, and condition. From the depositions given in the Greene matter, it is clearly derived that the training of the Crawford County Sheriff's Office was grossly inadequate.  In that the Sheriff's Office Correctional staff testified that they were not trained on the dangers of alcohol detoxification dramatically supports this opinion as each of these employees had received Mental Health First Aid training which included substance abuse withdrawals.

Training must be afforded to every employee in the correctional setting at every level of authority. Further training must be provided repeatedly. Cross-training is also essential so that every component of the Crawford County Jail understands the purpose, responsibility and function of each other and how their duties are interrelated. Failure to ensure this cross-training is effective will result in one problematic event after another and the overall mission of the department will continue to fail. I too would point out that failures in policy development and training is not the responsibility of line staff, it is the unquestionable responsibility of the government, the Sheriff and Crawford County.

It is the responsibility of the Crawford County Sheriff's Office to regularly review performance issues that demonstrate deficiencies in written policies and procedures and training adjustment. It is obvious that this is not happening at the Crawford County Sheriff's Office. Only with ongoing

updates in policy and training can these officials know that what they want to accomplish is being provided by their employees and service providers.

The Training component must not only ensure that staff gets the material necessary, but they must also make certain that employees in turn understand it and can comply with it in the performance of their duties. When performance deficiencies are discovered, it is the responsibility of administrative and training units to retrain through annual refresher courses or roll call training. Having comprehensive training plans is useless if the objectives are not understood or performed. Crawford County would be wise to redevelop all their policies and training. During my career I have always been responsible for the training of the personnel in my charge. This responsibility was both at a local and state level. From this experience I clearly understand the importance of providing this training correctly and on a frequent basis.

Along with policy improvements and better staffing, Crawford County must also address the supervisory oversight of their staff at all levels to ensure that all policies and procedures are followed completely in the manner that they were intended to provide direction. Without good supervision and oversight, staff will normally begin to alter the original intent of the policies for a multitude of personal and operational reasons. When this occurs, customs and practices become the operational standards and the purpose of policy is eroded. It must be the daily goal of every Crawford County Sheriff's Office administrative supervisor to ensure that every activity of their jail is addressed in the manner it was planned. Nothing short of this will ensure that the Crawford County Jail operates in a constitutional and statutory manner.

During my review of the Greene matter, I cannot find where any Crawford County Jail supervisor reviewed the actions of their security staff as it pertains to Greene's classification, medical care, housing assignment and observation schedule. Further, I can find no evidence that any jail supervisor questioned the medical and security management of Dwayne Greene. These omissions within the supervisory ranks include failure to review intake information and medical screening reporting, classification plans, security, housing assignments, medical care, detoxification efforts, mental health evaluations, criminal history reviews, medical history reviews, medication needs, frequent and regular assessments of his medical status and shared communication with Mr. Greene's other medical providers. At intake, Mr. Greene's well-known history of alcohol abuse was clear. Mr. Greene even expressed his personal concerns of withdrawals to a Crawford County Jail Deputy. Unfortunately, this information and that of the medical screen, classification, and the Northern Lakes is not utilized to prepare a treatment and custody plan. Even more unfortunate is that no supervisor is known to have questioned this lack of coordination. Crawford County's failure to manage their jail staff and health care provider is just another contributing fact that led to the unnecessary death of Dwayne Greene. From my experiences as a correctional manager, I have learned that absolute supervision of policy compliance is necessary to ensure that a correctional facility operates the way it was intended to. This supervision must be a part of every correctional section at every level.

Additionally, no Crawford County Jail administrative staff attempted to properly manage the health care provided to the inmate population entrusted to their care. While Crawford County should have been well aware of the dangers involved with detoxification and withdrawals, they ignored the real and obvious symptoms exhibited by Dwayne Greene. These acts of management omissions were directly related to the ultimate death of Dwayne Greene. In fact, while security and classification were also well aware of Mr. Greene's medical condition, no one made any effort

to question this lack of action. Even when the correctional officers knew Mr. Greene was in extremely grave health, they failed to refer him to medical for proper care. Furthermore, no medical or correctional staff ever followed up on Dwayne Greene's deteriorating condition. These failures are directly related to the tragic and unnecessary death of Mr. Greene. As I have indicated before, Crawford County has a non-negotiable responsibility to oversee and manage their health care provider to ensure that their inmate population is receiving all of the medical care that they require on a case by case basis. The Expert Reports of Dr. Bates, Luethy and Simpson and Briggs, Spitz, Shiener, Papazian, Fillman, Pozios, and Malinoff, support my opinions found in this report. Crawford County and Northern Lakes CMH should have known that Mr. Greene was experiencing an emergency medical event and had him immediately transferred to a hospital.

With respect to the failures of the Crawford County Classification Unit, it needs to be clearly pointed out that nowhere in the materials reviewed to date surrounding the death of Dwayne Greene can I find where the Crawford County Jail utilized any traditional classification practices that would have afforded him the specialized care and appropriate housing which he so desperately needed. Acceptable correctional classification systems incorporate all known facts regarding an inmate to include current charges, criminal history, current and past behavior, current and past medical conditions to make security housing arrangements. Only with this accumulation of information can an appropriate and safe housing and observation plan be established for the well-being of the inmate involved. Acceptable industry standards about classification were also overlooked. In my professional opinion, no classification process was ever incorporated in the Dwayne Greene custody plan. Once again, a dreadful failure that contributed to the tragic events that led to the death of Mr. Greene. Further, according to Crawford County Sheriff's Office Policy 95-004 Classification, any classification officer is to be trained in classification procedures; however, none of the named defendants in the Greene case have received that specialized training. This fact is derived from my review of each of these defendants' training records. Further, none of these defendants have any specialized training associated with intake, booking, medical/mental health screening or recognition. Officer Tessner booked and classified Mr. Greene – her recorded forms were incomplete and without specificity and were not inclusive of any special treatment notations or medical referrals.

Inadequate booking information and criminal history review, poor and confusing medical history reporting, along with known present medical conditions, and no classification effort all contributed to this unnecessary death.

In the business of corrections, the central points that will ensure that security failures don't occur in a correctional facility are intake processing, classification, and health services. These sections are a critical part of any correctional facility operation and should always be utilized as if they were the hub of the security wheel. Acceptable correctional classification systems incorporate all known facts regarding an inmate to make security housing arrangements, and where necessary appropriate treatment plans. Only with this accumulation of information can an appropriate and safe housing and observation plan be established for the well-being of the inmate involved. Acceptable industry standards pertaining to classification were also overlooked. Immediate policy development in the classification area is critical for Crawford County. What Crawford County has now is no classification system at all. This classification policy should also make it extremely clear that Classification and only Classification makes housing assignments and must authorize all inmate moves. Only then can Crawford County be assured that inmate management is inclusive of

all known information about any given inmate, to include current charges, criminal history, current and past medical and mental health issues, current and past institutional behavior, current and past drug and alcohol use, and any other specific information that may affect an appropriate housing assignment, and treatment.

As for a Classification System, Crawford County should only consider an Objective Jail Classification system that is inclusive of "Risk Assessment" factors as well as "Stabilization" factors. In support of my position on the Objective Jail Classification Systems, I offer the following nationally recognized publications pertaining to the utilization of an Objective Jail Classification System:

- National Institution of Corrections; Objective Jail Classification Systems: A Guide for Jail Administrators
- Texas Department of Criminal Justice, Correctional Institutions Division; The Advantages of an Objective Classification System
- Northpointe, Institute for Public Management, Inc.; Classification Implementation Manual for Smaller Jails
- Corrections.com; A look at Subjective and Objective Classification
- The National Sheriff's Association; Jail Classification and Discipline
- National Institution of Corrections; Internal Prison Classification Systems, Case Studies in Their Development and Implementation
- National Institution of Corrections; Comprehensive Objective Prison Classification, Participant Manual
- National Institution of Corrections; Objective Prison Classification, A Guide for Correctional Agencies
- National Institution of Corrections; Classification of High-Risk and Special Management Prisoners, A National Assessment of Current Practices

An objective classification system would have identified the substance abuse and mental health issues facing Mr. Greene and would have made appropriate medical and mental health referrals and housing assignments. A good objective classification system is also always inclusive of stabilization factors when classifying inmates. These factors are in part: age, charges, medical status, mental status, criminal history, employment, residence, family contact, and the establishment in the community. Unfortunately, none of these stabilization factors were utilized in the custody consideration of Mr. Greene. From my experience in the corrections profession, I can think of no more important function to the well-being of inmates and the security of a facility than a good Classification Unit. As I have mentioned earlier, Crawford County Sheriff's Office had no classification system in place that was even remotely recognizable. It is essential that Crawford County address this dangerous omission immediately. It is stated in The Texas Department of Criminal Justice, Correctional Institutions Division: The Advantages of an Objective Classification System publication points out that:

"Regardless of its size and complexity, a jail's primary responsibility is to safely and securely detain all individuals remanded to its custody. Classification is an essential management tool for performing this function. By definition, classification is the process of placing things or people into classes according to some rational idea or plan. A good system of classifying inmates will reduce escapes and escape attempts, suicides and suicide

attempts, the unnecessary incarceration of non-threatening prisoners, and unwarranted inmate-on-inmate assaults. All of these outcomes conserve valuable resources by reducing expenditures for legal fees and court costs, overtime pay, and medical expenses," and that "Objective inmate classification contributes to efficient jail operations. Information about the inmate is collected and a program is developed based upon custodial requirements and the inmate's needs. An orderly method is furnished for assessing the varied needs and requirements of each inmate, from commitment to release."

Additionally, it is stated in the Northpoint Institute for Public Management, Inc.; Classification Implementation Manual for Smaller Jails publication that:

"Jail administrators are increasingly aware that correct classification is a powerful means of avoiding public embarrassment, maintaining good public relations, and avoiding damaging litigation (NIC, 1985) and that erroneous or careless classification can produce public relations disasters. Classification procedures should provide a paper trail that simplifies the ability to demonstrate the degree to which staff followed official procedures," and that "The courts have identified objective classification as a way of ensuring consistent and equitable placements for both housing and program access (Gettinger, 1982). The high over classification error rate of subjective classification is simply more likely to lead to highly inconsistent decisions. Invalid classification methods invariably undermine consistency, fairness, and equity. The continuing use of informal and oversimplified methods of classification and untrained staff are both likely to produce errors of classification that may undermine equity and fairness."

From my experience and training over my many years in corrections, I am certain that the classification function of any correctional facility is one of the most vital activities needed to provide a safe and secure facility. Failure to do this activity correctly can and will have tragic results.

Standards organizations like the American Bar Association, the American Correctional Association, and the National Commission on Correctional Health Care each address Classification in such detail that, if reviewed, would provide any receptive correctional agency valuable insight on how to improve their own system. However, from my review of the Greene matter it appears that Crawford County did not consider this comprehensive guidance.

Correctional administrators of today's world must understand their responsibility in every respect. Standards, policies, guidelines, studies, research and case law must be an absolute part of their working knowledge. Nothing short of the totality of this knowledge will suffice. Failure to achieve this will result in egregious acts such as the Greene incident. Sadly, the Greene incident occurred because this type of administration and oversight was not in place within the ranks of the Crawford County Jail. It goes without saying that positive changes must take place in the future. With this in mind, and these responsibilities being of the utmost importance, how do failures of this nature continue to occur across this country? Deliberate indifference, subjective unreasonableness, negligence, lack of due process, excessive use of force, inadequate medical care, wrongful death, and so forth, have been litigated beyond belief. How can a correctional administration not understand and shepherd their agency with complete control? It is compulsory that government officials and correctional administrators understand the clear provisions of constitutional law and

000674

statutory guidelines and standards. There is no other option. For officials that do not understand these governances, there are numerous legal websites available through which they can gain charity. It is incumbent upon today's correctional administrators to do just that to remain current on case law and to fully understand the rights of detainees. A particularly valuable site is that of Americans for Effective Law Enforcement (AELE). The information found on this site includes a legalistic review of the corrections business. The American Bar Association (ABA) has also developed standards that, if adhered to, will assist correctional administrators to operate their facilities within constitutional and statutory standards. This document is entitled "Standards for Criminal Justice, Treatment of Prisoners." In the corrections profession, we must provide for the safety and security and humanity of every inmate, in every situation, in a constitutional manner.

One additional closing point which I will make is the inadequacy of the Crawford County Sheriff's Office Incident Report, Medical/EMS Response, (Inmate) Death Investigation completed by Detective John McDonald. This investigative report is directed at and inclusive of just one thing – and that is that Dwayne Greene was found unresponsive in the Crawford County Jail. The conclusion of the investigation was that Dwayne Greene was found unresponsive in the Crawford County Jail. No other factors of causation were reviewed. Given the incredible number of failures found within the Greene incident, it is baffling to this correctional practitioner how this was permitted to happen. Sadly, from Sheriff Wakefield on down, the investigative report goes unquestioned. A comprehensive investigation of an incident of this serious nature should have looked at every operational area that created the circumstances that permitted the failures in the Greene incarceration to occur. To name just a few of the failures; information sharing, intake processing, booking details, medical screening, classification, security observations, housing security, medical and mental health care, jail records review, supervision, staff shortages (correctional and medical), policies and procedures, training and the contractual involvement of Northern Lakes Community Mental Health Authority - to name a few. While the failures and confusions of all of these areas were directly related to the death of Mr. Greene, no authority of the Crawford County Sheriff's Office care enough to look into them during the investigation.

With regard to the Crawford County Sheriff's Office, the Crawford County Jail and Crawford County Commission, a complete review of their operation is absolutely necessary before additional inmates are exposed to similar unconstitutional treatment. Such as with Mr. Greene, their rights to be free from harm, their rights to be free from cruel and unusual punishment, their rights to due process, their rights to adequate health care, their rights to the protection of life and liberty, and their rights to be protected from violence at the hands of another inmate or staff may well be violated in the same manner. This operational Review should include staffing, housing separations, policies, training, supervision and health care contract oversight. The need for this management review is not a matter of a process which would be good to do – it is an absolute necessity to ensure that the Crawford County Jail is operating in a constitutional manner.

000675

## VIII.  SUMMATION

I have been in the corrections business for many years. I have operated everything from half-way houses to major institutions. I have administered to everything from therapeutic programs to death row, and every operational issue in between. I understand the daily functions and needs of this specialized business. These experiences allow me to provide clear and accurate opinions in the Dwayne Greene matter to a reasonable degree of professional certainty.

In summation, it is my emphatic and professional opinion that the Crawford County Sheriff's Office and their chosen jail staff at all levels failed to maintain adequate care, custody, and control of their inmate population, specifically, in the case of Dwayne Greene. As a result, Mr. Greene's federally protected constitutional rights to be free from harm, to be free from cruel and unusual punishment, to be provided due process, to be afforded needed and adequate medical and mental healthcare and the right to be afforded basic human needs were all violated. These violations occurred entirely as a result of Crawford County's deliberate indifference and callous disregard for his health and safety. Basic custody considerations, and necessary health care, mental health care, and detoxification efforts and appropriate medication were nonexistent. Classification efforts were never apparent to contribute and consolidate all of the known information pertaining to Mr. Greene in an effort to ensure his safety while incarcerated within the Crawford County Jail. Mr. Greene's intake information, medical screening information and classification information was inadequate and never shared so that necessary care could be provided.

As addressed in this report, Crawford County Policy and Procedures were inadequate, training was substandard and ineffective, management supervision was absent and concerns for humanity totally missing. In addition, the expected custody controls that are normally associated with an effective Classification system were nonexistent. The Sheriff's Office and their health care provider allowed Mr. Greene's death to occur due to their callous disregard for health and safety.

Clear and concise policy and procedures apparently had been replaced by unacceptable and dangerous customs and practices, all which were objectively unreasonable. These unreasonable acts of disregard must be stopped immediately for the security of all concerned.
Mr. Greene had a federally protected right to be free from harm – he was not and now he is dead. Mr. Greene was also to be afforded all of the other protections of the constitutional and statutory law and governances – he was not and now he is dead. The Crawford County Sheriff's Office administered to their clearly known responsibilities by using dangerous and life-threatening customs and practices of disregard that caused the unwarranted and preventable death of Dwayne Greene. It is completely inconceivable how this cruel and unthinkable event could have happened with all that is known today with respect to constitutional care, custody, and control within the corrections business.

The significance of the failures that I have expressed in this report have been emphatically echoed in a general manner with the Expert Reports of Dr. Johnny E. Bates, MD, MMM, CPE, CCHP, CCHP-P, Ms. Rebecca E. Luethy, RN, MSN, CNS, CCHP, Dr. C. Dennis Simpson, ED.D and Mr. Christopher A. Briggs, MA, LLP, CAADC, Dr. Werner U. Spitz, MD, FCAP and Dr. Gerald A. Shiener, MD. The failures that I have expressed, as it pertains directly to Crawford County and their medical providers, are also supported by Gerald N. Papazian, LPC, Terry S. Fillman, RN, MBA, CCHP, Dr. Herbert Lewis Malinoff, M.D. FACP, FASAM, and Dr. Vasilis K. Pozios, M.D.,

in their reports and opinions. In a uniform summation, all of the above-named experts and I have concluded that as a result of the deliberate indifference and callous disregard of the Crawford County Sheriff's Office and their health care providers, the unreasonable and unwarranted death of Dwayne Greene tragically occurred.

For the Crawford County Sheriff's Office to simply stand by and watch as Dwayne Greene suffered through the dangerous effects of alcohol withdrawals without the benefit of the critically needed medical care is indisputably unconscionable.

Respectfully submitted, this the 8th day of June 2019.


*/s/ Michael A. Berg*
Michael A. Berg

000677

EXHIBIT A

## RESUME

## MICHAEL A. BERG
16148 Sunray Road
Tallahassee, FL  32309
(850) 894-9407

## EDUCATION

High School:          Garrett High School, Garrett, Indiana 1968

Undergraduate:        University of Evansville, Evansville, Indiana
                      1968-1972
                      Bachelor of Arts Degree
                          Major Course Work: Criminology
                                             Sociology
                                             Psychology
                                             Political Science
                          Minor Course Work: Biology
                                             Education

Other Criminal Justice
Course Work:          University of Colorado
                      Michigan State University
                      University of Georgia
                      Florida State University

Other Correctional Training: Only selected training is listed here.  Over my many years as an active correctional practitioner, I attended and completed hundreds of elective and mandatory training programs, seminars, and conferences that are not listed here for brevity purposes only.

National Institute of Corrections Jail Center, Institute for Managers of Large Jail Systems, University of Colorado, Michigan State University, School of Criminal Justice, February 26 - March 10, 1978.

Southern Correctional Management Training Council of the Institute of Government for the University of Georgia, Athens, Georgia, 1970's and 1980's

United States Department of Justice, National Institute of Corrections, Planning on New Jails Training, Jacksonville, Florida, February 17 - 18, 1982.

United States Department of Justice, National Institute of Corrections, Law Enforcement Training and Research Associates, Inc., Institute for Correctional Management Skills, Jacksonville, Florida, May 13 - 20, 1982.

United States Department of Justice, National Institute of Corrections, National Academy of Corrections, Institute of Facility Planning and Plan Review, Boulder, Colorado, January 31 -

000678

February 4, 1983.

United States Department of Justice, National Institute of Corrections, National Academy of Corrections Jail Managers Institute

Institute of Police Technology and Management, University of North Florida, Police Executive Development, Jacksonville, Florida, April 24 - 28, 1989.

Florida Criminal Justice Executive Institute, Florida Department of Law Enforcement, Bureau of Criminal Justice Standards and Training, Florida State University, Chief Executive Seminar-Charter Class, Wakulla Springs, Florida, 1990 - 1991.

Florida Criminal Justice Executive Institute, The Center for Executive Studies, Contemporary Issues in Corrections, Jacksonville, Florida, June 16 - 18, 1992.

Florida Sheriff's Association, Diversified Training Program, Jail Management Issues in Florida, Tampa, Florida, February 22 – 24, 1993.

The Federal Law Enforcement Training Center, Correctional Management Institute, Glynco, Georgia


**PROFESSIONAL EMPLOYMENT**

| | |
|---|---|
| 7/7/10 | Retired from Florida Department of Corrections |
| 6/07 – 7/10 | Correctional Programs Consultant<br>State and Contract Work Release<br>Florida Department of Corrections<br>Tallahassee, Florida |
| 6/06 – 6/07 | Assistant to the Deputy Assistant Secretary of Institutions<br>Florida Department of Corrections<br>Tallahassee, Florida |
| 2/03 – 6/06 | Assistant to the Assistant Secretary of Institutions<br>Florida Department of Corrections<br>Tallahassee, Florida |
| 10/01 - 2/03 | Assistant to the Director of Institutions<br>Florida Department of Corrections<br>Tallahassee, Florida |
| 6/99 - 10/01 | Bureau Chief<br>Staff Development<br>Florida Department of Corrections<br>Tallahassee, Florida |

| | |
|---|---|
| 11/97 - 6/99 | Executive Assistant to the Secretary<br>Florida Department of Corrections<br>Tallahassee, Florida |
| 7/95 - Present | Michael A Berg & Associates<br>Tallahassee, Florida |
| 9/16/97 | Retired Jacksonville Sheriff's Office<br>25 Years |
| 7/95 - 9/97 | Professional Standards Sections<br>Inspections Unit<br>Office of the Sheriff<br>Jacksonville, Florida |
| 2/87 - 7/95 | Deputy Director<br>Jails and Prisons Division<br>Office of the Sheriff<br>Jacksonville, Florida |
| 4/77 - 2/87 | Chief of Jails<br>Jails and Prisons Division<br>Office of the Sheriff<br>Jacksonville, Florida |
| 11/74 - 4/77 | Facility Supervisor<br>Fairfield Correctional Institution<br>Jails and Prisons Division<br>Office of the Sheriff<br>Jacksonville, Florida |
| 5/76 - 8/76 | Adjunct Instructor<br>Psychology Department<br>University of North Florida<br>State of Florida<br>Jacksonville, Florida |
| 11/72 - 11/74 | Work Furlough Counselor<br>Work Furlough Program<br>Jails and Prisons Division<br>Office of the Sheriff<br>Jacksonville, Florida |
| 10/72 - 11/72 | Work Furlough Investigator<br>Work Furlough Program<br>Jails and Prisons Division<br>Office of the Sheriff<br>Jacksonville, Florida |

000680

9/72 - 10/72                    Correctional Officer
                               Jails and Prisons Division
                               Office of the Sheriff
                               Jacksonville, Florida

## PROFESSIONAL AWARDS AND APPOINTMENTS

Florida Council on Crime and Delinquency, 47th Annual Criminal Justice Institute, Recipient of the Statewide Distinguished Service Award in the area of Corrections, Orlando, Florida, 1976.  Also elected to statewide offices as follows: State Treasurer 1977 - 78, State Secretary 1978 - 79, State President Elect 1979 - 80, State President 1980 - 81.

Appointed by Governor Rubin Askew, Governor of the State of Florida, to serve as a member of the Corrections Task Force of the Governor's Commission on Criminal Justice Standards and Goals, 1978.

Appointed by Governor Rubin Askew, Governor of the State of Florida, to serve as a member of the Correctional Standards Council for the State of Florida, 1978.

Appointed by Governor Bob Graham, Governor of the State of Florida, to serve as a member of the Corrections Task Force of the Governor's Commission on Criminal Justice Standards and Goals, 1979.

Appointed by Governor Bob Graham, Governor of the State of Florida, to serve as a member of the Correctional Standards Council for the State of Florida, 1981.

Appointed by Governor Bob Graham, Governor of the State of Florida, to serve as a member of the Criminal Justice Standards and Training Commission for the State of Florida, 1981 and re-appointed in 1983.

Elected Vice Chairman of the Criminal Justice Standards and Training Commission in 1982, 1984 and 1986.

Appointed by Governor Bob Martinez, Governor of the State of Florida, to serve as a member of the Criminal Justice Standards and Training Commission for the State of Florida, 1987.

Elected Chairman of the Criminal Justice Standards and Training Commission in 1988 and 1989.

Recipient of the American Jail Association Golden Key Award, April 26, 1988.

Appointed by Governor Lawton Chiles, Governor of the State of Florida, to serve as a member of the Criminal Justice Standards and Training Commission for the State of Florida, 1991.

Recipient of the Florida Council on Crime and Delinquency's Louie L. Wainwright Award, July 1992.

Designated by Secretary Harry K. Singletary, Jr., Florida Department of Corrections, as proxy to the Criminal Justice Standards and Training Commission, State of Florida, 1997.

Designated by Secretary Michael W. Moore, Florida Department of Corrections, as proxy to the Criminal Justice Standards and Training Commission, State of Florida, 1999.

000681

## PROFESSIONAL CERTIFICATIONS

Certified by the State of Florida, Council of Correctional Standards, as a certified instructor in the field of Criminal Justice Training, January 4, 1977.  Active May 2015

Certified by the State of Florida, Council of Correctional Standards, as proficient in the Corrections Area, July 1, 1974.  Active May 2015

Certified by the State of Florida, Criminal Justice Standards and Training Commission, as proficient in the Law Enforcement Area, July 1986.  Active May 2015

## PROFESSIONAL AFFILIATIONS

American Correctional Association
Florida Council on Crime and Delinquency
National Sheriffs Association
Florida Sheriffs Association
National Institute of Corrections, Longmont, Colorado (Registered Consultant)
American Jail Association
University of Evansville Alumni Association
The National Student Register
Who's Who Among Students in American Universities and Colleges
Who's Who Among Greek Fraternities in American Universities and Colleges
Steven's Who's Who in Law Enforcement

## SPECIALIZED KNOWLEDGE AND EXPERIENCE

- Jails and Prison Administration and Management
- Budgeting and Budget Development
- Staffing and Staff Planning
- Policy and Procedure Development
- Jails and Prisons Standards and Accreditation
- Jails and Prisons Private Contracts
- Due Process Requirements
- Overcrowding Issues
- Use of Force
- Less than Lethal Equipment and Use
- Correspondence Control
- Alternative Programs
- Treatment Programs
- Correctional Litigation; State and Federal
- Jail and Prison Security
- Jail and Prison Classification
- Jail and Prison Health Services
- Jail and Prison Food Service and Canteen Service
- Jail Design Consideration
- ADA Accommodations

- Immigration Detainees
- Private Contracting
- Correctional Training
- Criminal Justice Standards and Training Commission
- Florida Model Jail Standards
- Correctional Grants
- Jail and Prison Design and Construction
- National Institute of Corrections Training Programs
- Statutory and Constitutional Law
- Religious Issues Consideration
- Disciplinary and Grievance Procedures
- Security Threat Groups

## CAREER NARRATIVE

Michael A. Berg joined the Office of the Sheriff, Jacksonville, Florida in September 1972, as a Correctional Officer I for the Jails and Prisons Division. In November 1974, Mr. Berg was appointed to the position of Facility Supervisor of Fairfield Correctional Institution. In that position, Mr. Berg directed all aspects of Fairfield Correctional Institution as well as all educational and treatment programs for the department. In April 1977, Mr. Berg was appointed to the position of Chief of Jails of the Jails Division of Duval County, Office of the Sheriff. By this appointment, Mr. Berg assumed total responsibility for the day to day operation of the Duval County Jail, the Duval County Jail Annex, and the inmate facilities of University Medical Center of Jacksonville with a combined total of seven hundred seventy-five (775) inmates, a staff of three hundred ten (310), and a budget of eleven and one half million dollars ($11,500,000).

In February of 1987, Mr. Berg was appointed Deputy Director of the Jails and Prisons Division. By this appointment, Mr. Berg assumed total responsibility of the daily operation of the Jails and Prisons Division which included the Duval County Jail, the Duval County Jail Annex, Fairfield Correctional Institute, the Community Corrections Divisions and the James I. Montgomery Correctional Institution. With this appointment, Mr. Berg was responsible for the total operation and services of three (3) major divisions, nearly seven hundred and fifty (750) employees and approximately three thousand (3,000) inmates. In this position, Mr. Berg was also responsible for an annual budget of nearly forty-one million dollars ($41,000,000).

As Deputy Director of Jails and Prisons, Mr. Berg was the leading member of the Sheriff's team that designed and administered the financing and construction of three (3) major correctional facilities in 1988, 1989 and 1990. These facilities are the three hundred (300) bed Catherine Street facility, the four hundred thirty-two (432) bed North Unit of the Prisons Division, and the new downtown Pre-Trial Detention Facility, which can house up to two thousand one hundred and eighty-nine (2,189) inmates. These facilities represent a cost of eighty-one million dollars ($81,000,00) and approximately two thousand nine hundred (2,900) new inmate beds.

On September 16, 1997, Mr. Berg retired from the Jacksonville Sheriff's Office after twenty-five (25) years of service.

In July 1995, he opened the criminal justice consultant firm of Berg and Associates, which he currently operates.

000683

In November 1997, Mr. Berg was appointed by Secretary Harry K. Singletary, Jr., as Executive Assistant (Chief of Staff) to the Secretary for the Florida Department of Corrections.

In January 1999, he continued to serve Secretary Michael W. Moore as Executive Assistant to the Secretary (Chief of Staff) for the Florida Department of Corrections.

In June 1999, he was promoted to the position of Bureau Chief of Staff Development for the Florida Department of Corrections.

In October 2001, Mr. Berg was selected to be the Assistant to the Director of Institutions for the Florida Department of Corrections.

In February 2003, he was selected to be the Assistant to the Assistant Secretary of Institutions for the Florida Department of Corrections.

In June 2006, Mr. Berg's position was modified to be the Assistant to the Deputy Assistant Secretary of Institutions for the Florida Department of Corrections.

In June 2007, Mr. Berg was assigned to coordinate the contracts for the privately operated Work Release and Transition Centers across the state.

In July 2010, Mr. Berg retired from the Florida Department of Corrections.

**Michael A. Berg**
BERG & ASSOCIATES

**16148 Sunray Road**
**Tallahassee, Florida  32309**
**850-894-9407**

**FIRM PROFILE AND CREDENTIALS**
Michael A. Berg and Associates

---

**Background**

Michael A. Berg and Associates is a criminal justice consultant firm formed by Michael A. Berg in 1995 after a twenty-five year career in criminal justice management, primarily in the area of corrections.  Michael A. Berg possesses expertise in the areas of criminal justice planning, jail design, criminal justice consultant efforts, expert witness needs, technical assistance for correctional operations, criminal justice training, correctional staffing, budget preparation, inmate industry and more.

Michael A. Berg and Associates has first-hand experience in all aspects of:

- Large, medium and small correctional facility planning, design, operations and management issues.
- Jail design and development issue for large, medium and small facilities.
- Inmate treatment and labor program planning, operations and management issues.
- Criminal justice training and staff development.
- Correctional law at the federal, state and county levels.

**Practice Philosophy**

Michael A. Berg and Associates is committed to the philosophy that any criminal justice facility must fit the exact needs of the utilizing agency. To ensure that this occurs, every effort is made to determine and understand what it is that the using agency has to have and desires to have in order to operate at its most effective potential.  These issues are incorporated in the planning and development effort in every appropriate area.  To accomplish this, frequent meetings are scheduled with the using agency on every operational issue.

000686

Michael A. Berg
**Principal**

**Experience
Summary**

Michael A. Berg represents over forty-four years of criminal justice management experience. He has experience in the management of small, medium and mega jails and prisons. His experience includes all areas of correctional and police related administrative issues from arrest to release. Mr. Berg is also very experienced in criminal justice training, correctional litigation, jail and prison design, inmate work and treatment programs, jail staffing plans and correctional operational policy and procedure development. Mr. Berg has provided technical assistance to both large and small correctional departments. He has performed as a consultant, technical assistance provider, expert witness and criminal justice equipment representative.

These experiences qualify Michael A. Berg to understand, review, and evaluate correctional operational issues involved within correctional administration, pre and post-trial facilities, staffing, training, and supervision. Michael A. Berg can also provide opinions on matters of correctional Housing Conditions, Classification Programs, Institutional Health and Safety Concerns, Fire Safety, Health Care Considerations, Policy Development, Correctional Standards and Statutory Regulations, Correspondence Control, Use of Force, Inmate Violence, Security Threat Groups, Immigration Detainees, Inmate Grievance Systems, Religious Freedoms, Out of Cell Time Programs, and Overcrowding Issues. Further, Michael A. Berg's experience allows him to assess operational matters involving intake, booking, health/medical assessments, classification, holding, and housing assignment. Michael A. Berg is also very capable in evaluating policies and procedures, post orders and compliance with applicable standards and constitutional/statutory guidelines. Michael A. Berg is also very familiar with the management of private service providers in the areas of heath/medical services, food service, maintenance service, phone service, and so forth.

Michael A. Berg has been qualified as an expert witness in the field of corrections and has testified as such on thirty-nine occasions, twenty-four in the last four years in state and federal courts, including providing opinions on use of force, wrongful death, correctional classification, security, housing assignments, detox programs, alternative programs, overcrowding and population issues, housing conditions, private for profit contracts for medical and mental health services, food service, correspondence matters, due process issues, immigration detainees, and ADA accommodations. A listing of cases which Michael A. Berg has testified at deposition is attached hereto. Michael A. Berg also served as the court appointed monitor in the Nassau County, Florida jail case in 1997 through 2001.

Michael A. Berg served as a commissioner for the State of Florida Correctional Standards Council and the Criminal Justice Standards and Training Commission under five governors for over twenty-five years. Mr. Berg is also the recipient of the Florida Council on Crime and Delinquencies Distinguished Service Award in the area of corrections, the American Jails Association's Golden Key Award and the highly coveted Louie L. Wainwright Award. Mr. Berg is also recognized for his contribution in the criminal justice arena by Steven's Who's Who in Law Enforcement.

**Jails and Prisons Related Projects**

Michael A. Berg has served as the team manager on the following correctional design projects:

Project Director – Jail Programming of the Pretrial Detention Facility, Duval County Jacksonville, Florida.

Project Director - Jail Programming of the Nassau County Jail and Sheriff's Office, Nassau County Florida.

Project Director - Prison Programming of the J. I. Montgomery Correctional Center, North Unit, Duval County, Jacksonville, Florida.

Project Director – Treatment Facility Programming of the Community Correctional Center, Duval County, Jacksonville, Florida.

Project Director – Staffing Plan Development for small, medium, and large correctional facilities for the Florida Department of Corrections Jail Review.

Project Director – Correctional Construction Oversight of small, medium and large facilities from site preparation for occupancy.

Project Director – Transition Planning of all small, medium and large facilities in Duval County, Jacksonville, Florida.

Project Director – Operations Procedure Development for new facilities, Duval County, Jacksonville, Florida.

Trainer and Consultant – National Institute of Corrections, PONI and HONI Projects.

Project Advisor – Judicial Facility Development of the 4th Judicial Circuit Court Facilities, Duval County, Jacksonville, Florida.

Project Director – Renovation/Remodeling and occupancy of Duval County Jail Annex and B-Wing of the J. I. Montgomery Correctional Center, Duval County, Jacksonville, Florida.

Project Director – Inmate Industrial Planning and Development, Duval County, Jacksonville, Florida.

**EDUCATION**

Bachelor of Arts Degree, University of Evansville
Social Science and Criminal Justice Areas

Additional Course Work in Criminal Justice
University of Georgia
University of Colorado
Michigan State University
Florida State University

000688

| | |
|---|---|
| **REGISTRATION** | Certified by the State of Florida Criminal Justice Standards and Training Commission in Corrections, Law Enforcement and Criminal Justice Training (Instructor) until 2015 |
| | Certified by the U. S. Justice Department, National Institute of Corrections as Registered Consultant |
| **PROFESSIONAL AFFILIATIONS** | Florida Sheriff's Association<br>Florida Council on Crime and Delinquency<br>National Sheriff's Association<br>American Jail Association<br>American Correctional Association |

## OTHER FACILITY DESIGN/PROGRAMMING AND TRANSITION PROJECTS

Davidson County Sheriff's Office
Davidson County Jail
Nashville, Tennessee
600 Bed Facility
Pre=HONI and Modified HONI

Dakota County Community Corrections
Dakota County Juvenile Facility
120 Bed Facility
Hastings, Minnesota
Pre-HONI

Walker County Sheriff's Office
Walker County Jail
Jasper, Alabama
124 Bed Facility
Pre=HONI and Modified HONI

Alachua County Commission
Alachua County Jail
Gainesville, Florida
900 Bed Facility
Systems Assessment

Osceola County Sheriff's Office
Osceola County Jail
Kissimmee, Florida
460 Bed Facility
System Assessment

Mason County Sheriff's Office
Mason County Jail
Ludington, Michigan
86 Bed Facility
Pre-HONI

Yavapai County Sheriff's Office
Yavapai County Jail
Prescott, Arizona
175 Bed Facility
Pre-HONI

Parma Ohio Police Department
Parma Jail
Parma Ohio
24 Bed Facility
Modified HONI

Lincoln County Sheriff's Office
Lincoln County Jail
Troy, Missouri
120 Bed Facility
Pre-HONI

Columbia County Sheriff's Office
Columbia County Jail
Appling, Georgia
300 Bed Facility
Pre-HONI

Maury County Sheriff's Office
Maury County Jail
Columbia, Tennessee
200 Bed Facility
Pre-HONI

Lake County Sheriff's Office
Lake County Jail
Crown Point, Indiana
560 Bed Facility
Pre-HONI

Jackson County Sheriff's Office
Jackson County Jail
Scottsboro, Alabama
125 Bed Facility
Pre-HONI, Modified HONI and Full HONI

Limestone County Sheriff's Office
Limestone County Jail
Athens, Alabama
250 Bed Facility
Operational Review and Programming Project

Clark County Sheriff's Office
Clark County Jail
Kahoka, Missouri
60 Bed Facility
Pre-HONI

Nobles County Sheriff's Office
Nobles County Jail
Worthington, Minnesota
104 Bed Facility
Pre-HONI

Montgomery County Sheriff's Office
Montgomery County Jail
Fonda, New York
224 Bed Facility
Pre-HONI

Van Buren County Sheriff's Office
Van Buren County Jail
Spencer, Tennessee
104 Bed Facility
Jail Programming and Design Project
Court Facility Programming and Design Project
Law Enforcement Center Programming and
Design Project

Nassau County Sheriff's Office
Nassau County Jail
Yulee, Florida
350 Bed Facility
Federal Court Appointed Monitor of
Federal Class Action Case against Nassau County
Assist in New Jail Design

Columbia County Sheriff's Office
Columbia County Jail
Lake City, Florida
Operational Overview and Jail Size Projections

Osceola County Sheriff's Office
Osceola County Jail
Kissimmee, Florida
Operational & Management Overview

Orange County Commission
Orange County Department of Corrections
Orlando, Florida
Operational & Management Overview

Miller County Sheriff's Office
Miller County Jail
Colquitt, Georgia
Jail Design & Privatization Project

Alachua County Commission
Alachua County Jail
Gainesville, Florida
Management Review Project

000691



# Standards for Adult Correctional Institutions

## 4th Edition

## Special Needs Inmates

**4-4305**
**(Ref. 3-4292)**

**Written policy, procedure, and practice provide for identification of special needs inmates.**

*Comment*: Special needs inmates include, but are not limited to, drug addicts and drug abusers, alcoholics and alcohol abusers, inmates who are emotionally disturbed or suspected of being mentally ill, the mentally retarded, and those who pose a high risk or require protective custody. Procedures should identify the number, type, and frequency of commitment for special needs inmates, and special programs should be instituted for their appropriate management when the numbers or frequency of commitment warrant. Every possible effort should be made to place the mentally ill and mentally retarded in a noncorrectional setting.

## Adjudicated Youth and Status Offenders

**4-4306**
**(Ref. 3-4293)**

**(MANDATORY) Written policy, procedure, and practice provide that adjudicated delinquent offenders and youths charged with offenses that would not be crimes if committed by adults do not reside in the institution.**

*Comment*: None.

## Youthful Offenders

**4-4307**
**(Ref. 3-4293-1)**

**If youthful offenders are housed in the facility, written policy, procedure, and practice provide that they are housed in a specialized unit for youthful offenders except when:**

- **a violent, predatory youthful offender poses an undue risk of harm to others within the specialized unit; and/or**
- **a qualified medical or mental-health specialist documents that the youthful offender would benefit from placement outside the unit.**

**Written policy, procedure, and practice provide for the preparation of a written statement of the specific reasons for housing a youthful offender outside the specialized unit and a case-management plan specifying what behaviors need to be modified and how the youthful offender may return to the unit. The statement of reasons and case-management plan must be approved by the warden or his or her designee. Cases are reviewed at least quarterly by the case manager, the warden or his or her designee, and the youthful offender to determine whether a youthful offender should be returned to the specialized unit.**

*Comment*: ACA policy prohibits confinement of youthful offenders in an adult facility; however, where the laws of the jurisdiction require such confinement, the provisions of the standard must be met.

Part 4: Institutional Services

# Section E: Health Care

GOAL:    Provide appropriate and necessary health services
and care for offenders.

## PERFORMANCE STANDARD

1A. **Offenders have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner.**

OUTCOME MEASURES

1. Number of offenders with a positive tuberculin skin test on admission in the past 12 months divided by the annual number of admissions in the past 12 months.
2. Number of offenders diagnosed with active tuberculosis in the past 12 months divided by the average daily population in the past 12 months.
3. Number of conversions to a positive tuberculin skin test in the past 12 months divided by the number of tuberculin skin tests given in the past 12 months.
4. Number of offenders with a positive tuberculin skin test who complete prophylaxis treatment for tuberculosis in the past 12 months divided by the number of offenders with a positive tuberculin skin test on prophylaxis treatment for tuberculosis in the past 12 months.
5. Number of Hepatitis C positive offenders in the past 12 months divided by the average daily population in the past 12 months.
6. Number of HIV positive offenders in the past 12 months divided by the average daily population in the past 12 months.
7. Number of HIV positive offenders who are being treated with highly active antiretroviral treatment in the past 12 months divided by the number of known HIV positive offenders in the past 12 months.
8. Number of offenders diagnosed with an Axis I (excluding sole diagnosis of substance abuse) in the past 12 months divided by the average daily population in the past 12 months.
9. Number of offender suicide attempts in the past 12 months divided by the average daily population in the past 12 months.
10. Number of offender suicides in the past 12 months divided by the average daily population in the past 12 months.
11. Number of offender deaths due to homicide in the past 12 months divided by the average daily population in the past 12 months.
12. Number of offender deaths due to injuries in the past 12 months divided by the average daily population in the past 12 months.
13. Number of medically expected offender deaths in the past 12 months divided by the average daily population in the past 12 months.
14. Number of medically unexpected offender deaths in the past 12 months divided by the average daily population in the past 12 months.
15. Number of offender admissions to the infirmary (where available) in the past 12 months divided by the average daily population in the past 12 months.
16. Number of offender admissions to off-site hospitals in the past 12 months divided by the average daily population in the past 12 months.

000382

17. Number of offenders transported off-site (via an ambulance or correctional vehicle) for treatment of emergency health conditions in the past 12 months divided by the average daily population in the past 12 months.

18. Number of offender specialty consults completed in the past 12 months divided by the number of specialty consults (on-site or off-site) ordered by primary health care provider (MD, NP, PA) in the past 12 months.

19. Number of offender grievances about access to health care services found in favor of the offender in the past 12 months divided by the number of offender grievances about access to health care services in the past 12 months.

20. Number of offender grievances related to the quality of health care found in favor of offenders in the past 12 months divided by the number of offender grievances related to the quality of health care in the past 12 months.

21. Number of offender grievances related to unfair treatment or rights violation found in favor of offenders in the past 12 months divided by the number of offender grievances related to unfair treatment or rights violation in the past 12 months.

22. Number of offender grievances related to safety or sanitation found in favor of offenders in the past 12 months divided by the number of offender grievances related to safety or sanitation in the past 12 months.

23. Number of offender lawsuits about access to health care services found in favor of offenders in the past 12 months divided by the number of offender lawsuits about access to health care services in the past 12 months.

24. Number of individual sick call encounters in the past 12 months divided by the average daily population in the past 12 months.

25. Number of physician contacts in the past 12 months divided by the average daily population in the past 12 months.

26. Number of individualized dental treatment plans in the past 12 months divided by the average daily population in the past 12 months.

27. Number of hypertensive offenders enrolled in a chronic care clinic in the past 12 months divided by the average daily population in the past 12 months.

28. Number of diabetic offenders enrolled in a chronic care clinic in the past 12 months divided by the average daily population in the past 12 months.

29. Number of incidents involving pharmaceuticals as contraband in the past 12 months divided by the average daily population in the past 12 months.

30. Number of cardiac diets received by offenders with cardiac disease in the past 12 months divided by the number of cardiac diets prescribed in the past 12 months.

31. Number of hypertensive diets received by offenders with hypertension in the past 12 months divided by the number of hypertensive diets prescribed in the past 12 months.

32. Number of diabetic diets received by offenders with diabetes in the past 12 months divided by the number of diabetic diets prescribed in the past 12 months.

33. Number of renal diets received by offenders with renal disease in the past 12 months divided by the number of renal diets prescribed in the past 12 months.

34. Number of needle-stick injuries in the past 12 months divided by the number of employees in the past 12 months.

35. Number of pharmacy dispensing errors in the past 12 months divided by the number of prescriptions dispensed by the pharmacy in the past 12 months.

36. Number of nursing medication administration errors in the past 12 months divided by the number of medications administered in the past 12 months.

000383

Part 4: Institutional Services

# EXPECTED PRACTICES

## Access to Care

**4-4344**
**(Ref. 3-4331)**

**(MANDATORY) Upon arrival at the facility, all offenders are informed about how to access health services and the grievance system. This information is communicated orally and in writing, and is conveyed in a language that is easily understood by each offender.**

*Comment*: No member of the correctional staff should approve or disapprove offenders' requests for health care services. The facility should follow the policy of explaining access procedures orally to offenders unable to read. When the facility frequently has non-English speaking offenders, procedures should be explained and written in their language.

*Protocols*: Written policy and procedures. An offender handbook. Grievance procedure.
*Process Indicators*: Documentation that offenders are informed about health care and the grievance system. Offender grievances. Interviews.

**4-4345**
**(New)**

**When medical copayment fees are imposed, the program ensures that, at a minimum, the following are observed:**

- **All offenders are advised, in writing, at the time of admission to the facility of the guidelines of the copayment program.**
- **Needed offender health care is not denied due to lack of available funds.**
- **Copayment fees shall be waived when appointments or services, including follow-up appointments, are initiated by medical staff.**

*Comment*: Offenders should receive appropriate health care based on need, without regard to financial status. Fees imposed should not be so excessive as to discourage offenders from seeking needed medical care.

*Protocols*: Written policy and procedure.
*Process Indicators*: Forms. An offender handbook. Interviews. Financial records.

## Clinical Services

**4-4346**
**(Ref. 3-4353)**

**There is a process for all offenders to initiate requests for health services on a daily basis. These requests are triaged daily by health professionals or health-trained personnel. A priority system is used to schedule clinical services. Clinical services are available to offenders in a clinical setting at least five days a week and are performed by a physician or other qualified health care professional.**

*Comment*: A priority system addresses routine, urgent, and emergency complaints and conditions. Health care request forms must be readily available to all offenders.

*Protocols*: Written policy and procedure. Sick call request form.
*Process Indicators*: A health record. Sick call request forms. Clinical provider schedules. Observation. Interviews.

## Continuity of Care

**4-4347**
**(Ref. 3-4330)**

**Continuity of care is required from admission to transfer or discharge from the facility, including referral to community-based providers, when indicated.**

*Comment*: When health care is transferred to providers in the community, appropriate information should be shared with the new providers in accordance with consent requirements.

*Protocols*: Written policy and procedure. Referral transfer form.
*Process Indicators*: Completed referral transfer forms. Health records. Facility logs. Interviews.

## Referrals

**4-4348**
**(Ref. 3-4360)**

**Offenders who need health care beyond the resources available in the facility, as determined by the responsible physician, are transferred under appropriate security provisions to a facility where such care is on call or available 24 hours per day.  A written list of referral sources includes emergency and routine care. The list is reviewed and updated annually.**

*Comment*: Treatment of an offender's condition should not be limited by the resources and services available within a facility. Health care staff should collaborate with security personnel in determining conditions of transportation and necessary security precautions when an offender needs to be transported to another facility or provider.

*Protocols*: Written policy and procedure. Referral consult form.
*Process Indicators*: Health records. Completed referral consult records. Documentation of annual list review. Transportation logs. Interviews.

## Transportation

**4-4349**
**(New)**

**A transportation system that assures timely access to services that are only available outside the correctional facility is required. Such a system needs to address the following issues:**

- prioritization of medical need
- urgency (for example, an ambulance versus a standard transport)
- use of a medical escort to accompany security staff
- transfer of medical information

**The safe and timely transportation of offenders for medical, mental health, and dental clinic appointments, both inside and outside the correctional facility (for example, to the hospital, health care provider, or another correctional facility) is the joint responsibility of the facility or program administrator and the health services administrator.**

by means of an illuminator light, mouth mirror, and explorer. X-rays for diagnostic purposes should be available, if deemed necessary. The result of the dental examination and dental treatment plan should be recorded on a uniform dental record using a numbered system such as the Federal Dental International System.

*Protocols*: Written policy and procedure. Dental screening by examination forms. Dental care request forms.

*Process Indicators*: Dental records. Admission logs. Referral and consultation records. Dental request forms. Dental interviews.

## Health Education

**4-4361**
**(Ref. 3-4363)**

**An ongoing program of health education and wellness information is provided to all offenders.**

*Comment*: Health education and wellness topics may include but are not to be limited to information on access to health care services, dangers of self-medication, personal hygiene and dental care, prevention of communicable diseases, substance abuse, smoking cessation, family planning, self-care for chronic conditions, self-examination, and the benefits of physical fitness.

*Protocols*: Written policy and procedure.

*Process Indicators*: Documentation of program availability. Program and class schedules. Attendance rosters. Interviews. Curriculum and lesson plans. Examples of pamphlets, brochures, or other written handouts.

## Health Screens

**4-4362**
**(Ref. 3-4343)**

**(MANDATORY) Intake medical screening for offender transfers, excluding intrasystem, commences upon the offender's arrival at the facility and is performed by health-trained or qualified health care personnel. All findings are recorded on a screening form approved by the health authority. The screening includes at least the following:**

*Inquiry into*:
- any past history of serious infectious or communicable illness, and any treatment or symptoms (for example, a chronic cough, hemoptysis, lethargy, weakness, weight loss, loss of appetite, fever, night sweats that are suggestive of such illness), and medications
- current illness and health problems, including communicable diseases
- dental problems
- use of alcohol and other drugs, including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use, and history of any problems that may have occurred after ceasing use (for example, convulsions)
- the possibility of pregnancy and history of problems (female only); and other health problems designated by the responsible physician

*Observation of the following*:
- behavior, including state of consciousness, mental status, appearance, conduct, tremor, and sweating

- body deformities, ease of movement, and so forth
- condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, and infestations, recent tattoos, and needle marks or other indications of drug abuse

Medical disposition of the offender:
- general population
- general population with prompt referral to appropriate health care service
- referral to appropriate health care service for emergency treatment

Offenders who are unconscious, semiconscious, bleeding, or otherwise obviously in need of immediate medical attention are referred. When they are referred to an emergency department, their admission or return to the facility is predicated on written medical clearance. When screening is conducted by trained custody staff, procedures will require a subsequent review of positive findings by the licensed health care staff. Written procedures and screening protocols are established by the responsible physician in cooperation with the facility manager.

*Comment:* Health screening is a system of structured inquiry and observation to (1) prevent newly arrived offenders who pose a health or safety threat to themselves or others from being admitted to the general population; (2) identify offenders who require immediate medical attention.

Receiving screening can be performed at the time of admission by health care personnel or by a health-trained correctional officer. Facilities that have reception and diagnostic units or a holding room must conduct receiving screening on all offenders on their arrival at the facility as part of the admission procedures.

*Protocols:* Written policy and procedure. Screening forms.
*Process Indicators:* Health records. Completed screening forms. Transfer logs. Interviews.

4-4363
(Ref. 3-4344)

(MANDATORY) All intrasystem transfer offenders receive a health screening by health-trained or qualified health care personnel which commences on their arrival at the facility. All findings are recorded on a screening form approved by the health authority. At a minimum, the screening includes the following:

Inquiry into:
- whether the offender is being treated for a medical or dental problem
- whether the offender is presently on medication
- whether the offender has a current medical or dental complaint

Observation of:
- general appearance and behavior
- physical deformities
- evidence of abuse or trauma

Medical disposition of offenders:
- to general population
- to general population with appropriate referral to health care service
- referral to appropriate health care service for emergency treatment

*Comment*: Health screening of intrasystem transfers is necessary to detect offenders who pose a health or safety threat to themselves or others and who may require immediate health care.

*Protocols*: Written policy and procedure. Screening form.

*Process Indicators*: Health records. Completed screening forms. Transfer logs. Interviews.

**4-4364**
**(New)**

**All in-transit offenders receive a health screening by health-trained or qualified health care personnel on entry into the agency system. Findings are recorded on a screening form that will accompany the offender to all subsequent facilities until the offender reaches his or her final destination. Health screens will be reviewed at each facility by health-trained or qualified health care personnel. Procedures will be in place for continuity of care.**

*Comment*: None.

*Protocols*: Written policy and procedure.

*Process Indicators*: Health records. Completed screening forms. Transfer logs. Interviews.

## Health Appraisal

**4-4365**
**(Ref. 3-4345)**

**(MANDATORY) A comprehensive health appraisal for each offender, excluding intrasystem transfers, is completed as defined below, after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90 days, a new health appraisal is not required, except as determined by the designated health authority. Health appraisals include the following:**

Within 14 days after arrival at the facility:
- review of the earlier receiving screen
- collection of additional data to complete the medical, dental, mental health, and immunization histories
- laboratory or diagnostic tests to detect communicable disease, including venereal disease and tuberculosis
- record of height, weight, pulse, blood pressure, and temperature
- other tests and examinations, as appropriate

Within 14 days after arrival for inmates with identified significant health care problems:
- medical examination, including review of mental and dental status (for those inmates with significant health problems discovered on earlier screening such as cardiac problems, diabetes, communicable diseases, and so forth)
- review of the results of the medical examination, tests, and identification of problems by a physician or other qualified health care personnel, if such is authorized in the medical practice act
- initiation of therapy, when appropriate
- development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation

# Mental Health Program

**4-4368**
**(Ref. 3-4336)**

(MANDATORY) There is a mental health program that includes at a minimum:

- screening for mental health problems on intake as approved by the mental health professional
- outpatient services for the detection, diagnosis, and treatment of mental illness
- crisis intervention and the management of acute psychiatric episodes
- stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting
- elective therapy services and preventive treatment where resources permit
- provision for referral and admission to licensed mental health facilities for offenders whose psychiatric needs exceed the treatment capability of the facility
- procedures for obtaining and documenting informed consent

*Comment*: An adequate number of qualified staff members should be available to deal directly with offenders who have severe mental health problems and to advise other correctional staff about their contacts with such individuals.

*Protocols*: Written policy and procedure. Screening form.
*Process Indicators*: Health records. Completed screening forms. Provider qualifications and time and attendance records. Observations. Interviews.

**4-4369**
**(Ref. 3-4337)**

The mental health program is approved by the appropriate mental health authority and provides for all activities carried out by mental health services personnel.

*Comment*: None.

*Protocols*: Written policy and procedure. Job descriptions for mental health personnel.
*Process Indicators*: Documentation of review by mental health personnel. Interviews.

# Mental Health Screen

**4-4370**
**(Ref. New)**

(MANDATORY) All intersystem and intrasystem transfer offenders will receive an initial mental health screening at the time of admission to the facility by mental health trained or qualified mental health care personnel. The mental health screening includes, but is not limited to:

Inquiry into:
- whether the offender has a present suicide ideation
- whether the offender has a history of suicidal behavior
- whether the offender is presently prescribed psychotropic medication
- whether the offender has a current mental health complaint

- whether the offenders are being treated for mental health problems
- whether the offender has a history of inpatient and outpatient psychiatric treatment
- whether the offender has a history of treatment for substance abuse

*Observation of*:
- general appearance and behavior
- evidence of abuse and/or trauma
- current symptoms of psychosis, depression, anxiety, and/or aggression

*Disposition of offender*:
- to the general population
- to the general population with appropriate referral to mental health care service
- referral to appropriate mental health care service for emergency treatment

*Comment*: None.

*Protocols*: Written policy and procedure. Mental health screening form.
*Process Indicators*: Health records. Completed mental health screening forms. Transfer logs. Interviews.

## Mental Health Appraisal

4-4371
(New)

(MANDATORY) All intersystem offender transfers will undergo a mental health appraisal by a qualified mental health person within 14 days of admission to a facility. If there is documented evidence of a mental health appraisal within the previous 90 days, a new mental health appraisal is not required, except as determined by the designated mental health authority. Mental health examinations include, but are not limited to:

- assessment of current mental status and condition
- assessment of current suicidal potential and person-specific circumstances that increase suicide potential
- assessment of violence potential and person-specific circumstances that increase violence potential
- review of available historical records of inpatient and outpatient psychiatric treatment
- review of history of treatment with psychotropic medication
- review of history of psychotherapy, psychoeducational groups, and classes or support groups
- review of history of drug and alcohol treatment
- review of educational history
- review of history of sexual abuse-victimization and predatory behavior
- assessment of drug and alcohol abuse and/or addiction
- use of additional assessment tools, as indicated
- referral to treatment, as indicated
- development and implementation of a treatment plan, including

## Mental Health Evaluations

**4-4372**
**(Ref. 3-4349)**   Offenders referred for mental health treatment will receive a comprehensive evaluation by a licensed mental health professional. The evaluation is to be completed within 14 days of the referral request date and include at least the following:

- review of mental health screening and appraisal data
- direct observations of behavior
- collection and review of additional data from individual diagnostic interviews and tests assessing personality, intellect, and coping abilities
- compilation of the individual's mental health history
- development of an overall treatment/management plan with appropriate referral to include transfer to mental health facility for offenders whose psychiatric needs exceed the treatment capability of the facility

*Comment*: Comprehensive individual psychological evaluations should be performed when there is a reasonable expectation that such evaluation will serve a therapeutic or disposition function useful to the overall interests of the offender. Written reports describing the results of the assessment should be prepared and all information should be appropriately filed.

*Protocols*: Written policy and procedure. Mental health referral form.
*Process Indicators*: Health records. Completed referral forms. Interviews with mental health provider(s). Clinic visit records.

## Suicide Prevention and Intervention

**4-4373**
**(Ref. 3-4364)**   (MANDATORY) There is a written suicide prevention plan that is approved by the health authority and reviewed by the facility or program administrator. The plan includes staff and offender critical incident debriefing that covers the management of suicidal incidents, suicide watch, assaults, prolonged threats, and death of an offender or staff member. It ensures a review of critical incidents by administration, security, and health services. All staff with responsibility for offender supervision are trained on an annual basis in the implementation of the program. Training should include but not be limited to:

- identifying the warning signs and symptoms of impending suicidal behavior
- understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors
- responding to suicidal and depressed offenders
- communication between correctional and health care personnel
- referral procedures
- housing observation and suicide watch level procedures
- follow-up monitoring of offenders who make a suicide attempt

---

000389

*Comment*: The program should include specific procedures for handling intake, screening, identifying, and supervising a suicide-prone offender and be signed and reviewed annually.

*Protocols*: Written policy and procedures. Training curriculum and lesson plans. Suicide watch logs or forms.
*Process Indicators*: Health records. Documentation of staff training. Documentation of suicide watches and critical incident debriefings. Observations. Interviews.

## Mental Illness and Developmental Disability

**4-4374**
**(Ref. 3-4367)**

**Offenders with severe mental illness or who are severely developmentally disabled receive a mental health evaluation and, where appropriate, are referred for placement in noncorrectional facilities or in units specifically designated for handling this type of individual.**

*Comment*: Offenders with severe mental illness or developmental disabilities are vulnerable to abuse by other offenders and require specialized care. These individuals may be a danger to self or others or be incapable of attending to their basic physiological needs.

*Protocols*: Written policy and procedures.
*Process Indicators*: Health records. Referral logs. Records. Interviews.

## Prostheses and Orthodontic Devices

**4-4375**
**(Ref. 3-4358)**

**Medical or dental adaptive devices (eyeglasses, hearing aids, dentures, wheelchairs, or other prosthetic devices) are provided when the health of the offender would otherwise be adversely affected, as determined by the responsible physician or dentist.**

*Comment*: Offenders may be required to provide copayments for these devices.

*Protocols*: Written policy and procedure.
*Process Indicators*: Purchase records. Health records. Interviews.

## Detoxification

**4-4376**
**(Ref. 3-4370)**

**(MANDATORY) Detoxification is done only under medical supervision in accordance with local, state, and federal laws. Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs is conducted under medical supervision when performed at the facility or is conducted in a hospital or community detoxification center. Specific guidelines are followed for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs. Offenders experiencing severe, life-threatening intoxication (an overdose), or withdrawal are transferred under appropriate security conditions to a facility where specialized care is available.**

000390

*Comment*: None.

*Protocols*: Written policy and procedure. Community contract agreements.
*Process Indicators*: Health records. Transfer records. Interviews.

## Management of Chemical Dependency

**4-4377**
**(Ref. 3-4371)**

Offenders have access to a chemical dependency treatment program.
When a chemical dependency program exists, the clinical management of
chemically dependent offenders includes, at a minimum, the following:

- a standardized diagnostic needs assessment administered to
  determine the extent of use, abuse, dependency, and/or codependency
- an individualized treatment plan developed and implemented by a
  multidisciplinary clinical team that includes medical, mental health,
  and substance abuse professionals
- prerelease relapse-prevention education, including risk management
- the offender will be involved in aftercare discharge plans

*Comment*: None.

*Protocols*: Written policy and procedure.
*Process Indicators*: Health records. Interviews. Prerelease, preventive, or
education curriculum.

## Pharmaceuticals

**4-4378**
**(Ref. 3-4341)**

(MANDATORY) Proper management of pharmaceuticals includes the
following provisions:

- a formulary is available
- a formalized process for obtaining nonformulary medications
- prescription practices, including requirements that
  (1) medications are prescribed only when clinically indicated as one
      facet of a program of therapy
  (2) a prescribing provider reevaluates a prescription prior to its
      renewal
- procedures for medication procurement, receipt, distribution,
  storage, dispensing, administration, and disposal
- secure storage and perpetual inventory of all controlled substances,
  syringes, and needles
- the proper management of pharmaceuticals is administered in
  accordance with state and federal law
- administration of medication by persons properly trained and under
  the supervision of the health authority and facility or program
  administrator or designee
- accountability for administering or distributing medications in a
  timely manner and according to physician orders

*Comment*: The formulary should include all prescription and nonprescription
medications stocked in a facility or routinely procured from outside sources.
Controlled substances are those classified by the Drug Enforcement Agency

# Section F: Social Services

**Principle:** The institution makes available the professional services necessary to meet the identified needs of inmates. Such services may include individual and family counseling, family planning, and parent education, and programs for inmates with drug and alcohol addiction problems.

## Scope of Services

**4-4428**
**(Ref. 3-4380)**

There is a social service program that provides a range of resources appropriate to the needs of inmates, including individual and family counseling, family planning, and parental education, and community services.

*Comment:* Social services provide guidance and professional assistance to inmates with family and personal problems; some services may be provided through contractual arrangements with community agencies.

**4-4429**
**(Ref. 3-4380-1)**

Written policy, procedure, and practice prohibit discrimination on the basis of disability in the provision of services, programs, and activities administered for program beneficiaries and participants.

*Comment:* Services, programs, and activities include, but are not limited to, the following:

- academic and vocational education (including developmental and rehabilitative programs)
- work programs/work release programs (by providing reasonable accommodations or alternatives for inmates with disabilities so that the benefits of these programs, including sentence reduction credits, are available to inmates with disabilities)
- recreation, exercise, and activities
- mail, telephone, and visiting
- library
- religious programs
- reception and orientation
- transportation services (to provide for safety and security, and to avoid undue discomfort, in light of inmate's disabilities)
- classification
- food service
- sanitation and hygiene
- health care
- social services
- release
- discipline, grievance procedures, and due process proceedings
- safety and emergency procedures
- access to media, courts, counsel, and law library

000392

- commissary/canteen
- volunteer programs
- psychological and psychiatric services

Program beneficiaries and participants include, but are not limited to: inmates, family members, clergy, attorneys, volunteers, and other authorized visitors.

The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities. Remedial action may include, but is not limited to: 1) making reasonable modifications to policies, practices, or procedures, 2) providing auxiliary aids and services to the hearing and visually impaired, 3) constructing new or altering existing facilities, and 4) delivering services at alternate accessible sites.

**4-4430**
**(Ref. 3-4381)**     **Written policy, procedure, and practice provide that institutional staff identify at least annually the needs of the inmate population to ensure that the necessary programs and services are available, including programs and services to meet the needs of inmates with specific types of problems.**

*Comment:* The review should include an evaluation of academic, vocational, library, religious, and leisure-time programs and services.

**4-4431**
**(Ref. 3-4382)**     **Community social service resources are used to augment social services provided in the institution.**

*Comment:* None.

## Program Coordination and Supervision

**4-4432**
**(Ref. 3-4383)**     **The social services program is administered and supervised by a qualified, trained person with a minimum of a bachelor's degree in the social or behavioral sciences or a related field.**

*Comment:* The social services program supervisor should have an undergraduate degree in the social or behavioral sciences, such as psychology, social work, or counseling to handle the administrative and programming responsibilities. A graduate degree may be an appropriate requirement for this position.

## Counseling

**4-4433**
**(Ref. 3-4384)**     **A planned, organized counseling program is provided by persons qualified by either formal education or training.**

*Comment:* Employees assigned to full-time counselor positions should have sufficient training and experience to provide effective guidance to inmates. These full-time employees should work solely in the social service, social work, and counseling specialties and do not include correctional officers and other staff who work closely with inmates and may provide informal counseling.

000393

4-4434
(Ref. 3-4385)

The institution has a formal mechanism to determine appropriate levels of social services staffing. The mechanism used to determine such staffing levels includes at a minimum:

- type of inmate population served
- type of institution
- legal requirements
- goals to be accomplished

The institution's use of a "team" approach and use of paraprofessionals, volunteers, and students also may influence the numbers of professional staff required.

*Comment:* Social services programs can assist offenders with family and personal problems through supportive guidance and professional assistance. A counseling program that is coordinated with the overall facility rehabilitation program can be effective in resolving personal and interpersonal problems.

4-4435
(Ref. 3-4386)

**Written policy, procedure, and practice provide that staff are available to counsel inmates upon request; provision is made for counseling and crisis intervention services.**

*Comment:* Staff members should make time available, on a regularly scheduled basis, for appointments with inmates who request them. Treatment offerings should include group therapy and group and individual counseling. Because inmates may have problems that require immediate attention, at least one staff member should be available 24 hours a day. Crisis intervention services should be available on an as-needed basis to assist disturbed inmates.

## Counseling for Pregnant Inmates

4-4436
(Ref. 3-4387)

**Written policy, procedure, and practice require that comprehensive counseling and assistance are provided to pregnant inmates in keeping with their expressed desires in planning for their unborn children.**

*Comment:* Counseling and social services should be available from either facility staff or community agencies to assist inmates in making decisions such as whether to keep their child, give the child up for adoption, or consent to an abortion. The written policy and defined procedures should be developed based on a formal legal opinion.

## Substance Abuse Programs

4-4437
(Ref. 3-4388)

**Written policy, procedure, and practice provide for substance abuse programs, to include monitoring and drug testing, for inmates with drug and alcohol addiction problems.**

*Comment:* None.

**4-4438**
**(Ref. 3-4388-1)**

Where a drug treatment program exists, written policy, procedure, and practice provide that the alcohol and drug abuse treatment program has a written treatment philosophy within the context of the total corrections system, as well as goals and measurable objectives. These documents are reviewed at least annually and updated, as needed.

*Comment*: None.

**4-4439**
**(Ref. 3-4388-2)**

Where a drug treatment program exists, written policy, procedure, and practice provide for an appropriate range of primary treatment services for alcohol and other drug abusing inmates that include, at a minimum, the following:

- inmate diagnosis
- identified problem areas
- individual treatment objectives
- treatment goals
- counseling needs
- drug education plan
- relapse prevention and management
- culturally sensitive treatment objectives, as appropriate
- the provision of self-help groups as an adjunct to treatment
- prerelease and transitional service needs
- coordination efforts with community supervision and treatment staff during the prerelease phase to ensure a continuum of supervision and treatment

*Comment*: None.

**4-4440**
**(Ref. 3-4388-3)**

Where a drug and alcohol treatment program exists, written policy, procedure, and practice provide that the facility uses a coordinated staff approach to deliver treatment services. This approach to service delivery shall be documented in treatment planning conferences and individual treatment files.

*Comment*: None.

**4-4441**
**(Ref. 3-4388-4)**

Where a drug and alcohol treatment program exists, written policy, procedure, and practice provide incentives for targeted treatment programs to increase and maintain the inmate's motivation for treatment.

*Comment*: These incentives may include a variety of options such as preferences in housing, clothing, award certificates, or other items consistent with the goals of the facility.

000395

# Performance-Based Standards for Adult Local Detention Facilities

## Fourth Edition



**4-ALDF-2A-17**
**(Ref. 3-ALDF-3A-14)**   The facility has a system for physically counting inmates. The system includes strict accountability for inmates assigned to work and educational release, furloughs, and other approved temporary absences. At least one formal count is conducted for each shift, with no less than three counts daily.

*Comment:* Electronic means should not be substituted for direct staff observation.

*Protocols:* Written policy and procedure. Accounting system. Forms. Identification forms/formats.
*Process Indicators:* Completed forms. Facility records and logs. Documentation of inmate accounting activities. Staff interviews.

## Facility Design

**4-ALDF-2A-18**
**(Ref. 3-ALDF-2B-01,**
**2B-03, 2C-03)**   Physical plant designs facilitate continuous personal contact and interaction between staff and inmates in housing units. All living areas are constructed to facilitate continuous staff observation, excluding electronic surveillance, of cell or detention room fronts and areas such as dayrooms and recreation spaces. (Renovation, addition, new construction only)

*Comment:* None.

*Protocols:* Written policy and procedure. Facility plans/specifications.
*Process Indicators:* Observation. Staff and inmate interviews.

## Reception

**4-ALDF-2A-19**
**(Ref. 3-ALDF-4A-01)**   Prior to accepting custody of an inmate, staff determines that the inmate is legally committed to the facility, and that the inmate is not in need of immediate medical attention.

*Comment:* None.

*Protocols:* Written policy and procedure. Admission forms.
*Process Indicators:* Completed admissions forms. Facility logs. Observation.

**4-ALDF-2A-20**
**(Ref. 3-ALDF-4A-01)**   The inmate and his/her property are immediately searched upon arrival at the facility.

*Comment:* None.

*Protocols:* Written policy and procedure.
*Process Indicators:* Observations. Staff and inmate interview. Intake records.

Part 2: Security

**4-ALDF-2A-21**
**(Ref. 3-ALDF-4A-01)**   Admission processes for a newly admitted inmate include, but are not limited to:

- recording basic personal data and information to be used for mail and visiting list
- criminal history check
- photographing and fingerprinting, including notation of identifying marks or other unusual physical characteristics
- assignment of registered number to the inmate
- medical, dental, and mental health screenings
- screening to detect signs of drug/alcohol abuse
- suicide screening
- inventory of personal property

*Comment*: None.

*Protocols*: Written policy and procedure. Intake and admission forms. Screening forms. Staff training curriculum.
*Process Indicators*: Observation. Inmate records/files. Intake and admission records.

**4-ALDF-2A-22**
**(Ref. 3-ALDF-4A-03)**   Newly admitted inmates are separated from the general population during the admission process. Inmates are assigned to initial holding settings according to their immediate security needs, physical and mental condition, and other considerations.

*Comment*: None.

*Protocols*: Written policy and procedure. Classification forms and procedures. Facility plans/specifications. Housing plan.
*Process Indicators*: Observation. Admission and housing records/logs. Inmate and staff interviews.

**4-ALDF-2A-23**
**(Ref. 3-ALDF-4A-01)**   There is an itemized inventory of all personal property of newly admitted inmates and secure storage of inmate property, including money and other valuables. The inmate is given a receipt for all property held until release.

*Comment*: None.

*Protocols*: Written policy and procedure. Inventory form. Receipt form.
*Process Indicators*: Completed inventory forms. Intake records. Completed receipts.

**4-ALDF-2A-24**
**(Ref. 3-ALDF-2E-11)**   Space is provided for storing the personal property of inmates safely and securely.

*Comment*: None.

Part 2: Security

Inmates verify, by signature, the receipt of their initial orientation and of the inmate handbook and written orientation materials. Signed acknowledgement of receipt of the handbook is maintained in the inmate's file.

*Comment*: None.

*Protocols*: Written policy and procedure. Receipt form.
*Process Indicators*: Completed receipt forms. Inmate interviews. Observation.

**4-ALDF-2A-29**
**(Ref. New)**

**Information is provided to inmates about sexual abuse/assault including:**

- **prevention/intervention**
- **self-protection**
- **reporting sexual abuse/assault**
- **treatment and counseling**

**The information is communicated orally and in writing, in a language clearly understood by the inmate, upon arrival at the facility.**

*Comment*: None.

*Protocols*: Policy and procedure
*Process Indicators*: Observation, inmate interviews, inmate handbook, completed receipt forms.

## Classification and Separation

**4-ALDF-2A-30**
**(Ref. 3-ALDF-4B-01**
**and 2C-03)**

There is a formal classification process that starts at admission, for managing and separating inmates, and administering the facility based upon the agency mission, classification goals, and inmate custody and program needs. The process uses verifiable and documented data about inmates. The classification system is used to separate inmates into groups that reduce the probability of assault and disruptive behavior. At a minimum, the classification system evaluates the following:

- **mental and emotional stability**
- **escape history**
- **history of assaultive behavior**
- **medical status**
- **age**
- **need to keep separate**

*Comment*: None.

*Protocols*: Written policy and procedure. Classification forms and formats. Methodology for validating process.
*Process Indicators*: Classification records. Documentation of verification of the process.

**4-ALDF-2A-31**
**(Ref. 3-ALDF-4B-02)**   The inmate classification process ensures periodic review of inmate status, and revision of inmate status as needed in response to changes in inmate behavior or circumstances. There is a process for appeal of classification decisions.

*Comment*: None.

*Protocols*: Written policy and procedure. Process for periodic review and appeal. Inmate handbook. Inmate orientation materials.
*Process Indicators*: Classification records. Documentation of periodic review and appeal. Inmate interviews.

**4-ALDF-2A-32**
**(Ref. 3-ALDF-4B-03**
**and 3E-06)**   Inmate management and housing assignment are based on age, gender, legal status, custody needs, special problems and needs, and behavior. Male and female inmates are housed in separate rooms/cells.

*Comment*: None.

*Protocols*: Written policy and procedure. Housing assignment process and forms.
*Process Indicators*: Inmate housing records. Observation. Staff and inmate interviews.

**4-ALDF-2A-33**
**(Ref. 3-ALDF-2B-02)**   The facility supports inmate separation according to existing laws and regulation and/or according to the facility's classification plan. (Addition, new construction)

*Comment*: None.

*Protocols*: Written policy and procedure. Facility plans/specifications. Applicable statutes and regulations. Classification plan.
*Process Indicators*: Inmate classification records. Housing records. Observation. Staff and inmate interviews.

**4-ALDF-2A-34**
**(Ref. 3-ALDF-2C-01-1)**   Single occupancy cells/rooms are available when indicated for the following:

- maximum and close custody
- inmates with severe medical disabilities
- inmates suffering from serious mental illness
- sexual predators
- inmates likely to be exploited or victimized by others
- inmates who have other special needs for single-occupancy housing.

*Comment*: None.

*Protocols*: Written policy and procedure. Facility plans/specifications.
*Process Indicators*: Observation. Interviews (staff, inmates.) Housing and classification records/logs.

000367

Part 2: Security

**4-ALDF-2A-35**
**(Ref. 3-ALDF-2C-04)** Inmates not suitable for housing in multiple occupancy cells are housed in single occupancy cells. No less than 10 percent of the rated capacity of the facility is available for single occupancy.

*Comment*: None.

*Protocols*: Written policy and procedure. Facility plans/specifications.
*Process Indicators*: Observation. Interviews (staff, inmates). Housing and classification records/logs.

**4-ALDF-2A-36**
**(Ref. 3-ALDF-2C-14)** Inmates participating in work or educational release programs are separated from inmates in the general population.

*Comment*: None.

*Protocols*: Written policy and procedure. Facility plans/specifications.
*Process Indicators*: Observation. Interviews (staff, inmates). Housing and classification records/logs.

## Youthful Offenders

**4-ALDF-2A-37**
**(Ref. 3-ALDF-4B-04)** Confinement of juveniles under the age of 18 is prohibited.

*Comment*: None.

*Protocols*: Written policy and procedure.
*Process Indicators*: Observation. Interviews (staff, inmates). Admission and housing.

**4-ALDF-2A-38**
**(Ref. 3-ALDF-4B-04-1)** If youthful offenders are housed in the facility, they are housed in a specialized unit for youthful offenders except when:

- violent, predatory youthful offender poses an undue risk of harm to others within the specialized unit, or
- a qualified medical or mental-health specialist documents that the youthful offender would benefit from placement outside the unit

A written statement is prepared describing the specific reasons for housing a youthful offender outside the specialized unit and a case-management plan specifying what behaviors need to be modified and how the youthful offender may return to the unit. The statement of reasons and case-management plan must be approved by the facility administrator or his/her designee. Cases are reviewed at least quarterly by the case manager, the administrator or his or her designee, and the youthful offender to determine whether a youthful offender should be returned to the specialized unit.

*Comment*: American Correctional Association policy prohibits confinement of youthful offenders in an adult facility; however, where the laws of the jurisdiction require such confinement, the provisions of the standard must be met.

000368

Part 4: Care

use toilet facilities without staff assistance when they are confined in their cells/sleeping areas. Toilets are provided at a minimum ratio of one for every 12 inmates in male facilities and one for every eight inmates in female facilities and one washbasin for every 12 inmates unless national or state building or health codes specify a different ratio. Urinals may be substituted for up to one-half of the toilets in male facilities. All housing units with three or more inmates have a minimum of two toilets.

*Comment*: None.

*Protocols*: Written policy and procedure. Facility plans/specifications. Applicable building codes and regulations.
*Process Indicators*: Observation. Inmate housing records. Measurement. Maintenance records.

**4-ALDF-4B-09**
**(Ref. 3-ALDF-2C-10)** Inmates have access to operable showers with temperature-controlled hot and cold running water, at a minimum ratio of one shower for every 12 inmates, unless national or state building or health codes specify a different ratio. Water for showers is thermostatically controlled to temperatures ranging from 100 degrees to 120 degrees Fahrenheit to ensure the safety of inmates and to promote hygienic practices.

*Comment*: None.

*Protocols*: Written policy and procedure. Facility plans/specifications.
*Process Indicators*: Observation. Measurement. Inspection reports. Maintenance records. Documentation of periodic measurement of water temperature. Inmate grievances. Inmate interviews.

## PERFORMANCE STANDARD: Continuum of Health Care Services

**4C. Inmates maintain good health. Inmates have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner.**

OUTCOME MEASURES:

(1) Number of inmates with a positive tuberculin skin test on admission in the past 12 months divided by the number of admissions in the past 12 months.

(2) Number of inmates diagnosed with active tuberculosis in the past 12 months divided by the average daily population in the past 12 months.

(3) Number of conversions to a positive tuberculin skin test in the past 12 months divided by the number of tuberculin skin tests given in the past 12 months.

(4) Number of inmates with a positive tuberculin skin test who complete prophylaxis treatment for tuberculosis in the past 12 months divided by the number of inmates with a positive tuberculin skin test on prophylaxis treatment for tuberculosis in the past 12 months.

(5) Number of Hepatitis C positive inmates in the past 12 months divided by the average daily population in the past 12 months.

(6) Number of HIV positive inmates in the past 12 months divided by the average daily population in the past 12 months.

(7) Number of HIV positive inmates who are being treated with highly active antiretroviral treatment in the past 12 months divided by the number of known HIV positive inmates in the past 12 months.

(8) Number of inmates diagnosed with an Axis I (excluding sole diagnosis of substance abuse) in the past 12 months divided by the average daily population in the past 12 months.

(9) Number of inmate suicide attempts in the past 12 months divided by the average daily population in the past 12 months.

(10) Number of inmate suicides in the past 12 months divided by the average daily population in the past 12 months.

(11) Number of inmate deaths due to homicide in the past 12 months divided by the average daily population in the past 12 months.

(12) Number of inmate deaths due to injuries in the past 12 months divided by the average daily population in the past 12 months.

(13) Number of medically expected inmate deaths in the past 12 months divided by the average daily population in the past 12 months.

(14) Number of medically unexpected inmate deaths in the past 12 months divided by the average daily population in the past 12 months.

(15) Number of inmate admissions to the infirmary (where available) in the past 12 months divided by the average daily population in the past 12 months.

(16) Number of inmate admissions to off-site hospitals in the past 12 months divided by the average daily population in the past 12 months.

(17) Number of inmates transported off-site (via an ambulance or correctional vehicle) for treatment of emergency health conditions in the past 12 months divided by the average daily population in the past 12 months.

(18) Number of inmate specialty consults completed in the past 12 months divided by the number of specialty consults (on-site or off-site) ordered by primary health care provider (MD, NP, PA) in the past 12 months.

(19) Number of inmate grievances about access to health care services found in favor of the inmate in the past 12 months divided by the number of inmate grievances about access to healthcare services in the past 12 months.

(20) Number of inmate grievances related to the quality of health care found in favor of inmates in the past 12 months divided by the number of inmate grievances related to the quality of health care in the past 12 months.

(21) Number of inmates' lawsuits about access to healthcare services found in favor of inmates in the past 12 months divided by the number of inmate's lawsuits about access to health care services in the past 12 months.

(22) Number of individual sick call encounters in the past 12 months divided by the average daily population in the past 12 months.

(23) Number of physician visits in the past 12 months divided by the average daily population in the past 12 months.

(24) Number of individualized dental treatment plans in the past 12 months divided by the average daily population in the past 12 months.

(25) Number of hypertensive inmates enrolled in a chronic care clinic in the past 12 months divided by the average daily population in the past 12 months.

(26) Number of diabetic inmates enrolled in a chronic care clinic in the past 12 months divided by the average daily population in the past 12 months.

(27) Number of incidents involving pharmaceuticals as contraband in the past 12 months divided by the average daily population in the past 12 months.

(28) Number of cardiac diets received by inmates with cardiac disease in the past 12 months divided by the number of cardiac diets prescribed in the past 12 months.

(29) Number of hypertensive diets received by inmates with hypertension in the past 12 months divided by the number of hypertensive diets prescribed in the past 12 months.

(30) Number of diabetic diets received by inmates with diabetes in the past 12 months divided by the number of diabetic diets prescribed in the past 12 months.

(31) Number of renal diets received by inmates with renal disease in the past 12 months divided by the number of renal diets prescribed in the past 12 months.

(32) Number of needle-stick injuries in the past 12 months divided by the number of employees in the past 12 months.

(33) Number of pharmacy-dispensing errors in the past 12 months divided by the number of prescriptions dispensed by the pharmacy in the past 12 months.

(34) Number of nursing medication administration errors in the past 12 months divided by the number of medications administered in the past 12 months.

## EXPECTED PRACTICES

## Access to Care

**4-ALDF-4C-01**
**(Ref. New)**

**(MANDATORY) All inmates are informed about how to access health services and the grievance system during the admission/intake process. This information is communicated orally and in writing, and is conveyed in a language that is easily understood by each inmate. The information is translated into those languages spoken by significant numbers of inmates. When a literacy or language problem prevents an inmate from understanding written information, a staff member or translator assists the inmate.**

*Comment*: No member of the correctional staff should approve or disapprove inmate requests for health care services. When the facility frequently has non-English speaking inmates, procedures should be explained and written in their language.

*Protocols*: Written policy and procedures. Inmate handbook. Grievance procedure.
*Process Indicators*: Documentation that inmates are informed about health care and grievance system. Inmate grievances. Interviews.

**4-ALDF-4C-02**
**(Ref. New)**

**When medical co-payment fees are imposed, the program ensures that, at a minimum:**

- **all inmates are advised, in writing, at the time of admission to the facility of the guidelines of the co-payment program**

- co-payment fees are waived when appointments or services, including follow-up appointments, are initiated by medical staff

*Comment*: Fees imposed should not be so excessive as to discourage inmates from seeking needed medical care.

*Protocols*: Written policy and procedure. Inmate handbook.
*Process Indicators*: Forms. Interviews. Financial records.

## Clinical Services

**4-ALDF-4C-03**
**(Ref. 3-ALDF-4E-26)** **There is a process for all inmates to initiate requests for health services on a daily basis. These requests are triaged daily by health professionals or health-trained personnel. A priority system is used to schedule clinical services. Clinical services are available to inmates in a clinical setting at least five days a week and are performed by a physician or other qualified health care professional. Health care request forms are readily available to all inmates.**

*Comment*: A priority system addresses routine, urgent, and emergent complaints and conditions.

*Protocols*: Written policy and procedure. Sick call request form.
*Process Indicators*: A health record. Sick call request forms. Clinical provider schedules. Observation. Interviews.

## Continuity of Care

**4-ALDF-4C-04**
**(Ref. 3-ALDF-4E-05)** **Continuity of care is required from admission to transfer or discharge from the facility, including referral to community-based providers, when indicated.**

*Comment*: When health care is transferred to providers in the community, appropriate information should be shared with the new providers in accordance with consent requirements.

*Protocols*: Written policy and procedure. Referral transfer form.
*Process Indicators*: Completed referral transfer forms. Health records. Facility logs. Interviews.

## Referrals

**4-ALDF-4C-05**
**(Ref. 3-ALDF-4E-30)** **Inmates who need health care beyond the resources available in the facility, as determined by the responsible physician, are transferred under appropriate security provisions to a facility where such care is on call or available 24 hours per day. A written list of referral sources includes emergency and routine care. The list is reviewed and updated annually.**

*Comment*: Health care staff should collaborate with security personnel in determining conditions of transportation and necessary security precautions when an inmate needs to be transported to another facility or provider.

diseases, education, smoking cessation, family planning, self-care for chronic conditions, self-examination, and the benefits of physical fitness.

*Protocols*: Written policy and procedure.

*Process Indicators*: Documentation of program availability. Program and class schedules. Attendance rosters. Interviews. Curriculum and lesson plans. Examples of pamphlets, brochures, or other written handouts.

## Health Screens

**4-ALDF-4C-22**
**(Ref. 3-ALDF-4E-19)**   (MANDATORY) Intake medical screening for inmates commences upon the inmate's arrival at the facility and is performed by health-trained or qualified health care personnel. All findings are recorded on a screening form approved by the health authority. The screening includes at least the following:

Inquiry into:

- any past history of serious infectious or communicable illness, and any treatment or symptoms and medications

- current illness and health problems, including communicable diseases

- dental problems

- use of alcohol and other drugs, including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use, and history of any problems that may have occurred after ceasing use

- the possibility of pregnancy

- history of problem

- other health problems designated by the responsible physician

Observation of the following:

- behavior, including state of consciousness, mental status, appearance, conduct, tremor, and sweating

- body deformities and other physical abnormalities

- ease of movement

- condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, and infestations, recent tattoos, and needle marks or other indications of drug abuse

Medical disposition of the inmate:

- refusal of admission until inmate is medically cleared

- cleared for general population

- cleared for general population with prompt referral to appropriate health care service

- referral to appropriate health care service for emergency treatment

Inmates, who are unconscious, semiconscious, bleeding, or otherwise obviously in need of immediate medical attention, are referred. When they are referred to an emergency department, their admission or return

to the facility is predicated on written medical clearance. When screening is conducted by trained custody staff, a subsequent review of positive findings by the licensed health care staff is required. The responsible physician, in cooperation with the facility manager, establishes protocols.

Facilities that have reception and diagnostic units or a holding room conduct receiving screening on all inmates on their arrival at the facility as part of the admission procedures.

*Comment*: Health screening is a system of structured inquiry and observation to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the general population and to identify inmates who require immediate medical attention. Receiving screening can be performed at the time of admission by health care personnel or by a health trained correctional officer. Examples of symptoms of serious, infectious or communicable diseases include a chronic cough, lethargy, weakness, weight loss, loss of appetite, fever, or night sweats that are suggestive of such illness.

*Protocols*: Written policy and procedure. Screening protocols.
*Process Indicators*: Health records. Completed screening forms. Transfer logs. Interviews.

**4-ALDF-4C-23**
**(Ref. 3-ALDF-4E-20)** (MANDATORY) All intrasystem transfer inmates receive a health screening by health-trained or qualified health care personnel, which commences on their arrival at the facility. All findings are recorded on a screening form approved by the health authority. At a minimum, the screening includes the following:

Inquiry into:

- whether the inmate is being treated for a medical or dental problem
- whether the inmate is presently on medication
- whether the inmate has a current medical or dental complaint

Observation of:

- general appearance and behavior
- physical deformities
- evidence of abuse or trauma

Medical disposition of inmates:

- cleared for general population
- cleared for general population with appropriate referral to health care service
- referral to appropriate health care service for emergency treatment

*Comment*: Health screening of intrasystem transfers is necessary to detect inmates who pose a health or safety threat to themselves or others and who may require immediate health care.

*Protocols*: Written policy and procedure. Screening form.

000373

Part 4: Care

*Process Indicators*: Health records. Completed screening forms. Transfer logs. Interviews.

## Health Appraisal

**4-ALDF-4C-24**
**(Ref: 3 ALDF 4E 21)**   (MANDATORY) A comprehensive health appraisal for each inmate is completed within 14 days after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90 days, a new health appraisal is not required except as determined by the designated health authority. Health appraisal includes the following:

- review of the earlier receiving screening
- collection of additional data to complete the medical, dental, mental health, and immunization histories
- laboratory and/or diagnostic tests to detect communicable disease, including venereal disease and tuberculosis
- recording of height, weight, pulse, blood pressure, and temperature
- other tests and examinations, as appropriate
- medical examination, including review of mental and dental status
- review of the results of the medical examination, tests, and identification of problems by a physician or other qualified health care personnel, if such is authorized in the medical practice act
- initiation of therapy, when appropriate
- development and implementation of treatment plan, including recommendations concerning housing, job assignment, and program participation

*Comment*: Test results, particularly for communicable diseases, should be received and evaluated before an inmate is assigned to housing in the general population. Information regarding the inmate's physical and mental status also may dictate housing and activity assignments. When appropriate, additional investigation should be conducted into alcohol and drug abuse and other related problems.

*Protocols*: Written policy and procedure. Health appraisal form.
*Process Indicators*: Health records. Completed health appraisal forms. Transfer logs. Interviews.

**4-ALDF-4C-25**
**(Ref. New)**   Health appraisal data collection and recording includes the following:

- a uniform process as determined by the health authority
- health history and vital signs collected by health-trained or qualified health care personnel
- collection of all other health appraisal data performed only by qualified health personnel

000374

- review of the results of the medical examination, tests, and identification of problems is performed by a physician or mid-level practitioner, as allowed by law

*Comment*: None.

*Protocols*: Written policy and procedure.
*Process Indicators*: Health records.

## Periodic Examinations

**4-ALDF-4C-26**
**(Ref. 3-ALDF-4E-21)**   The health authority determines the conditions for periodic health examinations for inmates.

*Comment*: Inmates incarcerated for more than 12 months should be placed on a schedule for periodic health exams and should be examined prior to release to protect both the inmate and the public.

*Protocols*: Written policy and procedure.
*Process Indicators*: Health records. Completed annual health appraisal forms. Interviews.

## Mental Health Program

**4-ALDF-4C-27**
**(Ref. 3-ALDF-4E-11)**   (MANDATORY) Mental health services include at a minimum:

- screening for mental health problems on intake as approved by the mental health professional

- referral to outpatient services for the detection, diagnosis, and treatment of mental illness

- crisis intervention and the management of acute psychiatric episodes

- stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting

- referral and admission to licensed mental health facilities for inmates whose psychiatric needs exceed the treatment capability of the facility

- obtaining and documenting informed consent

*Comment*: An adequate number of qualified staff members should be available to deal directly with inmates who have severe mental health problems and to advise other correctional staff about their contacts with such individuals.

*Protocols*: Written policy and procedure. Screening form.
*Process Indicators*: Health records. Completed screening forms. Provider qualifications and time and attendance records. Observations. Interviews.

**4-ALDF-4C-28**
**(Ref. New)**   Mental health services and activities are approved by the appropriate mental health authority.

*Comment*: None

000375

Part 4: Care

*Protocols*: Written policy and procedure. Job descriptions for mental health personnel.
*Process Indicators*: Documentation of review by mental health personnel. Interviews.

## Mental Health Screen

4-ALDF-4C-29
(Ref. New)

(MANDATORY) All inmates receive an initial mental health screening at the time of admission to the facility by mental-health trained or qualified mental-health care personnel. The mental-health screening includes, but is not limited to:

Inquiry into whether the inmate:

- has a present suicide ideation
- has a history of suicidal behavior
- is presently prescribed psychotropic medication
- has a current mental health complaint
- is being treated for mental health problems
- has a history of inpatient and outpatient psychiatric treatment
- has a history of treatment for substance abuse

Observation of:

- general appearance and behavior
- evidence of abuse and/or trauma
- current symptoms of psychosis, depression, anxiety, and/or aggression

Disposition of inmate:

- cleared for general population
- cleared for general population with appropriate referral to mental-health care service
- referral to appropriate mental-health care service for emergency treatment

*Comment*: None.

*Protocols*: Written policy and procedure. Mental health screening form.
*Process Indicators*: Health records. Completed mental health screening forms. Transfer logs. Interviews.

## Mental Health Appraisal

4-ALDF-4C-30
(Ref. New)

(MANDATORY) All inmates receive a mental health appraisal by a qualified mental health person within 14 days of admission to the facility. If there is documented evidence of a mental health appraisal within the previous 90 days, a new mental health appraisal is not required, except as

determined by the designated mental health authority. Mental health examinations include, but are not limited to:

- assessment of current mental status and condition
- assessment of current suicidal potential and person-specific circumstances that increase suicide potential
- assessment of violence potential and person-specific circumstances that increase violence potential
- review of available historical records of inpatient and outpatient psychiatric treatment
- review of history of treatment with psychotropic medication
- review of history of psychotherapy, psycho-educational groups, and classes or support groups
- review of history of drug and alcohol treatment
- review of educational history
- review of history of sexual abuse victimization and predatory behavior
- assessment of drug and alcohol abuse and/or addiction
- use of additional assessment tools, as indicated
- referral to treatment, as indicated
- development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation

*Comment:* None.

*Protocols:* Written policy and procedure. Mental health appraisal form.
*Process Indicators:* Health records. Completed mental health appraisal forms. Transfer logs. Interviews.

## Mental Health Referrals

4-ALDF-4C-31
(Ref. New)

Inmates referred for mental health treatment receive a comprehensive evaluation by a licensed mental health professional. The evaluation is completed within 14 days of the referral request date and includes at least the following:

- review of mental health screening and appraisal data
- direct observations of behavior
- collection and review of additional data from individual diagnostic interviews and tests assessing personality, intellect, and coping abilities
- compilation of the individual's mental health history
- development of an overall treatment/management plan with appropriate referral to include transfer to mental health facility for inmates whose psychiatric needs exceed the treatment capability of the facility

000377

## Mental Illness and Developmental Disability

4-ALDF-4C-34
(Ref. New)

**Inmates with severe mental illness or who are severely developmentally disabled receive a mental health evaluation. Where appropriate, these inmates are referred for placement in noncorrectional facilities or in units specifically designated for handling this type of individual.**

*Comment*: Inmates with severe mental illness or developmental disabilities are vulnerable to abuse by other inmates and require specialized care. These individuals may be a danger to themselves or others or be incapable of attending to their basic physiological needs.

*Protocols*: Written policy and procedures.
*Process Indicators*: Health records. Referral logs. Records. Interviews.

## Prostheses and Orthodontic Devices

4-ALDF-4C-35
(Ref. 3-ALDF-4E-29)

**When the health of the inmate would otherwise be adversely affected, as determined by the responsible physician or dentist, medical or dental adaptive devices are provided.**

*Comment*: Inmates may be required to provide copayments for these devices. Devices include, but are not limited to, eyeglasses, hearing aids, dentures, wheelchairs, or other prosthetic devices.

*Protocols*: Written policy and procedure.
*Process Indicators*: Purchase records. Health records. Interviews.

## Detoxification

4-ALDF-4C-36
(Ref. 3-ALDF-4E-39)

**(MANDATORY) Detoxification is done only under medical supervision in accordance with local, state, and federal laws. Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs is conducted under medical supervision when performed at the facility or is conducted in a hospital or community detoxification center. Specific guidelines are followed for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs. Inmates experiencing severe, life-threatening intoxication (an overdose) or withdrawal are transferred under appropriate security conditions to a facility where specialized care is available.**

*Comment*: None.

*Protocols*: Written policy and procedure. Community contract agreements.
*Process Indicators*: Health records. Transfer records. Interviews.

000378

## Management of Chemical Dependency

**4-ALDF-4C-37**
**(Ref. 3-ALDF-4E-41)**   Inmates have access to a chemical dependency treatment program. When a chemical dependency program exists, the clinical management of chemically dependent inmates includes at a minimum the following:

- a standardized diagnostic needs assessment administered to determine the extent of use, abuse, dependency, and/or codependency

- an individualized treatment plan developed and implemented by a multidisciplinary clinical team that includes medical, mental health, and substance abuse professionals

- prerelease relapse-prevention education, including risk management

- inmate involvement in aftercare discharge plans

*Comment:* None.

*Protocols:* Written policy and procedure.
*Process Indicators:* Health records. Interviews. Prerelease, preventive or education curriculum.

## Pharmaceuticals

**4-ALDF-4C-38**
**(Ref. 3-ALDF-4E-17)**   (MANDATORY) Management of pharmaceuticals includes:

- a formulary

- a formalized method for obtaining nonformulary medications

- prescription practices, including, requirements that medications are prescribed only when clinically indicated as one facet of a program of therapy, and a prescribing provider reevaluates a prescription prior to its renewal

- medication procurement, receipt, distribution, storage, dispensing, administration, and disposal

- secure storage and perpetual inventory of all controlled substances, syringes, and needles

- administration and management in accordance with state and federal law and supervision by properly licensed personnel

- administration of medication by persons properly trained and under the supervision of the health authority and facility or program administrator or designee

- accountability for administering or distributing medications in a timely manner and according to physician orders

*Comment:* The formulary should include all prescription and nonprescription medications stocked in a facility or routinely procured from outside sources. Controlled substances are those classified by the Drug Enforcement Agency as Schedule II–V.



Core Jail Standards

American Correctional Association

**Admissions**

1-CORE-2A-14     (Ref. 4-ALDF-2A-20, 2A-21, 2A-23)
Admission processes for a newly-admitted inmate include, but are not limited to:

- search of the inmate and personal property
- inventorying and providing secure storage of personal property
- providing an itemized receipt of personal property
- recording of basic personal data
- performing a criminal history check
- photographing and fingerprinting, as required
- health screening
- suicide screening
- Alcohol and drug screening
- Assignment to initial housing area based on their immediate needs and security.

Comment: Admission forms may be recorded electronically.

Protocols: Written policy and procedure. Intake and admission forms. Screening forms. Staff training curriculum. Inventory form. Receipt form.

Process Indicators: Observations. Intake records/files. Intake and admission records. Completed inventory forms and receipts.

**Orientation**

1-CORE-2A-15     (Ref. 4-ALDF-2A-27)
Prior to or upon being housed, each inmate is provided with an orientation that includes facility rules, regulations, and inmate handbook.

Comment: None. Information in the inmate handbook is available upon request. Orientation can be supplemented electronically.

Protocols: Written policy and procedure. Orientation information and process. Inmate handbook.

Process Indicators: Observation. Intake records

## Classification and Separation

## Objective Classification System

1-CORE-2A-16    (Ref. 4-ALDF-2A-30, 2A-31)

An objective classification system is used to separate inmates into groups to reduce the probability of assault and disruptive behavior. All inmates are classified using an objective classification process that at a minimum:

- Identifies the appropriate level of custody for each inmate
- Identifies appropriate housing assignment
- Identifies the inmate's interest and eligibility to participate in available programs

### There is a process for review and appeal of classification decisions.

Comment: None.

Protocols: Written policy and procedure. Classification forms and formats. Methodology for validating process. Process for periodic review and appeal. Inmate handbook. Inmate orientation materials.

Process Indicators: Classification records. Documentation of verification of the process. Documentation of periodic review and appeal.

## Separation in Classification

1-CORE-2A-17    (Ref. 4-ALDF-2A-32, 2A-33)

Inmate management and housing assignment considers age, gender, legal status, custody needs, special problems and needs, and behavior. Male and female inmates are housed in separate rooms/cells. Inmates are separated according to consistent with the facility's classification plan.

Comment: None.

Protocols: Written policy and procedure. Housing assignment process and forms. Facility plans/specifications. Applicable statutes and regulations. Classification plan.

Process Indicators: Inmate housing records. Observation. Inmate classification records. Observation.

© American Correctional Association  www.aca.org

## Single-Occupancy Cells

1-CORE-2A-18     (Ref. 4-ALDF-2A-34)
Inmates not suitable for housing in multiple occupancy cells based on classification should be are housed in single occupancy cells.

Comment: None.

Protocols: Written policy and procedure. Facility plans/specifications.

Process Indicators: Observation. Housing and classification records/logs.

## Youthful Offenders

### Prohibition on Youthful Offenders

1-CORE-2A-19     (Ref. 4-ALDF-2A-37)
Confinement of persons under the age of eighteen in an adult facility is prohibited.

Comment: None.

Protocols: Written policy and procedure.

Process Indicators: Observation.

# Special Management Inmates

### Segregation for Protection

1-CORE-2A-21     (Ref. 4-ALDF-2A-44)
The facility administrator or designee can order immediate segregation when it is necessary for facility safety, security and order. The action is reviewed within 72 hours by the appropriate authority.

Comment: None.

Protocols: Written policy and procedure.

Process Indicators: Documentation of review within 72 hours. Facility records. Inmate records.

## Health Care

Association www.aca.org

I-CORE-2A-22       (Mandatory)       (Ref. 4-ALDF-2A-45)
When an inmate is transferred to segregation for health care concerns, a medical referral will be made to health care personnel for assessment and review in accordance with the protocols established by the health authority.

Comment: Following the health assessment, the health care provider determines the appropriate setting for further medical attention or examination and may request an inmate's removal from a cell or housing area to a clinical environment.

Protocols: Written policy and procedure.

Process Indicators: Health records. Segregation logs. Duty assignment roster for health care providers. Observation.

## Conditions of Segregation

I-CORE-2A-23       (Ref. 4-ALDF-2A-51)
Segregation housing units provide living conditions that approximate those of the general inmate population. All exceptions are clearly documented. Segregation cells/rooms permit the inmates assigned to them to converse with and be observed by staff members.

Comment: None.

Protocols: Written policy and procedure. Facility plans/specifications.

Process Indicators: Observation.

Comment: None.

Protocols: Written policy and procedure.

Process Indicators: Observation. Documentation of cleaning and storage. Documentation of clothing issue.

## Personal Hygiene

1-CORE-4B-03      (Ref. 4-ALDF-4B-06)
Articles and services necessary for maintaining proper personal hygiene are available to all inmates including items specifically needed for females.

Comment: None.

Protocols: Written policy and procedure.

Process Indicators: Documentation that items are provided. Observation.

## Plumbing Fixtures

1-CORE-4B-04      (Ref. 4-ALDF-4B-08, 4B-09, 4C-10)
Inmates, including those in medical housing units or infirmaries, have access to showers, toilets, and washbasins with temperature controlled hot and cold running water twenty-four hours per day. Water for showers is thermostatically controlled to temperatures ranging from 100 degrees to 120 degrees Fahrenheit.

Comment: None.

Protocols: Written policy and procedure. Facility plans/specifications. Applicable building codes and regulations. Documentation of periodic measurement of water temperature.

Process Indicators: Observation. Inmate housing records. Measurement. Inspection/Maintenance records or reports. Ratio documentation. Observation.

## PERFORMANCE STANDARD: Continuum of Health Care Services

4C.   Inmates maintain good health. Inmates have unimpeded access to a continuum of health care services so that their health care needs, including prevention and health education, are met in a timely and efficient manner.

## EXPECTED PRACTICES

## Access to Care/ Clinical Services

1-CORE-4C-01     (Mandatory) (Ref. 4-ALDF-4C-01, 4C-02, 4C-03)
At the time of orientation all inmates are informed about procedures to access health services. There is a process for all inmates to access health care services on a daily basis by means of sick call, inmate request or staff referral. When the necessary medical, dental, mental health, or substance abuse care is not available at the facility, inmates are referred to and given timely access to the needed clinical services in another appropriate health care facility. Inmates may also request access to traditional healing practitioners for medicinal services.

Comment: No member of the correctional staff will deny inmate requests for health care services. When the facility frequently has non-English speaking inmates, procedures should be explained and written in their language.

Protocols: Written policy and procedures. Inmate handbook. Grievance procedure.

Process Indicators: Documentation that inmates are informed about health care and grievance system. Inmate grievances. Financial records. Sick call request form. A health record. Clinical provider schedules. Observation.

## Continuity of Care/Referrals

1-CORE-4C-02     (Ref. 4-ALDF-4C-04, 4C-05)
The designated health care provider will provide for continuity of care for inmates from admission to transfer or discharge from facility.

Comment: None.

Protocols: Written policy and procedure. Referral transfer/consult form. Memorandum of Agreement (MOA) with health care provider.

Process Indicators: Completed referral, transfer, consult forms. Health records. Facility logs. Interviews. Transportation logs.

## Emergency Plan

1-CORE-4C-03     (Mandatory)(Ref. 4-ALDF-4C-08)
Inmates have access to twenty-four-hour emergency health care services, including on-site first aid, basic life support, and transfer to health care facilities as necessary.

Comment: In the event that primary health services are not available, and particularly in emergency situations, back-up facilities or providers should be predetermined. The plan may include the use of an alternative hospital emergency service or a physician on-call service.

Protocols: Written policy or procedure.

Process Indicators: Designated facility. Provider lists. Transportation logs.

1-CORE-4C-04       (Ref. 4-ALDF-4C-09)

## Pregnancy Management

1-CORE-4C-05       (Mandatory) (Ref. 4-ALDF-4C-13)
Pregnant inmates have access to obstetrical services by a qualified provider, including prenatal, peripartum, and post partum care.

Comment:

Protocols: Written policy and procedure. Inmate handbook. Contract or agreement.

Process indicators: Health record entries. Laboratory records. Interviews.

## Communicable Disease and Infection Control Program

1-CORE-4C-06       (Mandatory) (Ref. 4-ALDF-4C-14, 4C-15, 4C-16, 4C-17, 4C-18)
Communicable diseases are managed in accordance with a written plan developed in consultation with, and approved by, the designated health authority. The plan includes provisions for the screening, surveillance, treatment, containment, and reporting of infectious diseases. Infection control measures include the availability of personal protective equipment for staff and hand hygiene promotion throughout the facility. The plan also provides for handling bio-hazardous waste and decontaminating medical and dental equipment must comply with applicable tribal or federal regulations.

Comment: Because of their serious nature, methods of transmission, and public sensitivity, these diseases require special attention. Plans for the management of tuberculosis may be based on incidence and prevalence of the disease within the agency's population and the surrounding community.

Protocols: Written policy and procedure, codes, and regulations and treatment guidelines.

Process Indicators: Health records. Chronic care forms and clinic visit logs. Interviews. Documentation of waste pick up, and/or cleaning logs.

Chronic Care

1-CORE-4C-07       (Mandatory) (Ref. 4-ALDF-4C-19)
Inmates with chronic medical conditions, such as diabetes, hypertension, and mental illness receive periodic care by a qualified health care provider in accordance with

individual treatment plans that include monitoring of medications and laboratory testing.

Comment: Professionally recognized chronic care guidelines are available from disease-specific organizations and various medical and physicians' associations.

Protocols: Written policy and procedure. Chronic care protocols and forms.

Process Indicators: Health records. Chronic care logs.

## Dental Care

### 1-CORE-4C-08      (Ref. 4-ALDF-4C-20)
Access to routine and emergency dental care is provided to inmates.

Comment: None.

Protocols: Written policy and procedure. Inmate request form.

Process Indicators: Dental records. Admission logs. Referral and consultation records. Dental request forms.

## Health Screens

### 1-CORE-4C-09      (Mandatory) (Ref. 4-ALDF-4C-22, 4C-29)
Intake physical and mental health screening commences upon the inmate's arrival at the facility unless there is documentation of a medical screening within the previous 90 days or the inmate is an intra-system transfer. Screening is conducted by health-trained staff or by qualified health care personnel in accordance with protocols established by the health authority. The screening includes at the least the following:

- current or past medical conditions, including mental health problems and communicable diseases
- current medications, including psychotropic medications
- history of hospitalization, including inpatient psychiatric care
- suicidal risk assessment, including suicidal ideation or history of suicidal behavior
- use of alcohol and other drugs including potential need for detoxification
- dental pain, swelling, or functional impairment
- possibility of pregnancy
- cognitive or physical impairment.

Observation of the following:

- behavior, including state of consciousness, mental status, appearance, conduct, tremor, or sweating

- body deformities and other physical abnormalities
- ease of movement
- condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, infestations, recent tattoos, and needle marks or other indications of injection drug use
- symptoms of psychosis, depression, anxiety and/or aggression

Medical disposition of the inmate:

- refusal of admission until inmate is medically cleared
- cleared for general population
- cleared for general population with prompt referral to appropriate medical or mental health care services
- referral to appropriate medical or mental health care service for emergency treatment
- process for observation for high risk events, such as seizures, detoxification, head wounds, and so forth

Comment: Health screening is a system of structured inquiry and observation to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the general population and to identify inmates who require immediate medical attention. Receiving screening can be performed at the time of admission by health care personnel or by a trained correctional officer. Examples of symptoms of serious, infectious or communicable diseases include a chronic cough, lethargy, weakness, weight loss, loss of appetite, fever, or night sweats that are suggestive of such illness.

Protocols: Written policy and procedure. Screening protocols. Mental health screening form.

Process Indicators: Health records. Completed mental health screening forms. Transfer logs.

## Intra-System Transfer and Health Screening

1-CORE-4C-10      (Mandatory) (Ref. 4-ALDF-4C-23)
When inmates are transferred to another facility, copies of health information maintained in the detention records are transferred with inmates to the receiving facility. At a minimum, health information may include the following:

- a review of the inmate's medical, dental, and mental health problems
- current medications
- current treatment plan

000360

Comment: The transfer of health care information is necessary to identify ~~detect~~ inmates who pose a health or safety threat to themselves or others and who may require immediate health care.

Protocols: Written policy and procedure. Screening form.

Process Indicators: Completed screening forms. Transfer logs.

## Health Appraisal

1-CORE-4C-11     (Mandatory) (Ref. 4-ALDF-4C-24)
A health appraisal is completed for each inmate within 14 days after arrival at the facility in accordance with protocols established by the health authority, unless a health appraisal has been completed within the previous 90 days. The health appraisal includes the review of the previous receiving screening, a medical history and physical examination by a qualified health care provider, and an individual treatment plan.

Comment: Information regarding the inmate's physical and mental status also may dictate housing and activity assignments. When appropriate, additional investigation should be conducted into alcohol and drug abuse and other related problems.

Protocols: Written policy and procedure. Health appraisal form.

Process Indicators: Health records. Completed health appraisal forms. Transfer logs.

## Access to Mental Health & Substance Abuse Services ~~Program~~

1-CORE-4C-12     (Mandatory) (Ref. 4-ALDF-4C-27, 4C-28)
Inmates have access to mental health, and chemical substance abuse services as clinically warranted in accordance with protocols established by the health authority that include:

- screening for mental health problems
- referral to outpatient services, including psychiatric care
- crisis intervention and management of acute psychiatric episodes
- stabilization of the mentally ill and prevention of psychiatric deterioration in the facility
- referral and admission to inpatient facilities
- informed consent for treatment.

American Correctional Association ...

Comment: The designated health care provider should have available an adequate level of mental health services and substance abuse services to deal directly with inmates who have severe mental health problems and to advise/train correctional staff in managing inmates with mental health needs.

Protocols: Written policy and procedure. Screening form.

Process Indicators: Health records. Completed screening forms.

## Suicide Prevention and Intervention

1-CORE-4C-13        (Mandatory) (Ref. 4-ALDF-4C-32)
The facility has specific procedures, developed in consultation with the health authority, for handling intake, screening, identifying, and continually supervising the suicide-prone inmate. All staff responsible for supervising suicide-prone inmates are trained annually on program expectations.

Comment: None.

Protocols: Written policy and procedures. Training curriculum and lesson plans. Suicide-watch logs or forms.

Process Indicators: Documentation of staff training. Documentation of suicide watches and critical incident debriefings. Observations.

## Social Detoxification

1-CORE-4C-14        (Mandatory) (Ref. 4-ALDF-4C-36)
Specific criteria are established for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center. A medical clearance from a health care provider is required upon re-entry to the facility.

Comment: None.

Protocols: Written policy and procedure.

Process Indicators: Transfer records.

## Pharmaceuticals

1-CORE-4C-15        (Mandatory) (Ref. 4-ALDF-4C-38)
Pharmaceuticals are managed in accordance with policies and procedures approved by the health authority and in compliance with Tribal and federal laws and regulations. The policies require dispensing and administering prescribed medications by qualified personnel, adequate management of controlled

American Correctional Association

# STANDARDS FOR HEALTH SERVICES
# IN JAILS

## 2014

These standards represent the official position of the National Commission on Correctional Health Care with respect to requirements for health services in jails. They do not necessarily represent the official position of supporting organizations or individuals represented on the National Commission on Correctional Health Care Board of Directors.

National Commission on Correctional Health Care

000343

**J-A-01**
*essential*

SUP 1.1.1

## ACCESS TO CARE

### Standard

Inmates have *access to care* to meet their serious medical, dental, and mental health needs.

### Compliance Indicator

The responsible health authority (RHA) identifies and eliminates any barriers to inmates receiving health care.

### Definition

*Access to care* means that, in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered.

### Discussion

This standard intends to ensure that inmates have access to care to meet their serious health needs and is the principle on which all National Commission on Correctional Health Care standards are based. It is also the basic principle established by the U.S. Supreme Court in the 1976 landmark case *Estelle v. Gamble.*

Unreasonable barriers to inmates' access to health services are to be avoided. Examples of unreasonable barriers include the following:

1. Punishing inmates for seeking care for their serious health needs
2. Assessing excessive fees that prevent or deter inmates from seeking care for their serious health needs, or assessing any fees for treatments arising from sexual abuse
3. Deterring inmates from seeking care for their serious health needs, such as holding sick call at 2 a.m., when this practice is not reasonably related to the needs of the institution
4. Having an understaffed, underfunded, or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs

The NCCHC position statement Charging Inmates a Fee for Health Care Services offers additional guidance about fee-for-service programs; it is available at www.ncchc.org.

3

National Commission on Correctional Health Care

| J-A-02 | RESPONSIBLE HEALTH AUTHORITY |
| essential | |

DHS UP
1.1.2

**Standard**

The facility has a designated health authority responsible for *health care* services.

**Compliance Indicators**

1. The responsible health authority (RHA) arranges for all levels of health care and assures quality, accessible, and timely health services for inmates.
2. The RHA's responsibilities are documented in a written agreement, contract, or job description.
3. The RHA is on site at least weekly.
4. The RHA may be a physician, *health administrator*, or agency. Where the agency acting as RHA is a state, regional, national, or corporate entity, there is also a designated individual at the local level to ensure that policies are carried out. When this authority is someone other than a physician, final clinical judgments rest with a single, designated, licensed, *responsible physician*.
5. Where there is a separate organizational structure for mental health services, there is a *designated mental health clinician*.
6. All aspects of the standard are addressed by written policy and defined procedures.

**Definitions**

*Health care* is the sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. Health care includes medical, dental, mental health, nutrition, and other ancillary services, as well as maintaining clean and safe environmental conditions.

A *health administrator* is a person who by virtue of education, experience, or certification (e.g., MSN, MPH, MHA, FACHE, CCHP) is capable of assuming responsibility for arranging all levels of health care and ensuring quality and accessible health services for inmates.

A *responsible physician* is a designated MD or DO who has the final authority at a given facility regarding clinical issues.

A *designated mental health clinician* refers to a psychiatrist, psychologist, or psychiatric social worker who is responsible for clinical mental health issues when mental health services at the facility are under a different authority than the medical services.

*Qualified health care professionals* include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients.

4

## Discussion

This standard seeks to ensure a coordinated health care system. The RHA functions to assure that health services are organized, adequate, and efficient. If this designated authority is not a physician, the responsible physician supervises the clinical aspects of health care.

A single, designated responsible physician (an MD or DO) is required in all instances. The responsible physician supervises clinical judgments regarding the care provided to inmates at the facility. This includes establishing and implementing policies for the clinical aspects of the program; monitoring the appropriateness, timeliness, and responsiveness of care and treatment; and reviewing the recommendations for treatment made by health care clinicians in the community.

When a facility's satellite program is a significant distance from the main unit, it is recommended that an on-site *qualified health care professional* be designated as the RHA for the satellite.

National Commission on Correctional Health Care

**J-G-02**
*essential*

DHS UP
2.4.9

## PATIENTS WITH SPECIAL HEALTH NEEDS

### Standard

A proactive program exists that provides care for *special needs patients* who require close medical supervision or multidisciplinary care.

### Compliance Indicators

1. Individual *treatment plans* are developed by a physician or other qualified clinician at the time the condition is identified, and updated when warranted.
2. The treatment plan includes, at a minimum:
   a. The frequency of follow-up for medical evaluation and adjustment of treatment modality
   b. The type and frequency of diagnostic testing and therapeutic regimens
   c. When appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication
3. Special needs are listed on the master problem list.
4. The facility maintains a list of special needs patients.
5. All aspects of the standard are addressed by written policy and defined procedures.

### Definitions

*Special needs patients* are those with health conditions that require regular care.

A *treatment plan* is a series of written statements specifying a patient's particular course of therapy and the roles of qualified health care professionals in carrying it out.

### Discussion

This standard intends to ensure that inmates with significant health conditions receive ongoing multidisciplinary care.

The special needs program serves a broad range of health conditions and problems that require the physician or other designated qualified health care professionals to design a treatment plan tailored to the patient's needs. The treatment plan is individualized, typically multidisciplinary, and based on an assessment of the patient's needs, and includes a statement of short- and long-term goals as well as the methods by which these goals will be pursued. When clinically indicated, the treatment plan gives patients access to the supportive and rehabilitative services (e.g., physical therapy, individual or group counseling, self-help groups) that the treating clinician deems appropriate.

Adolescence is a period during which an inmate requires special attention to diet, exercise, and nutrition.

000344

Developmentally disabled individuals include those with limited intellectual ability who may need habilitation planning, assistance in accepting the limitations of their conditions, and special attention to their physical safety in the corrections environment. Examples of developmental disability include fetal alcohol spectrum disorder, autism, brain injury, and Down syndrome.

Frail or elderly inmates include those who suffer from conditions that impair their ability to function to the extent that they require assistance in activities of daily living (e.g., dressing, feeding, transferring, toileting).

Physical disabilities can refer to mobility impairments (e.g., amputations, paraplegia) or to other disabilities that limit daily functioning (e.g., visual, hearing, or speech impairments).

Patients with serious mental health needs include those with basic psychotic disorders or mood disorders (e.g., depressive disorder or bipolar disorder), those who self-injure, the aggressive mentally ill, those with post-traumatic stress disorders, and suicidal inmates.

Many patients with mental illness also have co-occurring substance abuse disorders. In addition, post-traumatic stress disorders are common among inmates due to past sexual, physical, or emotional abuse. Alcohol and other substance abuse can be significant problems requiring individual treatment planning.

It is recommended that treatment plans for patients with mental health conditions incorporate ways to address the patients' problems and enhance patients' strengths, involve patients in their development, and include relapse prevention risk management strategies. The strategies should describe signs and symptoms associated with relapse or recurring difficulties (e.g., auditory hallucinations), how the patient thinks a relapse can be averted, and how best to help the patient manage crises.

Patients with recent hospitalizations, emergency room visits, and/or urgent care visits may qualify as a special needs patient. For chronic care patients, refer to G-01 Chronic Disease Services.

Patients with special needs are followed closely. Regularly scheduled chronic clinics are a good way to ensure continuity of care. The master problem list includes known drug allergies and any special needs. The use of flow sheets facilitates tracking these patients, particularly those with chronic illnesses. The parameters to be followed on the flow sheets coincide with criteria established for each of the common chronic illnesses, thereby facilitating review for compliance with the criteria in standard A-06 Continuous Quality Improvement Program. (See also G-01 Chronic Disease Services.)

000345

National Commission on Correctional Health Care

J-G-06
*essential*

DHS 4P
2.4.10
DOC 00
31.2.
DOC 00
31.04

## PATIENTS WITH ALCOHOL AND OTHER DRUG PROBLEMS

### Standard

Patients with alcohol or other drug (AOD) problems are assessed and properly managed by a physician or, where permitted by law, other qualified health care professionals.

### Compliance Indicators

1. Disorders associated with AOD (e.g., HIV, liver disease) are recognized and treated.
2. The correctional staff are trained in recognizing AOD problems in inmates.
3. There is evidence of communication and coordination between medical, mental health, and substance abuse staff regarding AOD care.
4. There is on-site individual counseling, group therapy, or self-help groups.
5. All aspects of the standard are addressed by written policy and defined procedures.

### Discussion

The intent of this standard is that a patient's addictions are identified and properly managed.

All health care professionals can have a part in treating the diseases of alcohol and other drug abuse. Medical staff have several roles in this regard: (1) appropriate assessment of intoxication and withdrawal (see G-07 Intoxication and Withdrawal), (2) treatment of disorders associated with AOD (e.g., HIV, liver disease), (3) appropriate prescription of psychoactive drugs as required (see G-04 Basic Mental Health Services), and (4) supportive and appropriate motivational counseling during clinical encounters. Inquiry about and support of the patient's efforts to deal with AOD problems by the medical practitioner is often a strong motivator.

Ideally, individual counseling, group counseling, self-help groups, residential programs, and clinical management are coordinated. In any event, policy and procedures define the roles of the AOD treatment team and the health care team, as well as the areas of mutual interest and collaboration. Clinical management of the patient is supervised by a physician. Community self-help initiatives such as Alcoholics Anonymous and Narcotics Anonymous may be an appropriate supplement or alternative to counseling provided by in-house staff.

Increasingly, in larger correctional systems, inmates with AOD disorders receive treatment for these problems from specialized treatment professionals. It is recommended that counselors who treat AOD problems be properly qualified to do so. Medical and mental health clinicians can facilitate the treatment process by referring inmates for treatment, providing counseling to motivate inmates to

## Discussion

The intent of this standard is that inmates who are intoxicated or undergoing withdrawal are appropriately managed.

Significant percentages of inmates admitted to correctional institutions have a history of alcohol and/or other drug abuse. Newly incarcerated individuals may enter intoxicated or develop symptoms of alcohol or other drug withdrawal. The withdrawal may be mild, moderate, or severe. Alcohol withdrawal is the abstinence syndrome with the highest mortality rate, although withdrawal from opiates and depressant drugs (e.g., benzodiazepines) may be, on occasion, life-threatening. Barbiturate withdrawal, while less common in correctional settings, also may be life-threatening. Mild to moderate forms of withdrawal can worsen without appropriate treatment, and continued assessment is required.

The treatment for most non-life-threatening withdrawal is amelioration of symptoms, which can be managed in the convalescent or outpatient setting. Abstinence syndromes in certain groups (including those who are psychotic, geriatric, epileptic, pregnant, adolescent, or otherwise medically ill) may require different protocols. For example, current medical thinking is that pregnant patients should not be withdrawn from a methadone maintenance program.

Detoxification and withdrawal are best managed by a physician or other medical professional with appropriate training and experience. As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times. Clinical management should also include the use of validated withdrawal assessment instruments, such as the Clinical Opiate Withdrawal Scale or the Objective Opiate Withdrawal Scale in cases of opiate withdrawal, and the Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised in the case of alcohol withdrawal.

Training for correctional officers includes recognizing the signs and symptoms of intoxication and withdrawal (see C-04 Health Training for Correctional Officers). Intoxication and withdrawal also increase the potential for suicide, a factor that is to be incorporated into the staff training on suicide prevention (see G-05 Suicide Prevention Program).

Resources that the facility can use to develop policies, train staff, and obtain further information include the American Society of Addiction Medicine and the American Academy of Addiction Psychiatry.

receive treatment, legitimizing self-help groups, tailoring controlled substances prescribing practices, and otherwise being a partner in the process of treatment.

Many patients with mental illness also have co-occurring substance abuse disorders. Ideally, they will be treated by practitioners who are trained in both disciplines. Mental health subspecialties often have differing therapeutic approaches that need to be modified when treating patients with co-occurring disorders. Additionally, a patient's functional and organic needs often require a holistic approach by medical and mental health professionals.

123

...nal Commission on Correctional Health Care

J-G-07
*essential*

CHS UP
3.4.10

## INTOXICATION AND WITHDRAWAL

### Standard

Protocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives, or opioids.

### Compliance Indicators

1. Established protocols are followed for the assessment, monitoring, and management of individuals manifesting symptoms of alcohol and drug intoxication or withdrawal.
2. The protocols for intoxication and detoxification are approved by the responsible physician, are current, and are consistent with nationally accepted treatment guidelines.
3. Individuals being monitored are housed in a safe location that allows for effective monitoring.
4. Inmates experiencing severe or progressive intoxication (overdose) or severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility.
5. Individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using recognized standard assessments at appropriate intervals until symptoms have resolved.
6. *Detoxification* is done under physician supervision.
7. If a pregnant inmate is admitted with opioid dependence or treatment (including methadone and buprenorphine), a qualified clinician is contacted so that the opioid dependence can be assessed and appropriately treated.
8. The facility has a policy that addresses the management of inmates, including pregnant inmates, on methadone or similar substances. Inmates entering the facility on such substances have their therapy continued, or a plan for appropriate treatment of the methadone withdrawal syndrome is initiated.
9. All aspects of the standard are addressed by written policy and defined procedures.

### Definitions

*Detoxification* is the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug on which the person is physiologically dependent, of one that is cross-tolerant to it, or of one that medical research has demonstrated to be effective.

*Opiates* are any preparation or derivative of opium, as well as opioid, a synthetic narcotic that resembles an opiate in action but is not derived from opium.

124

000349

National Commission on Correctional Health Care

The treatment plan may use any format that contains all of the required elements. Individual treatment forms are preferable since they facilitate developing a comprehensive plan that is easily identifiable. SOAP (subjective, objective, assessment, plan) notation in the progress notes is another way to document a treatment plan.

Treatment plans for developmentally disabled individuals may focus on helping the inmate to cope with the correctional environment and alerting custody staff to the special needs of the inmate. Developmental disabilities have implications for health education, informed consent issues, and the manner in which the inmate may perceive and respond to verbal communication from custody staff. Inmates with intellectual limitations are at increased risk for victimization and may need special housing arrangements.

112

000350

# DETOXIFICATION OF CHEMICALLY DEPENDENT INMATES

**Federal Bureau of Prisons**

**Clinical Guidance**

## FEBRUARY 2014
## (REFORMATTED JANUARY 2018)

*Federal Bureau of Prisons (BOP) Clinical Guidance is made available to the public for informational purposes only. The BOP does not warrant this guidance for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof. Proper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient specific. Consult the BOP Health Management Resources Web page to determine the date of the most recent update to this document: http://www.bop.gov/resources/health_care_mngmt.jsp.*

*Federal Bureau of Prisons*
*Clinical Guidance*

*Detoxification of Chemically Dependent Inmates*
*February 2014*

## TABLE OF CONTENTS

1. PURPOSE ........................................................................................................................ 1

2. INTRODUCTION ............................................................................................................... 1

3. DETECTION OF SUBSTANCE ABUSE AND TREATMENT OF WITHDRAWAL ..................... 1

    TABLE 1: Symptoms and Signs of Conditions Requiring Immediate Medical Attention .................. 3

4. MANAGEMENT OF INMATES WITH COMPLICATING MEDICAL AND PSYCHIATRIC CONDITIONS ........................... 3

5. PLACEMENT OF INMATES FOR DETOXIFICATION ............................................................ 4

6. ALCOHOL WITHDRAWAL ................................................................................................ 5

    TABLE 2. Overview of Treatment of Alcohol Withdrawal, Based on CIWA-Ar score ........................ 7

    TABLE 3. Recommended Schedule for Lorazepam Treatment of Alcohol Withdrawal ...................... 8

7. BENZODIAZEPINE WITHDRAWAL ................................................................................... 10

    TABLE 4. Symptoms of Benzodiazepine Withdrawal ................................................................. 11

8. BARBITURATE WITHDRAWAL ........................................................................................ 13

    TABLE 5. Symptoms of Barbiturate Withdrawal ...................................................................... 14

9. OPIATE WITHDRAWAL .................................................................................................. 15

10. COCAINE/STIMULANTS ............................................................................................... 17

11. INHALANTS ................................................................................................................. 18

DEFINITIONS ..................................................................................................................... 19

REFERENCES ..................................................................................................................... 20

APPENDIX 1. DETOXIFICATION OVERVIEW ........................................................................ 22

APPENDIX 2. ALCOHOL WITHDRAWAL ASSESSMENT AND TREATMENT FLOWSHEET ......... 23

APPENDIX 3: SYMPTOMS AND SIGNS OF DRUG ABUSE* ..................................................... 25

APPENDIX 4: BENZODIAZEPINE DOSE EQUIVALENTS ......................................................... 26

APPENDIX 5: BARBITURATE DOSE EQUIVALENTS .............................................................. 27

APPENDIX 6: PATIENT INFORMATION – DETOXIFICATION FROM ALCOHOL ......................... 28

APPENDIX 7: PATIENT INFORMATION – DETOXIFICATION FROM BENZODIAZEPINES ........... 29

APPENDIX 8: PATIENT INFORMATION – DETOXIFICATION FROM BARBITURATES ................. 30

APPENDIX 9: PATIENT INFORMATION – DETOXIFICATION FROM OPIATES (NARCOTICS) ........ 31

000572

## 1. PURPOSE

The Federal Bureau of Prisons (BOP) Clinical Guidance for *Detoxification of Chemically Dependent Inmates* provides recommended standards for the medical management of withdrawal from addictive substances for federal inmates.

## 2. INTRODUCTION

Substance use disorders pose a significant and expensive public health problem. Substance abuse affects not only the substance abusers and their families, but also society as a whole—through increases in crime, domestic violence, highway fatalities, incarceration, and health care costs.

Any substance that alters perception, mood, or cognition can be abused. Commonly identified substances of abuse include illicit drugs, alcohol, and certain prescription drugs—which act through their hallucinogenic, stimulant, sedative, hypnotic, anxiolytic, or narcotic effects. Other less commonly recognized substances of abuse include medications with anticholinergic, antihistaminic, or stimulant effects, e.g., tricyclic antidepressants, antiparkinsonian agents, low potency antipsychotics, anti-emetics, and cold and allergy preparations.

Substance use disorders are highly prevalent among inmate populations, affecting an estimated 30–60% of inmates. Drug intoxication and withdrawal may be particularly evident at the time of incarceration. The Bureau of Justice Statistics reports that an estimated 70% of all inmates in local jail facilities in the U.S. had committed a drug offense or used drugs regularly, and an estimated 35% were under the influence of drugs at the time of the offense.

## 3. DETECTION OF SUBSTANCE ABUSE AND TREATMENT OF WITHDRAWAL

The safe and effective treatment of withdrawal syndromes requires that clinicians be alert to the possibility of substance dependence in all new inmate arrivals at their institutions. A concise overview of detoxification is provided in *Appendix 1*.

➔ *The DSM-5 criteria for abuse, intoxication, and withdrawal from selected substances are available at* *http://www.dsm5.org/Pages/Default.aspx.*

- **A careful inmate history and clinical assessment is essential.** Substance abusers are rarely accurate in their description of patterns of drug use; they can greatly underestimate or deny their substance abuse, as well as overstate the extent of it. Furthermore, because individuals who abuse substances are likely to be abusing multiple substances, the possibility of more than one addiction must be carefully considered; intoxication from multiple drugs will complicate treatment of the withdrawal syndrome. An overview of the clinical presentations of substance abuse is listed in *Appendix 3. Symptoms and Signs of Drug Abuse*.

- **Not all substances of abuse produce clinically significant withdrawal syndromes. However, discontinuing substances on which an individual is dependent will likely produce some psychological symptoms.** Withdrawal from substances such as stimulants, cocaine,

000573

hallucinogens, and inhalants can be accomplished with psychological support and symptomatic treatment alone, along with periodic reassessment by a health care provider.

- **The intensity of withdrawal cannot always be predicted.** The addictive nature of a substance is determined by many factors including the physiology, psychology, and neurochemistry of the individual, as well as characteristics of the substance itself. Generally, the most addictive substances are those that are high-potency, that cross the blood-brain barrier quickly, that have a short half-life, and that produce a significant change in the neurochemistry of the brain. These same characteristics also tend to make a slow and safe withdrawal from the substance more difficult, especially if the substance being abused is used as treatment in the detoxification process. **Frequent clinical assessments, along with indicated treatment adjustments (in both dose and frequency) are imperative.**

- **Substances that produce dangerous withdrawal syndromes for individuals with physiological dependence include alcohol, sedative/hypnotics, and anxiolytics.** Withdrawal from narcotics is not generally considered dangerous, except in pregnant women and the medically debilitated; however, narcotic withdrawal does result in significant symptomatology, which can be markedly reduced with targeted therapies.

- **Whenever possible, the clinician should substitute a long-acting medication for short-acting drugs of addiction.** A safe withdrawal plan entails, when feasible, substituting a long-acting, cross-tolerant substance and gradually tapering that substance (not more rapidly than 10–20% per day—depending on the substance and the setting available for detoxification).

- **Every effort should be made to ameliorate the inmate's signs and symptoms of alcohol or drug withdrawal.** Adequate doses of medication should be used, with frequent reassessment. Inmates experiencing withdrawal should also be kept as physically active as medically permissible.

- **Initiation of withdrawal should be individualized.** Substance abuse often leads to significant medical sequelae including liver disease, chronic infections, trauma, cognitive impairment, psychiatric disorders, nutritional deficiencies, and cardiac disease. Detoxification and withdrawal are stressors, and may exacerbate or precipitate medical or psychological decompensation. In some cases, medical stabilization may be preferred to resolve the immediate crisis prior to initiating withdrawal.

- **To the greatest extent possible during detoxification, the provider should control the inmate's access to the prescribed medication regimen.** Overdose with either the prescribed medication or with other drugs is always a possibility. Administration of all controlled medications should be directly observed in a pill line. In addition, consider direct observation of ancillary medications (e.g., clonidine). Inmates should be counseled on the dangers of supplementing their detoxification regimens with over-the-counter medications, prescription medications diverted from other inmates, or illicit drugs and alcohol.

- **Detoxification alone is rarely adequate treatment for alcohol and other drug dependencies.** Inmate education regarding the detoxification process is a necessary component of a successful detoxification plan. In addition, clinicians should conduct periodic assessments to detect the development of any psychiatric symptoms such as depression, suicidal thinking, or underlying psychosis. Inmates should be considered for follow-up psychological support through group therapy, individual counseling, 12-step recovery meetings, or similar programs. These services provide alternative methods of coping with the stresses that trigger alcohol or

drug abuse. Psychology staff can also determine whether referrals to drug education or to nonresidential or residential drug treatment programs are indicated.

- Symptoms and signs of conditions that require immediate medical attention are listed in TABLE 1 below:

TABLE 1: SYMPTOMS AND SIGNS OF CONDITIONS REQUIRING IMMEDIATE MEDICAL ATTENTION

| | |
|---|---|
| • Change in mental status | • Abdominal pain |
| • Increasing anxiety | • Upper and lower gastrointestinal bleeding |
| • Hallucinations | • Changes in responsiveness of pupils |
| • Temperature greater than 100.4ºF (these patients should be considered potentially infectious) | • Heightened deep tendon reflexes and ankle clonus, a reflex beating of the foot when pressed rostrally, indicating profound central nervous system irritability and the potential for seizures |
| • Significant increases and/or decreases in blood pressure and heart rate | |
| • Insomnia | |

# 4. MANAGEMENT OF INMATES WITH COMPLICATING MEDICAL AND PSYCHIATRIC CONDITIONS

Careful consideration should be given to inmates with co-morbid medical and psychiatric conditions, since these patients are at greater risk for severe withdrawal symptoms and complications.

- **Brain injury:** Inmates with a history of brain injuries of any type are more likely to suffer seizures and/or delirium during detoxification, and therefore require closer monitoring.

- **Co-morbid seizure disorder:** The presence of an underlying seizure disorder needs to be considered when tapering from benzodiazepines, barbiturates, and alcohol. Patients with pre-existing seizure disorders will be more susceptible to seizures as their medications are tapered; a slower taper is indicated for these inmates.

- **Cardiac disease:** Inmates with cardiac disease are more sensitive to sympathetic hyperactivity, so careful monitoring and control of symptoms is essential. A slower taper is also indicated for these inmates.

- **Liver and kidney diseases:** Inmates with liver or renal disease may metabolize drugs and medications more slowly; as such, they require closer monitoring for drug toxicity and possible adjustments as treatment regimens are tapered.

- **Psychiatric disorders:** Inmates with pre-existing psychiatric conditions may suffer an exacerbation of their illness during detoxification. A collaborative treatment effort with psychology and psychiatry staff is warranted for management of these inmates. Inmates without pre-existing psychiatric illness may also experience significant psychological distress during detoxification, including the development of suicidal ideation, plan, and intent. A careful assessment of the inmate's mental status, with particular attention to thoughts of self-harm, should be part of every inmate evaluation during detoxification.

- **Elderly inmates:** Elderly inmates are at increased risk of complications during detoxification. The elderly are less likely to show marked sympathetic hyperactivity during withdrawal, but they are just as likely to suffer a severe withdrawal syndrome. Detoxification in the elderly is further complicated by these factors: a greater need for prescription drugs and the potential for drug-drug interactions; a greater risk of drug toxicity from slower drug metabolism; and the higher incidence of complicating medical conditions such as heart disease and cognitive disorders. Careful monitoring, ongoing titration of medications, and inpatient hospitalization for complicated patients may be necessary.

- **Pregnancy:** Pregnancy significantly complicates detoxification efforts. Many medications cross the placenta and/or are secreted in breast milk. Careful consideration must be given to the known and unknown effects of medications on the fetus or infant, and these must be weighed against the risks of detoxification. Pregnant women generally should be maintained on their medications throughout their pregnancy, but each case is unique and should be managed in close consultation with an obstetrical specialist. Pregnant women on methadone ordinarily should not be detoxified, as this increases the risk of miscarriage and premature labor. Refer to the BOP Pharmacy Services Program Statement with regards to methadone. Pregnant women with alcohol dependence should be managed in an inpatient setting, due to the risk of miscarriage during detoxification.

- **Risk of suicide:** The frequency of suicide attempts is substantially higher among patients with a substance use disorder. Frequent and thorough patient assessments are indicated during the withdrawal period with particular attention to thoughts of self-harm.

- **Short-stay inmates:** Inmates with short sentences, or with lengths of stay that are thirty days or less, generally should not be detoxified off benzodiazepines or barbiturates if these agents are currently medically indicated. However, opiate detoxification can be completed safely in less than two weeks, and alcohol detoxification is a necessity for all inmates who present with alcohol dependence or withdrawal.

## 5. PLACEMENT OF INMATES FOR DETOXIFICATION

Detoxification can be safely and effectively accomplished for inmates in a variety of housing placements, including: locked jail units, general population, observation cells in the health services unit, and Special Housing Units, or when necessary as inpatients in a community hospital or Medical Referral Center (MRC). The specific housing placement should be determined on a case-by-case basis, in accordance with BOP policy and through multidisciplinary recommendations made by health care, psychology, and custody staff. The optimal placement will depend on the type of substance abuse, the severity of the withdrawal syndrome, the inmate's co-morbid medical and psychiatric conditions, security concerns, and the resources of the institution.

If an inmate is placed in a locked unit or Special Housing Unit for detoxification, their medications, medical assessments, and ongoing monitoring must all be provided in a timely manner. If detoxification in a locked unit or Special Housing Unit cannot be accomplished with these assurances, strong consideration should be given to one of two options: *either* inpatient detoxification *or* medical stabilization and maintenance, with postponement of attempts at

detoxification. Transferring patients from mainline facilities to MRCs for the management of withdrawal is not typically indicated or necessary.

All medications prescribed for the treatment of withdrawal should be administered via directly observed therapy at pill lines. Ideally, dosing should be three times a day or less, so as to accommodate pill lines at most institutions.

## 6. ALCOHOL WITHDRAWAL

## DIAGNOSIS OF ALCOHOL USE DISORDERS

### SCREENING

As the initial step in diagnosing alcohol use disorders, all incoming inmates should be screened for a history of alcohol use. Inmates presenting with alcohol intoxication should be presumed to have alcohol use disorder until proven otherwise. Despite the difficulty in obtaining an accurate history from an intoxicated inmate, a full assessment should be attempted.

### WITHDRAWAL SYNDROME

The alcohol withdrawal syndrome can develop in any individual who has a history of regular, heavy use of alcohol, has a known dependence on alcohol, or has clinical signs of intoxication. Alcohol withdrawal syndromes can be mild, moderate, or life-threatening. The severity of an individual's alcohol withdrawal syndrome is difficult to predict, although a history of problems with withdrawal makes it likely that a similarly severe withdrawal syndrome will occur again. Individuals with a high blood alcohol level (>100 mg/dL) and concurrent signs of withdrawal are at particularly high risk for a severe withdrawal syndrome.

Uncomplicated alcohol withdrawal is generally completed within five days. Alcohol withdrawal symptoms can develop within a few hours of decreasing or discontinuing use. Symptoms generally peak within 24–36 hours after abstinence begins. Early signs and symptoms of withdrawal include gastrointestinal distress, anxiety, irritability, increased blood pressure, and increased heart rate. Later, symptoms of moderate intensity develop, including insomnia, tremor, fever, anorexia, and diaphoresis. Withdrawal seizures can occur at various times during alcohol withdrawal, but generally begin within 48 hours of the last drink. Withdrawal delirium, "delirium tremens," usually begins 48–72 hours after the last drink. If allowed to progress, delirium can result in changes in consciousness, marked autonomic instability, electrolyte imbalances, hallucinations, and death. With appropriate intensive treatment, mortality from delirium tremens is markedly reduced (to 1% or less).

➔ *In many alcoholics, the severity of withdrawal symptoms increases after repeated withdrawal episodes. This is known as the* **kindling phenomenon**, *and suggests that even patients who experience only mild withdrawal should be treated aggressively to reduce the severity of withdrawal symptoms in subsequent episodes. Kindling also may contribute to a patient's relapse risk and to alcohol-related brain damage and cognitive impairment.*

PATIENT EVALUATION

A careful patient history and physical examination by a clinician is indicated for all inmates suspected of clinically significant alcohol use:

- An assessment should be made of the frequency of alcohol use, length of time used, amount used, symptoms of withdrawal when use is decreased or discontinued, and the date and amount of alcohol last consumed.

- If alcohol use disorder is suspected, further inmate history should cover, in part: other substances used, signs and symptoms of gastritis or gastrointestinal hemorrhage, history of trauma (especially head trauma), liver disease, history of seizure disorder, pancreatitis, psychiatric illness, and suicidal ideation.

- Physical examination is necessary to evaluate the inmate for the aforementioned conditions, as well as to assess vital signs, possible cardiac and lung disease, and neurologic and mental status.

- Laboratory evaluation should include a complete blood count, comprehensive serum chemistry panel, urine toxicology (for medical reasons, not correctional), and a pregnancy test for women.

- The medical indications for other studies such as a chest radiograph, electrocardiogram, viral hepatitis serologies, and screening for sexually transmitted diseases should be based on the individual assessment.

- Inmates may be brought to the Health Services Unit for assessment of intoxication after being given a breathalyzer test by a correctional officer. Although performance of this test remains the function of Correctional Services, the results are medically relevant and should be ascertained and assessed by the clinician.

➔ *Prior to initiating treatment, the inmate's status should be scored using the Clinical Institute Withdrawal Assessment of Alcohol, revised (CIWA-Ar), (BP-S708.060). The CIWA-Ar is an evidence-based scoring system that should be used over time to objectively assess the severity and progression of alcohol withdrawal symptoms. The CIWA scoring system and a sample record for CIWA-Ar scores are provided in Appendix 2.*

## TREATMENT OF ALCOHOL WITHDRAWAL

Inmates experiencing alcohol withdrawal should be counseled by a health care provider on the signs and symptoms of withdrawal, the anticipated treatment plan, and patient responsibilities.

- Specific treatment strategies for alcohol withdrawal should be determined by the condition of the individual inmate, and should be reviewed and approved by a physician.

- Educational information in *Appendix 6, Patient Information – Detoxification from Alcohol* should be used when appropriate.

### THIAMINE REPLACEMENT

**All inmates with suspected alcohol use disorder should be treated with thiamine (vitamin B1),** 100 mg either orally or intramuscularly, daily for at least 10 days, up to 4 weeks for those at high risk for malnutrition. Due to the potential dire consequences of non-compliance, oral doses should be administered at pill line.

000578

Thiamine replacement should always precede administering parenteral glucose to persons with alcohol intoxication; otherwise, the glucose infusions can precipitate Wernicke-Korsakoff syndrome and the severe cardiovascular complications associated with thiamine deficiency discussed below.

- **Wernicke encephalopathy:** Characterized by confusion, lethargy, inattentiveness, impaired memory, vision changes (e.g., nystagmus), and ataxia. Often undetected and under-diagnosed, untreated Wernicke's encephalopathy can advance to Korsakoff psychosis.

- **Korsakoff psychosis:** Characterized by impaired memory (particularly new memory formation), hallucinations, and confabulation. Korsakoff psychosis is associated with significant morbidity and a 15–20% fatality rate.

## BENZODIAZEPINE THERAPY

**Benzodiazepines are the mainstay of alcohol withdrawal treatment in the correctional setting.** Benzodiazepine treatment for alcohol withdrawal in the BOP should be based on the CIWA-Ar score (*Appendix 2*), in accordance with the guidelines shown in TABLE 2 below.

➔ *Patients actively seizing as a result of alcohol withdrawal, or showing signs of delirium tremens, should be immediately treated with benzodiazepines.*

TABLE 2. OVERVIEW OF TREATMENT OF ALCOHOL WITHDRAWAL, BASED ON CIWA-AR SCORE

| CIWA-Ar Score | Level of Withdrawal | Recommended Treatment |
|---|---|---|
| <10 | MILD | Supportive, non-pharmacologic therapy and close monitoring are indicated (unless patient has history of alcohol withdrawal seizures or co-morbid cardiovascular conditions). |
| 10–15 | MODERATE | Medication (lorazepam) is indicated to reduce symptoms and the risk of major complications. |
| >15 | SEVERE | Strong consideration should be given to hospitalizing inmates who exhibit severe symptoms, as they are at increased risk for serious complications. |

**Lorazepam is the recommended benzodiazepine for managing alcohol withdrawal in most inmates:**

- Lorazepam does not require cytochrome oxidation for metabolism, so its clearance is not impaired by liver disease, a common co-morbidity for inmate populations. This is in contrast to other benzodiazepines such as chlordiazepoxide, diazepam, and clonazepam, which are metabolized in the liver and can accumulate with slow metabolizers or with liver disease.

- Another benefit of lorazepam is that it can be administered orally, intravenously, or intramuscularly—unlike diazepam and chlordiazepoxide, which should NEVER be given intramuscularly because of erratic absorption.

  ► Ambulatory alcohol detox is normally managed with oral benzodiazepines. For the most part, intramuscular administration should be avoided, due to variable drug absorption.

  ► IV access should be established in all patients who are at risk of severe withdrawal. All patients with seizures or delirium tremens should be given IV benzodiazepines. IV administration should only be considered in the hospital/inpatient setting.

000579

- TABLE 3 outlines lorazepam dosing recommendations based upon CIWA-Ar scores.
  - ▸ For inmates with *moderate to severe withdrawal*, symptom-triggered therapy based upon CIWA-Ar scores (see *Appendix 2*) is recommended and has been shown to require less overall benzodiazepine use.
  - ▸ A fixed-dose schedule is recommended for inmates with *mild withdrawal* who are being treated with lorazepam because they have either a history of alcohol withdrawal seizures or co-morbid cardiovascular conditions.
- ➜ *For information about benzodiazepine dependence, see Section 7, Benzodiazepine Withdrawal.*

TABLE 3. RECOMMENDED SCHEDULE FOR LORAZEPAM TREATMENT OF ALCOHOL WITHDRAWAL

| MILD WITHDRAWAL (CIWA-Ar Score = 8–9) | MODERATE WITHDRAWAL (CIWA-Ar Score = 10–15) | SEVERE WITHDRAWAL (CIWA-Ar Score >15) |
|---|---|---|
| ★ *All inmates with alcohol withdrawal should be treated with thiamine (100 mg orally or intramuscularly) daily for at least 10 days. Thiamine replacement must be completed before administration of parenteral glucose.* | | |
| **Most Inmates** | | |
| Repeat CIWA-Ar every 4–8 hours, until CIWA-Ar score has remained less than 10 for 24 hours without medication. | 1. Administer lorazepam every hour: 2–4 mg IM, PO, or IV. <br> 2. Repeat CIWA-Ar in one hour (90 minutes, if giving lorazepam orally). <br> 3. Repeat lorazepam 2–4 mg every 60–90 minutes until CIWA-Ar score is less than 10. Then, discontinue lorazepam. <br> 4. Repeat CIWA-Ar every 4–8 hours until the score has remained less than 10 for 24 hours. If the score rises again within this 24-hour period, repeat steps 1–3 above. | Hospitalization for inpatient detoxification and monitoring is strongly suggested. <br><br> Lorazepam is administered according to the same schedule as described under "Moderate Withdrawal." However, an increase in frequency of both lorazepam and CIWA-Ar may be indicated. <br><br> Lorazepam can be given up to 2–4 mg IV, as frequently as every 15–20 minutes. |
| **Inmates with History of Alcohol Withdrawal Seizures** | | |
| *Generally, inmates with a history of alcohol withdrawal seizures will present with signs and symptoms of moderate-to-severe withdrawal. Do not give anti-seizure medications unless the inmate also has an underlying seizure disorder. Carbamazepine may be useful in treating patients with a history of alcohol withdrawal seizures (see below).* | | |
| *Suggested initial regimen:* * <br> **Days 1–2:** Lorazepam 2 mg, 3x daily <br> **Days 3–4:** Lorazepam 2 mg, 2x daily <br> **Day 5:** Lorazepam 2 mg, single dose (AM or HS) <br> **Days 1–6:** Monitor 3x daily with CIWA-Ar.** | Same as above. | Same as above. |
| *(Table 3 continues on next page.)* | | |

000580

| MILD WITHDRAWAL (CIWA-Ar Score = 8–9) | MODERATE WITHDRAWAL (CIWA-Ar Score = 10–15) | SEVERE WITHDRAWAL (CIWA-Ar Score >15) |
|---|---|---|
| | *(Table 3 continued from previous page.)* | |
| **Inmates with Co-Morbid Cardiovascular Conditions** | | |
| *Conditions include:* hypertension, angina, congestive heart failure, or history of myocardial infarction or stroke. | | |
| *Consider lorazepam treatment, even if only mild withdrawal symptoms.* **Suggested initial regimen:** * **Days 1–2:** Lorazepam 1–2 mg, 3x daily **Days 3–4:** Lorazepam 1–2 mg, 2x daily **Day 5:** Lorazepam 1–2 mg, single dose (AM or HS) **Days 1–6:** Monitor 3x daily with CIWA-Ar.** | Same as above. | Same as above. |

\*   In these cases, the dose of lorazepam may need to be decreased if the inmate experiences somnolence, ataxic gait, slurred speech, or other signs of medication intoxication.

\*\*  If the CIWA-Ar score is greater than or equal to 10 at any time, follow the steps for "Moderate Withdrawal" or "Severe Withdrawal."

## CARBAMAZEPINE

Carbamazepine may be used to treat alcohol withdrawal symptoms in patients who have a history of alcohol-related seizures.

- Carbamazepine dosing is generally started at 600 to 1,200 mg on the first day in divided doses and is generally tapered to 0 mg over 5 to 10 days.
- The following tapered dosing schedule can be used:  **Day 1** = 600–800 mg; **Day 2** = 500 mg; **Day 3** = 400 mg; **Day 4** = 300 mg; and **Day 5** = 200 mg.

Carbamazepine is just as effective as the benzodiazepines in generally healthy individuals with mild-to-moderate alcohol withdrawal. However, a limitation of carbamazepine is its interaction with multiple medications that undergo hepatic oxidative metabolism. Thus, carbamazepine may be less useful in older patients or in those with multiple medical problems.

## ADJUNCTIVE TREATMENTS OF ALCOHOL WITHDRAWAL

- **Many of the symptoms of alcohol withdrawal are caused by increased sympathetic activity. CLONIDINE has been used successfully to attenuate these symptoms.** A variety of dosing schedules for clonidine have been used to suppress acute symptoms of alcohol withdrawal. Generally, a dose of 0.1 to 0.2 mg every 8 hours is adequate to control symptoms. The dose can generally be tapered over 3–5 days as symptoms subside. Decreased renal function may necessitate more frequent monitoring and lower doses.

  → *Clonidine's usual side effects include hypotension and somnolence. Treatment with clonidine requires careful monitoring of vital signs, as well as increased vigilance for other withdrawal problems.*

  ▶ **Clonidine should only be used for mild withdrawal symptoms.** Clonidine will mask the symptoms of withdrawal and artificially lower the CIWA-Ar score, without decreasing the

risk for seizures or delirium tremens. Therefore, clonidine should NOT be utilized for moderate or severe withdrawal.

- ► **Patients in active substance withdrawal are at increased risk of suicide, and clonidine is fatal in overdose.** Extra care is therefore warranted, including monitoring inmates for thoughts of self-harm and limiting its administration to pill line with direct observation. Consider administering crushed immediate-release tablets to prevent "tonguing" or "cheeking" of the medication.

- ► **If a patient is taking clonidine concurrently with a beta-blocker,** it is best to gradually withdraw the beta-blocker, and then withdraw the clonidine over two to four days. The beta-blocker can then be reinstituted after clonidine has been successfully withdrawn. Concurrent beta-blocker therapy may exacerbate an increase in blood pressure upon clonidine withdrawal.

- **Anti-seizure medications may have a use in the treatment of alcohol withdrawal, especially in those individuals with underlying seizure disorders.** In such cases, anti-seizure medications should be given in therapeutic doses with careful attention to blood levels. Anti-seizure medications do not replace the need for benzodiazepines in the treatment of alcohol withdrawal and will not prevent the development of delirium tremens.

- **Individuals in alcohol withdrawal often develop fluid imbalances, electrolyte abnormalities, and hypoglycemia.** Careful attention to these issues can prevent significant medical complications. Treatment may require the use of intravenous fluids, glucose (after appropriate thiamine replacement), and electrolytes.

- **Individuals with alcohol dependence frequently suffer from malnutrition.** Short-term supplementation with a daily multivitamin (containing folate) is advisable if malnutrition is suspected. Refer to BOP National Formulary non-formulary use criteria for multivitamins.

- **Hypomagnesemia may develop during alcohol withdrawal.** However, routine magnesium supplementation has not been proven to be medically necessary, and is not recommended.

## 7. BENZODIAZEPINE WITHDRAWAL

### DIAGNOSIS OF BENZODIAZEPINE USE DISORDERS

- Benzodiazepine withdrawal syndrome can begin within a few hours of last drug use (especially when using short-acting drugs), but may take several weeks to resolve. **Because of the high risk of delirium, seizures, and death, benzodiazepine withdrawal should always be treated.**

- **Physiological dependence on benzodiazepine is diagnosed through a careful determination of several factors:** type of medications used, length of time used, amount used, reasons for use, symptoms that occur when doses are missed or medication is discontinued, and date and amount of drug last used. **Physiological benzodiazepine dependence can occur even when the medication is taken only as prescribed** and may not include any significant biopsychosocial consequences. Physiological dependence develops within 3–4 weeks of regular use.

- Although recreational use and abuse of benzodiazepines does occur, most inmates who present with benzodiazepine dependence had been prescribed these medications previously to

## APPENDIX 2. ALCOHOL WITHDRAWAL ASSESSMENT AND TREATMENT FLOWSHEET

Guidelines for using the *Alcohol Withdrawal Assessment and Treatment Flowsheet* on next page:

1. **Early intervention for a CIWA-Ar score of 8 or greater** provides the best means of preventing the progression of withdrawal. The CIWA-Ar scale is the most sensitive tool for assessing a patient who is experiencing alcohol withdrawal.

2. **Use the attached** *Alcohol Withdrawal Assessment and Treatment Flowsheet* to document the patient's vitals and CIWA-Ar scores, as well as the administration of PRN medications.

3. **Follow the Assessment Protocol** shown at the top of the flowsheet. Record the date, time, vitals, and the CIWA-Ar ratings and Total Score each time the patient is assessed.

4. **To calculate the Total CIWA-Ar Score,** rate the patient according to each of the 10 CIWA-Ar criteria, and then add together the 10 ratings. Each criterion is rated on a scale from 0 to 7 (except for "Orientation and Clouding of Sensorium," which is rated on a scale from 0 to 4). The clinician can select any rating from 0 to 7 (or 0 to 4, in the case of "Orientation"), even for criteria where not every number on the rating scale is defined.

000595

AUG 2009
ALCOHOL WITHDRAWAL ASSESSMENT AND TREATMENT FLOWSHEET

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

| Assessment Protocol | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| a. Assess vitals and CIWA-Ar. | Date | | | | | | | | |
| b. If total CIWA-Ar score ≥ 8, repeat every hour. Once the CIWA-Ar score < 8, then repeat every 4–8 hours until score has remained < 8 for 24 hours. | Time | | | | | | | | |
| | Pulse | | | | | | | | |
| | RR | | | | | | | | |
| c. If initial Total CIWA-Ar score < 8, repeat CIWA every 4–8 for 24 hours. | O₂ sat | | | | | | | | |
| d. If indicated, administer PRN medications per BOP protocol. | BP | | | | | | | | |

**Use the CIWA-Ar Scale to assess and rate each of the following 10 criteria.**

*Nausea/Vomiting:* Rate on scale of 0–7.
0 - none; 1 - mild nausea, no vomiting; 4 - intermittent nausea; 7 - constant nausea, frequent dry heaves and vomiting

*Tremors:* Have patient extend arms and spread fingers. Rate on scale of 0–7.
0 - no tremor; 1 - not visible, but can be felt fingertip-to-fingertip; 4 - moderate with arms extended; 7 - severe, even with arms not extended

*Anxiety:* Rate on scale of 0–7.
0 - none, at ease; 1 - mildly anxious; 4 - moderately anxious or guarded, so anxiety is inferred; 7 - equivalent to acute panic states, as in severe delirium or acute schizophrenic reactions

*Agitation:* Rate on scale of 0–7.
0 - normal activity; 1 - somewhat normal activity; 4 - moderately fidgety and restless; 7 - constantly paces or thrashes about

*Paroxysmal Sweats:* Rate on scale of 0–7.
0 - no sweats; 1 - barely perceptible sweating, palms moist; 4 - beads of sweat obvious on forehead; 7 - drenching sweats

*Orientation & Clouding of Sensorium:* Ask, "What day is this? Where are you? Who am I?" Rate on scale of 0–4.
0 - oriented; 1 - cannot do serial additions, uncertain about date; 2 - disoriented to date by no more than 2 days; 3 - disoriented to date by > 2 days; 4 - disoriented to place and/or person

*Tactile Disturbances:* Ask, "Have you experienced any itching, pins and needles sensation, burning or numbness, or a feeling of bugs crawling on or under your skin?" Rate on scale of 0–7.
0 - none; 1 - very mild itch, P&N, burning, numbness; 2 - mild itch, P&N, burning, numbness; 3 - moderate itch, P&N, burning, numbness; 4 - moderate hallucinations; 5 - severe hallucinations; 6 - extremely severe hallucinations; 7 - continuous hallucinations

*Auditory Disturbances:* Ask, "Are you more aware of sounds around you? Are they harsh? Do they startle you? Do you hear anything that disturbs you or that you know isn't there?" Rate on scale of 0–7.
0 - not present; 1 - very mild harshness or ability to startle; 2 - mild harshness or ability to startle; 3 - moderate harshness or ability to startle; 4 - moderate hallucinations; 5 - severe hallucinations; 6 - extremely severe hallucinations; 7 - continuous hallucinations

*Visual Disturbances:* Ask, "Does the light appear to be too bright? Is its color different than normal? Does it hurt your eyes? Are you seeing anything that disturbs you or that you know isn't there?" Rate on scale of 0–7.
0 - not present; 1 - very mild sensitivity; 2 - mild sensitivity; 3 - moderate sensitivity; 4 - moderate hallucinations; 5 - severe hallucinations; 6 - extremely severe hallucinations; 7 - continuous hallucinations

*Headache:* Ask, "Does your head feel different than usual? Does it feel like there is a band around your head?" Rate on scale of 0–7. Do not rate dizziness or lightheadedness.
0 - not present; 1 - very mild; 2 - mild; 3 - moderate; 4 - moderately severe; 5 - severe; 6 - very severe; 7 - extremely severe

**Total CIWA-Ar Score:**
(8–9 = mild withdrawal; 10–15 = moderate withdrawal; >15 = severe withdrawal)

Indications for PRN Medication: Please follow the protocol in BOP *Clinical Practice Guidelines for Detoxification of Chemically Dependent Inmates* for use of lorazepam and other medications for withdrawal. See *Table 2* and Section 6, *Alcohol Withdrawal* .

| Medication administered? (see Medication Administration Record) Yes/No: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Time of PRN medication administration: | | | | | | | | | |
| Assessment of response: (CIWA-Ar Score 30–60 minutes after medication administered) | | | | | | | | | |
| Provider initials: | | | | | | | | | |

| Inmate Name _____ | | Signature/Title | Initials | Signature/Title | Initials |
|---|---|---|---|---|---|
| Reg No. _____ | | | | | |
| Date of Birth ___/___/___ | | | | | |
| Institution _____ | | | | | |

000596

# JAIL OFFICER'S TRAINING MANUAL





© 1980
National Sheriffs' Association



# TABLE OF CONTENTS

**SECTION I: BASIC ISSUES** .................................................................. 1
Chapter One:        The American Jail: Its Origins And Developments ...................... 7
Chapter Two:        Legal Rights and Responsibilities Within The Corrections Environment ... 14
Chapter Three:      Litigation Procedure ...................................................... 26
Chapter Four:       Written Communications ................................................... 39
Chapter Five:       Role Concepts, Attitudes, and Interpersonal Communication ............... 47
Chapter Six:        Dealing With Stress ....................................................... 

**SECTION II: SECURITY** ...................................................................... 61
Chapter Seven:      Basic Jail Security Principles ............................................ 68
Chapter Eight:      Booking and Admissions ................................................... 87
Chapter Nine:       Classification of Inmates ................................................. 95
Chapter Ten:        Disciplinary Procedures .................................................. 102
Chapter Eleven:     Contraband Control ....................................................... 109
Chapter Twelve:     Key and Tool Control ..................................................... 118
Chapter Thirteen:   Patrol Procedures In The Jail ............................................ 150
Chapter Fourteen:   Escort of Inmates ........................................................ 166
Chapter Fifteen:    Hostage Incidents In The Jail ............................................ 177
Chapter Sixteen:    Release Procedures ....................................................... 

**SECTION III: SPECIAL PROCEDURES** .......................................................... 189
Chapter Seventeen:    Sick Call .............................................................. 198
Chapter Eighteen:     Recreation and Visiting ................................................ 208
Chapter Nineteen:     Diabetic and Epileptic Inmates ......................................... 215
Chapter Twenty:       Medical Problems Confronting Women Inmates ............................. 220
Chapter Twenty-One:   Drug Withdrawal In The Jail ............................................ 237
Chapter Twenty-Two:   Alcohol Abuse Emergencies In The Jail .................................. 242
Chapter Twenty-Three: Psychological Disorders: Psychopathic and Neurotic Personalities ....... 249
Chapter Twenty-Four:  Homosexual Behavior In The Jail ........................................ 254
Chapter Twenty-Five:  Suicide Prevention ..................................................... 

**SECTION IV: SUPERVISION** .................................................................. 263
Chapter Twenty-Six:   Supervising Inmates: Principles and Skills ............................. 276
Chapter Twenty-Seven: Personal Supervision Problems In Housing and General Areas ............. 282
Chapter Twenty-Eight: Special Supervision Problems In The Jail ............................... 294
Chapter Twenty-Nine:  Supervision of Inmates In Dining Areas ................................. 299
Chapter Thirty:       Supervision of Minimum Security Inmates ................................

# CHAPTER TWENTY-TWO
## ALCOHOL ABUSE EMERGENCIES IN THE JAIL

The special inmate most often seen by the jail officer probably is the alcoholic. Familiar symptoms of intoxication include shakiness; staggering; slurred speech; a blank, glassy-eyed look; and the unpleasant odors of heavy drinking. When a person with these signs is being booked, officers should make certain that they do not confuse these symptoms with those of serious medical disorders. For example, persons suffering from multiple sclerosis, epilepsy, diabetes, head injuries, and other medical disorders have occasionally been considered drunk when they were being admitted to the jail. Sometimes the mistake in diagnosis prevented proper medical care, resulting in the death of the inmate.

Jail booking officers should conduct a basic medical screening of *all* inmates and consult a physician if the inmate shows signs of a medical disorder or serious alcoholism.



*Intoxicated person report used by the St. Louis, Missouri Metropolitan Police Department.*

Case Study 1:

*Molly Pitcher, 21, was arrested by a state highway patrol officer for speeding and, because she was obviously intoxicated and unfit to drive, the officer brought her to the Rattlesnake County Jail. Inmate Pitcher passed out while she was being admitted, but the booking officer revived her by splashing a bucket of cold water on her face. He finished booking her and took her to the women's cell block, where she was placed on a bunk to "sleep off her drunk." Her husband was not notified that she was in jail.*

*Jail officers were unaware that inmate Pitcher had been attending a party where there were drugs of all types available. She had been taking methaqualone tablets, a popularly abused depressant, and drinking gin to wash down the pills. Officer Heidi Hessian, who was supervising the women's section, had a lot of paperwork to complete and did not bother to check on the inmates during the shift. When the next shift came on duty, Officer Carrie Nation checked the inmates and found Pitcher unconscious. Officer Nation immediately called for an ambulance. When inmate Pitcher arrived at the County Hospital Emergency Room, she was in a coma and died several hours later. Her husband, who was then notified, successfully sued Rattlesnake County, the sheriff, the booking officer, and Officer Hessian for negligence.*

This case study points out that alcohol, when combined with other drugs, *especially depressants,* is a lethal mix. In a report issued in December, 1979, the National Institute of Drug Abuse in Washington stated that alcohol, when used in combination with other drugs, is now the *leading cause* of emergency room visits and drug-related deaths. The most popular "killer cocktail" is alcohol and morphine taken together; this combination was found in the blood of ten percent of the patients who died from alcohol-drug interactions in 1979. Also high on the list of emergency room reports was the combination of alcohol and aspirin.

Because officers generally will not know whether inmates have taken other drugs along with alcohol, they must attempt to find out by questioning the inmates during the booking process. Inmates who are unconscious at the booking desk should be taken to a hospital emergency room immediately, *not* revived temporarily with a bucket of water and placed in a cell to "sleep it off." *All* inmates who are intoxicated when admitted to the jail must be observed constantly and examined every 15 minutes by officers for signs of unconsciousness, coma, or toxic reactions—if the officer observes symptoms of a toxic reaction, he should play it safe and send the inmate to a hospital emergency room for treatment. It is always better

) be *overcautious,* as the officers at the Rattlesnake
County Jail learned—too late.

## LCOHOL WITHDRAWAL SYNDROMES

An intoxicated person who is admitted to the jail
ften requires medical treatment. Heavy, long-time drink-
's withdrawing from alcohol may suffer from the DTs
lelirium tremens). The mortality rate for persons suffer-
g from the DTs who do not receive proper medical
eatment ranges from five to fifteen percent. Alcohol
ithdrawal can be more serious than withdrawal from
any dangerous narcotics.

There are four alcohol withdrawal syndromes: tremu-
usness and hallucinations, seizures, auditory hallucino-
, and delirium tremens.

### emulousness And Hallucinations

A tremulousness and hallucinations reaction usually
gins from seven to eight hours after the inmate has had
last drink and attains maximum severity within 24
urs. The withdrawing inmate is overly alert, nervous,
aky, weak, has a flushed face, suffers a loss of appetite,
d often has a rapid heart beat. Disordered perceptions,
llucinations, and delusions may be present. The inmate
uld be housed in a well-lighted, individual cell away
m noise and activity. Officers should watch him care-
ly.

**Treatment.** The inmate may be disoriented; this can
netimes be overcome by talking to him or leaving a
sonal item in his cell, such as a picture from his wallet.
e officer should explain to the inmate that he is a cor-
tional officer carrying out his normal duties and is
re to help the inmates. It is best to contact the infir-
ry staff or a local doctor for advice on how to handle
inmate. The doctor may prescribe food or medication
recommend that the inmate be moved to a detoxifica-
center or hospital.

### zures

Seizures may occur within a seven to 48 hour period
r the inmate has stopped drinking. They are essentially
nd mal, epileptic-like seizures and should be treated as
h. *Only from two to six seizures should occur during
seven to 48-hour period and each seizure should not
more than five minutes.*

**Treatment.** Surprisingly, a series of these seizures
not pose a serious medical threat. As each seizure
urs, the officer should treat it as a *grand mal* epilepsy
ck. He should not restrain the inmate. However, the
cer should observe the inmate carefully and make a
plete written report to the jail medical staff or to local
lical authorities. The officer should become concerned
e inmate seems to have one seizure after another

without regaining consciousness or if each seizure lasts
more than five minutes. If either of these conditions
occur, the inmate should be transferred to a hospital.
Officers should consider the situation a medical emer-
gency if the seizures occur in conjunction with a high fever
or with the DTs.

### Auditory Hallucinosis

Between 12 and 48 hours after he stops drinking the
inmate may have auditory hallucinations. When this
occurs, the inmate usually will complain that he hears
accusing voices which are persecuting him, but otherwise
he may appear to be rational and alert.

**Treatment.** Officers should keep the inmate in a well-
lighted cell, away from noise and activity. Since the
inmate may be paranoid, officers might try to convince
him that they mean him no harm, that they are concerned
about him, and that the voices he hears are the result of
drinking and will eventually go away.

### DTs (Delirium Tremens)

This is an extremely dangerous medical condition
with a mortality rate of from five to 15 percent. DTs
usually occur within 72 to 96 hours after the inmate has
had his last drink.

The symptoms of delirium tremens are:

- Profound confusion and disorientation;
- Delusions;
- Vivid hallucinations;
- Tremor;
- Agitation;
- Autonomic overactivity (increased pulse and breath-
  ing);
- Pallor;
- Sweating;
- Possible terror or confusion;
- High fever with possible convulsions; and
- Vomiting.

**Treatment.** Transfer the inmate to a hospital imme-
diately. While the officers are waiting for an ambulance to
arrive at the jail, a hospital or jail physician may advise
them to give the inmate emergency medical aid for high
fever and convulsions if necessary; however, officers
should not restrain an inmate who is suffering from con-
vulsions. If the inmate is admitted to a jail infirmary, the
infirmary staff should administer multivitamin pills and
fluids to him within two hours from the time he is admit-
ted. They should also keep him well-hydrated. The com-
mercial drink Gatorade is an inexpensive, available fluid
which physicians advise jail staff to give to inmates suffer-
ing from DTs, but it should only be administered after a

240 / Jail Officer's Training Manual

Thiamin injection and upon the orders of a doctor.

## GENERAL RULES FOR HANDLING ALCOHOL ABUSERS IN THE JAIL

Not all intoxicated inmates who are admitted to the jail pose serious medical problems. Many new inmates have simply had too much to drink and will suffer no more than some vomiting and a hangover. However, whether the situation appears serious or not, officers should keep these general rules in mind:

1. **Level of Consciousness:** A booking officer should *never* admit an unconscious person to the jail even if he thinks the person has merely passed out from drinking. Anyone who faints or collapses in the jail and who does not recover consciousness almost immediately should be sent to the hospital. The level of consciousness of an admitted inmate should always improve while he is in the jail. If the level of consciousness deteriorates, then the inmate may be in danger of falling into a coma; medical personnel should be notified immediately. Officers should wake an inmate who is sleeping off a "drunk" every 3 or 4 hours. If an officer cannot wake an inmate or if his level of consciousness seems to be getting worse, the officer should request an *immediate* medical evaluation. During the booking process and again every few hours, officers can give inmates this simple test to evaluate their level of consciousness:

   a. Who are you? Who am I?

   b. Where are you?

   c. What is the present year, date, day, and approximate time of day?

   d. Count backwards from 29 by 3's.

   e. What does the expression "don't cry over spilt milk" mean?

   The answers to these questions should improve as the effects of the alcohol wear off. If the inmate's responses do not improve, the officer should request both a medical and psychological evaluation for the inmate. Complete documentation should be made of *every* circumstance surrounding such an inmate.

2. **Observation:** Officers should observe *all* alcohol abuse admissions closely to detect medical symptoms and to prevent suicides.

3. **Paranoia:** When some people are very drunk or in a great deal of discomfort from alcohol withdrawal, they may feel extremely threatened and paranoid. A person who has these feelings will probably distrust the jail officer. The officer should try to act in a non-threatening manner and be reassuring to the inmates.

4. **Screening:** Each jail should have admissions procedures which include basic psychological and medical screening. During the screening process, officers should seek information on how much the inmate has had to drink, whether he has taken any drugs, and whether he has any suicidal feelings. If the inmate indicates that he has been taking alcohol and barbiturates, officers should obtain medical assistance immediately, since this combination can be fatal. By the time severe reactions set in, it may be too late.

5. **Depression and Suicide:** Often an intoxicated inmate is "high" or hostile when he is admitted to the jail. But as the blood alcohol level drops, he may become depressed to the point of suicide. All alcohol abuse admissions should be considered potential suicide risks until they are completely withdrawn from alcohol (which may take three or four days).

6. **Vomiting and Staggering:** The intoxicated inmate should be protected from harming himself and encouraged to rest and lie down to prevent head injuries. A semi-conscious, vomiting inmate should be turned face down with his head to one side to prevent him from choking on his own vomit. If there are any signs of head injuries, such as bruises, bumps, or stitches, and vomiting occurs, officers should seek an *immediate* medical evaluation even if the inmate must be transferred to a hospital.

7. **Antabuse Reaction:** Antabuse is a drug given to alcoholics to prevent them from drinking alcohol. Those who drink while on antabuse will have these symptoms:

   a. Very red face;

   b. Pain;

   c. Fast heart rate;

   d. Vomiting; and

   e. Cold sweats.

   If the inmate has been taking both antabuse and alcohol and has these symptoms, officers should transfer him to a medical facility immediately.

8. **After Admission:** An inmate who has adjusted to the jail environment after alcohol withdrawal still has special needs. Often the doctor will recommend a special diet to repair the alcoholic's poor physical health. The inmate must also be watched carefully: alcoholics sometimes try to drink various poisonous cleaners, paint thinners, and other fluids containing alcohol on an attempt to become

intoxicated. Jail staff members should be alert to this possibility.

Case Study 2:

*Inmate Brandy Waters was an alcoholic who considered the Reindeer County Jail to be his "home away from home." He worked as a farmhand, but every time he got paid he would head for Whitetail City to "tie one on" and "raise a little hell." At least twice a year the judge would sentence Waters to a 30-or 60-day term at the jail.*

*Right before Christmas, Waters was sentenced to an unusual 90 days in the jail because he had gone too far on his last big drunk. He had spent his entire paycheck and his military pension check buying holiday "good cheer" drinks for all his buddies. The bartender at the Big Horn Tavern told Waters he couldn't have any credit. Badly in need of a drink, Waters knocked over a "Santa Claus" at a Salvation Army kettle and stole all the money in the kettle, which turned out to be $74. He managed to get completely intoxicated before he was identified as the thief and arrested.*

*The Reindeer County Jail had a small infirmary and Waters was housed there, since he began suffering from tremulousness and hallucinations seven hours after he was admitted. Because it was Christmas Eve, the sheriff had permitted the jail cook to prepare a large holiday dinner for the jail officers and road deputies who were on duty. The meal was being served in the rollcall room. Officer Rudolph Blitzen was the only officer on duty in the infirmary and didn't think he would be able to go to the dinner when it was his turn for a meal break. Since the three inmates in the infirmary were all sleeping, the duty sergeant told Officer Blitzen the inmates would be OK if Blitzen wanted to go to the dinner and leave the inmates alone for an hour. Before he left, Officer Blitzen made certain that the medicine cabinet was securely locked.*

*While Officer Blitzen was on his dinner break, Waters woke up and started wandering around the infirmary. A half-gallon jug of rubbing alcohol caught his attention, and he began drinking it. By the time Officer Blitzen returned two hours later, Waters had polished off the alcohol and was sprawled on the floor snoring, with the empty bottle near him. Officer Blitzen called for an ambulance and sent Waters to the County Hospital for emergency treatment. Fortunately—for Officer Blitzen and the sheriff—inmate Waters recovered.*

This case study points out that known alcoholics must be watched *constantly*, since they will often drink substances that contain alcohol or other intoxicants. Officers should not leave inmates in an infirmary unsupervised, since a medical emergency could easily occur during the officer's absence. In this case, the supervising sergeant should have detailed another officer to the infirmary while Officer Blitzen was on his meal break. In addition, Officer Blitzen should have kept the rubbing alcohol locked in the medical supply cabinet—with a known alcoholic in the infirmary, leaving the alcohol on a shelf in clear view was like leaving a loaded gun next to a person with suicidal tendencies.

In recent years there has been an increasing consensus that the jail is not the proper place for people who are intoxicated (unless they have been arrested and charged with committing a serious crime). Many cities and counties have established alcohol rehabilitation centers where intoxicated people can be taken. If such a center is available, jail staff members should make an effort to transfer intoxicated new admissions there for treatment.

The former practice of housing intoxicated people in "drunk tanks" to "dry out" is disappearing from use because too many deaths have resulted from such careless procedures. Until intoxicated people can be handled in appropriate community facilities, jail staff members should carefully document *all* treatment provided to intoxicated inmates.



*Inmates suffering from delirium tremens experience frightening hallucinations.*

## SUMMARY

1. If an inmate showing signs of alcoholism is admitted to the jail, he should be examined by a physician; he will need to be observed at all times.

Familiar symptoms of intoxication include shakiness; staggering; slurred speech; a blank, glassy-eyed look; and the unpleasant odors of heavy drinking; However, when a person with these signs is being

booked, officers should make certain that they do not confuse these symptoms with those of serious medical disorders, such as multiple sclerosis, epilepsy, diabetes, and head injuries. Intoxicated inmates must be watched constantly, since they may go into alcohol withdrawal, a serious medical condition which could be fatal if not properly treated.

2. **If the jail is responsible for housing intoxicated inmates, these inmates must receive proper medical treatment.**

Officers should carefully document *all treatment* provided to intoxicated inmates. Officers are responsible for the safety of these inmates and must watch for signs of paranoia, unconsciousness, drug/alcohol reactions, depression and suicidal tendencies, vomiting, and antabuse reactions. If these symptoms appear, then officers should secure the necessary medical or psycological treatment for the inmates. Officers should never ignore intoxicated or withdrawing inmates, since the inmates may die—alcohol is a lethal drug.

## SUGGESTED READINGS

### Alcohol Abuse Emergencies in the Jail

*American Medical Association Standards for the Accreditation of Medical Care and Health Services in Jails.* Chicago, IL: American Medical Association, 1978.

Hanmer, Jean, Michael Benjamin, and Gary Jacobs. *A Practical Manual for County Officials on the Treatment of Alcoholism.* Washington, D.C.: National Association of Counties Research Foundation, 1975.

Hay, Linda, Barbara Rice, and Jacqueline Rosenberg. *Hearts Project: Helping Examine Alcoholism Resources and Treatment Services.* Washington, D.C.: National Association of Counties Research Foundation, 1977.

*Ingham County Jail Alcohol Program: A Local Correctional Facility Prevention-Treatment Program Model.* Mason, MI: Ingham County Sheriff's Department, ND.

*Inmate Programs and Services Handbook.* New Haven, Ct: Connecticut Department of Corrections, 1978.

Jesse, Jack G. *Ingham County Program Pioneers in Alcohol Rehabilitation.* Mason, MI: Michigan Corrections Association, ND.

*Manual of Mental Health, Drug and Alcohol Emergencies for Jails and Detention Centers,* Bureau of Corrections Training, Kentucky Department of Justice.

McCann, S. Anthony. *Programs to Re-Educate, Readjust, and Restore Inmates of the County Jail.* Washington, D.C.: National Association of Counties Research Foundation, 1976.

*Sober House, Inc., Detoxification Center.* Kansas City, MO. Salvation Army, ND.

Swift, R. Michael. *How to Help an Alcoholic Who Insists He Doesn't Need Any Help.* Westport, CT: Fairfield County Council on Alcoholism.

# ABA Standards for Criminal Justice
## *Third Edition*

# Treatment of Prisoners



# PART II:
# INTAKE AND CLASSIFICATION

## General Commentary

This Part deals with the reception of prisoners, their initial and subsequent custody and health screening and assessment, and their assignment to particular levels of custody and control. It places a good deal of emphasis on prisoner "classification"—the process by which correctional agencies decide on appropriate housing, custody, and programming for prisoners. Initial classification and regular reclassification, using appropriate evidence-based methods, are key to both safe confinement and rehabilitation, because appropriate individualized risk analysis puts dangerous prisoners in more confined settings but leaves less dangerous prisoners with more liberty, facilitating productive and rehabilitative activity. Standards 23-2.2 and 23-2.3 set out the core principles of using and periodically reviewing the application of a classification regimen, along with some details. Many of the other Standards can be safely and effectively implemented only if they are preceded by sound classification of the affected prisoners.

The most secure classification status is long-term solitary confinement, sometimes in a facility or unit labeled "supermax." Living conditions in this kind of isolated setting are generally the same, however, whether it is conferred after a classification or other non-disciplinary process (in which event it is usually labeled "administrative segregation") or as discipline for a serious rule infraction (in which event it is usually labeled "disciplinary segregation"). Sometimes, that is, segregation is used to control or even (as "protective custody") to protect, other times to punish. Most of the Standards deal generally with all assignments to segregated housing, regardless of the justification. Eight Standards, including four in this part (23-2.6 to 2.9) regulate administrative and disciplinary segregation, long and short-term. Standard 23-2.6 sets out very broad substantive prerequisites for placing a prisoner in segregation even for a short time; 23-2.7 provides far narrower rationales acceptable for segregation for a longer period. 23-2.8 deals with

31

the extremely important topic of mental health monitoring of prisoners in segregation, and forbids housing of prisoners with serious mental illness in segregation. Standard 23-2.9 governs the process by which a decision is made to house a prisoner in long-term segregation. In Part III, Standard 23-3.7 and 23-3.8 limit the degree of sensory deprivation and isolation even in such a setting, and Standard 23-3.9 deals with facility "lockdowns," which can sometimes operate, *de facto*, as wholesale segregating reclassification. Finally, 23-6.11(c) and (d) repeat 2.8(a)'s rule against housing prisoners with serious mental illness in anti-therapeutic environments—which long-term segregation cannot help but be—and require development, instead, of high-security mental health housing appropriate for those whose mental illness interferes with their appropriate functioning in general population.

Some background may be helpful. The forerunner of today's "supermax" facilities was the federal maximum security prison at Alcatraz, which closed in 1963. A high-security control unit at the U.S. Penitentiary in Marion, Illinois, opened in 1978, but the modern supermax prison was not born until USP Marion was locked-down permanently in 1983, after the murder of two correctional officers by prisoners on the same day. The federal Bureau of Prisons opened another such facility in Florence, Colorado, in 1994; by 1999, more than 30 States operated supermax prisons.[38] These freestanding facilities hold thousands of prisoners, and have also made more salient the issues raised by similar custody arrangements in units within general population facilities.

To understand life in long-term segregation, consider, for example, the Supreme Court's description of life in the Ohio State Penitentiary, the supermax facility that was the subject of *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005):

> In the OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one

---

38. Chase Riveland, *Supermax Prisons: Overview and General Considerations* 5, 1 (NIC 1999), *available at* http://www.nicic.org/pubs/1999/014937.pdf.

*ABA Treatment of Prisoners Standards*     **Part II**

hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

Some prisoners are sufficiently mentally resilient (or their stays in segregation sufficiently short) that isolating confinement does them no lasting harm; for others, the human cost can be devastating. Abundant research demonstrates that prisoners in segregation often experience physical and mental deterioration. Indeed, even in 1890, the Supreme Court discussed some of the evidence relating to the penitentiary system of solitary confinement:

[E]xperience demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168 (1890).[39] The modern evidence is abundant. As a leading expert summarizes:

Solitary confinement—that is the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal

---

39. *See also Chambers v. Florida*, 309 U.S. 227, 237-38 (1940) (referring to "solitary confinement" as one of the techniques of "physical and mental torture" governments have used to coerce confessions).

environmental stimulation and minimal opportunity for social interaction—can cause severe psychiatric harm. It has indeed long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning.[40]

Some dangerous prisoners pose a threat to others unless they are physically separated. But such separation does not necessitate the social and sensory isolation that has become routine. Extreme isolation is not about physical protection of prisoners from each other. It is a method of deterrence and control—and as currently practiced it is a failure. The segregation units of American prisons are full not of Hannibal Lecters but of "the young, the pathetic, the mentally ill."[41]

Long-term segregation units are extraordinarily expensive to build and operate. Too many prisoners are housed in them for too long, in conditions whose harshness stems more from criminal justice politics than from correctional necessity or even usefulness. Those prisoners experience extreme suffering within the units, and those who have serious mental illness frequently decompensate and become floridly psychotic. As one judge has explained, "[f]or these inmates, placing them in the SHU [Security Housing Unit] is the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995), mandamus denied, 103 F.3d 828 (9th Cir. 1996).[42] Some prisoners who start off relatively psychologically healthy experience mental health damage, as well. Such conditions are inconsistent with the human dignity of prisoners, and frequently also make prisoners angrier, more difficult to manage, and less well equipped to live in general population or outside prison. It is for this reason that the Standards require several important reforms

---

40. Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006).

41. Rob Zaleski, *Supermax Doesn't Reflect the Wisconsin that Walter Dickey Knows*, Capital Times (Madison, Wis.), Aug. 27, 2001 (quoting Walter Dickey, former secretary of the Wisconsin Department of Corrections).

42. *See also Jones'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wis. 2001); Settlement Agreement, *Disability Advocates v. N.Y. State Office of Mental Health*, No. 1:02-cv-04002 (S.D.N.Y. Apr. 25, 2007), *available at* http://disability-advocates.org/complaints/DAIvOMHSettlement.pdf.

in this area of criminal justice policy—and the ABA is far from the first organization to offer proposals along these lines[43]:

- Provide sufficient process prior to placing or retaining a prisoner in segregation to be sure that it is warranted. (23-2.9)
- Limit the permissible reasons for segregation. Disciplinary segregation should generally be brief and should rarely exceed one year. Longer-term segregation should be imposed only if the prisoner poses a continuing and serious threat. Segregation for protective reasons should take place in the least restrictive setting possible. (23-2.6, 23-5.5)
- Decrease isolation within segregated settings. Even prisoners who cannot mix with others can be allowed in-cell programming, supervised (and physically isolated) out-of-cell exercise time, face-to-face interaction with staff, access to television or radio, phone calls, correspondence, and reading material. (23-3.7, 23-3.8)
- Decrease sensory deprivation within segregated settings. Limit the use of auditory isolation, deprivation of light and reasonable darkness, punitive diets, etc. (23-3.7, 23-3.8)
- Allow prisoners to progress gradually towards more privileges and fewer restrictions, even if they continue to require physical separation. (23-2.9)
- Do not place prisoners with serious mental illness in what is an anti-therapeutic environment. Maintain appropriate secure mental health housing for them, instead. (23-2.8, 23-6.11)
- Carefully monitor prisoners in segregation for mental health deterioration, and deal with it appropriately if it occurs. (23-6.11)

## Standard 23-2.1   Intake screening

(a) **Correctional authorities should screen each prisoner as soon as possible upon the prisoner's admission to a correctional facility to identify the prisoner's immediate potential security risks, including vulnerability to physical or sexual abuse, and should closely**

---

43. *See, e.g.,* John J. Gibbons & Nicholas de B. Katzenbach (chairs), Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons 52-60 (Vera Institute of Justice 2006) (making similar recommendations and discussing other comparable proposals).

supervise prisoners until screening and follow-up measures are conducted.

(b)  Correctional authorities should screen each prisoner as soon as possible upon the prisoner's admission to a correctional facility to identify issues requiring immediate assessment or attention, such as illness, communicable diseases, mental health problems, drug or alcohol intoxication or withdrawal, ongoing medical treatment, risk of suicide, or special education eligibility. Medical and mental health screening should:

   (i)  use a properly validated screening protocol, including, if appropriate, special protocols for female prisoners, prisoners who have mental disabilities, and prisoners who are under the age of eighteen or geriatric;

   (ii)  be performed either by a qualified health care professional or by specially trained correctional staff; and

   (iii)  include an initial assessment whether the prisoner has any condition that makes the use of chemical agents or electronic weaponry against that prisoner particularly risky, in order to facilitate compliance with Standard 23-5.8(d).

(c)  Correctional authorities should take appropriate responsive measures without delay when intake screening identifies a need for immediate comprehensive assessment or for new or continuing medication or other treatment, suicide prevention measures, or housing that takes account of a prisoner's special needs.

## Cross References

ABA, TREATMENT OF PRISONER STANDARDS, 23-2.4(d) (special classification issues, transgender prisoners), 23-5.4(b) (self-harm and suicide prevention), 23-5.4(b) (self-harm and suicide prevention), 23-5.8(d) (use of chemical agents, electronic weaponry, and canines), 23-6.11(b) (services for prisoners with mental disabilities), 23-6.12 (prisoners with chronic and communicable diseases)

## Related Standards

ABA, LEGAL STATUS OF PRISONERS STANDARDS (2d. ed. superseded), Standard 23-3.4 (classification)

ABA, RESOLUTION, 116 (Feb. 2004) (mental and emotional illness)

ACA, JAIL STANDARDS, 4-ALDF-2A-19 and 2A-25 (reception), 4-ALDF-4C-22 (health screens) and 4C-29 (mental health screen)

ACA, PRISON STANDARDS, 4-4285 (admission), 4-4372 (mental health evaluations)

AM. ASS'N FOR CORR. PSYCHOL., STANDARDS § 28-29 (reception screening)

AM. PSYCHIAT. ASS'N, GUIDELINES, C.1 (jail mental health screening and evaluation), D.1 (prison mental health screening and evaluation)

AM. PUB. HEALTH ASS'N, CORRECTIONS STANDARDS, III.A.1 to .5, .7 (receiving medical and mental health screening), III.C (follow-up), VI.B (drug and alcohol detoxification and treatment), VII.B.7 to .12 (initial screening of juveniles)

CORR. ED. ASS'N, PERFORMANCE STANDARDS, ¶¶ 31 (education and classification), 60 (special needs students)

NCCHC HEALTH SERVICES STANDARDS, E-02 (receiving screening), E-03 (transfer screening)

U.N. Standard Minimum Rules, art. 24 (immediate examination)

## Commentary

The Standard requires intake screening that covers both security and health issues, and that looks for both vulnerability and risk to others. Intake screening must be done not only for newly incarcerated prisoners but for those being transferred from other correctional facilities. Security intake screening should assess both general and individual issues—vulnerability, for example, might be based on characteristics like age or weight, or on personal history with other prisoners. Health care intake screening can occur at the same time, by appropriately health-trained correctional staff or health care staff. This screening, often called "receiving screening" in relevant professional standards, is not to be confused with the subsequent, more detailed evaluation required by Standard 23-2.5 (though the two can be combined in institutions that are able to provide a complete evaluation promptly upon admission). The relevant NCCHC standards, E-02 (receiving screening) and E-03 (transfer screening), provide more detail on timing and content, and on responses to various health issues found in the screening, explaining, for example, differences between the screening necessary for prisoners transferred intrasystem and others. The National Institute of Justice has a helpful

publication that sets out sample mental health screening instruments and discusses their validation.[44]

For jails, the intake screening (as well as the health care assessment required by Standard 23-2.5) should be an occasion for correctional authorities to identify persons with mental illness who may be eligible for diversion from the criminal justice system and to connect with mental health service providers, pretrial service providers, and others, as recommended by ABA policy.[45] As an important and comprehensive report on mental illness and the criminal justice system notes,

> The admission of an individual with mental illness into a county or municipal detention facility presents an opportunity to determine whether continued involvement with the criminal justice system is the most appropriate strategy to address that individual's situation. Once a detainee has been identified as having a mental illness, corrections officials can work with pretrial service programs, mental health service providers, and other partners to determine whether the detainee may be eligible for programs that provide an alternative to further detention.[46]

Subdivision 2.1(b)(iii)'s requirement that intake screening "include an initial assessment whether the prisoner has any condition that makes the use of chemical agents or electronic weaponry against that prisoner particularly risky" is a rare instance in which these Standards actually conflict with an extant professional standard. The American Public Health Association standards, wary of involving health care professionals in non-care-giving roles that might undermine the patient-provider relationship, forbid such professionals to screen prisoners "for suitability for restraint by stun gun weapons, noxious gases, or restraint boards."[47] The approach embodied in Standard 23-2.1 prioritizes safety in uses of force over the subtler risk about which the APHA is concerned.

---

44. Julian Ford et al., Mental Health Screens for Corrections (Nat'l Inst. of Justice, Research for Practice, May 2007).

45. *See* Am. Bar Ass'n, Resolution 116, (Feb. 2004) (mental and emotional illness).

46. Criminal Justice/Mental Health Consensus Project Report 104 (2002), *available at* http://consensusproject.org/downloads/Entire_report.pdf. (*See generally id.,* chapters 13 and 17, on intake screening).

47. Am. Pub. Health Ass'n, Corrections Standards, III.A.4.c.

Note that the assessment in question is only the first occasion for staff to note in a prisoner's file the existence of a condition that augments the risk of either chemical agents or electronic weaponry. See commentary to Standard 5.8(d).

## Standard 23-2.2   Classification system

In order to implement appropriate classification, housing, and programming, correctional officials should:

(a) implement an objective classification system that determines for each prisoner the proper level of security and control, assesses the prisoner's needs, and assists in making appropriate housing, work, cellmate, and program assignments;

(b) initially and periodically validate an objective classification instrument to ensure consistent and appropriate custody and other decisions for each correctional facility's population, including prisoners' assignments to multiple occupancy cells or dormitories; and

(c) ensure that classification and housing decisions, including assignment to particular cells and cellmates, take account of a prisoner's gender, age, offense, criminal history, institutional behavior, escape history, vulnerability, mental health, and special needs, and whether the prisoner is a pretrial detainee.

### Cross References

ABA, Treatment of Prisoner Standards, 23-2.3 (classification procedures), 23-2.4 (special classification issues), 23-2.9 (procedures for placement and retention in long-term segregated housing, 23-3.2 (conditions for special types of prisoners), 23-5.2(a)(i) (prevention and investigation of violence), 23-5.4 (self-harm and suicide prevention), 23-5.5 (protection of vulnerable prisoners), 23-8.2 (rehabilitative programs), 23-10.5(f)(iii) (privately operated correctional facilities, classification systems)

### Related Standards

ABA, Legal Status of Prisoners Standards (2d ed., superseded), Standard 23-3.4 (classification)

ACA, Jail Standards, 4-ALDF-2A-22 and 2A-25 (reception), 2A-30 and 2A-32 (classification and separation)

ACA, Prison Standards, Principle 4B (classification), 4-4295 and 4-4296 (classification plan), 4-4399 (special needs)

Am. Pub. Health Ass'n, Corrections Standards, III.A.8 (medical classification)

NCCHC, Health Services Standards, A-08 (Communication on Patients' Health Needs)

U.N. Standard Minimum Rules, arts. 8 (separation of categories), 63 (purpose of classification), 67-69 (classification and individualization)

## Commentary

As discussed in the general commentary to this Part, appropriate classification of prisoners, which then guides their appropriate housing, supervision, and programming, is key for prisoner safety and rehabilitation. This Standard requires use of a classification system that is both "objective" and "validated." A helpful discussion of objective classification is included in the 2006 report of the Commission on Safety and Abuse in America's Prisons:

> Before 1980, most of the nation's prisons and jails used "subjective classification," which relies heavily on the judgment and hunches of line officers. Since then, every prison system has shifted, at least as a matter of policy, to "objective classification." These standardized and automated classification criteria "place greater emphasis on fairness, consistency, and openness in the decision-making process."

> Numerous studies of both jails and prisons demonstrate that violent acts, escapes, and deaths by violence can all be significantly reduced by using a validated objective classification system. But currently, the full potential of this tool is not being realized. As James Austin, a leading researcher, reported in 2003: "Although prison classification and other risk assessment instruments are now common, there is a disturbing trend that suggests that many of these systems were implemented without first being properly designed and tested." In addition, many jails do not use objective classification at all: In eight of the 21 states

surveyed in 2003, fewer than half of local jails reported using objective classification.[48]

Validation and revalidation are population-specific processes that seek to ensure, both initially and over time, that classification systems continue to make "consistent and reliable custody decisions, use valid criteria for those decisions, systematically assess inmate program needs, and increase the safety and security of staff and inmates."[49] As described in the Department of Justice (National Institute of Corrections) publication, "[v]alidation studies track the misconduct of a sample of prisoners (e.g., an admission, release, or current population cohort) over a given period to determine whether the risk factors scored by the classification system are associated with prisoner misconduct. Statistical tests are used in completing the analysis of the risk factors."[50] Validation studies must be performed on a facility's particular population. But generally, they have shown the following factors to be the most predictive of prisoner misbehavior: younger age; male gender; history of violence; history of mental illness; gang membership; program nonparticipation; recent disciplinary actions. Factors that tend to have little if any predictive capability include: severity of the current offense; sentence length; time left to serve; detainers; alcohol and drug use.[51]

The U.S. Department of Justice has frequently insisted on both objectivity and validation of classification systems in its prison and

---

48. CONFRONTING CONFINEMENT: A REPORT OF THE COMMISSION ON SAFETY AND ABUSE IN AMERICA'S PRISONS 29 (Vera Institute of Justice 2006), *available at* http://www. prisoncommission.org (internal citations omitted; the sources quoted and cited are: JAMES AUSTIN, FINDINGS IN PRISON CLASSIFICATION AND RISK ASSESSMENT (National Institute of Corrections 2003), *available at* http://www.nicic.org/Library/018888; Connie Clem & Dave Sheanin, *Issues in Jail Operations*, in PERSPECTIVES FROM STATE JAIL INSPECTION AGENCIES (National Institute of Corrections, 2003), *available at* http://www.nicic.org/ Library/019259; NATIONAL INSTITUTE OF CORRECTIONS, JAIL CLASSIFICATION SYSTEM DEVELOPMENT: A REVIEW OF THE LITERATURE (1992), *available at* http://www.nicic.org/ Library/010681).

49. Patricia L. Hardyman, James Austin & Owan Tulloch, *Revalidating External Prison Classification Systems: The Experience of Ten States and Model for Classification Reform* (Institute on Crime, Justice and Corrections, January 2002), *available at* http://www.nicic. org/pubs/2002/017382.pdf.

50. James Austin & Patricia Hardyman, *Objective Prison Classification: A Guide for Correctional Administrators* (National Institute of Corrections, July 2004), *available at* http://www.nicic.org/pubs/2004/019319.pdf.

51. *Id.* at 46.

jail settlement agreements under the Civil Rights of Institutionalized Persons Act.[52]

*Subdivision (c)*: This provision lists factors that ought to enter into classification; no one factor should alone be dispositive for classification decision-making. How the factors affect housing and other decisions varies. Some prisoner characteristics are incorporated relatively simply into a general classification system; others—in particular, age and gender (including transgender status, see Standard 23-2.4(d))—require more systematically different treatment. For youthful prisoners and for women prisoners, appropriate classification requires careful research and separate validation of a classification instrument.[53]

Among the special needs referenced that may affect classification and housing decisions, along with work and program assignments, are various types of chronic illness, serious communicable diseases, physical or mental disability, pregnancy, and others. For discussion, see NCCHC, HEALTH SERVICES STANDARDS, A-08 (communication on patients' health needs).

International law sources are substantially more rigid than this Standard on the separation of pretrial detainees from convicted prisoners. For example, Article 10 (¶2(a)) of the International Covenant on Civil and Political Rights states that: "Accused persons shall, save in exceptional circumstances, be segregated from convicted persons."[54] The issue comes up routinely in jails, which incarcerate people in many situations, including those: (a) waiting to make bail, (b) unable to make

---

52. *See, e.g.*, Settlement Agreement Between the United States and the County of Gila, Arizona Regarding the Gila County Jail, *United States v. Gila County*, 98-2269 (D. Ariz. Jan. 5, 2009), *available at* http://www.usdoj.gov/crt/split/documents/gilajailsa.htm.

53. *See, e.g.*, Craig S Schwalbe, *Risk Assessment for Juvenile Justice: A Meta-Analysis*, 31 LAW & HUM. BEHAV. 449 (2007); Miles D. Harer & Neal P. Langan, *Gender Differences in Predictors of Prison Violence: Assessing the Predictive Validity of a Risk Classification System*, 47 CRIME & DELINQ. 513 (2001); Kathryn Ann Farr, *Classification for Female Inmates: Moving Forward*, 46 CRIME & DELINQ. 3 (2000).

54. The text of the ICCPR is *available at* http://www2.ohchr.org/english/law/ccpr. htm. The U.S. is signatory to the ICCPR, but signed with an "understanding: relevant to this provision: "[T]he United States understands the reference to 'exceptional circumstances' in paragraph 2(a) of Article 10 to permit the imprisonment of an accused person with convicted persons where appropriate in light of an individual's overall dangerousness, and to permit accused persons to waive their right to segregation from convicted persons." *See* http://untreaty.un.org/humanrightsconvs/Chapt_IV_4/reservations/ USA.pdf.

bail and awaiting trial, (c) post-trial awaiting sentencing, (d) post-sentencing but awaiting transfer to prison, (e) serving misdemeanor or short-term felony sentences, (f) detained as unlawful immigrants rather than for criminal justice reasons. Convicted prisoners in jails are mostly in category (e), and they tend to be less dangerous than some of the more violent offenders in categories (b), (c), and (d). U.S. jail practice focuses the classification inquiry on dangerousness and consequent need for supervision, rather than on conviction status. Experts agree that this increases safety and security. The Standard therefore accords with U.S. practice rather than international sources.

Prisoners whose classification has not been completed present unknown needs and risks and should therefore be held in appropriate housing, preferably separately from general population prisoners, but in any case sufficiently secure and with sufficient supervision to ensure their safety.

## Standard 23-2.3   Classification procedures

(a) Initial classification of a prisoner should take place within [48 hours] of the prisoner's detention in a jail and within [30 days] of the prisoner's confinement in a prison.

(b) Each classification decision should be in writing, and should set forth the considerations and factors that led to the decision; the written decision should be made available to the prisoner, and should be explained by an appropriate staff member if the prisoner is incapable of understanding it. Correctional authorities should be permitted to summarize or redact information provided to the prisoner if it was obtained under a promise of confidentiality or if its disclosure could harm the prisoner or others or would not serve the best treatment interests of the prisoner.

(c) If a classification decision has an impact on a prisoner's release date or ability to participate in facility programs, correctional authorities should provide the prisoner an opportunity to request reconsideration and at least one level of appeal.

(d) Correctional authorities should review the classification of a prisoner housed in a prison at least every [12 months], and the classification of a prisoner housed in a jail at least every [90 days].

74.    A correctional administrator is required to be familiar with every aspect of their institutional operation to include statutory and constitutional requirements, correctional case law, standards, contractual arrangements, programs, health services, mental health services, dental, pharmaceuticals, substance abuse treatments and classification programs.  A corrections administrator is expected to be familiar with the constitutional requirements for operating a constitutional jail.  According to a publication from September, 2007, by the U.S. Department of Justice, National Institute of Corrections, entitled *Jails and the Constitution: An Overview*:

> Those who run jails need to know courts continue to look over their shoulders and that the United States Constitution shapes or limits decisions in many areas. State constitutions and state laws do the same.  Those who fund jails may not need to know the detailed requirements of the law to the degree of jail administrators, but still must recognize that the price of running a substandard facility can be very substantial.

75.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

MICHAEL A. BERG

Executed this 26th day of December, 2019

{00819877.DOCX}                                    57