# EXHIBIT 45

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

CHERYL GREENEE, PERSONAL
REPRESENTATIVE OF THE ESTATE

OF DWAYNE GREENEE, DECEASED,

Case No. 2:18-cv-11008-MAG-DRG

Plaintiff,

HON. THOMAS J. LUDINGTON

v.

CRAWFORD COUNTY, SHERIFF KIRK
WAKEFIELD, RANDELL BAERLOCHER,
RENEE CHRISTMAN, KATIE TESSNER,
DONALD STEFFES, WILLIAM SBONEK,
TIMOTHY STEPHAN, JOEL AVALOS, DALE
SUITER, AMY JOHNSON, DAVID NIELSON,
LARRY FOSTER, SHON CHMIELEWSKI,
NORTHERN LAKES COMMUNITY MENTAL
HEALTH AUTHORITY, NANCI KARCZEWSKI
AND STACEY KAMINSKI, LPC, Individually
and Officially and Jointly and Severally,

Defendants.

{00816296.DOCX}

STATE OF MISSOURI     )

                           )

COUNTY OF  ST. LOUIS   )

## AFFIDAVIT OF REBECCA E. LUETHY

Before me, the undersigned, a Notary Public in and for the State of Missouri, personally appeared Rebecca E. Luethy, who is known to me and who being by me first duly sworn, on oath and says as follows:

1.     My name is Rebecca E. Luethy.  I am a Registered Nurse in the State of Missouri.  I am over eighteen years of age and have personal knowledge of the facts stated herein:

2.     I understand that the Crawford County defendants have challenged certain of my opinions in the above captioned matter.  I understand that Defendants claim my opinions are inadmissible because: 1) I have no experience or expertise as a corrections officer or in the administration of a corrections facility; 2) my opinions lump all the Crawford County defendants together and fail to identify any specific corrections officer; and 3) that I am not qualified to offer

{00816296.DOCX}

opinions that the conduct of the defendants were a substantial factor in causing the death of Dwayne Greene.

I.      **Qualifications, Knowledge, Skill, Experience, Training and Education**

3.      I became a licensed Registered Nurse in 1983.  I first became involved in providing health care to correctional facilities and inmates in 1985 for Correctional Medical Services, Inc.  (now Corizon).  During the approximately twenty-six (26) years that I worked there I was responsible for: direct patient care including safe detoxification of patients, supervision of nurses providing patient care, development of policies and procedures for direct patient care delivery, Continuous Quality Improvement and Infection Control activities, officer training, development of policies for nursing and patient education, development of corporate policies for Continuous Quality Improvement and Infection Control, and development of proper healthcare  staffing patterns for jails and prisons.  Work experience that is specifically relevant to the Dwayne Greene case included: health care administration experience in a small jail setting which entailed, among other things, education of officers regarding detoxification and withdrawal, and development of save withdrawal procedures.  A copy of my curriculum vitae is attached hereto and incorporated by reference.

{00816296.DOCX}

4.      Since 2011 I have worked for Centurion which provides health care services in prisons and jails across the nation. Since that time, I have been responsible for jail and prison programmatic development. Work experience that is specifically relevant to the Dwayne Greene case includes: development of staffing plans to support the needs of patients in jails and prisons, support of programs that provide detoxification and addictions treatment, establishment of a program that assists physicians in DATA-2000 waivers so that safe and effective detoxification can take place in prisons and jails.

5.      I have been a Certified Correctional Health Professional (CCHP) since 2010. This Certification was awarded to me by the National Commission on Correctional Health Care (NCCHC) after passing its exam. According to the NCCHC website, "the mission of the National Commission on Correctional Health Care is to improve the quality of health care in jails, prisons and juvenile confinement facilities. NCCHC establishes standards for health services in correctional facilities, operates a voluntary accreditation program for institutions that meet those standards, produces resource publications, conducts educational conferences and offers certification for correctional health professionals."

6.      In order to obtain Certification, I had to pass a competency examination administered by the NCCHC.  According to the NCCHC website:

The CCHP examination measures a candidate's knowledge, understanding and application of the content areas covered on the exam, including standards and guidelines essential to the delivery of appropriate health care, the basic legal principles for practicing in a correctional health care system, the ethical obligations of correctional health professionals and the role of health care professionals in delivering care in the correctional environment. The examination is not intended to measure clinical competency. Some questions pertain to specific settings (e.g., jail, prison or juvenile facility); others are more general in nature.

7.      The CCHP Exam covers a wide variety of health care issues, including: Governance and Administration; Health Promotion, Safety and Disease Prevention; Personnel and Training; Ancillary Healthcare services; Patient Care and Treatment; Special Needs and Services; and Medical-Legal Issues.  Attached to this Affidavit is a copy of the CCHP Exam Content Outline.  An example of a topic which I have shown competency is "Health training for correctional officers".  This subject matter assures I am aware of the role correctional officers play in assuring the healthcare safety of detainees, and that I can articulate the

{00816296.DOCX}

signs of withdrawal that officers are qualified to identify, and required to report

to health services staff.  Another subject matter in which I have shown

competency is "Medically supervised withdrawal and treatment".  This subject

matter assures I understand the process of identifying detainees who are at risk

for withdrawal, the method for establishing a plan of care for detainees who are

withdrawing, the actions required in monitoring a withdrawing patient, the

continuous evaluation of the health status of a withdrawing patient, and steps to

take when a patient fails to respond to care and treatment.

      8.     I have presented on the foundations of sound correctional healthcare

practice in university settings, and have made the following presentations

amongst many others through the NCCHC:

- Development of staffing plans for jails
- Provision of telehealth services in prisons and jails
- Telephonic disease management and lifestyle training

      9.     I have had hands on experience in delivering health care services to

inmates who are going through alcohol withdrawal and have impending alcohol

withdrawal.  This hands-on experience has included: direct health care and

supervision of direct health care in correctional facilities.  Additionally, I have

participated in designing and presenting healthcare educational programs to

{00816296.DOCX}

correctional officers as it pertains to alcohol withdrawal in corrections. I have provided pre-NCCHC audit surveys to assure jails and prisons are adhering to all NCCHC policies, including those for detoxification and withdrawal.  An example  of the role of the Correctional Officer in ensuring compliance for the audit survey includes participation in a routine training program which is established and approved by the facility administrator and includes a module on intoxication and withdrawal as well as a module on procedures for appropriate referral of detainees with medical problems to medical staff.  Additionally, assurance that a certificate or other documentation is kept on site/in the personnel file which acknowledges class attendance is an important component of the training program.

10.    I remain in the private practice of correctional healthcare.  I am responsible for proposing healthcare solutions to correctional facilities to ensure that inmate health care needs are met and providing staffing plans for those correctional facilities subsequent to proposal acceptance.  This is non-litigation related work.  As part of my responsibilities, experience and training, I am knowledgeable regarding the role that Corrections Officer plays in inmate healthcare.  The Corrections Officer is responsible for the safety and security of all detainees/offenders in their charge.  I have trained Corrections Officers

{00816296.DOCX}

regarding the signs and symptoms of severe alcohol withdrawal and/or Delirium

Tremens.

11.     During my career as a Correctional Nurse I have provided care to

patients undergoing severe alcohol withdrawal and/or delirium tremens in an

infirmary setting.   I have also provided care and directed treatment for patients

who are at risk for Delirium Tremens and are experiencing active Delirium

Tremens.  My earliest experience directing treatment for a patient at risk for

Delirium Tremens was in July, 1985.  My experience with this urgent medical

condition is ongoing as part of my professional responsibilities.  I am aware of and

intimately familiar with the causes of death related to Delirium Tremens due to

my active involvement in designing programs for correctional facilities to prevent

Delirium Tremens.  This is non-litigation related.

## II.    UNDERLING DATA, SUPPORTING LITERATURE AND
   WIDELY-ACCEPTED METHODOLOGY

12.     In formulating my opinions in this case, I used widely accepted

methodologies.  First, I reviewed the extensive materials that were provided and

which were listed in my May 28, 2019, Report.  That Report is attached hereto as

if incorporated by reference.  Those materials include case specific documents,

testimony and Correctional Health Care standards.  I considered my extensive

{00816296.DOCX}

non-litigation related experience in actually treating this urgent medical condition in formulating my opinions. I considered my non-litigation related experience in training corrections officers on the subject of alcohol withdrawal and on developing programs which focus on the necessity of collaboration between security and health services in the correctional setting. In formulating my opinions, I have considered the medical and nursing literature which I am familiar with. I also utilized generally accepted methodologies for a Registered Nurse in a correctional health care setting.

13.   As part of the methodology used, I summarized the medical records, reports and other documents for the time period of December 4, 2017 – December 8, 2017. This summary will assist the trier of fact in understanding the timeline of important events during incarceration of Dwayne Greene. There were at least 40 notations in the Jail Log and on the Video notes where Officers recognized signs of severe alcohol withdrawal exhibited by Dwayne Greene but did not ensure medical treatment.

**III.   Opinions And Basis**

14.   Crawford County's criticism that I have no experience or expertise as a corrections officer or in the administration of a corrections facility is not on point. My experience and experience comes from the side of what the

correctional health care community expects of properly trained corrections

officers.  I have extensive experience in providing health care services to

correctional facilities.  As a result of that, I have experience and training as to

what properly trained corrections officers should know about alcohol withdrawal

– because I have performed this training myself and have designed programs to

educate corrections officer regarding alcohol withdrawal in all of its stages.  Many

small- and medium-sized jails do not enjoy on site nursing services 24 x 7, nor do

they have infirmary housing where nurses are responsible for the routine

monitoring and recording of detainee's health status.  In these instances, as with

Crawford County, health care staff must rely on the observations and reporting of

officers regarding those detainees who are or who are believed to be withdrawing

from alcohol or other drugs.  Accurate observations and routine reporting, with

an eye for any significant behavioral changes are essential.  Another, and perhaps

safer, solution, is to send all detainees suspected of drug or alcohol withdrawal to

the local Emergency Room prior to detention in order to assure the detainee is

seen by credentialed health care staff before he is committed to a jail where

healthcare staff are not frequently in attendance.  Additionally, I have extensive

experience in providing health care proposals to corrections administrations;

therefore, I am well versed in what a proper health care program at a correctional

facility should look like. Observing someone going through alcohol withdrawal is not solely the responsibility of health care staff, especially in those institutions without 24 x 7 onsite healthcare staff, or in those institutions without and infirmary or other health care housing unit.

15.    Crawford County alleges that my opinions lump all the Crawford County defendants together and fail to identify any specific corrections officer. The Case Chronology that I performed provides a very detailed set of findings as to what each Corrections Officer noted and my "Clinical Notations" regarding that observation. I specifically offered the opinion that Corrections Officers, Corporal and Jail Administrator Captain Randell Baerlocher all disregarded the training they had received regarding alcohol withdrawal. I offered that Corrections Officer Larry Foster is a trained Emergency Medical Technician yet while Mr. Greene was exhibiting signs of severe withdrawal, Foster neither logged any of Mr. Greene's behavior, used his EMT skills to assess Mr. Greene's vital signs, nor contacted on-call healthcare staff. I also offered the opinion that Katie Tessner and Renee Christman . . . shared their concerns about Dwayne Greene, yet took no action to have him assessed by a health care professional. Throughout my report I give numerous examples of Corrections Officers denying access to health care in spite of observing signs and symptoms of an urgent medical condition.

{00816296.DOCX}

16.    Crawford County claims that I am not qualified to offer opinions that

the conduct of the defendants were a substantial factor in causing the death of

Dwayne Greene.   The reason the correctional healthcare community develops

policies for the identification and treatment of withdrawal is because the

mortality rate for untreated withdrawal, especially alcohol withdrawal, is

extremely high.  The important role of the Correctional Officer in these cases has

been well-documented, especially in small to medium sized jails where there is no

established infirmary and where healthcare staff are not on duty 24 x 7, the role

of the observant Correctional Officer cannot be overstated.

Further Affiant sayeth not.

Rebecca E. Luethy, R.N.

Subscribed and sworn to before me

this ___ day of December, 2019

KELSIE R HENSON
Notary Public - Notary Seal
St Charles County - State of Missouri
Commission Number 13500657
My Commission Expires Aug 14, 2023

Notary Public,

St Charles County, Missouri

My Commission Expires on: Aug. 14, 2023

{00816296.DOCX}

**Opinions, Case Chronology, and Clinical Notations**

**Summary of Medical Records, Depositions, Reports, and other Documents**

Prepared by Rebecca E. Luethy, RN, MSN, CNS, CCHP

for

Kevin Riddle, Attorney and Counselor
FIEGER, FIEGER, KENNEY & HARRINGTON, PC

May 28, 2019

Greene v Crawford County et al Case Number 2:18-CV-11008-MAG-DRG

## Introduction

I was retained by Kevin Riddle on behalf of the plaintiff on February 5, 2019 to act as Expert Witness for healthcare services regarding Greene v Crawford County et al CASE NO. 2:18-CV-11008-MAG-DRG.

I have carefully reviewed and considered the documents provided to me listed below, and I have formed the opinions based upon my skills, knowledge, and expertise as a corrections nurse, also listed below. Please know that if there are any additional depositions, investigations, policies, reports, memos, video recordings, photos, or other materials produced in this case, a supplemental report could be needed; therefore I reserve the right to supplement my opinions and/or this report. My curriculum vita has previously been provided to Mr. Riddle and is attached. Additionally, I have been involved in the supervision and treatment of persons experiencing alcohol withdrawal in the correctional setting for thirty-three years:  through direct care, through supervision of direct care, through education of healthcare and security staff, and through the writing of policy as it pertains to alcohol withdrawal in corrections.

Alcohol intoxication is a leading cause of death in jails.  It requires urgent if not emergent management to prevent complications, including death.   When providing treatment and support for medically supervised alcohol withdrawal in corrections, care must be provided pursuant to written jail policy and defined procedures promulgated by jail administration and driven by nationally accepted treatment guidelines.  National Commission on Correctional Healthcare Compliance indicators include:

1. Established protocols are followed for the assessment, monitoring, and management of individuals manifesting symptoms of alcohol and drug intoxication or withdrawal.
2. The protocols for intoxication and detoxification are approved by the responsible physician, are current, and are consistent with nationally accepted treatment guidelines.
3. Detoxification is done only under physician supervision in accordance with local, state, and federal laws.
4. Inmates experiencing severe, life-threatening intoxication or withdrawal are transferred immediately to a licensed acute care facility.
5. Individuals at risk for progression to more severe levels of intoxication or withdrawal are kept under constant observation by qualified health care professionals or health-trained correctional staff, and whenever severe withdrawal symptoms are observed, a physician is consulted promptly.

The records I reviewed in preparation of this document include:

- Records from Sacred Heart Rehab Center for 2/25/17 admission
- Transcript of Jury Status Conference of 12/4/17
- Crawford County Sheriff's Office Jail Booking System Daily Jail Log Inquiry 12/4/17-12/8/17
- Crawford County Sheriff's Office Jail Booking System Inmate Roster by Cell 12/4/17-12/8/17
- Crawford County Sheriff's Office Daily Jail Log Report-Adult 12/4/17-12/8/18
- List of Corrections Officers, Nurses on duty and detainees 12/4/17-12/7/17
- Corrections officers schedules December 2017

2

- Northern Lakes Community Mental Health Jail Crisis Screening Contact dated 12/7/17
- Crawford County Inter-Agency Agreement with Northern Lakes Community Mental Health
- Contract between MDHHS and Northern Lakes Community Mental Health Authority for Managed Mental Health support and Services for FY 2018
- Northern Lakes Policies-Supports and Services-Jail Services 107.501
- Corrections Health Care Policies:
    - 01-088 (untitled) regarding responsible health authority (reviewed 12/29/18)
    - Inmate Administration Medication Policy 01-051  (reviewed 1/26/18)
    - Inmate Participation in Research Policy 01-080 (reviewed 1/26/18)
    - Inmate Rights Policy 95-013  (reviewed 1/26/18)
    - Inmate Admission Policy 95-002 (reviewed 1/26/18)
    - Inmate Classification Policy 95-004 (reviewed 1/26/18)
    - Inmate Health Appraisal Policy 01-081 (reviewed 1/26/18)
    - Inmate Cell Check Policy 01-082 (reviewed 1/26/18)
    - Mental Health Services Policy 12-103 (reviewed 1/26/18)
- Northern Lakes Policies:
    - 107.301 *Emergency Services*
    - 107.302 *Assessment and Intervention*
- Decedent's Jail Record
- Fax from Sacred Heart Rehabilitation Center
- Jail Logs 12/4/17-12/8/17
- Jail Video Logs –typed- 12/4/17-12/8/17
- Hand-written timeline of 12/4/17-12/7/17 prepared by Johnson.
- Month End Statement for December 2017 from  DDV Services, LLC  for Denise DeVolder
- Mental Health Service Request form dated 12/7/17 0430
- Crawford County Sheriff's Office Incident Report
- Grayling Department of Public Safety Incident Report
- Mobile Medial Response report
- Munson Healthcare Grayling Hospital Records dated 12/8/17
- Munson Medical Center-Traverse City Medical Records dated 12/8/17-12/12/17
- Autopsy Report; Autopsy Photos
- Certificate of Death
- Records of Dr. E. Douglas (consult, autopsy, toxicology)
- Toxicology Report 12/10/17
- NLCMH email correspondence regarding decedent Complaint dated March 28, 2018
- Training records of Tessner, Baerlocher, Avalos, Johnson, Christman
- C. Dennis Simpson Summary Opinion
- Depositions and Exhibits of:
    - William Denno, detainee
    - Wade Schmidt, detainee

- o   Terry McCleery, detainee
- o   Marvin Townsend, detainee
- o   Stacey Kaminski, LPC, CMH supervisor
- o   Nanci Karzsucki, LLPC, CMH therapist
- o   C.O. Larry Foster
- o   Captain Randell Baerlocher, Jail Administrator. Supervisor
- o   C.O. Amy Johnson (813)
- o   C.O. Corporal Renee Christman  -(811)
- o   Corporal C.O. Katie Tessner (819)
- o   Joanie Blamer, Community MH First Aid Trainer
- o   C.O. Joel Avalos (816)
- o   John McDonald, Lt.  (retired)
- o   C.O. Donald Steffes (812)
- o   C.O. Timothy Stephan (814)
- o   Deputy Ryan Swope
- o   Deputy John Klepaldo
- o   Kirk Wakefield, Sheriff (ret.)
- o   C.O. Dale Suiter (821)
- o   Road Patrol Sergeant Shon Chmielewski (923)
- o   Sheriff Shawn Kracyz
- o   Bailiff Steven Detmer (820)
- o   Jeanne Huffnagel, RN
- o   C.O. David Nielson (822)
- o   C.O. William Sbonek
- o   Cheryl Greene, mother
- o   John Greene, father

## Opinions

My review of the listed materials and documents combined with my thirty three years' experience in correctional health care has caused me to form the following opinions regarding the care and treatment of the decedent, Dwayne Greene (hereinafter referred to as DG), during his time of incarceration at the Crawford County Jail from 12/4/17-12/8/17.  I have also included a case chronology (Appendix A), certain Michigan Department of Corrections County Jail Services Unit Administrative Rules for Jails and Lockups (Appendix B), and certain relevant jail standards promulgated by the National Commission on Correctional Health Care (NCCHC), which are included as Appendix C, and which represent nationally accepted minimal standards for delivery of health care services in jails.

Crawford County Jail in Grayling, Michigan has a total capacity of 51 beds and is not NCCHC accredited.

In summary, I believe:

4

1) DG's serious medical needs were purposefully ignored, reflecting deliberate indifference, which was a substantial factor in causing his death.

There is no question DG had a "serious medical need".

Some factors to consider in determining whether a "serious medical need" is at issue are: 1.) whether a reasonable physician or layperson would perceive the medical need in question as important and worthy of comment or treatment; 2.) whether the medical condition significantly affects daily activities; and 3.) the existence of chronic and substantial pain. (Clement v. Gomez, 2002). A "serious medical need" is present whenever the failure to treat an offender's condition could result in further significant injury, the unnecessary and wanton infliction of pain, or death. (Clement v. Gomez, 2002).

Severe alcohol withdrawal syndrome including delirium tremens is a serious medical need (Kindl vs. City of Berkley, 2015), and in fact, a medical emergency. DG's care givers/jailers ignored his worsening symptoms by failing to: a) contact the nurse on call, b) take him to the Urgent Care Center/call the Urgent Care Center, c) take him to the ED, or d) dial 911.

The blatant disregard DG's serious medical need shows breach of standard of care toward DG's fragile health status and is evident:

- DG and his attorney advised the judge that he would experience severe alcohol withdrawals if sent to jail without treatment.
- There are at least forty (40) notations in the Jail Log and on the Video notes where Officers recognize signs of severe alcohol withdrawal exhibited by DG.
- Corrections Officer Larry Foster is a trained Emergency Medical Technician. Yet, while DG was exhibiting signs of severe withdrawal, Foster neither: 1) logged any of DGs behavior while on shift from 6PM 12/6 to 6AM 12/7, 2) Used his EMT skills to assess DG's vital signs, 3) contacted on-call healthcare staff.
- Nurse Hufnagel stated (depo 21:2-6) stated she was called on occasion, when off duty, when the officers felt there was a medical emergency in the jail. She also stated (depo 21:14) that delerium tremens is a medical emergency.
- Nurse Hufnagel's common practice was to tape directions and signs/symptoms to medication carts as a means to communicate with security (depo 25).
- Nurse Hufnagel stated Crawford County had never asked her to create a policy for detainees going through withdrawal, or for when officers should call 911, but that they did follow state rules and regulations (depo 36)
- Nurse Hufnagel stated she relied on the corrections officers to call her when they recognized the signs and symptoms of alcohol withdrawal in a detainee (depo 69:25), but had never seen a jail protocol for alcohol withdrawal ( depo 70:1)
- Corrections Officers and Corporals, Katy Tessner and Renee Christman had a text exchange on December 7 where they described DG's insomnia, lack of appetite, and hallucinations, and shared their concerns about DG, yet took no action to have him assessed by a health care professional.

In fact, they used the term "lol" (Laugh out Loud) in their text exchange when referring to DG's severe withdrawal signs.

- All officers on duty between December 4 and December 8 (except Renee Christman) as well as the Jail Administrator had attended a class in October, 2017 from The National Council for Behavioral Health.  Signs and symptoms of withdrawal as well as actions to be taken were taught in the class by a qualified instructor and a PowerPoint tool.  The reference/text book that participants all received during class had instructions to call an ambulance when detainees are exhibiting signs of severe alcohol withdrawal, yet all disregarded their training and none sought medical help for DG. The certificate attained at the end of the training states the recipient has "completed the 8-hour course and is now certified in Mental Health First Aid USA and has been trained to provide initial help to people experiencing mental health problems such as depression, anxiety disorders, psychosis, and substance use disorders".

- C.O.s, Corporals, and Jail Administrator Captain Randell Baerlocher all disregarded the training they had received regarding alcohol withdrawal.

**2) DG did not receive timely access to medical care so was denied proper Access to Care.**

Proper Access to Care is the hallmark standard upon which jail healthcare policies and procedures are developed.  Appropriate access to care was not provided to DG, which contributed directly to his death.

***Jail staff denied DG access to nursing staff when nurses were at the jail on 12/4.***

Jail staff could easily have presented DG to the nurse on 12/4 shortly after DG arrived at the jail. Records show DG's Intake Screen, created by C.O. Katie Tessner at 12:37 PM, took place prior to the nurses leaving the jail at 1:06 PM, a full half hour after Tessner noted DG's alcohol history, current intoxication and PBT. Careful and diligent jail staff would have made sure the nurse saw DG prior to her departure that day, especially when they believed the nurse would not return until Friday, December 8. Careful and diligent nursing staff would have either sent DG to the ED immediately, or would have phoned the physician for orders, or would have crafted a care plan for DG which included focused and continuous review of signs of withdrawal, education on when to call the nurse if signs worsened, and a plan for the nurse to check in on DG routinely either in person or by phone.  A flow sheet for continuous monitoring for signs of withdrawal should have been implemented.

***Mental Health Staff denied DG access to proper medical judgement.***

The policy of Crawford County is that "qualified licensed health care professionals shall determine all medical matters of the Crawford County Jail "(Policy 01-088).  Nanci Karczewski, LLPC, had qualifications in the area of counseling, and not medicine or nursing. Jail administration was aware that Ms. Karczewski's qualifications did not include medicine or nursing (Baerlocher deposition 58:5-25 and 59:1-18), and acknowledges that it is a violation of policy for officers to obtain medical judgement/opinion from someone who is not a medical healthcare professional (Wakefield deposition 55:23-25 and 56: 1-12).  Although Ms. Karczewski had personal experience of delerium tremens and knew delerium tremens was a medical issue, (deposition 63:11-14), she made no referral for appropriate care and

6

treatment.  She should have made a referral to other health care staff employed at/by the jail or to physicians or facilities outside the jail.

Nanci Karczewski, LLPC, NLCMH therapist, was summoned through interagency referral on 12/7 to visit DG.

- Ms. Karczewski admitted in her deposition that she "only assessed detainees for harm to self or others", therefore, she disregarded the  Northern Lakes Community Mental Health Policy *Emergency Services* (107.301) which states "When contacted with a request for emergency services, the on-call Workforce Member is responsible for:
    - o  Determining the nature of the problem.
    - o  Making an assessment of the person's need for mental health services.
    - o  Determining what other service interventions may be necessary.
    - o  Responding to service needs directly when appropriate and/or referring the person to other agencies or persons or services when such action is service needs, recommending such services when appropriate.
- Ms. Karczewski told jail staff that DG was experiencing withdrawals and knew the signs and symptoms of delerium tremens, yet did not suggest accessing medical treatment or call 911, even though she knew she was not certified or licensed to determine he was safe to stay in jail.
- Ms. Karczewski knew DG's signs were not pertaining to mental health issues, and knew signs of delerium tremens reflected a medical problem.  She also knew she was not a qualified medical health care professional.
- In his deposition, retired Sheriff Kirk Wakefield admitted if staff didn't follow training "bad things happen", and that taking healthcare advice from non-qualified healthcare professionals is in violation of policy.

Stacey Kaminski, LPC, NLCMH supervisor, and direct supervisor of Ms. Karzsucki, discussed the importance of providing integrated care in her deposition, but then contradicted herself when she stated staff from NLCMH only looks at mental health issues.

### Jail staff did not think and act independently.

All jail staff had access to contracted jail nurses and physicians, but none were contacted.   All jail staff had the duty to think and act independently after witnessing DG's travail.  By not acting prudently and independently, the jail staff shows deliberate indifference which resulted in denial of Access to Care.  Reckless behavior included: continuing to note DG's worsening condition, yet not accessing professional medical care, and texting and joking about DG's condition.

### Jail staff allowed DG to languish.

Jail staff planned to allow DG to continue on his downhill trajectory until the nurse arrived for her planned Friday 8AM visit.  Yet, the invoice from DDV Services, LLC notes the nurse did not visit again until December 12, which was the following Tuesday.  The jail staff state they had planned to let the

nurse see DG on Friday, 12/8, yet none called the nurse to make sure she was coming or to refer DG to her. Jail staff didn't really know when the nurse would return.

Per C.O. Nielson's deposition, the jail now offers Gatorade to those experiencing alcohol withdrawal (Depo 23:19-20), and now when detainees show advanced signs of withdrawal, the officers call for medical assistance (Depo. 26:21). Neilson had been taught that calling CMH was the first step when detainees showed signs of withdrawal (Depo 28:14). In December 2017, Neilson knew he could call EMS (Depo 29: 20-24)

**3) Jail staff disregarded the standard of care, and it was foreseeable, even to a layperson, that DG would be further injured and die.**

The jail staff should have reasonably been able to foresee that harm would come to DG if he wasn't treated. DG's signs and symptoms were severe enough to warrant at minimum consultation with the jail nurses or physician, and also earlier and immediate referral to the hospital to obtain additional help. A pending emergency event should have been considered and steps should have been taken to keep DG safe from harm. Jail staff failed to consider or assess DG's obvious symptoms; instead, they described his travail in great detail in the jail log notes.

The jail staff's failure to provide standard of care directly caused DG's death. Had DG been sent to the ED days earlier when his symptoms first started, or even after the visit by the MH workforce member when he continued to have increasing signs of morbidity, care could have been provided at the ED which would likely have saved his life. Had the jail staff phoned the jail physician or nurse, those staff would likely have ordered an immediate transport to the ED.

DG lost his life in part due jail staff's deliberate indifference to his failing health. The staff's blatant disregard for DG's condition and the ignoring of his pleas over three days can be established as the direct cause of his death.

**4) Jail staff ignored county and state policies regarding health care services, and did not adhere to nationally recognized standards for provision of health care services in jails.**

The County Inmate Admission Policy (95-002) states: "Whenever an individual is brought into the Crawford County Jail for booking, the Corrections Officer shall check the individual for injury or illness. If an arrestee is injured or ill acceptance as an inmate shall be refused until the arresting agency has obtained medical attention. Arrestee's that are under the influence of alcohol and the level is .30% or greater will require medical clearance before acceptance." DG should have been sent directly from booking to the Emergency Department for evaluation and treatment. On December 4, DG went to court at 9 AM and waited until 12:15 PM to see a judge. The judge ordered DG to have a PBT, which was performed sometime after 12:23 PM when he was escorted to jail and prior to his return to court at 1:20 PM. It registered 0.194. DG had not been drinking for at least 4 hours prior to administration of the PBT and still blew a 0.194. Corrections Officers, who have access to a chart that indicates how quickly alcohol leaves the body, should have inferred from the 0.194 PBT after at least four hours of abstinence that DG warranted a trip to the Emergency Department.

The County Inmate Admission Policy (95-002) also states that Corrections Officers are to: "Refuse admission if the subject is injured or obviously ill until a physician has seen the person and pronounces the subject medically sound for admittance". The C.O.s also ignored this policy and proceeded with booking DG, yet disavowed their own policy again by failing to complete his intake medical paperwork.

The same County Inmate Admission Policy (95-002) also states the C.O. must "Complete the booking forms, medical screening sheet, record it on the County's computer system". C.O. Tessner did not complete the booking form at the time of intake, and in fact disregarded critical components of that form which would have alerted her to the need to send DG immediately to the emergency room.

The policy further states it is the Corrections Officer's responsibility to perform the booking process to "include every step as outlined". When questioned why she did not complete the booking screen, Tessner stated "I thought he would bond out" in her deposition. When asked why she did not complete the following day when it was apparent he would not bond out, she stated "I forgot".

Throughout DG's stay at the jail, Corrections Officers noted no fewer than 40 times, the signs of severe alcohol withdrawal: hallucinations, delirium, disorientation, agitation, insomnia, delusions, and hyperthermia.

They disregarded jail policy Inmate Mental Health Services (12-103) which states: "The prevention of injury or the loss of life in this facility shall be the foremost concern for all employees. Any employee taking notice of an inmate with severe depression or unusual behaviors shall be diligent in taking any necessary action to ensure the inmate receives necessary services, medical or mental."

Minimally, the County should have had in place a flow sheet for C.O.s to track and monitor DGs signs of withdrawal. Many qualification instruments have been developed for monitoring alcohol withdrawal (Guthrie, 1989; Sullivan et al., 1989; Sellers & Naranjo, 1983). No single instrument is significantly superior to others. What is clear is that there are significant clinical advantages to quantifying the alcohol withdrawal syndrome. Quantification is key to preventing excess morbidity and mortality in patients who are at risk for alcohol withdrawal.

Michigan Department of Corrections County Jail Services Unit Administrative Rules for Jails and Lockups promulgated in 1998 provide five separate policies after which the Crawford County policies seem to be established:

- R 791.728 Health care
- R 791.729 Health care personnel qualifications
- R 791.730 Pharmaceuticals
- R 791.731 Health screening
- R 791.732 Health appraisals

These policies are included as Appendix B. The Corrections Officers have also disregarded the policies set forth by the State of Michigan.

9

Since 1978, the National Commission on Correctional Health Care (NCCHC) has promulgated standards which jails adopt to ensure delivery of safe and effective health care services to their detainees.  These standards pertain to jails of any size, from small rural jails to large multi-facility jail systems.  A county's creation of policies and procedures based upon standards such as *Access to Care*, *Policies and Procedures*, and *Intoxication and Withdrawal* (attached as Appendix C below) and others are essential to avoid tragedies like those described in this case.

**5) Although jail staff were trained to identify and respond to life-threatening withdrawal symptoms, all ignored their training.  This deliberate indifference was a substantial factor in causing the death of DG.**

Because correctional personnel are often the first to respond to problems, they must be aware of the potential for emergencies that may arise, know the proper response to life-threatening situations, and understand their part in the early detection of illness and injury.

Crawford County jail administration sent all C.O. staff to training in October 2017 called Mental Health First Aid USA.  As part of that training, the C.O.s learned:

- Alcohol withdrawal syndromes encompass symptoms ranging from mild tremulousness to life-threatening delirium tremens (DT).
- DT is a syndrome characterized by agitation, disorientation, hallucinations, and autonomic instability (tachycardia, hypertension, hyperthermia, and diaphoresis) in the setting of acute reduction or abstinence from alcohol.
- Patients in alcohol withdrawal require medical treatment and observation.

All C.O.s except Christman: 1) acknowledge attending class, 2) claim they were attentive in class, 3) remember the training itself, 4) received a certificate of completion, and could 5) cite where they kept a copy of the training manual.  And in his deposition, Suiter (13:16) admitted he was aware of the information taught regarding delerium tremens and what to do for delerium tremens.  That he was aware on the evening of the 7th and the morning if the 8th that delerium tremens was not a mental health issue, and he agreed that he did not follow the training provided by Northern Lakes.  Similarly, in Sbonek's deposition (30:13014), he admits he should have known signs and symptoms of severe withdrawal.  Yet none followed the recommendations of the training or adhered to the directions in the study manual regarding identification of severe withdrawal symptoms or when to call an ambulance.

Appendix A

## Case Chronology
### Summary of Medical Records, Reports, and other Documents
### 12/4/17-12/8/17

| Time | Event/Care Provider | Source | Event/Description | Luethy Clinical Notations |
|------|--------------------|--------|-------------------|---------------------------|
| | | | **December 4, 2017** | |
| 0845 | Nurse Visit/Denise DeVolder, RN | Daily Jail Log | Notes nurse arrives for bi-weekly duties | Time stamp verified by month-end statement by DDV Services, LLC. Captain's deposition states nurses visit 2x/week; however, next visit by nurses is December 12...8 days later. |
| 0936 | Nurse Visit/Jeanne | Daily Jail Log | Notes a second nurse arrives for bi-weekly duties | |
| 1227 | PBT/#819 | Daily Jail Log | Notes DG's PBT is .194/placed in D01 | Nurses should have been notified that PBT was .194. Should have advised officers to call if DG returned from court. Thorough history and baseline vital signs needed at minimum. Should have started flow sheet noting behavior, etc., like CIWA. Many qualification instruments have been developed for monitoring alcohol withdrawal (Guthrie, 1989; Sullivan et al., 1989; Sellers & Naranjo, 1983). No single instrument is significantly superior to others. What is clear is that there are significant clinical advantages to quantifying the alcohol withdrawal syndrome. Quantification is key to preventing excess morbidity and mortality in a group of patients who are at risk for alcohol withdrawal. Such instruments help clinical personnel recognize the process of withdrawal before it progresses to more advanced stages, such as delirium tremens. |
| 1229 | Brought to Jail/Tessner | Johnson's notes* | "Tessner brought Greene from court to Jail". | |
| 1230 | PBT/Tessner | Johnson's notes | "Tessner gave Greene a PBT: .194% | Tessner's depo says past practice is to observe and then refer to the nurse when someone is detoxing 57:20. That staff could have called the nurse 58:11. |
| 1237 | Intake/Tessner | Intake Screen | Intake screen notes DG is intoxicated, with hx of alcohol abuse. Answers "no" to | Intake screen found in Tessner's Exhibits. Why didn't Tessner |

11

| | | | "Does arresting officer see inmate as a medical, mental health, suicide risk now?"<br><br>Tessner does not answer second half of intake screen, types "Temp Bond revocation—no questions asked at this time".<br><br>(+) response to all questions regarding alcohol. Tessner did not complete answers to questions about drugs, even though DG answered "yes" to question" Do you use drugs?". Intake screen not co-signed by medical. | complete the intake screen? Under question "Do you use alcohol?" Tessner states "Did not ask".<br><br>In deposition, Tessner says she did not complete the intake because she "Assumed he'd bond out" 16:11. But she gave a PBT and she knew the result could have caused bond revocation 11:23. |
|---|---|---|---|---|
| 1305 | Getting DG ready for court/#819 | Daily Jail Log | | |
| 1306 | Nurses leave/#819 | Daily Jail Log | | Why weren't the nurses called to look at his intake form/do a quick exam/have a conversation with DG prior to him going to court? |
| 1307 | DG to court/#819 | Daily Jail Log | | |
| 1308 | | Johnson's notes | "Sbonek shackling Greene and taking him to court". | |
| 1333 | DG back from court/Sbonek | Johnson's notes | "Sbonek bringing Greene back from court. Old bond was forfeited and new bond". | In depo, Tessner states she did not know Greene's atty argued he would detox while in jail and needed help. Also did not know Greene was scheduled to go to rehab in 2 days. Admits she knew Greene was likely to experience ETOH withdrawal 21:22.<br><br>She also knew the nurses had left without seeing Greene, and wouldn't be back until the 8th. 22:5. |
| 1705 | | Johnson's notes | "Sbonek opening food chute for dinner". | |
| 1709 | Dinner | Johnson's notes | Dinner served to Greene-he takes tray and drinks into his cell & 816 in booking'. | |
| 1720 | | Johnson's notes | "Greene puts tray back on food chute'. | |
| | | | December 5, 2017 | |
| 0014 | | Johnson's notes | Greene receives TP. | Tessner's depo states she "forgot" to complete Greene's booking on 12/5. 62:12. |
| 0806 | Breakfast | Johnson's notes | "Trustees serving breakfast. Greene takes tray and drinks into cell". | |
| 0815 | | Johnson's notes | "Appears that Greene takes food off tray and puts it on window ledge for later". | |
| 0816 | | Johnson's notes | "Greene sets tray and cups on food chute". | |
| 0915 | Tremors | Johnson's notes | "Greene asking Tessner if he can use the phone to have money put in his account from his family so he can by a snack pack. Tessner explaining the power is out so the | Tessner's depo states she noticed tremors but did not note them in the log 31:22. Denies noticing hallucinations 32:8. |

| | | | phones don't work but that when the power comes back on, he can make a call". | First sign of tremors. |
|---|---|---|---|---|
| 0918 | | Johnson's notes | "Greene asking Tessner how to become a trustee and Tessner explaining to process". | |
| 1155 | | Johnson's notes | "Greene asks Tessner for the Uno deck on the shelf, but it's empty. Greene then asks for a puzzle and Tessner brings him one". | |
| 1209-1241 | Lunch | Johnson's notes | Lunch. | Does DG eat? |
| 1710-1745 | Dinner | Johnson's notes | Dinner. | Does DG eat? |
| 1712 | | Johnson's notes | "Greene asking Avalos if he can be put in population. Avalos told him not yet, but that he would make sure the night shift would get him a shower". | |
| 2235-2247 | Shower | Johnson's notes | Out for shower. | |
| | | | **December 6, 2019** | |
| 0304-0551 | | Johnson's notes | Steffes speaks with DG, DG shuts food chute, opens food chute. | Did he sleep? |
| | Insomnia/McDonald | Incident Report | Christman states she did not see DG sleep. | First documentation of insomnia. |
| 0752 | | Johnson's notes | Asks when he can have breakfast. | |
| 0807-0817 | Breakfast | Johnson's notes | Breakfast. | Does DG eat? |
| 0942-0948 | Phone calls | Johnson's notes | Out for phone call. | |
| 0946 | | Johnson's notes | "Greene uses fax line phone appears to make 2 phone calls" | |
| 1001-1125 | | Johnson's notes | Requests visitation form | Do we have a copy of the visitation form? |
| 1200 | Hallucinations/McDonald | Incident Report | Christman told McDonald "around noon DG was starting to detox. Would talk normal then hallucinate asking for tools to fix ceiling." That he believed water was coming from ceiling. She stated she never saw him sleep. | First documentation of hallucination.<br><br>Hallucinations are defined as experiences and sensations that are not comprehensible to others. |
| 1207-1237 | Lunch | Johnson's notes | Lunch | Does DG eat? |
| 1340 | Hallucinations and Agitation/811 | Daily Jail Log Report | "Acting erratic appears to be hallucinating and to be detoxing". | First documentation of agitation. |
| 1451 | | Johnson's notes | Receives Ind. Kit from Christman | "Toothbrush especially". |
| 1531 | Moved cell | Johnson's notes | "Moved him to D02 & gave him a cup." | |
| 1531 | Hallucination | Johnson's notes' | He felt that the wall had "faults" and need to fix. Moved him to calm him and clean cell". | |
| 1616 | Hallucination | Johnson's notes | "Baerlocher, Christman, and Stephan into D02 to check on Greene. He was reaching into drain. We chatted about how he felt, | Second documented hallucination. |

13

| | | | he asked about dinner and time". | |
|---|---|---|---|---|
| 1626 | Hallucination | Johnson's notes | "Soap in drain". | Third documented hallucination. |
| 1626 | | Johnson's notes | "Continuing to put hand in drain". | |
| 1708-1734 | Dinner | Johnson's notes | Dinner. | Did DG eat? |
| 1741 | Agitation | Johnson's notes | "He was yelling he wanted to leave told him he had to see the judge first he said ok". | |
| 2126 | Hallucination | Johnson's notes | "Speaking with him about trash he thought was on the floor?" | |
| December 7, 2017 | | | | |
| 0036 | Insomnia Agitation | Johnson's notes | Staff have been speaking with DG since 0013. At 0036 notes state Greene was perhaps kicking door? | |
| | | Incident Report/McDonald | | Foster states he did not see DG sleep. |
| 0051 | Agitation | Johnson's notes | Staff took Greens crocs because he wouldn't stop kicking the door. | |
| 0430 | Hallucination  Mental Health Service Request/Larry Foster #823 | Mental Health Service Request | Routine request sent to CMH. "Talking to wall". | Contract between Sheriff and NLCMH only provided services for SA Disorders if they occurred in conjunction with another diagnosable SMI.  Why did Foster request NLCMH instead of the nurse? |
| 0454 | Hyperthermia | Johnson's notes | "Took off uniform". | First documentation of feeling overheated/hyperthermia. |
| 0505 | | Johnson's notes | "Steffes placing mop in front of D02 – possibly green had urinated at door". | |
| 0600-"ish" | Hyperthermia  Hallucination | Johnson's notes | He asked for tools? I explained he couldn't have them in jail. Asked how he felt and he wasn't wearing uniform ("hot") he again wanted to leave, see judge." | |
| 0615 | Agitation | Johnson's notes | "Chrisman observing Greene-telling ho quiet down". | |
| 0620 | Hallucination Agitation Disoriented/Christman | Daily Jail Log Report | "Inmate DG is still showing signs that he is still going through withdrawals from alcohol. He has tried to leave the cell, asking for a hammer and nails, thinking his mother are speaking to him, he periodically yells lout or bangs door, floor and walls. He is compliant and pleasant when speaking to him, but is confused and does not comprehend that he is here in the jail." | |
| 0713 | Agitation/Christman | Daily Jail Log Report | "...he is still trying to get out of his cell." | |
| 0724 | Agitation/Christman | Daily Jail Log Report | "...still hyper and agitated." | |
| 0805-0832 | Breakfast. | Johnson's notes | Breakfast. "Greene takes drinks into his cell and appears to drink one". | Did he eat? |
| 0852 | Agitation | Johnson's | "Greene yelling-pounding wanted to be | |

| | | notes | released". | |
|---|---|---|---|---|
| 0926 | Hallucination<br><br>Moved to D01 | Johnson's notes | Moved to D01 so D02 can be cleaned again. "He was moving his hands like he was pulling string.  He also thought I need to pat him down again." | |
| 0936 | Agitated<br><br>Disoriented | Johnson's notes | "He was trying periodically to figure out how to open the door.  Fluctuating between realizing he was in jail, then not.  He was angry the judge incarcerated him". | |
| 0947 | Insomnia | Jail log | "still has not slept.  Still slightly agitated." | |
| 0953 | Overheated | Johnson's notes | "Christman opening D-1 chute giving him a clean uniform to attempt to convince him to re-dress he stated he didn't want to dress." | |
| 1013 | Hallucination | Johnson's notes | "Speaking with him about the walls" | |
| 1049 | | Johnson's notes | "Greene put on sweatshirt". | |
| 1210 | Agitated | Johnson's notes | "Trying to get him to take food tray.  Shut chute so he wouldn't hurt himself—kept saying "I eat when I'm hungry". | Typed notes, which are reflected here to the left, disagree with written notes, which say:  "Johnson speaking with trustees in booking room, the opening food chute.  Trustee tried to serve-Greene pushed tray back out."  Hand-written entry has been amended to include "*so  he wouldn't hurt himself*". |
| 1211 | | Johnson's notes | "Johnson trying to serve Greene his meal.  He keeps placing his arm through chute". | |
| 1212 | Lunch/refused<br><br>Anorexia | Johnson's notes | "Greene refused meal. "Please note-not served food nor drink" Has a Styrofoam cup in cell though. | |
| 1214 | Agitated | Johnson's notes | "Gave him a cup, tried to get him to take his food tray again.  Didn't leave tray in cell because it was agitating him." | |
| 1400 | Delusional/Nanci Karczyewski, LPC | Mental Health Service Request | "Met with Dwayne.  He is delusional while experiencing alcohol withdrawal.  Dwayne admits to significant alcoholism so is struggling with DTs.  Does not appear to be risk to himself." | Delusions are defined as beliefs that conflict with reality. |
| 1411 | CMH visiting/Nanci | Daily Jail Log | Visit from mental health provider | |
| 1414 | | Johnson's notes | "Christman opening D-1 food chute.  Nanci from CMH talking to Greene." | |
| 1423 | | Johnson's notes | "Nanci done speaking with Greene". | |
| 1425 | | Johnson's notes | "We informed Nanci he refused his lunch.  Christman and Nanci back to D-1.  Nanci convinced Greene to eat saltine crackers and drink some more water". | |
| 1440 | | Johnson's notes | Taking crackers to him.  "Shut the chute, was worried he would toss stuff back out". | |
| 1441 | | Johnson's notes | "Johnson taking snacks to Greene.  He took them.  Fruit/crackers-we figured any food was good". | |

| 1514 & 1517 | CMH leaves/Nanci | Daily Jail Log | Mental health provider leaves | |
| 1708 | Agitated | Johnson's notes | Christman…"talking to him. Greene stated he eats only he's ready, I asked him to try". | |
| 1716 | Agitated | Johnson's notes | Greene stood on ½ wall, Christman had to go in cell-Stephan and Johnson in booking as well". | |
| 1717 | | Johnson's notes | "Greene drank his milk. Once it dawned on me the other drink was coffee, I removed". | |
| 1719 | | Johnson's notes | "Got him more milk because he drank the other (and we took the coffee)". | |
| 1738 | | Johnson's notes | "I had the trustees leave his tray, to give him a chance to eat/pick at it". | |
| 1752 | | Johnson's notes | "Shut chute, didn't want him putting his arm through". | This entry is absent in Johnson's written notes. |
| 1948 | Hallucinations | Renee Christman text to Katie Tessner | "Wanted to give you a head's up that Greene is still going through the DTs, has not slept nor ate much. Hallucinations, etc. CMH seen and spoke to him. She said he is showing classic signs of withdrawal. Hopefully by the time you're there he will have decided to sleep. He has been monitored closely…" | |
| 1957 | | Tessner text to Christman | " I had a suspicion that Green was going to have some issues, but hoped it wouldn't be so…." | |
| 1957 | | Christman text to Tessner | "(I am). Except for the DTs. LOL. If your calm and level spoken with Greene he doesn't go off at least…." | |
| 2237 | | Johnson's notes | "Greene put on uniform". | |
| 2233 | | Johnson's notes | "Greene seems to be sitting down more often from like 2240". | |
| Note date: 12/27 | Notification of failure to present/Sacred Heart Rehab Center | Faxed Letter | Notification that DG failed to show up on 12/7 for a planned stay at the Inpatient Detox and Residential Treatment Center | |
| | | | December 8, 2017 | |
| 0009 | Insomnia | Johnson's notes | "Foster speaking with Greene". | |
| | Insomnia/McDonald | Incident Report | Suiter tells McDonald he did not see DG sleep. | |
| 0613 | Insomnia Hallucinations | Johnson's notes | "Greene moving mat around". | Tessner's depo says she was advised at shift change that Greene had not slept all night. 52-6. And she was advised Greene had been hallucinating 52-19. |
| 0720 | | Johnson's handwritten notes | "Tessner into booking with med cart". | |
| 0728 | | Johnson's notes | "Greene can still be seen standing/camera". | |
| 0742 | | Johnson's handwritten | "Tessner back to booking from passing meds". | |

16

|  |  | notes |  |  |
|---|---|---|---|---|
| 0743 |  | Johnson's notes | "Avalos to D-1 to check on Greene". | Tessner's depo says she was administering medications in the jail when man-down was called 46-21.<br><br>Yet she says she doesn't recall the nurse doing anything special for patients undergoing withdrawal 49-22.  Usually meds are ordered if someone is a probably withdrawal patient.  Has she never administered meds for withdrawal?<br><br>Avalos deposition page 31-25 and 32-1 says he saw DG down, felt for a pulse, and it was weak so he started CPR.  Does Avalos have a CPR card?  Should never star CPR when a patient has a pulse. |
| 0744 |  | Johnson's notes | "Tessner to D-1, then directed to get AED" |  |
| 0745 |  | Johnson's notes | "Tessner back with AED". |  |
| 0750 | Mobile Medical Response arrives | Johnson's notes | "MMR in Booking Room" |  |
| 0800 |  |  |  | Was nurse supposed to be here at 8AM on 12/8? |
| 0815 |  | Johnson's notes | "MMR exiting Jail security garage with Greene". |  |
| 0830 | Normal Temp | ED notes | Temp 97.3 at 0830 upon arrival at Munson Healthcare Grayling Hospital ED. |  |
| 1040 | Normal temp | ED notes | Temp 97.2 at 10:40 AM upon transfer to Munson Medical center in Traverse City. |  |
| 12/12 | Pronounced | Autopsy Report<br><br>Autopsy Photos | Cause of death:  complications of chronic ethanol use. Abrasions on feet were noted. | In depo 60-11 Stephen says medical emergency would be when· "Like if he cracked his · · ·head open or cut his hand or cut his foot because when · · ·they bang on the door because sometimes some people · · ·cut their feet ". |
|  | Abrasions on right foot | Autopsy photos | Autopsy photos: #3091982_DSC_0025 and 0029-0031 show abrasions on the ball of DG's right foot. | In depo 60-11 Stephen says medical emergency would be when· "Like if he cracked his · · ·head open or cut his hand or cut his foot because when · · ·they bang on the door because sometimes some people · · ·cut their feet ". |

\* Johnson's notes:  are notes written by the Crawford County Corrections Officers that were documented for purposes of creating the Jail Video Log.  Not all of the information contained in the notes is within the jail video log.

**Appendix B**

**Michigan Department of Corrections**
**County Jail Services Unit**
**Administrative Rules for Jails and Lockups**

**R 791.728 Health care.**
A facility shall establish and maintain written policy, procedure, and practice which provide that all medical, psychiatric and dental inmate matters involving medical judgment are the sole province of the responsible physician, dentist or other qualified health professional.

**R 791.729 Health care personnel qualifications.**
Personnel who provide health care services to inmates shall be licensed by the state of Michigan when required. Verification of current credentials and job descriptions shall be on file in the facility.

**R 791.730 Pharmaceuticals.**
(1) The administrator or medical director, or both, of a facility shall establish policies and procedures that are in compliance with local, state, and federal regulations governing the distribution, dispensing, prescribing, administering, or disposing of any controlled substance or prescribed medication affecting an inmate.

 (2) Drugs may be dispensed for patients only pursuant to the written orders of a licensed practitioner acting within the scope of his or her license.

**R 791.731 Health screening.**
A facility shall establish and maintain written policy, procedure, and practice that require medical, dental, and mental health screening to be performed on all inmates by a trained staff member designated by the facility administrator. All findings are recorded on a form approved by the facility's designated health authority. The screening includes at least all of the following:

(a) Inquiry into all of the following:
> (i) Current illness and health problems, including venereal diseases and other infectious diseases.
> (ii) Dental problems.
> (iii) Mental health problems.
> (iv) Use of alcohol and other drugs, including all of the following information:
>> (A) The type of types of drugs used.

18

(B) Mode of use.

(C) Amounts used.

(D) Frequency used.

(E) Date or time of last use.

(F) History of any problems that may have occurred after ceasing use, for example, convulsions.

(v) Past and present treatment or hospitalization for mental disturbance or suicide.

(vi) Possibility of pregnancy.

(vii) Other health problems designated by the responsible physician.

(b) Observation of all of the following:

(i) Behavior, including all of the following:

(A) State of consciousness.

(B) Mental status.

(C) Appearance.

(D) Conduct.

(E) Tremor.

(F) Sweating.

(ii) Body deformities and ease of movement.

(iii) Condition of skin, including any of the following:

(A) Trauma markings.

(B) Bruises.

(C) Lesions.

(D) Jaundice.

(E) Rashes and infestations.

(F) Needle marks or other indications of drug abuse.

(c) The medical disposition of inmate shall be to 1 of the following:

(i) General population.

(ii) General population with prompt referral to appropriate health care service.

(iii) Referral to appropriate health care service for emergency treatment.


**R 791.732 Health appraisals.**

(1) A facility shall establish and maintain written policy, procedure, and practice which require that a health appraisal for each inmate be completed by a trained health care person within 14 days after arrival at the facility. If there is documented evidence of a health appraisal within the previous 90 days, then a new health appraisal is not required, except as determined by the designated health authority. A health appraisal includes at least all of the following:

(a) Review screening performed under R 791.732.

(b) Collection of additional data to complete the medical, dental, mental health, and immunization histories.

(c) Laboratory or diagnostic tests, or both, to detect communicable disease, including venereal disease and tuberculosis.

(d) Recording of all of the following:

       (i) Height.

       (ii) Weight.

       (iii) Pulse.

       (iv) Blood pressure.

       (v) Temperature.

(e) Other tests and examinations, as appropriate.

(f) Medical examination, including review of mental and dental status.

(g) Review of the results of the medical examination and tests and identification of problems by a physician or other qualified health care personnel.

(h) Initiation of therapy when appropriate.

(i) Development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation.

(2) An inmate diagnosed as being contagious shall be removed from the facility or quarantined in well-ventilated quarters and separate from other inmates. In a case of suspected contagion, the administrator shall consult with the facility's designated health authority or the local health department.

3) If, in the opinion of a licensed physician, an inmate needs hospitalization, the administrator, as directed by the physician, shall deliver the inmate to the nearest hospital or to any hospital designated by the county.

Appendix C

**A selection of pertinent (2008) National Commission on Correctional Health Care Standards for Jails**

**J-A-01: ACCESS TO CARE (*essential*)**

**Standard**

Inmates have *access to care* to meet their serious medical, dental, and mental health needs.

**Compliance Indicator**

The responsible health authority (RHA) identifies and eliminates any barriers to inmates receiving health care.

**Definition**

*Access to care* means that, in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered.

**Discussion**

This standard intends to ensure that inmates have access to care to meet their serious health needs and is the principle upon which all National Commission on Correctional Health Care standards are based. It is also the basic principle established by the United States Supreme Court in the 1976 landmark case, *Estelle v. Gamble.*

Unreasonable barriers to inmates' access to health services are to be avoided. Examples of unreasonable barriers include the following:
1. Punishing inmates for seeking care for their serious health needs;
2. Assessing excessive fees that prevent or deter inmates from seeking care for their serious health needs; or assessing any fees for treatments arising from sexual abuse
3. Deterring inmates from seeking care for their serious health needs, such as holding sick call at 2:00 a.m., when this practice is not reasonably related to the needs of the institution.

**Optional Recommendations**

The NCCHC position statement Charging Inmates a Fee for Health Care Services offers additional guidance about fee-for-service programs; it is available at www.ncchc.org.

**J-A-05: POLICIES AND PROCEDURES (*essential*)**

**Standard**

The facility has a manual or compilation of *policies* and defined *procedures* regarding health care services that addresses each applicable standard in the *Standards for Health Services in Jails*.

**Compliance Indicators**

1. Health care policies and procedures are site specific.
2. Each policy and procedure in the health care manual is reviewed at least annually, and revised as necessary under the direction of the responsible health authority (RHA). The manual bears the date of the most recent review or revision and, at a minimum, the signatures of the facility's RHA and responsible physician.
3. Other policies, such as those for custody, kitchen, industries, or corporate, do not conflict with health care policies.
4. The manual or compilation is accessible to health staff.
5. All aspects of the standard are addressed by written policy and defined procedures.

**Definitions**

A *policy* is a facility's official position on a particular issue related to its operations.

A *procedure* describes in detail, sometimes in sequence, how a policy is to be carried out.

**Discussion**

This standard intends to ensure that policies and procedures are written and available to staff. A policies and procedures manual is an important reference for new as well as established health staff.

A facility need not develop policies and procedures for standards that do not apply to it, such as G-09 Counseling and Care of Pregnant Inmate when females are not held at the facility and G-03 Infirmary care when the facility does not have an infirmary.

Some RHAs insert a signed and dated declaration at the beginning of the manual stating that policies and procedures have been reviewed and approved. Others require that each policy and procedure be signed by the RHA. Either is acceptable. However, when changes to individual health services policies are made, they must be dated and signed individually by the RHA and responsible physician.

This standard recognizes that all policies and procedures governing health services operations may not be promulgated by the same authority. For example, policies on correctional officer training, smoking, and custody-ordered restraints are promulgated by the custody administration rather than health services. It is not necessary for health services to write its own policy statements on such topics. Rather, the governing policies may be compiled as an addendum to the health services policy manual. Authorizing dates and signatures are required on all policies and procedures regardless of issuing authority, but those not promulgated by health services need not be signed by the RHA and responsible physician.

22

Annual review of policies, procedures, and programs is good management practice. This review facilitates incorporating changes made during the year into the agency's manual and encourages decisions about previously discussed but unresolved matters.

**Optional Recommendations**

Each policy should be cross-referenced with the appropriate NCCHC standard or standards. However, if is not necessary that each standard have a separate policy and procedure statement (i.e., more than one standard may be addressed in the same policy and procedure, or several policies may address a single standard).

### J-G-06: INTOXICATION AND WITHDRAWDR (*essential*)

**Standard**

Specific protocols exist for inmates under the influence of alcohol or other drugs or those undergoing withdrawal.

**Compliance Indicators**

6. Established protocols are followed for the assessment, monitoring, and management of individuals manifesting symptoms of alcohol and drug intoxication or withdrawal.
7. The protocols for intoxication and detoxification are approved by the responsible physician, are current, and are consistent with nationally accepted treatment guidelines.
8. Detoxification is done only under physician supervision in accordance with local, state, and federal laws.
9. Inmates experiencing severe, life-threatening intoxication (overdose) or withdrawal are transferred immediately to a licensed acute care facility.
10. Individuals at risk for progression to more severe levels of intoxication or withdrawal are kept under constant observation by qualified health care professionals or health-trained correctional staff, and whenever severe withdrawal symptoms are observed, a physician is consulted promptly.
11. If a pregnant inmate is admitted with opiate use (including the partial agonist buprenorphine), a physician is contacted so that the opiate dependence can be assessed and appropriately treated.
12. The facility has a policy that addresses the management of inmates, including pregnant inmates, on methadone or other similar substances. Inmates entering the facility on such substances have their therapy continued, or a plan for appropriate treatment of the methadone withdrawal syndrome is initiated.
13. All aspects of the standard are addressed by written policy and defined procedures.

**Definitions**

*Detoxification is the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug on which the person is physiologically dependent, of one that is cross-tolerant to it, or of one that medical research has demonstrated to be effective.*

23

*Opiates* are any preparation or derivative of opium, as well as opioid, a synthetic narcotic that resembles an opiate in action but is not derived from opium.

**Discussion**

The intent of this standard is that inmates who are intoxicated or undergoing withdrawal are appropriately managed.

Significant percentages of inmates admitted to correctional institutions have a history of alcohol and/or other drug abuse.  Newly incarcerated individuals may enter intoxicated or develop symptoms of alcohol or other drug withdrawal.  The withdrawal may be mild, moderate, or severe.  Alcohol withdrawal is the abstinence syndrome with the highest mortality rate, although withdrawal from opiates and depressant drugs (e.g., benzodiazepines) may be, on occasion, life-threatening. Barbiturate withdrawal, while less common in correctional settings, also may be life-threatening. Mild to moderate forms of withdrawal can worsen without appropriate treatment, and continued assessment is required.

The treatment for most non-life-threatening withdrawal is amelioration of symptoms, which can be managed in the convalescent or outpatient setting.  Abstinence syndromes in certain groups (including those who are psychotic, geriatric, epileptic, pregnant, adolescent, or otherwise medically ill) may require different protocols.  For example, current medical thinking is that pregnant patients should not be withdrawn from a methadone maintenance program.

As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions.  In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times.

Training for correctional officers includes recognizing the signs and symptoms of intoxication and withdrawal (see C-04 Health Training for Correctional Officers).  Intoxication and withdrawal also increase the potential for suicide, a factor that is to be incorporated into the staff training on  suicide prevention (see G-05 Suicide Prevention Program).  For additional guidance, see Appendix H-Guide to Developing and Revising Alcohol and Opioid Detoxification Protocols.

**Optional Recommendation**

Resources that the facility can use to develop policies, train staff, and obtain further information include the American Society of Addiction Medicine and the American Academy of Addiction Psychiatry.

Rebecca E. Luethy, MSN, RN, LNC, CCHP

14961 Straub Hill Lane                                    314-308-9504 (cell/txt)
Chesterfield, MO  63017                                   reluethy@gmail.com

---

### PROFESSIONAL EXPERIENCE

**Expert Witness**                                        **2010-present**

Self-employed as a nursing expert witness in the field of correctional health care.

*Litigation of interest-past three years*

Mary Gordon v. County of Orange et al (2015) (Case No.SACV14-01050 CJC); 1983 action for the
    wrongful death of an inmate. Represented the plaintiff through The Sehat Law Firm, PLC.

Ruffin v Cuyahoga County, et al (2016). (Case No. 1:16-CV-00640) 1983 action for the wrongful death
    of an inmate. Represented the plaintiff through David B. Malik, Esq.

Mounts v County of Yuba, et al (2017), (Case No.2:16-CV-01544-JAM-GGH) action for claims for
    damages:  permanent loss of vision to left eye.  Represented the plaintiff through Herrig & Vogt,
    LLP.

Wanda Giles, et al v County of San Bernardino (2017), (Case No. CIVDS 141 7030) action for wrongful
    death of an inmate.  Represented the plaintiff through Ripley and Associates.

Elaine Bridges and Jimmie Lee Moore v. County of Lost Angeles, et al (2017) (LASC South District
    Case No. TC028303); action for wrongful death of an inmate.  Represented the plaintiff through
    The Sweeny Firm Lawyers and Manning & Kass, Ellrod, Ramierez, Trestor, LLP.

Summer Strickler v Blaine County, Hill County, and the State of Montana (2018), (Case No. DDV-12-
    0937) action for negligence and wrongful death.  Represented plaintiff through Patrick Flaherty,
    Esq.

Guardado et al vs. County of San Bernardino et al, (2018-current), (USDC Case No. 5:17-cv-00797)
    action for wrongful death.  Representing plaintiff through Law Offices of Dale K. Galipo.

**Centurion**                                            **October 2011-present**

A privately-held organization that provides healthcare services in prisons jails across the nation.

*Senior Strategist* - Drive operations development and success in existing business for Centurion, a
    wholly-owned subsidiary of the Centene Corporation.

- Introduce new business solutions to support Centurion;
- Participate in proposal development for Centurion LLC;
- Create staffing plans for Centurion LLC;
- Ensure seamless startups and transitions for Centurion LLC;
- Advisor regarding comprehensive medical services programming to executive staff;
- Introduce Centene programs and specialty companies (Envolve) to the corrections market.

**Mid America Health, Inc.**                                                    **Feb.-Sept. 2011**

A privately-held organization that provides dental and telehealth services to corrections and the United States military.

*Vice President* – Drive business development success and operations excellence throughout the organization.

**Correctional Medical Services, Inc.  (now *Corizon Health*)**               **1985-2011**

A privately-held organization that provides healthcare services in prisons and jails nationally.

***Director, Business Development (1995-2011)***
***Area Sales Manager (1990-1995)***
***Clinical Programs Manager (1988-1990)***
***Health Services Administrator (1985-1988)***

**Clinical Positions**                                                          **1983-1985**
Staff Nurse:  Our Lady of Lourdes Hospital, Binghamton, NY, 2/84-7/85.  Medical gerontology unit. Duties included Team Leader, Evening Charge Nurse.
Staff Nurse:  Mercy South Hospital, Fairfield, OH, 9/83-1/84. Telemetry Unit.

**EDUCATION/CERTIFICATIONS/ASSOCIATIONS**

- MS in Nursing, State University of New York at Binghamton, Binghamton, NY.  **Clinical Nurse Specialist** program with emphasis on Family Health.
- BS in Nursing Science, Valparaiso University, Valparaiso, IN.  **Missouri RN License:  RN 109530**.
- Certified Correctional Health Professional, National Commission on Correctional Health Care.
- Legal Nurse Consultant certificate, Auburn University, Auburn, AL.
- March of Dimes® Nurse of the Year® committee member, 2016, 2017, 2018.
- Member, Association of Women Executives in Corrections
- Member, American College of Correctional Physicians
- Member, National Commission on Correctional Health Care
- Member, American Correctional Association

**PUBLICATIONS/PRESENTATIONS/AWARDS**

- Luethy, R., "A Successful Health Coaching and Lifestyle Management Program for Diabetics in Prison", *CorrDocs.* Vol. 21, Issue 2, Summer 2018.

- Case-In-Point® Platinum Award Winner 2017 Disease Management/Population Health - Focus on Wellness Prison Diabetic Program
- Case-In-Point® Platinum Award Winner 2017 Patient Engagement and Education - Focus on Wellness Prison Diabetic Program
- Case-In-Point® Platinum Award Winner 2018 Women's & Children's Case Management -- Parenting Journal for incarcerated Women
- Hermes® Creative Awards Gold Winner for H.E.R., Healing, Empowerment, Resources: My Family Journal
- DecisionHealth Annual Conference:  Correctional Health Lifestyle Management, April, 2018
- NCCHC: various presentations. Request list.
- Schoenly, L. (2016). Quick Start for Correctional Nurses:  Is Correctional Nursing for You? R.E. Luethy (Ed.). New York, NY: Anchor.
- Guest lecturer:  Washington University Olin School of Business, 2016, 2017, 2018.

**Compensation**

$3,000.00 initial retainer
$200.00/hour case work
$1600.00/day testimony
$200.00/hour travel
Reasonable travel expenses

**Signature**

Rebecca E. Luethy, RN, MS
14961 Straub Hill Lane
Chesterfield, MO 63017
314-308-9504
reluethy@gmail.com

Signature _____         Date ___5/28/19_____
            Rebecca E. Luethy



# Certified Correctional Health Professional

## EXPERTISE... LEADERSHIP... RECOGNITION... SUCCESS

# Candidate Handbook



The Premier National Certification Program for Professionals in Correctional Health Care



A Program of the National Commission on Correctional Health Care

CCHP Board of Trustees
1145 W. Diversey Pkwy.
Chicago, IL 60614
www.ncchc.org/cchp

## CERTIFICATION FOR CORRECTIONAL HEALTH PROFESSIONALS

### Professional Recognition

Participation in NCCHC's Certified Correctional Health Professional program is an investment in your future that will give you a professional edge. Certification recognizes the mastery of national standards and the knowledge expected of leaders in this complex, specialized field. The CCHP credential is a symbol of achievement and leadership, and is highly valued not only by participants but also by employers.

Correctional health professionals face unique challenges: working within strict security regulations, dealing with crowded facilities, understanding the complex legal and public health considerations of providing care to incarcerated populations and more. Achieving professional certification is the surest way to prove that you have the tools to meet these challenges.

### Purpose

The purpose of the CCHP examination is to measures a candidate's knowledge, understanding and application of national standards and guidelines essential to the delivery of appropriate health care, the basic legal principles for practicing within a correctional health care system, the ethical obligations of correctional health professionals and the role of health care professionals in delivering care in the correctional environment. The examination does not measure clinical competency.

### Eligibility

Professionals from many different disciplines and work settings have earned CCHP certification. All correctional health professionals are encouraged to apply. Eligibility requirements are as follows:

- Credentials appropriate to the applicant's field and employment position, and the requirements of the state in which the applicant is licensed. The credentials must be free of any restriction that would limit professional practice solely to the correctional setting. If a license or credential is not required for practice, then the credential is not required for certification.
- Good character and fitness. Character and fitness is one of the most important components of the application. An applicant's record of conduct should justify the trust of patients, employers and others.

### Application and Candidacy

Elements of the application:
- Application form
- Resume or curriculum vitae documenting education and professional experience
- Copies of valid credentials, e.g., license, diploma (see Eligibility above)
- Signed application statement
- Examination fee
- Exam registration form (through NCCHC or PSI)

For application deadlines for each exam, see www.ncchc.org/CCHP/calendar.

Once the application, supporting materials and examination fee have been received and approved, applicants will receive acknowledgment of their candidacy to take the CCHP exam. Candidates must register before the registration deadline for the exam they wish to take. Incomplete applications will be kept on file for six months, after which time a new application and fees must be submitted. A candidate must take the exam within one year of the application approval date.

CERTIFICATION FOR CORRECTIONAL HEALTH PROFESSIONALS

CCHP Exam Content Outline

I. GOVERNANCE AND ADMINISTRATION (20%-25%)
   a. Access to care
   b. Responsible health authority
   c. Medical autonomy
   d. Administrative meetings and reports
   e. Policies and procedures
   f. Continuous quality improvement program
   g. Privacy of care
   h. Health records
   i. Procedure in the event of an inmate death
   j. Grievance process for health care complaints

II. HEALTH PROMOTION, SAFETY, AND DISEASE PREVENTION (10%-15%)
   a. Healthy lifestyle promotion
   b. Infectious disease prevention and control
   c. Clinical preventive services
   d. Medical surveillance of inmate workers
   e. Suicide prevention and intervention
   f. Contraception
   g. Communication on patients' health needs
   h. Patient safety
   i. Staff safety

III. PERSONNEL AND TRAINING (5%-10%)
   a. Credentials
   b. Clinical performance enhancement
   c. Professional development
   d. Health training for correctional officers
   e. Medication administration training
   f. Inmate workers
   g. Staffing
   h. Health care liaison
   i. Orientation for health staff

IV. ANCILLARY HEALTH CARE SERVICES (8%-14%)
   a. Pharmaceutical operations
   b. Medication services
   c. Clinic space, equipment and supplies
   d. On-site diagnostic services
   e. Medical diets
   f. Patient escort
   g. Emergency services and response plan
   h. Hospital and specialty care

CERTIFICATION FOR CORRECTIONAL HEALTH PROFESSIONALS

V.  PATIENT CARE AND TREATMENT (15%-20%)
- a.  Information on health services
- b.  Receiving screening
- c.  Transfer screening
- d.  Initial health assessment
- e.  Mental health screening and evaluation
- f.  Oral care
- g.  Nonemergency health care requests and services
- h.  Nursing assessment protocols and procedures
- i.  Continuity, coordination and quality of care
- j.  Discharge planning

VI.  SPECIAL NEEDS AND SERVICES (12%-18%)
- a.  Patients with chronic disease and other special needs
- b.  Infirmary-level care
- c.  Mental health services
- d.  Medically supervised withdrawal and treatment
- e.  Counseling and care of the pregnant inmate
- f.  Response to sexual abuse
- g.  Care for the terminally ill

VII.  MEDICAL-LEGAL ISSUES (8%-14%)
- a.  Restraint and seclusion
- b.  Segregated inmates
- c.  Emergency psychotropic medication
- d.  Therapeutic relationship, forensic information and disciplinary actions
- e.  Informed consent and right to refuse
- f.  Medical and other research
- g.  Executions (prisons only)

# CERTIFICATION FOR CORRECTIONAL HEALTH PROFESSIONALS



The Certified Correctional Health Professional (CCHP) program
is sponsored by the National Commission on Correctional Health Care.



National Commission on Correctional Health Care
1145 W. Diversey Parkway
Chicago, Illinois 60614
Phone: (773) 880-1460
Fax: (773) 880-2424
cchp@ncchc.org
www.ncchc.org