# Exhibit 49

{00658286.DOCX}



1664 Rolling Woods Drive
Troy, Michigan 48098-4385

Phone: 248 641 0988
Fax: 248 641 0788

Email: danielbkennedy@comcast.net
www.forensiccriminology.com



July 9, 2019

Haider A. Kazim, Esq.
Cummings McClorey Davis Acho
310 West Front Street
Suite 221
Traverse City, MI 49684

RE:   *Estate of Dwayne Greene v. Northern Lakes CMH et al.*
      File No. 2:18-cv-11008-MAG-DRG

Dear Mr. Kazim:

You will recall our telephone conversation in mid-June concerning the above-styled case. During that conversation, you asked if I would review the file in this matter and comment on the actions of Crawford County Sheriff's Office personnel and of select employees of Northern Lakes Community Mental Health Authority. In particular, you asked me to look at this file from the perspective of appropriate jail policies and procedures with appreciation of a sheriff's care, custody, and control obligations. I have formed a number of opinions in this matter although I would appreciate an opportunity to supplement this report should the court allow.

## The Case

By now, enough expert reports have been written which detail the basic facts of this case. In summary, however, Mr. Dwayne Green was incarcerated in the Crawford County Jail from Monday afternoon, December 4, 2017, until he collapsed during the morning of Friday, December 8, 2017, and died a few days later after being taken off life support. His estate filed suit under 42 USC 1983 arguing that the Crawford County Sheriff's Office and Northern Lakes Community Mental Health Authority deprived him of his constitutional rights to appropriate medical care under the 8th Amendment. In essence, plaintiff's estate argues that Mr. Greene suffered from Alcohol Withdrawal Syndrome up to and including Alcohol Withdrawal Delirium (DT) and that he was offered no medical attention while in custody until the time he died. He was placed in an observation cell in the booking area and merely observed as he manifested agitation, hallucinations, and other pathological signs.

## Expert Background

I believe myself qualified to opine on this matter due to my professional and academic involvement with the field of corrections over the past fifty years. Early in my career, I worked as

Haider A. Kazim, Esq. -2- July 9, 2019

a counselor on the midnight shift for the Federal Prerelease Guidance Center (a halfway house operated by the Federal Bureau of Prisons) located in Detroit. I also served as a probation officer for Detroit Recorder's Court handling men's felony cases. In that capacity, I visited numerous jails on a regular basis. After receiving my Ph.D. from Wayne State University, I directed the Macomb County Criminal Justice Center where we provided basic training for police officers and in-service training for corrections officers. Around this time, I also received my licensure from the State of Michigan as a Master's Social Worker–Clinical and Macro.

I joined the criminal justice faculty at the University of Detroit in 1977, where we offered the Master of Correctional Science degree as well as the Bachelors of Art in Criminal Justice. I taught courses in criminology and penology for over thirty years and chaired the department for ten years.

While at the University of Detroit, we developed a five-course educational program which allowed our students to receive preferential selection as corrections officers for the Michigan Department of Corrections. I have also provided training for the Oakland County Sheriff's Office and training as well as consulting for the Wayne County Sheriff's Office. In recognition of my work in criminal justice and corrections, I was appointed Special Deputy Sheriff for Wayne County and Administrative Reserve Deputy for Oakland County (both are honorary positions).

In addition, I served as a consultant on correctional program development to the State of Massachusetts, as a consultant to the U.S. Virgin Islands Law Enforcement Planning Commission, and as a member of the U.S. Virgin Islands Task Forces on Crime Prevention and Corrections. I also participated in evaluation of such activities as public detoxification programs (Detroit) and predelinquent diversion programs (Macomb County Juvenile Court, Michigan).

My academic work in corrections has involved publishing numerous articles relevant to prisoner rehabilitation, prevention of jail suicide, and drug-related healthcare issues. This work has appeared in academic journals as well as the American Jail Association's principle organ, American Jails. Over the years, I have also testified as an expert in both federal and state courts and have consulted on numerous other jail-related civil cases which never reached trial level. More specific information concerning my professional involvement in the field of corrections can be found in my vita.

## Foundation for Opinions

Before arriving at the opinions expressed below, I reviewed the expert reports of Michael Berg; Dr. Herbert Malinoff; Dr. Valilis Pozios; Terry Fillman, RN; Gerald Papazian, PLC; Joseph Lothschutz, CPA; C. Dennis Simpson, Ed.D.; and Stephanie Nofar, MA, LPC. I also studied depositions given by Stacey Kaminski, Sheriff Kirk Wakefield, Nanci Karczewski, Randell Baerlocher, and Katie Tessner.

Haider A. Kazim, Esq.                          -3-                            July 9, 2019

Preparatory to writing this report, I also reviewed numerous documents, including NCCHC standards, ACA standards, and Michigan Administrative Rules for Jails and Lockups. I reviewed relevant Crawford jail policies, inmate records, incident reports, and jail logs. I also studied jail photos as well as Michigan Department of Corrections jail inspection records. As is my practice, I also reviewed current literature concerning the problem of alcohol withdrawal in jail, both urban and rural. Finally, I reviewed the Inter-Agency Agreement between Crawford County and CMH, and the CMH Jail Services policy.

### Opinion 1

*Evolving standards of decency and increasing liability costs demand that sheriffs address the medical needs of their prisoners in a comprehensive manner.*

The modern sheriff is expected to professionalize the jail function and not concentrate his or her attention just on road patrol issues, as has been the case for many years. The biggest source of liability for a county is often the sheriff's office, and the biggest problem in the sheriff's office is usually the jail. In fact, the jail clearly carries the greatest risk of liability of all the functions in the sheriff's office.[1] Unfortunately, Sheriff Kirk Wakefield seems to have eschewed any particular interest in jail operations and relied on Captain Randell Baerlocher for all jail matters.

### Opinion 2

*Rising mortality rates among jail inmates require renewed efforts to provide medical care at a community-level standard of care.*

Inmates are frequently in poor health when they enter facilities, and many suffer from pre-existing illness and disease. Compared to the general population, they suffer disproportionately from infectious diseases, mental illness, hypertension, epilepsy, cancer, diabetes, and, quite notably, drug and alcohol abuse.[2] Of the five major mortality concerns (homicide, suicide, accident, illness or disease, and drug and alcohol intoxication), illness or disease, drug and

---

[1] See W. Welsh, Counties in Court (Temple University Press, 1995); and M. Martin and P. Katsampes, Sheriff's Guide to Effective Jail Operations (National Institute of Corrections, 2007), pp. 5-7, 19-21, 45.

[2] A. Binswanger et al., "Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared With the General Population," Journal of Epidemiology and Community Health 63 (2009): 912-919.

Haider A. Kazim, Esq. -4- July 9, 2019

alcohol problems, and suicide lead the mortality data.[3] The number one cause of mortality, however, is illness or disease, and this medical care should be a priority of all correctional administrators. This is not to say, however, that alcohol problems or suicide should not be fully addressed. In fact, suicide and illness tend to fluctuate, with suicide a leading cause one year and illness the next.

### Opinion 3

*Alcohol abuse and its consequences are a problem for most (if not all) jails.*

Anyone with experience in policing, jails, and criminal justice in general realizes that alcohol abuse is very common among justice-involved individuals. "Substance use disorders are the rule" in overall corrections populations.[4] Substance abuse and dependence are typically many orders of magnitude higher in prisoners than the general population.[5] One report estimated that 80 percent of adult Americans in correctional facilities have a history of involvement with drugs or alcohol.[6]

### Opinion 4

*Alcohol abuse is even a bigger problem in rural communities than in urban areas.*

For any number of reasons, rural residents have a bigger problem with alcohol and alcoholism than residents of our big cities. For example, a leading textbook on rural policing reports that "Alcohol, among the most popular of the mind-altering drugs, is of particular concern in rural areas." Arrest rates for DUIL in rural counties is 795 per 100,000 compared to cities of over

---

[3] J. Russo et al., Caring for Those in Custody: Identifying High-Priority Needs to Reduce Mortality in Correctional Facilities (Rand Corporation, 2017), p. 4; See also M. Noonan and S. Ginder, Mortality in Local Jails and State Prisons (U.S. Dept. of Justice, 2014).

[4] J. Lee et al, "Screaming for Public Purpose: Promoting an Evidence-Based Approach to Screening of Inmates to Improve Public Health," p. 258 in R. Greifinger (Ed.), Public Health Behind Bars: From Prisons to Communities (Springer, 2007).

[5] S. Fazel, et al., "Substance Abuse and Dependence in Prisoners: A Systematic Review," Addiction 101 (2006): 181-191.

[6] Mr. Greene was a heroin user and an alcoholic. The 80 percent figure is found in V. Modesto-Lowe, "Recognition and Treatment of Alcohol Use Disorders in U.S. Jails," Psychiatric Services 54 (2003): 1413-1414.

Haider A. Kazim, Esq.                          -5-                            July 9, 2019

250,000 with an arrest rate of 341 per 100,000.[7] Binge drinking among youths is also more common than in urban areas. Rural youth have a higher alcohol use and methamphetamine use than urban counterparts and, the more rural the area, the higher the use.[8]

Opinion 5

*Given the frequency of their encounters with substance abusers, corrections officers serving rural areas should be especially trained in recognizing and referring to medical authorities the signs of Alcohol Withdrawal Syndrome and Alcohol Withdrawal Delirium (Delirium Tremens or DT).*

Our nation's sheriffs deal with alcohol-related problems on a daily basis. Many people in jails simply drank too much and will sober up, possibly with hangovers. Others are chronic drinkers addicted to alcohol. Most such unfortunates will withdraw from alcohol without serious consequences. Others, however, perhaps five percent will progress to the Delirium Tremens stage, which can be life threatening.[9] Severe withdrawal symptoms are often treated with benzodiazepines while vital signs are continuously monitored. This is a medical issue, not a counseling issue.

The National Sheriff's Association published a major text in 1980 titled Jail Officers' Training Manual. It remains today an effective training tool and devotes Chapter 22 to the problem of alcohol withdrawal in custody. If an inmate shows signs of alcoholism, he should be examined

---

[7] R. Weisheit et al, Crime and Policing in Rural and Small-Town America, 3rd ed. (Waveland Press, 2006), pp. 75-76.

[8] D. Lambert et al., "Substance Abuse by Youth and Young Adults in Rural America," The Journal of Rural Health 24 (2008): 221-228. Given the distances between population centers and the lack of public transportation, rural youth are more likely to drive under the influence. See, also, K. Van Gundy, Substance Abuse in Rural and Small-Town America (University of New Hampshire, Carsey Institute, 2006), p. 16; T. Borders and B. Booth, "Rural, Suburban, and Urban Variations in Alcohol Consumption in the United States," Journal of Rural Health 23 (2007): 314-321.

[9] D. Yost, "Alcohol Withdrawal Syndrome," American Family Physician 54 (1996): 657-664; see also D. Finn and J. Crabbe, "Exploring Alcohol Withdrawal Syndrome," Alcohol Health & Research World 21 (1997): 149-156.

Haider A. Kazim, Esq. -6- July 9, 2019

by a physician (or other medical personnel). In other words, call a doctor or nurse, <u>not</u> a mental health counselor.[10]

Of particular importance to jail operations is the booking process.[11] With regard to newly admitted prisoners, it is important to determine if they have ever suffered from withdrawal in the past. If so, they will likely experience withdrawal again but with even more severe consequences. This is known as "kindling" and should serve as a red flag to jail intake officers.[12] As a booking/intake officer, CO Katie Tessner should have been aware of this phenomenon, queried Mr. Greene on this issue, and alerted the jail nurse. Again, call a doctor or nurse, not a mental health counselor.

### Opinion 6

*Neither Ms. Nanci Karczewski nor Ms. Stacey Kaminski was "deliberately indifferent" to the health care needs of Mr. Greene. When Ms. Karczewski came to the jail to interview Mr. Greene and subsequently advised jail personnel he was suffering alcohol withdrawal, she imposed no "cruel and unusual punishment" on him. Nor did Ms. Kaminski, who was not even aware of this issue at the time.*

Ms. Karczewski was trained as a mental health counselor and had no nursing or medical training. Her scope of practice was counseling and she was not empowered to make medical decisions, as would be required in the treatment of Alcohol Withdrawal Syndrome or Alcohol Withdrawal Delirium. Sheriff Kirk Wakefield admitted that accepting health care advice from her, a nonqualified healthcare professional, would be a violation of jail policy, just as it was within Northern Lakes policy not to offer it.[13]

Ms. Karczewski had no authority to "ensure" that Mr. Greene be hospitalized or otherwise attended to by a jail nurse. She had no custody or control of Mr. Greene. There is no indication she actually drew an inference he was at risk of death yet consciously ignored this inference. In fact, she stated in her deposition she did not know that Delirium Tremens required medical

---

[10] B. Bosarge et al., Jail Officers' Training Manual (National Sheriff's Association and National Institute of Corrections, 1980), pp. 238-249.

[11] Betty Bosarge, First/Second Line Jail Supervisor's Training Manual (National Sheriffs' Association and National Institute of Corrections, 1994), pp. 176-177.

[12] M. Bayard et al., "Alcohol Withdrawal Syndrome," American Family Physician 69 (2004): 1443-1450.

[13] See Sheriff Wakefield deposition at p. 56 and Stacey Kaminski deposition at pp. 58-60.

Haider A. Kazim, Esq. -7- July 9, 2019

treatment.[14] Even had she suggested hospitalization, it apparently was not jail custom or practice to medicalize alcohol withdrawal but to allow inmates to withdraw "cold turkey." In effect, Ms. Karczewski told jail personnel what they already knew, that Mr. Greene was experiencing withdrawal DT. That, alone, was deemed insufficient to take medical action by jail personnel. Ms. Karczewski was in no position to force a policy change on the Crawford County Jail. If anyone was in a position to persuade the jail to provide medical attention to Mr. Greene, it would have been the court which remanded him or his criminal defense attorney who was fully aware of the possibility of severe alcohol withdrawal. Bailiff Detmer should also have provided this "hand over" information when he returned Mr. Greene to the jail although it is unlikely this would have made a difference.

### Opinion 7

*It is doubtful the Crawford jail met select requirements imposed by the State of Michigan as listed in <u>Administrative Rules for Jails and Lockups</u> published by the County Jail Services Unit of the Michigan Department of Corrections.*

R 791.728 Health Care provides that all medical...matters involving medical judgment are the sole province of the "responsible physician," dentist, or other qualified health professional.

R 791.731 Health Screening requires the recording of health problems by the "facility's designated health authority" and the identification of other problems by "the responsible physician."

R 791.732 requires jail officials to consult with the "facility's designated health authority" or the local health department.

Although I was provided with copies of the nurses' contract with the jail, there were no copies provided to me of any contracts between the jail and an M.D. or D.O. The Crawford County Jail's procedure would be to take an ill or injured inmate to either Au Sable Urgent Care or Grayling Mercy Hospital ER. The fact that these organizations would from time to time treat jail inmates, just as they would treat anyone who walks through their doors, does not make them the jail's "designated health authority."

It is my understanding that a designated health authority is a medical professional under contract or who has a special relationship with a jail to provide medical services and to consult with the sheriff or jail administrator on overall inmate health care and related policies and procedures. In other words, there is a special relationship between the doctor and the jail wherein the doctor provides health services to the inmate population and has final responsibility for decisions related

---

[14] See Nanci Karczewski deposition at p. 51.

Haider A. Kazim, Esq. -8- July 9, 2019

to medical judgments.[15] A Physician's Assistant at a walk-in clinic is going to simply treat the patient in front of him or her and not be concerned with the overall health care policies and procedures of the jail from which said patient came.

In the deposition of Captain Randell Baerlocher, jail administrator, he acknowledges that his staff never recognized the dangers associated with alcohol withdrawal even though many on his staff had received Mental Health First Aid training discussing the need to seek medical help for Delirium Tremens.[16] Perhaps if there had been a designated health authority or physician with some sort of responsibility for the care of inmates, Captain Baerlocher would have been advised to do more for the withdrawing inmate than to simply observe his delusional, agitated behavior.[17]

Opinion 8

*The Crawford County Jail did not meet Standard J-G-07 of the Standards for Health Services in Jails, 2014 published by the National Commission on Correctional Health Care (NCCHC).*

Although the NCCHC standards are not required by federal or Michigan law, they do serve as a "gold" standard for jails wishing to ensure compliance with U.S. constitutional law in this aspect of inmate care. Standard J-G-07 requires that inmates showing signs of withdrawal are monitored by health care professionals "using recognized standard assessments at appropriate intervals until symptoms have resolved." Inmates experiencing "severe alcohol/sedative withdrawal are transferred immediately to a licensed acute care facility."

Given the intensity of Mr. Greene's withdrawal signs, this standard would have required the "responsible physician" to review the level of medical supervision available at all times and advise as a precaution that severe withdrawal syndrome "must never be managed outside of a

---

[15] See ACA, Core Jail Standards (American Correctional Association, 2010), pp. 38 and 87; and NCCHC, Standards for Health Services in Jails (National Commission on Correctional Health Care, 2014), p. 174.

[16] See deposition of Randell Baerlocher at p. 166.

[17] There is a comprehensive literature on how to recognize the stages of alcohol withdrawal as one progresses through tremulousness, hallucinosis, seizure, and Delirium Tremens, including general timelines and medical treatment recommendations, e.g., benzodiazepines. See T. Wilcox, "Developing an Effective Alcohol Withdrawal Protocol," Correctional Health Care Report 4 (May/June 2003): 49-50, 63-64; M. Mayo-Smith, "Management of Alcohol Withdrawal Delirium," Archives of Internal Medicine 164 (2004): 1405-1412; M. Mayo-Smith, "Pharmacological Management of Alcohol Withdrawal: A Meta-Analysis and Evidence-Based Practice Guideline," JAMA, 278 (1997): 144-151.

Haider A. Kazim, Esq. -9- July 9, 2019

hospital." As a related comment, J-C-04 requires all corrections officers to be trained to recognize acute manifestations of alcohol withdrawal.[18] Captain Baerlocher said at p. 31 of his deposition that there were no guidelines for his employees to follow to determine whether someone was going through withdrawal. Based on the events of December 4, 2017, through December 8, 2017, jail officials met neither of these two standards. Had they met these standards, it is likely Mr. Greene would have survived his stay at the jail.

### Opinion 9

*The Crawford County Jail did not meet Standard 1-CORE-4C-14, Detoxification, of the Core Jail Standards of the American Correctional Association (ACA).*

Although this standard is not required by law, it is clearly the preferred practice of the ACA. The standard requires detoxification under medical supervision in accordance with clinical protocols approved by the health authority. "Specific criteria are established for referring symptomatic inmates suffering from withdrawal...for more specialized care at a hospital or detoxification center."[19] Once again, Mr. Greene was not cared for under the provisions of this standard. Because Delirium Tremens is usually survivable under proper care, had this standard been followed, it is more likely than not Mr. Greene would have survived his stay at the Crawford County Jail. 1-CORE-4D-01 also requires a facility to have a "designated health authority," a subject I have already discussed.

### Opinion 10

*The ultimate cause of Mr. Greene's death was administrative failure on the part of the Crawford County sheriff and his jail administrator.*

More specifically, Sheriff Wakefield and jail administrator Captain Baerlocher did not establish clear and comprehensive policy with regard to medical treatment of inmates experiencing Alcohol Withdrawal Syndrome and Alcohol Withdrawal Delirium (failure to direct). Additionally, Sheriff Wakefield and Captain Baerlocher failed to train corrections officers for those tasks they were certain to encounter on the job.

The Crawford County Jail practiced the "old school" method of dealing with substance abuse disorder: "cold turkey" withdrawal. Correctional medicine now realizes that alcohol withdrawal is generally more health threatening and possibly fatal than heroin withdrawal. Hence, modern jails generally assign a nurse to monitor the vital signs of an inmate undergoing withdrawal

---

[18] See NCCHC standards at pp. 44, 124-125.

[19] See p. 37 of ACA's Core Jail Standards.

Haider A. Kazim, Esq. -10- July 9, 2019

and/or offer a detoxification program which provides medically assisted treatment, often in the form of benzodiazepines. Should an inmate develop Delirium Tremens, he or she is hospitalized where, with proper treatment, survival is the most likely outcome. No such policy existed at the Crawford County Jail.[20]

Then, there is the problem of effective training. Although it seems most of the corrections officers involved with Mr. Green's care were aware he was undergoing alcohol withdrawal, they did not seem to realize the possibly fatal nature of this syndrome, especially when Delirium Tremens sets in. A number of them identified Mr. Greene as suffering "DTs" but did not regard this as a medical emergency which called for hospitalization; instead, they called for a mental health counselor. There is no evidence to suggest any of the corrections officers were aware of the "kindling" effect wherein any previous Alcohol Withdrawal Syndrome experience forecasts the next one will be worse. Indeed, Captain Baerlocher himself said he wasn't familiar with the definition of DT at the time (he thought it just meant detoxing).[21] No procedure to recognize the dangers of withdrawal was ever established, i.e., no training.

## Conclusion

County jails in rural and small-town America are less likely to house armed robbers, serial rapists, and other such violent offenders than urban facilities. They are, however, likely to encounter alcohol-fueled domestic violence, disorder, and drunks.[22] As such, corrections personnel should be well versed in the medical implications of Alcohol Withdrawal Syndrome and Alcohol Withdrawal Delirium. Mr. Dwayne Greene died from the untreated effects of both. Jail policy-makers failed to anticipate and respond adequately to the Alcohol Withdrawal Syndrome suffered by Mr. Greene and, undoubtedly, other inmates before him. This was a policy failure. It also appears that corrections personnel were insufficiently trained in the possible fatal consequences of untreated Delirium Tremens. This was a training failure.

Mental Health Counselor Nanci Karczewski responded to the jail to determine if Mr. Greene posed a threat of suicide. She advised jail personnel that Mr. Greene's delusions were related to alcohol withdrawal and not an immediate mental health issue suggesting harm to others or self-harm. She remained within her scope of practice and her remit to screen for possible self-injury. She did not deny him access to competent medical care or violate any medical orders concerning

---

[20]See Baerlocher deposition at p. 31.

[21]See Baerlocher deposition at p. 77, 163.

[22]B. Payne, B. Berg, and J. Sun, "Policing in Small Town America: Dogs, Drunks, Disorder and Dysfunction," Journal of Criminal Justice 33 (2005): 31-41.

Haider A. Kazim, Esq. -11- July 9, 2019

the care of Mr. Greene.[23] Equally so, her supervisor, Ms. Stacey Kaminski, did no such thing as well.

Please contact me for elaboration on any of the points raised above. Once again, I request permission to prepare a supplemental report after I have had time to review additional materials relevant to this case.

Respectfully submitted,

Daniel B. Kennedy, Ph.D., C.P.P.

sm

---

[23] All correctional administrators should recognize these elements of constitutionally mandated medical care. See W. Rold, "Legal Considerations in the Delivery of Health Care Services in Prisons and Jails" in M. Puisis, Clinical Practice in Correctional Medicine, 2nd ed. (Mosby, 2006), pp. 522-523.