# Exhibit 51

# VASILIS K. POZIOS, M.D.

229 SCIO VILLAGE COURT NUMBER 211
ANN ARBOR, MICHIGAN 48103

PHONE 617.792.1888 · E-MAIL VPOZIOS@GMAIL.COM

May 7, 2019

Mr. Haider Kazim
Cummings, McClorey, Davis & Acho, P.L.C.
310 West Front Street, Suite 221
Traverse City, MI 49684

Dear Mr. Kazim,

At your request, I reviewed a number of records to offer an opinion regarding the mental health assessment of Crawford County Jail inmate Dwayne Greene by Northern Lakes Community Mental Health Authority employee Nanci Karczewski, LLPC, and other matters related to inmate health care provided by the Crawford County Jail.

**Sources of Information:**

1. Plaintiff's Complaint.
2. Postmortem Examination Report.
3. Neuropathology Report.
4. Spectrum Health Record dated January 16, 2018.
5. Sacred Heart Record dated December 27, 2017.
6. List of Individuals in Booking Area.
7. Video Log.
8. Mental Health Services Request with Northern Lakes Community Mental Health Jail Crisis Screening Contact.

1

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000041

9.  Jury Status Conference Transcript.

10. Axis Forensic Toxicology Report.

11. Medical Certificate of Death.

12. Daily Jail Log Report – Adult.

13. Katie Grimm Text Messages.

14. Crawford County Inter-Agency Agreement Regarding Mental Health Services
    and Jail Diversion Services for Persons with Serious Mental Health Illness Who
    are in or at Risk of Becoming Involved in the Criminal Justice System.

15. Corrections Inmate Health Care Policy 01-088.

16. Corrections Inmate Rights Policy 95-013.

17. Corrections Inmate Admission Policy 95-002.

18. Corrections Inmate Classification Policy 95-004.

19. Corrections Inmate Health Appraisal Policy 01-081.

20. Inmate Mental Health Services Policy 12-103

21. Crawford County Jail Records.

22. Deposition Transcript of Amy Johnson and related exhibits.

23. Deposition Transcript of Dale Suiter and related exhibits.

24. Deposition Transcript of Donald Steffes, Jr., and related exhibits.

25. Deposition Transcript of Joanie Blamer and related exhibits.

26. Deposition Transcript of Joel Avalos and related exhibits.

27. Deposition Transcript of John McDonald and related exhibits.

28. Deposition Transcript of Katie Tessner and related exhibits.

29. Deposition Transcript of Kirk Wakefield and related exhibits.

30. Deposition Transcript of Larry Foster and related exhibits.

31. Deposition Transcript of Marvin Townsend. and related exhibits

32. Deposition Transcript of Nanci Karczewski and related exhibits.

33. Deposition Transcript of Ronald Baerlocher and related exhibits.

34. Deposition Transcript of Renee Christman and related exhibits.

35. Deposition Transcript of Shon Chmieleski and related exhibits.

36. Deposition Transcript of Stacey Kaminski and related exhibits.

37. Deposition Transcript of Terry McCleery and related exhibits.

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000042

38. Deposition Transcript of Timothy Stephan and related exhibits.

39. Deposition Transcript of Wade Schmidt and related exhibits.

40. Deposition Transcript of William Denno and related exhibits.

41. Expert Report of Michael A. Berg.

42. Expert Report of Gerald A. Shiener, M.D.

43. Expert Report of Stephanie Nofar, M.A., L.P.C., C.A.A.D.C.

44. Expert Report of Johnny E. Bates, M.D.

45. Expert Report of Werner U. Spitz, M.D., F.C.A.P.

46. Export Report of C. Dennis Simpson, Ed.D.

47. Expert Report of Rebecca E. Luethy, R.N., M.S.N., C.N.S., C.C.H.P.

48. *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition (DSM-5),
    published by the American Psychiatric Association.

49. *International Classification of Diseases*, Tenth Edition (ICD-10), published by
    the World Health Organization.

50. Michigan Licensing and Regulatory Affairs "Counseling Application for a
    Limited License"

51. Michigan Licensing and Regulatory Affairs "Counseling FAQ"

52. M.C.L.A. 333.18101, "Counseling scope of practice."

53. M.C.L.A. 333.18201, "Practice of psychology."

54. M.C.L.A. 333.16189, "Practice of medicine."

55. Noonan ME: Mortality in local jails, 2000-2014-Statistical Tables. Bureau of
    Justice Statistics, Statistical Tables, NCJ, December 2016b.


**Brief Summary of the Facts:**

Mr. Dwayne Greene was a 32-year-old man who was a pre-trial detainee incarcerated in
the Crawford County Jail in Grayling, Michigan. Mr. Greene, who had a history of
alcohol dependence, was charged with Operating While Intoxicated, his third offense.
Mr. Greene was intoxicated at his arraignment on December 4, 2017, with a BAL of
0.194. Mr. Greene asked to be diverted from the criminal justice system in order to
receive treatment at Sacred Heart Drug and Alcohol Rehabilitation Center, where he was
scheduled to be admitted on December 7, 2017 at 3:00 pm for Inpatient Detox and

3

Residential treatment. Instead, Judge Hunter revoked his bond, and Mr. Greene spent the next four days incarcerated in the Crawford County Jail until he was transported by ambulance on December 8, 2017 to the Munson Healthcare Grayling Hospital ER after being found unresponsive by corrections officers.

On December 6, 2017, after about 48 hours into his incarceration, corrections officers began to notice that Mr. Green was becoming confused and appeared to be hallucinating, mistaking a pile of clothing for a backpack, thinking his mother was speaking to him, and asking for his tools to fix a crack from which he said water was falling. Corrections officers also noted Mr. Greene did not comprehend that he was in jail, was "hyper," and was not sleeping. On December 7, 2017, at 4:30 am, corrections officer Larry Foster made a routine Mental Health Service Request, noting Mr. Greene was "talking to the wall." Later that day, at 2:11 pm, Northern Lakes Community Mental Health Authority employee Nanci Karczewski, L.L.P.C., assessed Mr. Greene. In response to the Mental Health Service Request, Ms. Karczewski communicated to officers that Mr. Greene "did not appear to be a risk to himself." She also noted Mr. Greene was "delusional while experiencing alcohol withdrawal," and was "struggling with DTs."

The following day, on December 8, 2017, at 7:43 am, Mr. Greene was found unresponsive in his cell, pulseless, and not breathing. Corrections officers, city police officers, and EMT performed CPR on Mr. Greene, restoring his pulse. Mr. Greene was subsequently transported by ambulance to Munson Healthcare ER where he was stabilized in critical condition and then transferred to Munson Healthcare in Traverse City, where he was pronounced dead on December 12, 2017 after his family decided to terminate care.

**Opinion:**

1. It is my opinion, to a reasonable degree of medical certainty, that alcohol withdrawal delirium is a medical condition that requires medical treatment. The following evidence supports my opinion:

4

a. The hallmark signs and symptoms of delirium, such as confusion, disorientation, agitation, and hallucinations, are caused by dysregulation of the brain and nervous system.  Alcohol withdrawal delirium is a form of delirium caused by dysregulation of the brain and nervous system resulting from withdrawal from alcohol.

b. Alcohol withdrawal delirium is listed in diagnostic manuals widely used by physicians and other medical providers to diagnose and study medical conditions.

    i. "Alcohol withdrawal delirium" is listed as a neurocognitive disorder (NCD) in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition (DSM-5), published by the American Psychiatric Association, a professional organization representing nearly 40,000 physicians practicing the medical specialty of psychiatry.  Although alcohol withdrawal delirium is listed in the DSM-5, as stated on page 591 of the DSM-5, "The NCDs are unique among DSM-5 categories in that these are syndromes for which the underlying pathology, and frequently the etiology as well, can potentially be determined."

    ii. "Alcohol dependence with withdrawal delirium" is listed in the *International Classification of Diseases*, Tenth Edition (ICD-10), published by the World Health Organization.  According to the WHO Statistical Information System (WHOSIS), ICD-10 is currently the most widely used statistical classification system for diseases in the world.

c. Physical examination and diagnostic tests, tasks performed by medical providers, are needed to exclude other diagnoses and confirm the diagnosis of alcohol withdrawal delirium.

d. Alcohol withdrawal delirium is treated with medications, typically benzodiazepines, prescribed by licensed medical providers.

e. Because of the potential life-threatening consequences of alcohol withdrawal delirium, the medical treatment of alcohol withdrawal delirium

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000045

is often conducted in an inpatient medical setting in order to closely monitor the patient.

    i. Regular monitoring of vital signs, including blood pressure and heart rate, by nursing staff is necessary to detect autonomic instability, a potential indicator that death may be imminent.

    ii. Fluids and medications may need to be administered intravenously.

    iii. Some medications used to treat alcohol withdrawal delirium, particularly when administered intravenously, can cause respiratory depression. Emergency medical intervention, including intubation and resuscitation, may be required.

2. It is my opinion, to a reasonable degree of medical certainty, that Nanci Karczewski, a limited license professional counselor, was not expected to diagnose alcohol withdrawal delirium, a serious medical condition, when she assessed Dwayne Greene on December 7, 2017. The following evidence supports my opinion:

    a. Limited license professional counselors do not possess the requisite training and expertise to diagnose medical conditions.

        i. Limited license professional counselors are not educated in the diagnosis of medical conditions. According to the Michigan Department of Licensing and Regulatory Affairs counseling application for a limited license, applicants are required to have completed coursework in "career development; consulting; counseling techniques; counseling theories, counseling philosophy; group techniques; professional ethics; research methodology; multicultural counseling; testing procedures; practicum." Required coursework does not include medical topics, including the diagnosis of medical conditions.

        ii. Limited license professional counselors do not, according to current Michigan statute, have the ability to diagnose. According to M.C.L.A. 333.18101, the scope of practice of professional

6

counselors does not include the term "diagnosis."  Furthermore, according to M.C.L.A. 333.18101, the "practice of counseling" expressly excludes the practices of medicine and psychology, two professions that include the term "diagnosis" in statutory definitions of their respective scopes of practice.

1. The practice of medicine is defined in M.C.L.A. 333.16189 as "the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts."

2. According to M.C.L.A. 333.18201, "Practice of psychology" means "the rendering to individuals, groups, organizations, or the public of services involving the application of principles, methods, and procedures of understanding, predicting, and influencing behavior for the purposes of diagnosis, prevention, amelioration, or treatment of mental or emotional disorders, disabilities or behavioral adjustment problems by means of psychotherapy, counseling, behavior modification, hypnosis, biofeedback techniques, psychological tests, or other verbal or behavioral means.  The practice of psychology shall not include the practice of medicine such as prescribing drugs, performing surgery, or administering electro-convulsive therapy."

b. Physical examination and diagnostic tests, tasks performed by medical providers, are needed to exclude other diagnoses and confirm the diagnosis of alcohol withdrawal delirium.  Ms. Karczewski is not a licensed medical provider such as a physician, nurse practitioner, or physician's assistant, nor does she purport to be one.  Therefore, she did

7

not have the training and expertise to perform these tasks and thus would
not have been expected to diagnose alcohol withdrawal delirium.

c. Although Ms. Karczewski stated in her deposition she had recognized
signs of delirium tremens, she said she did not know the condition
required medical intervention or that it could result in death.  This is not
surprising given the fact that Ms. Karczewski's training and expertise as a
limited license professional counselor does not encompass the diagnosis
and treatment of medical conditions.

　　i. Ms. Karczewski stated in her deposition testimony that she had not
　　learned about delirium tremens as part of her master's program
　　curriculum at Florida Gulf Coast University.

　　ii. Ms. Karczewski stated in her deposition testimony that she had not
　　received trainings in delirium tremens through Northern Lakes
　　Community Mental Health Authority (NLCMHA).

d. Ms. Kaminski stated in her deposition testimony that, in her experience
working in the emergency department, medical providers, not limited
license professional counselors such as herself, evaluated patients for
delirium tremens.

c. Ms. Karczewski stated in her deposition testimony that she never made
DSM-5 diagnoses as part of her jail assessments.

f. Although Ms. Karczewski allegedly told Corporal Christman that Mr.
Greene exhibited "classic signs of withdrawal," as stated in text messages
between Corporals Christman and Tessner dated December 7, 2017, Ms.
Karczewski was corroborating observations previously made by
corrections officers.  This does not mean Ms. Karczewski diagnosed
alcohol withdrawal delirium, a medical condition.

3. It is my opinion, to a reasonable degree of medical certainty, that, consistent with
Ms. Karczewski's role in the Crawford County Jail, the scope and purpose of her
Jail Crisis Screening Contact on December 7, 2017 was to assess Mr. Greene's

8

risk of suicide, not make a diagnosis.  The following evidence supports my opinion:

    a.  Corporal Christman testified in her deposition that her reason for calling NLCMHA and expediting the Mental Health Service request was to make sure that Mr. Greene wasn't at risk of harming himself or anyone else.

    b.  Ms. Karczewski assessed Mr. Greene's risk of suicide.

        i.  In response to the Routine Mental Health Service Request (initiated by Officer Foster as a "Routine" request but subsequently changed to an "Urgent" request by Corporal Christman), dated December 7, 2017, Ms. Karczewski stated Mr. Greene "does not appear to be a risk to himself."

       ii.  Captain Baerlocher testified in his deposition that Ms. Karczewski told him after her assessment of Mr. Greene that he was not at risk of self-harm.

      iii.  Corporal Christman testified in her deposition that Ms. Karczewski told her Mr. Greene was not at risk of harming himself or others.

      iv.  On the Jail Crisis Screening Contact note dated January 3, 2018, Ms. Karczewski appropriately listed Mr. Greene's "significant alcohol use" as a risk factor for suicide.  Alcohol use is a known risk factor for suicide.

       v.  According to Ms. Karczewski's deposition testimony, although she had never previously been asked by Crawford County Jail corrections officers to assess inmates for hallucinations, as a result of her assessment, Ms. Karczewski determined Mr. Greene's hallucinations were caused by his withdrawal from alcohol, and she appropriately listed psychosis as a risk factor for suicide on the Jail Crisis Screening Contact document dated January 3, 2018.  Hallucinations are a symptom of psychosis, and psychosis is a known risk factor for suicide.

    c.  According to Ms. Karczewski's deposition testimony, when she assessed Mr. Green on December 7, 2017, the Jail Crisis Screening Contact form

9

did not include the option to list a diagnosis. This suggests the
formulation of a diagnosis was not the goal of such an evaluation; rather,
the goal was to assess inmates' risk of suicide.

d. Suicide is the leading cause of death in local jails (Noonan 2016).
Therefore, it is reasonable to conclude that assessing Crawford County Jail
inmates for risk of suicide was of utmost priority and was the purpose of
the Jail Crisis Screening Contact.

e. Corporal Tessner testified in her deposition that, outside of when an
inmate has requested to talk to NLCMHA, when she has called
NLCMHA, it is her understanding that NLCMHA is evaluating the inmate
for risk to self and others. Since the Mental Health Service request was
made by a corrections officer and not Mr. Greene, it is reasonable to
conclude the request was to assess Mr. Greene's risk of suicide.

f. According to the Inmate Mental Health Services Policy 12-103, criteria
for an "Urgent" referral designation includes "past history of active self-
harm attempts" and "current history of self harm or harm to others,"
whereas a "Routine" referral does not include these criteria. Since it is
noted in Crawford County Jail Booking Admission Report and Crawford
County Sheriff Office Initial Screening/Classification, dated August 5,
2017, that Mr. Greene did not have a history of suicide attempts, it is
reasonable to conclude that when Corporal Christman changed the status
of the request from "Routine" to "Urgent," it meant she believed Mr.
Greene had a "current history of self harm or harm to others." This
suggests suicide risk assessment became the focus of Ms. Karczewski's
Jail Crisis Screening Contact on December 7, 2017.

4. It is my opinion, to a reasonable degree of medical certainty, that Ms. Karczewski
should not have known that alcohol withdrawal delirium is a serious medical
condition requiring medical treatment when she evaluated Mr. Greene on
December 7, 2017. The following evidence supports this opinion:

10

    a. As I previously stated, the counseling scope of practice as defined in M.C.L.A. 333.18101 does not include the diagnosis of medical conditions.

    b. Not only are limited license professional counselors not trained to diagnose medical conditions, the referral of their clients to medical providers is outside the scope of their practice.  According to M.C.L.A. 333.18101, "referral includes determining the need for referral to 1 or more statutorily regulated mental health professionals whose expertise, skills, and competence are appropriate to the problems of the individual, informing the individual of the referral, and communicating as appropriate with the professional to whom the individual has been referred." Therefore, Ms. Karczewski should not have known to refer Mr. Greene to a medical doctor for medical treatment, and thus did not fall below the standard of care for limited license professional counselors by not expressly requesting the corrections officers to call 911 or transport Mr. Greene to the ER for medical evaluation.

    c. Although NLCMHA offered trainings to its employees in Mental Health First Aid that taught how to intervene when someone is experiencing alcohol withdrawal, these trainings were not required, and Ms. Karczewski had not received this training at the time of her evaluation of Mr. Greene on December 7, 2017.  Additionally, according to Michigan Licensing and Regulatory Affairs "Counseling FAQ," continuing education is not a requirement for limited license professional counselors to renew their license.  Mental Health First Aid, a continuing education training course, is therefore not required for licensure.

5. It is my opinion, to a reasonable degree of medical certainty, that Crawford County corrections officers were aware that Mr. Greene, beginning on December 6, 2017 and continuing until he was found unresponsive on December 8, 2017, was confused and hallucinating as a result of alcohol withdrawal.  The following evidence supports my opinion:

11

a. Corporal Christman documented in the Daily Jail Log that Mr. Greene was confused and hallucinating as a result of alcohol withdrawal.

    i. According to the Daily Jail Log Report dated December 6, 2017 at 1:40 pm, Corporal Christman logged, "GREENE/DWAYNE IN D-01 ACTING ERRACTIC, APPEARS TO BE HELLUCINATING [sic], AND TO BE DETOXING." Corporal Christman testified in her deposition that, prior to December 8, 2017, she understood withdrawal and de-toxing to mean the same thing.

    ii. According to the Daily Jail Log Report dated December 7, 2017 at 6:20 am, "INMATE DWAYNE GREENE IS STILL SHOWING SIGNS THAT HE IS STILL GOING THROUGH WITHDRAWELS [sic] FORM [sic] ALCOHOL. HE HAS TRIED TO LEAVE THE CELL, ASKING FOR HAMMER AND NAILS, THINKING HIS MOTHER IS SPEAKING TO HIM, HE PERIODICALLY YELLS OUT OR BANGS DOOR, FLOOR AND WALLS. HE IS COMPLIANT AND PLEASANT WHEN SPEAKING TO HIM, BUT IS CONFUSED AND DOES NOT COMPREHEND THAT HE IS HERE IN THE JAIL. WE WILL CONTIUNUE TO MONITOR HIM CLOSELY."

b. Officer Johnson testified in her deposition that there were times Mr. Greene had visual hallucinations and there were also times where he was confused. Officer Johnson testified she knew Mr. Green was going through alcohol withdrawal because, based on her own experience, he was exhibiting signs and symptoms that she associates with alcohol withdrawal.

    i. Officer Johnson testified that, on December 6, 2017, she observed Mr. Greene to be having what appeared to be hallucinations "off and on" in the context of alcohol withdrawal.

    ii. Officer Johnson testified that on December 7, 2017, Mr. Greene was confused at times, and there were times when he was completely coherent.

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000052

c. Corporal Christman testified in her deposition that she observed Mr. Greene winding up a cord that didn't exist and looked like he was trying to fix things in his cell. It is reasonable to assume that Mr. Greene was exhibiting these unusual behaviors because he was confused and experiencing visual hallucinations. Corporal Christman testified in her deposition that Mr. Greene's hallucinations led her to the conclusion he was going through DTs.

d. Even if corrections officers had not directly observed Mr. Greene to be confused and hallucinating as a result of alcohol withdrawal, they were aware of it through documentation in the Daily Jail Log or by verbal briefing from fellow officers.

   i. Corporal Christman testified that officers working the same shift would be familiar with the information contained in the Daily Jail Log.

   ii. Corporal Christman testified in her deposition she was sure the topic of Mr. Greene's hallucinations was discussed with Officers Stephan and Johnson.

   iii. Officer Stephan testified in his deposition that on December 6, 2017 he was aware of the Daily Jail Log entry stating Mr. Greene was acting erratic, appeared to be hallucinating and to be de-toxing.

   iv. Officer Foster testified in his deposition that prior to December 6, 2017 at 8:00 pm, he was aware of the Daily Jail Log record stating Mr. Greene was acting erratic, appeared to be hallucinating, and to be de-toxing.

   v. Officer Suiter testified in his deposition that Officer Foster indicated to him that Mr. Greene was hallucinating. Officer Suiter also testified that he was aware that Mr. Greene was undergoing alcohol withdrawal and that the Daily Jail Log entry indicated confusion.

13

6.  It is my opinion, to a reasonable degree of medical certainty, that Crawford
    County corrections officers, when they became aware Mr. Greene was confused
    and hallucinating as a result of alcohol withdrawal, should have called 911 or
    transported Mr. Greene to the nearest ER for medical evaluation. The following
    evidence supports my opinion:

    a.  Less than two months prior to the onset of Mr. Greene's confusion and
        hallucinations caused by alcohol withdrawal, Crawford County corrections
        officers were certified in Mental Health First Aid-USA for Law
        Enforcement, Corrections and Public Safety, a required training that
        explicitly instructed the corrections officers to call 911 when the person
        "has delirium tremens – a state of confusion and visual hallucinations."

        i.   According to slide 98 of the Mental Health First Aid-USA for Law
             Enforcement, Corrections and Public Safety PowerPoint
             presentation, in the section covering alcohol withdrawal, "Call 911
             when a person is withdrawing from alcohol and "has delirium
             tremens – a state of confusion and visual hallucinations."

        ii.  According to the corresponding Mental Health First Aid-USA for
             Law Enforcement, Corrections and Public Safety manual, Chapter
             8, page CC864, "Alcohol withdrawal may lead to a medical
             emergency." On page CC865, under the section titled, "When to
             Call an Ambulance," the manual states, "Call an ambulance or
             seek medical help if the person has delirium tremens – a state of
             confusion and visual hallucinations."

        iii. According to page 45 of the Mental Health First Aid-USA for Law
             Enforcement, Corrections and Public Safety, Adult Curriculum
             Supplement, under the title "Corrections Scenarios," a clinical
             vignette clinical vignette that specifically dealt with a confused jail
             inmate who is withdrawing from alcohol is presented.

        iv.  Ms. Blamer testified in her deposition that, not only did corrections
             officers certified in Mental Health First Aid-USA learn about
             hallucinations through the didactic lecture, they also engaged in

· 14

       role-playing exercises to mimic what it's like to observe someone who is hallucinating, reinforcing their ability to recognize these symptoms.

    v. Ms. Blamer testified in her deposition that the term "delirium tremens" is presented to trainees only in the context of alcohol withdrawal. She testified that, in her presentation, in addition to reading the word "delirium tremens" aloud, she also used the abbreviation, "DTs," when speaking about delirium tremens. It is therefore reasonable to assume that corrections officers certified in Mental Health First Aid-USA understood that delirium tremens is sometimes abbreviated "DTs" and is a medical emergency caused by alcohol withdrawal.

    vi. Even though Corporal Christman was out on medical leave and did not attend the training, it was the practice and custom for officers to share information. Additionally, Corporal Tessner testified in her deposition that the Mental Health First Aid manual was readily accessible to corrections officers in the jail.

b. Corrections officers testified in their depositions that they were aware Mr. Greene was undergoing alcohol withdrawal and were aware that the auditory and visual hallucinations, confusion, disorientation, and erratic behavior that Mr. Greene was experiencing and exhibiting was the result of going through alcohol withdrawal. It was therefore not reasonable for corrections officers to have requested a mental health worker to assess Mr. Greene when they knew, according their Mental Health First Aid-USA certification, that Mr. Greene was experiencing a medical emergency and were instructed to call 911 when a person is confused and have visual hallucinations in the context of alcohol withdrawal.

c. Although Captain Baerlocher testified in his deposition that at the time of Mr. Greene's death it was a practice and pattern of the Crawford County Jail to rely upon a mental health professional for an opinion related to medical care, Sheriff Wakefield testified in his deposition that it would be

15

a violation of Crawford County Sheriff's Department to have a person who is not a qualified health professional as defined in policy to provide medical judgment. According to Corrections Inmate Health care Policy 01-088, "Qualified, licensed health care professionals shall determine all medical matters of the Crawford County Jail. All medical, psychiatric and dental inmate matters involving medical judgment are the sole province of the responsible physician, dentist or other qualified health professional."

d.  Although Crawford County Jail protocol and practice at the time was that corrections officers kept inmates undergoing alcohol withdrawal and exhibiting these symptoms in an observation cell, and made them available to the Crawford County Jail nurse when she was scheduled to be in the Jail, policy allowed for corrections officers to intervene to ensure inmates receive necessary services such as calling 911 or transporting Mr. Greene to an ER for emergency medical evaluation.

   i.  According to the Crawford County Inmate Mental Health Services Policy 12-103, "Any employee taking notice of an inmate with severe depression or unusual behaviors shall be diligent in taking any necessary action to ensure the inmate receives necessary services, either medical or mental."

   ii.  Captain Baerlocher testified in his deposition that if corrections officers felt that Mr. Greene needed immediate medical attention that they had every authority to call an ambulance or call 911, and that there had been past practice of that.

   iii.  Mr. Greene exhibited unusual behaviors as a result of confusion and hallucinations in the context of alcohol withdrawal, such as having a conversation with the wall, picking at non-existent bugs on the wall, and winding up a cord when none existed. This should have caused Crawford County corrections officers, employees of Crawford County, to take necessary action and call 911 or transport Mr. Greene to the ER to receive a medical

16

evaluation and ensure Mr. Greene received necessary medical services.

e. Ms. Karczewski stated in her deposition testimony that corrections officers called her and changed the status of the mental health assessment request from "Routine" to "Urgent." This suggests corrections officers knew Mr. Greene's confusion and hallucinations were worsening and thus should have prompted them to facilitate an emergency medical evaluation by calling 911 or transporting Mr. Greene to the ER, not request a mental health assessment or wait until the next morning for the Jail nurse to come in on her regular day. Even if corrections officers ignored the Mental Health First Aid-USA for Law Enforcement, Corrections and Public Safety recommendation of calling 911 when they observed Mr. Greene's unusual behaviors in response to confusion and hallucinations in the context of alcohol withdrawal, it was still unreasonable for corrections officers to ignore the Corrections Inmate Mental Health Services Policy 01-088 by not contacting the Crawford County Jail nurse or a medical doctor simply because Ms. Karczewski did not explicitly tell them to do so.

f. On December 7, 2017, Ms. Karczewski stated in her receipt to the Mental Health Service Request that Mr. Greene was "delusional while experiencing alcohol withdrawal." In fact, according to Ms. Karczewski's deposition testimony, regarding Mr. Greene going through delirium tremens, Captain Baerlocher told Ms. Kraczewski he "was aware that that was happening." Instead of waiting until the following day for a nurse to assess Mr. Greene, corrections officers, including Captain Baerlocher, should have called 911 or transported Mr. Green to the nearest ER for emergency medical evaluation. By the time a nurse was available, Mr. Greene was already unresponsive.

In summary, it is my opinion, to a reasonable degree of medical certainty, that Ms. Karczewski did not fall below the standard of care for licensed professional counselors

17

by not referring Mr. Greene for medical care because it is outside the counseling scope of practice to do so.  Corrections officers, when they noticed Mr. Greene was exhibiting signs of alcohol withdrawal delirium and nursing staff was unavailable, should have sent Mr. Greene to the ER for an emergency medical evaluation, not requested a mental health assessment.  Finally, the limited access to nursing staff and medical providers constituted grossly inadequate medical care on the part of the Crawford County Jail, who is constitutionally required to provide medical care for its inmates.

I reserve the right to amend my report, including my opinion, as new information becomes available.

Respectfully submitted,

Vasilis K. Pozios, M.D.
Forensic Psychiatrist

18

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000058