# Exhibit 52

{00658286.DOCX}

# EXPERT REPORT

Terry S. Fillman, RN, MBA, CCHP
Health Services Administrator
San Bernardino County Sheriff's Department
9500 Etiwanda Ave
Rancho Cucamonga, CA 91739

Date of Report: May 6, 2019

Re. Greene v. Northern Lakes Community Mental Health Authority et al. Case No.: 2:18-CV-11008-MAG-DRG.

I, Terry S. Fillman RN, MBA, CCHP have been employed as a Correctional Nurse for 27 years with San Bernardino County Sheriff's Department in California. I am currently the Health Services Administrator managing health care operations and staff for medical, mental health, and dental patient services for corrections with an average daily population of 6,000 inmates. I provide direct patient care for high acuity, special needs and referred patients. I am a Certified Correctional Health Professional (CCHP) and currently a member and educator for the American Correctional Health Services Association (ACHSA), National Commission on Correctional Health Care (NCCHC), American Correctional Association (ACA), American Jail Association (AJA), Health Administrator Corrections Inspector for the Institute of Medical Quality for correctional facility accreditation and CA Title 15 inspections, and Board of State and Community Corrections (BSCC) Executive Steering Committee Member for Title 15 Policy Review and Revision 2016/2017. I am an educator for Correctional Healthcare and Jail Operations for deputies, non-medical professional corrections staff; correctional medical, dental and mental health licensed professionals since 1995.

Based on my education, training, correctional healthcare experience, ongoing patient healthcare, educator for Correctional Healthcare and Jail Operations for deputies, and review of all listed documents, I am a qualified expert for review and written opinion in the matter of Greene v. Northern Lakes Community Mental Health Authority et al. Case No.: 2:18-CV-11008-MAG-DRG.

My rate of compensation for expert review and opinions is $250 per hour; $350 per hour for deposition testimony, plus travel and expenses at cost, if any. My CV is attached and listed as Exhibit A. In the past four years, I have testified as a witness by deposition or by trial listed as Exhibit B. I have not authored any publications in the past 10 years.

I have reviewed the following materials regarding the above case:

Complaint (Bates pages 1-38)
Mental Health Services Request and Jail Crisis Screening Contact (Bates pages 39-41)
Crawford County Inter-Agency Agreement Regarding Mental Services and Jail Diversion Services For Persons With Serious Mental Illness Who Are In Or At Risk Of Becoming Involved In The Criminal Justice System (Bates pages 42-46)
Jail Policies (Bates pages 47-69)
Stephanie Nofar Report (Bates pages 70-77)
Rebecca Luethy Report (Bates pages 78-104)

| 1 | Greene v Northern Lakes Mental Health et al. | Expert Report by Terry Fillman |

Dwayne Green Jail Records from August and December 2017 (Bates pages 150-151)
Deposition Transcript of Dale Suitor without Exhibits
Deposition Transcript of Timothy Stephan without Exhibits
Deposition Transcript of Donald Steffes without Exhibits
Deposition Transcript of Katie Tessner without Exhibits
Deposition Transcript of Renee Christman without Exhibits
Deposition Transcript of Randall Baerlocher without Exhibits
Deposition Transcript of Larry Forster without Exhibits
Deposition Transcript of Amy Johnson without Exhibits
Deposition Transcript of Stacey Kaminski, LPC, CMH Supervisor
Deposition Transcript of Nanci Karczewski LLPC, CMH Therapist
Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised (CIWA-Ar)
UpToDate" topic "Management of Moderate and Severe Alcohol Withdrawal Syndromes"

## Opinions:

Based on my education, training, correctional healthcare experience, ongoing patient healthcare, educator for custody correctional staff including Correctional Healthcare and Jail Operations, and review of all listed documents, it is my expert opinion that correctional officers knew of Mr. Dwayne Greene's serious medical needs, knew that Mr. Greene was demonstrating symptoms of life-threatening Delirium Tremens, failed to summon appropriate medical care, violated policies and procedures, and fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances. The collective correctional officers' documented actions and inactions at Crawford County Jail in Grayling Michigan failed to obtain qualified medical care for Mr. Greene for a condition that is easily treatable and could have been life-saving.

The documented mental health assessment by Nanci Karczewski LLPC, CMH Therapist responding to a request by a correctional officer for Mr. Greene was appropriate within licensure and clinical responsibility, within policies and procedures for mental health, and demonstrated the standard of what another reasonable correctional health-trained mental health professional would have done given the same circumstances.

Nanci Karczewski did not have the licensure, clinical expertise, or responsibility to personally refer Mr. Greene to medical personnel, obtain Provider orders, or deliver life-saving medications and treatment to Mr. Greene. Correctional officers had the responsibility to refer Mr. Greene to appropriate medical personnel and only a licensed medical professional could have obtained Provider orders and delivered life-saving medications and treatment to Mr. Greene.

## Facts Upon Which My Opinions are Based:

On December 4, 2017 Mr. Greene was booked into Crawford County Jail in Grayling Michigan actively intoxicated with a history of alcohol abuse and withdrawal. Documentation on the *Crawford County Sheriff's Office Medical Screening Report* for Mr. Green included "Yes" answers to conscious and under the influence of alcohol. "No" answers included bleeding, illness, tremors or sweating, symptoms suggesting emergency service, signs of alcohol or drug withdrawals, and mental health

history or suicidal. Documentation on the *Crawford County Sheriff's Office Initial Screening/Classification* form for Mr. Green includes observations/comments yes as understands questions, eyes red or bloodshot, walks with a stagger, talks with slurred speech, and odor of alcohol. No answers to assaultive, loud, self-inflicted injury, bizarre behavior, seeing visions or hearing voices, confused or depressed. Correctional officers were aware of the potential alcohol withdrawals for Mr. Greene, but did not request medical staff evaluate Mr. Greene when they were available on-site. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances.

Per the *Crawford County Jail Corrections Inmate Admission Policy 95-002* the "correctional officer's responsibility includes completing the booking forms and medical screening sheet record, documenting current illness and health problems including diseases, dental problems, mental health problems, use of alcohol and other drugs, the type of drugs used, mode of use, amount and frequency used, and date or time of last use. The medical disposition of an inmate includes general population, general population with prompt referral to an appropriate Healthcare service, or referral to an appropriate Healthcare service for emergency treatment." Based on Mr. Greene's history and clinical presentation, another reasonable health-trained correctional officer would have initiated a prompt referral to medical staff.

On December 5, 2017 as documented by correctional officers, Mr. Greene began demonstrating unintentional, rhythmic muscle movement identified as tremors often associated with alcohol withdrawals. Correctional officers were aware of the potential alcohol withdrawals for Mr. Greene, but did not request qualified medical staff evaluate Mr. Greene. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances.

On December 6, 2017 as documented by correctional officers, Mr. Greene began demonstrating insomnia, agitation and hallucinations. Correctional officer documentation for Mr. Greene included acting erratic, appears to be hallucinating and to be detoxing. When combined with known alcohol abuse and withdrawal history the demonstrated symptoms were significant symptoms of moderate to severe alcohol withdrawals. Had correctional officers notified qualified medical staff, the internationally recognized Clinical Institute Withdrawal Assessment tool (CIWA Ar) could have been completed by a qualified and licensed medical professional for Mr. Greene. As attached the CIWA form used commonly in correctional and non-correctional health settings by qualified and licensed medical professionals identifies common symptoms and signs of alcohol withdrawal by category including nausea and vomiting, tremors, proximal sweats, anxiety, agitation, tactile disturbances, auditory disturbances, visual disturbances, headache, orientation and clouding of sensorium. Each section allows a qualified and licensed medical professional to interact with the patient documenting clinical observations and subjective reports by the patient to establish a score for each category. The maximum score is 67. Mild alcohol withdrawal is often defined with a score less than or equal to 15, moderate alcohol withdrawal with scores of 16 to 20, and severe alcohol withdrawal with any score greater than 20. Though correctional officers documented that Mr. Greene had symptomology including insomnia, agitation and hallucinations, without referral and assessment by qualified and licensed medical professionals, there was no way to appropriately quantify Mr. Greene's clinical condition as with the standardized CIWA Ar form. Correctional officers were aware of the alcohol withdrawal symptomology for Mr. Greene, but did not request qualified medical staff evaluate Mr. Greene. Correctional officers were aware of Mr. Greene's serious medical need and did not summon

3 | *Greene v Northern Lakes Mental Health et al.*           Expert Report by Terry Fillman

appropriate medical care by qualified medical professionals. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances.

**FIGURE 1**

**The Clinical Institute Withdrawal Assessment for Alcohol—Revised**

Addiction Research Foundation Clinical Institute Withdrawal Assessment for Alcohol (CIWA-Ar)

Patient _____ Date |—|—|—| Y m d   Time ____:____ (24-hour clock, midnight=00:00)

Pulse or heart rate, taken for one minute: _____   Blood pressure: _____/_____

**NAUSEA AND VOMITING**—Ask "Do you feel sick to your stomach? Have you vomited?" Observation.
0 no nausea and no vomiting
1 mild nausea with no vomiting
2
3
4 intermittent nausea with dry heaves
5
6
7 constant nausea, frequent dry heaves and vomiting

**TREMOR**—Arms extended and fingers spread apart. Observation.
0 no tremor
1 not visible, but can be felt fingertip to fingertip
2
3
4 moderate, with patient's arm extended
5
6
7 severe, even with arms not extended

**PAROXYSMAL SWEATS**—Observation.
0 no sweat visible
1 barely perceptible sweating, palms moist
2
3
4 beads of sweat obvious on forehead
5
6
7 drenching sweats

**ANXIETY**—Ask "Do you feel nervous?" Observation.
0 no anxiety, at ease
1 mildly anxious
2
3
4 moderately anxious, or guarded, so anxiety is inferred
5
6
7 equivalent to acute panic states as seen in severe delirium or acute schizophrenic reactions

**AGITATION**—Observation.
0 normal activity
1 somewhat more than normal activity
2
3
4 moderately fidgety and restless
5
6
7 paces back and forth during most of the interview, or constantly thrashes about

**TACTILE DISTURBANCES**—Ask "Have you any itching, pins and needles sensations, any burning, any numbness, or do you feel bugs crawling on or under your skin?" Observation.
0 none
1 very mild itching, pins and needles, burning or numbness
2 mild itching, pins and needles, burning or numbness
3 moderate itching, pins and needles, burning or numbness
4 moderately severe hallucinations
5 severe hallucinations
6 extremely severe hallucinations
7 continuous hallucinations

**AUDITORY DISTURBANCES**—Ask "Are you more aware of sounds around you? Are they harsh? Do they frighten you? Are you hearing anything that is disturbing to you? Are you hearing things you know are not there?" Observation.
0 not present
1 very mild harshness or ability to frighten
2 mild harshness or ability to frighten
3 moderate harshness or ability to frighten
4 moderately severe hallucinations
5 severe hallucinations
6 extremely severe hallucinations
7 continuous hallucinations

**VISUAL DISTURBANCES**—Ask "Does the light appear to be too bright? Is its color different? Does it hurt your eyes? Are you seeing anything that is disturbing to you? Are you seeing things you know are not there?" Observation.
0 not present
1 very mild sensitivity
2 mild sensitivity
3 moderate sensitivity
4 moderately severe hallucinations
5 severe hallucinations
6 extremely severe hallucinations
7 continuous hallucinations

**HEADACHE, FULLNESS IN HEAD**—Ask "Does your head feel different? Does it feel like there is a band around your head?" Do not rate for dizziness or lightheadedness. Otherwise, rate severity.
0 not present
1 very mild
2 mild
3 moderate
4 moderately severe
5 severe
6 very severe
7 extremely severe

**ORIENTATION AND CLOUDING OF SENSORIUM**—Ask "What day is this? Where are you? Who am I?"
0 oriented and can do serial additions
1 cannot do serial additions or is uncertain about date
2 disoriented for date by no more than 2 calendar days
3 disoriented for date by more than 2 calendar days
4 disoriented for place and/or person

Total CIWA-Ar Score _____
Rater's Initials _____
Maximum Possible Score 67

This scale is not copyrighted and may be used freely.

---

4 | *Greene v Northern Lakes Mental Health et al.*   *Expert Report by Terry Fillman*

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000068

The *Crawford County Jail Corrections Inmate Health Care Policy 01-088* includes "Qualified, licensed health care professionals shall determine all medical matters of the Crawford County Jail. All medical, psychiatric and dental inmate matters involving medical judgment are the sole province of the responsible physician, dentist or other qualified health professional. Purpose is to provide adequate inmate health care." Health-trained correctional officers would be aware of this policy, yet did not notify any qualified licensed health care professionals to determine medical matters for Mr. Greene. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances.

The *Crawford County Jail Corrections Inmate Mental Health Services Policy 12-103* includes "It shall be the policy of the Crawford County Sheriff's Office, Corrections Division to provide Mental Health Services to the inmate population consistent with Michigan's Mental Health Code, the Michigan Department of Corrections - Rules for Jails and Lockups and the MSCTC - Michigan Sheriffs Coordinating and Training Council." "Purpose to establish a written policy as clarification of the procedure to handle individuals regarding mental health services." "The program shall establish a mental health protocol and approved, reviewed procedures, including, at a minimum: training in suicide prevention and intervention; suicide screening and intervention; referrals for treatment, evaluation, diagnosis, crisis intervention; routine care, stabilization and prevention of deterioration and, if necessary, diversion to a mental health facility." "Procedure Mental Health Protocol it shall be the responsibility of Corrections Officers and medical service staff to screen, attempt to detect, implement necessary safely procedures to assist in the safety of and make appropriate referrals for any inmate displaying obvious signs, symptoms or need for mental health services, however all decisions in the matter of treatment shall be the sole province of the designated Mental Health Authority." "Staff shall utilize the Mental Health Services Request Form when making any mental health referrals." "Staff shall initiate a Mental Health Services Referral under any of the following circumstances: Disposition from the Medical Intake Screening indicating a referral for appropriate mental health service is emergent. Any history of active suicide attempts. Indication of suicide ideation on the intake screening. Active suicide attempt. Current mental health client either private or public. Current use of mental health medications. Information from a third party indicating mental instability or suicide ideation. History of self-mutilation. Request by an inmate. Any employee taking notice of an inmate with severe depression or unusual behaviors shall be diligent in taking any necessary action to ensure the inmate receives necessary services, either medical or mental. Multiple factors could indicate a more serious need for referral designation." "Referral Designation - Emergent - any of the following: Active suicide attempt, severe mental deterioration, unmanageable with normal protocol for safety and control, petitionable or emergency intervention necessary."

On December 7, 2017 documentation for Mr. Greene by correctional officers included Mr. Greene was struggling with Delirium Tremens (DT), yelling and pounding on the door at times, and tried to wind up a cord with his hands when there were no cords. Mr. Greene tried to leave his cell asking for a hammer and nails, thinking his mother was speaking to him, being confused, and not comprehending that he was in the jail. Mr. Greene was described as talking to the wall, still hyper, agitated and had not slept. Correctional officers were aware of the moderate to severe alcohol withdrawal symptoms for Mr. Greene, his obvious serious medical needs, but did not request qualified medical staff to evaluate Mr. Greene. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances.

5 | *Greene v Northern Lakes Mental Health et al.*     Expert Report by Terry Fillman

According to "UpToDate" topic "Management of Moderate and Severe Alcohol Withdrawal Syndromes" excerpts include: "Clinical manifestations of severe withdrawal and delirium tremens. Approximately 5 percent of patients who undergo withdrawal from alcohol suffer from DT. DT is defined by hallucinations, disorientation, tachycardia, hypertension, hyperthermia, agitation, and diaphoresis in the setting of acute reduction or abstinence from alcohol. DT typically begins between 48 and 96 hours after the last drink and lasts one to five days." "Severe alcohol withdrawal is often associated with fluid and electrolyte abnormalities. Almost all patients in acute withdrawal are hypovolemic as a result of diaphoresis, hyperthermia, vomiting, tachypnea, and decreased oral intake. Hypokalemia is common due to renal and extrarenal potassium losses, alterations in aldosterone concentrations, and changes in potassium distribution across the cell membrane Hypomagnesemia is common in patients with DT and predisposes them to dysrhythmias and seizures. Hypophosphatemia results from malnutrition, may be symptomatic, and, if severe, can contribute to cardiac failure and rhabdomyolysis." "With early identification and appropriate management, mortality from DT is less than 5 percent. This figure has diminished from the 37 percent mortality rate reported in the early 20th century, probably as a result of earlier diagnosis, improvements in supportive and pharmacologic therapies, and improved treatment of comorbid illnesses. Death usually is due to arrhythmia, complicating illnesses such as pneumonia, or failure to identify an underlying problem that led to the cessation of alcohol use, such as pancreatitis, hepatitis, or central nervous system injury or infection. Older age, preexisting cardiopulmonary disease, core body temperature greater than 104°F, and coexisting liver disease are associated with a greater risk of mortality."

Instead of notifying qualified licensed medical staff to evaluate Mr. Greene for his obvious serious medical needs, correctional staff completed a request for a mental health evaluation. The correctional officers' actions and inactions fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances.

On December 7, 2017 at approximately 2 PM documentation on the *Northern Lakes Community Mental Health Jail Crisis Screening* face-to-face contact for Mr. Greene by Nanci Karczewski, LLPC, MHP, QMHP includes referral source as "law-enforcement." *Presenting Problems and Precipitating Factors* include "Jail staff requested a correctional mental health contact for Dwayne. He had come in to Jail earlier in the week after going to court on Monday while intoxicated. He was jailed and the plan for detoxification and then rehabilitation was delayed due to his condition during his hearing. Dwayne did not report any significant issues, but was very delusional during the conversation with this worker. He was able to answer basic questions and provide his date of birth, his occupation and a few other questions. He continues to try to wind up a cord with his hands, but there were no cords. He was showing other behaviors but was polite and courteous to this worker. He talked openly and had some behaviors that were unusual but not aggressive. When questioned about why he was in jail he was able to report what had happened during the court appearance." "Dwayne has a history of heavy alcohol use and is currently in jail for his third operating a vehicle while intoxicated. He easily admits to being an alcoholic. Mental status includes appearance unremarkable, orientation unable to assess, psychomotor unremarkable, judgment unable to assess, speech rambling illogical, attitude cooperative, memory unable to assess, affect appropriate, concentration or attention good, mood euthymic, intelligence unable to assess, thoughts delusional disorganized incoherent tangential, and unmotivated." Mental status general includes "Dwayne was seen in the observation cell up front in the booking area of the jail. He was dressed in just a jail sweatshirt and his boxer briefs. He was active during the contact and walked around in the cell, moves back-and-forth is trying to roll up some wire

or some string. His speech was rapid and illogical and affect was broad. He was not oriented to place or time. Mood was euthymic whereas he showed no anger, no mania, and showed no depression during the contact. Dwayne was active during the encounter and walked around in his cell, pretending to build things but no other psychomotor activity was noted. Worker was unable to assess his motivation, judgment or attitude. Thoughts were delusional and disorganized as well as being illogical." Denies risk for suicide. Risk assessment includes "Dwayne denied thoughts of self-harm. He showed no aggression or anger during this contact. There are risk factors that include significant alcohol use as well as the psychosis that is currently present. Dwayne is currently located in one of the observation cells so that his behaviors can be monitored by jail staff. Clinical intervention includes attempted to assess Dwayne. Very difficult process due to his delusional behavior while going through the DTs. Consulted with Jail staff regarding concerns for Dwayne. The visit with Dwayne was requested so that he would be assessed regarding his level of stability. Consulted with Randy B Jail Administrator on his concerns for Dwayne. Reinforced the ability for CMH to come into the jail at any time to meet with Randy. Client will request follow-up contact. Disposition includes "if the jail staff feels there's a need, or Dwayne requests contact with correctional mental health, a contact visit will take place." The mental health assessment of Mr. Greene by Nanci Karczewski was timely, appropriate within licensure and responsibility, and demonstrated what another health-trained correctional mental health professional would have done given the same circumstances. Nanci Karczewski did not have the licensure, clinical expertise, or responsibility to personally refer Mr. Greene to medical personnel, obtain Provider orders, or deliver life-saving medications and treatment to Mr. Greene. Correctional officers had the responsibility to refer Mr. Greene to appropriate medical personnel and only a licensed medical professional could have obtained Provider orders and delivered life-saving medications and treatment to Mr. Greene.

On December 8, 2017 at approximately 7:27 AM Corporal Tessner started the dispersing of the morning medications to inmates. Officer Avalos seated by computer jail 02 watched inmate Greene in D01 walking around his cell as Corporal Tessner walked out of the booking room. At this time, officer walked to the control panel to let Corporal Tessner into the cell blocks. Officer watched Corporal Tessner until she had finished passing out the medications and exited A-block, that was about 7:41 AM. As Corporal Tessner walked into the control room she asked officer "if Greene was alright?" I responded that he was just standing by the back of the cell. I then looked and Greene was lying on the floor. I went into D01 to check on Greene at 7:43 AM and shook Greene and he was unresponsive. I then started chest compressions and had Corporal Tessner call for help. Corporal Tessner there then brought me the automatic external defibrillator. I continued compressions until Deputies Ryan Swope, John Klepadlo and Lieutenant McDonald showed up. Instantly Deputy Swope took over the chest compressions while myself and Deputy Klepadlo hooked up the AED.

The Medical Examiner found that the Cause of Death for Mr. Greene was "Complications of Chronic Ethanol Use" with an Investigative and Autopsy finding of "Alcohol Withdrawal."

## Summary of Opinions and Conclusion:

Based on my education, training, correctional healthcare experience, ongoing patient healthcare, educator for custody correctional staff including Correctional Healthcare and Jail Operations, and review of all listed documents, it is my expert opinion that correctional officers knew of Mr. Dwayne Greene's serious medical needs, knew that Mr. Greene was demonstrating symptoms of life-threatening Delirium Tremens, failed to summon appropriate medical care, violated policies and procedures, and fell below the standards of what another reasonable health-trained correctional officer would have done given the same circumstances. The collective correctional officers' documented actions and inactions at Crawford County Jail in Grayling Michigan failed to obtain qualified medical care for Mr. Greene for a condition that is easily treatable and could have been life-saving.

The documented mental health assessment by Nanci Karczewski LLPC, CMH Therapist responding to a request by a correctional officer for Mr. Greene was appropriate within licensure and clinical responsibility, within policies and procedures for mental health, and demonstrated the standard of what another reasonable correctional health-trained mental health professional would have done given the same circumstances.

Nanci Karczewski did not have the licensure, clinical expertise, or responsibility to personally refer Mr. Greene to medical personnel, obtain Provider orders, or deliver life-saving medications and treatment to Mr. Greene. Correctional officers had the responsibility to refer Mr. Greene to appropriate medical personnel and only a licensed medical professional could have obtained Provider orders and delivered life-saving medications and treatment to Mr. Greene.

The above opinions and conclusions are based on a reasonable degree of medical nursing certainty and on the information provided. I reserve the right to amend my report should additional information become available through discovery.

Terry Fillman, RN, MBA, CCHP

Signature: _____   Date: 5/16/19

8 | Greene v Northern Lakes Mental Health et al.          Expert Report by Terry Fillman

Defendants NLCMHA, Karczewski and Kaminski's Rule 26a2 Disclosures 000072