UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHERYL GREENE, Personal
Representative of the Estate of Dwayne
Greene, deceased,

                Plaintiff,                          Case No. 18-11008

v.                                          Honorable Thomas L. Ludington

CRAWFORD COUNTY, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS CRAWFORD COUNTY'S MOTION FOR SUMMARY JUDGMENT,
GRANTING DEFENDANTS NLCMHA'S MOTION FOR SUMMARY JUDGMENT
AND DENYING AS MOOT NLCMHA'S MOTIONS TO EXCLUDE AND IN LIMINE**

Mr. Dwayne Greene died on December 12, 2017 after being detained at the Crawford County Jail in Grayling Michigan. Plaintiff Cheryl Greene, Dwayne's mother and his personal representative, filed her first amended complaint addressing her son's death on August 28, 2019. She alleges in Counts I and II that Defendants were deliberately indifferent and violated her son's "right to be free from cruel and unusual punishment while incarcerated under the custody and control of Defendants" under the Eighth and Fourteenth Amendments in failing to secure medical assistance for her son who was experiencing symptoms of alcohol withdrawal while in their custody. ECF No. 46 at PageID.636-645. Next, she alleges Defendants failed to intervene when her son's Eighth Amendment/Fourteenth Amendment right to be free from deliberate indifference was being violated and that failure caused his death (Count III). Count IV alleges a *Monell* liability claim against Defendants Crawford County, Sheriff Wakefield, and Northern Lakes Community Mental Health Authority. Plaintiff alleges Defendants "were responsible for inmates' custody and

care, and/or encouraged the [Crawford County and NLCMHA employees] to" violate Mr. Greene's constitutional right to be free from deliberate indifference. ECF No. 46 at PageID.647. Finally, Plaintiff alleges a pendent state law claim of gross negligence and/or wanton and willful misconduct (Count V). Specifically, Plaintiff alleges that while Mr. Greene was in Defendants' custody and they monitored and cared for him "in an extremely careless, grossly negligent, reckless, and wanton and willful manner without concern whatsoever for his safety and welfare, and failed to tend to [Mr. Greene's] serious medical needs." ECF No. 46 at PageID.654.

Defendants Crawford County and its employees filed a motion for summary judgment on December 10, 2019. ECF No. 59. Defendants contend that all of the corrections officers are entitled to qualified immunity for Counts I, II, and III, that the *Monell* claim fails because there is no underlying constitutional violation, and that the corrections officers are eligible for governmental immunity as to the gross negligence claim. Defendants Northern Lakes Community Mental Health Authority ("NLCMHA") and its employees filed their own motion for summary judgment on the same day. ECF No. 61. The NLCMHA Defendants argue that all claims are barred by Eleventh Amendment sovereign immunity. They further argue that even if sovereign immunity does not apply, the individual Defendants are entitled to qualified immunity for Counts I, II, and III, that the *Monell* claim fails because Plaintiff cannot establish a NLCMHA policy responsible for a constitutional violation, and that the Defendants are entitled to governmental immunity for the state law gross negligence claim. Responses and replies were timely filed. ECF Nos. 65, 66, 67, 77, 78.

After reviewing the facts, NLCMHA Defendants' argument for sovereign immunity will be addressed first. Then, each claim will be analyzed first for the Crawford Defendants and then for the NLCMHA Defendants. Finally, a short summary of the remaining claims will be provided.

## I.

Mr. Dwayne Greene was incarcerated in the Crawford County Jail on December 4, 2019 after his bond was revoked. ECF No. 59-5. After several days in the custody of the jail, he suffered delirium tremens due to alcohol withdrawal, lost consciousness on December 8, 2019 and passed away on December 12, 2017 at Munson Medical Center. ECF No. 46 at PageID.636; ECF No. 59 at PageID.2411.

## A.

Mr. Greene was a carpenter. He worked for his family's roofing business and after it closed he worked for multiple construction companies. ECF No. 59-10 at PageID.2662. He worked 8–12 hours a day depending on weather and the availability of construction materials. ECF No. 59-10 at PageID.2663. His Mother described him as a functional alcoholic. ECF No. 59-10 at PageID.2666.

On August 6, 2017 Mr. Greene was arrested for operating a vehicle while impaired, third offense, which is a felony. ECF Nos. 59-5; 59-3. He was booked into the Crawford County Jail on August 6, 2017 and his Mother believes he was able to post bail the following morning. ECF No. 59-10 at PageID.2667.

From August 2017 to December 2017 Mr. Greene was trying to reduce his consumption of alcohol. ECF No. 59-10 at PageID.2669. He drank vodka daily but reduced his consumption from a fifth a day to a pint a day. ECF No. 59-10 at PageID.2669.

On December 4, 2017 Mr. Greene appeared at the Crawford County Circuit Court to enter a guilty plea. ECF No. 59-5. Crawford County Circuit Court Judge Colin Hunter was informed that Mr. Greene acknowledged that he had been drinking alcohol that day and ordered Mr. Greene to take a preliminary breath test. *Id.* Mr. Greene's breath alcohol level was .194, even after waiting

for 3-4 hours at the courthouse for his hearing. *Id.* During the hearing, Mr. Greene's attorney explained to Judge Hunter that "he's tried to quit on his own before, and he's had seizures. He will get violently ill in the jail going cold turkey." *Id.* at PageID.2524. Despite Mr. Greene's attorney's plea, Judge Hunter revoked Mr. Greene's bond finding that he was a danger to himself. He explained that "I'm going to trust that the jail staff is going to do what they're trained to do, which is, if they see a problem, they're going to address it immediately, but I'm absolutely not going to cut you free on a bond." *Id.* He further explained to Mr. Greene that

> Now, again, that doesn't mean that I feel that you don't need treatment. I think you do. . . . If you – let me be clear though, Mr. Greene, if you qualify for treatment, I don't stand in the way of that, and I won't stand in the way of that. Whether or not you're going to be able to qualify for that treatment while you've got pending matters and before you've been sentenced, I think I know the answer to that is that most centers won't allow you to that treatment. That being said, if you can get into a rehab center, I won't have a problem signing an order, which is going to be prepared by your attorney, which allows you to be released to the center.
> *Id.* at PageID.2524-2525.

### B.

Captain Baerlocher is the Crawford County Jail ("the jail") administrator who reported, at the time, to Sheriff Wakefield. ECF No. 59-7 at PageID.2551; ECF No. 66-24 at PageID.3648. Katie Tessner and Renee Christman are Corporals, and supervisors, at the Crawford County Jail. ECF No. 59-7 at PageID.2562; ECF No. 59-2 at PageID.2442. The jail has 57 beds and an average daily population of 37. ECF No. 59-7 at PageID.2575. Generally, the corrections officers or COs monitor the inmates and report to their supervisors, the corporals. ECF No. 59-7 at PageID.2560. They do not usually update Capt. Baerlocher about the details of daily activity in the jail *Id.* If a CO is "doing something with the inmate" or if an inmate displayed "severe behaviors," they would usually log it in the jail record. ECF No. 59-15 at PageID.2864.

The Crawford County Jail is not certified by the American Correctional Association, nor has it sought the certification from the American Correctional Association. ECF No. 59-7 at PageID.2557. Additionally, Capt. Baerlocher is not aware of Crawford County using the CIWA ("Clinical Institute Withdrawal Assessment for Alcohol") score of the PAWSS ("Prediction Alcohol Withdrawal Severity Scale"). ECF No. 59-7 at PageID.2566.

Capt. Baerlocher, the sheriff, and the undersheriff all share responsibility for promulgating policies and procedures at the jail. ECF No. 59-7 at PageID.2551. The undersheriff instructs employees about policy and then has them sign a copy of the policy to corroborate that they have been instructed about the policy. ECF No. 59-7 at PageID.2564. If Capt. Baerlocher sees someone not following policy, then he will address it with them. ECF No. 59-7 at PageID.2564. If there was any training that occurred on alcohol withdrawal, Capt. Baerlocher would be responsible for the training. ECF No. 66-24 at PageID.3648.

Captain Baerlocher explained that if a bailiff or corrections officer was in court and heard a defense attorney explain that a defendant would become violently ill by quitting alcohol, it would have been expected practice for the officer to communicate the information to the jail staff. ECF No. 59-7 at PageID.2555. However, Captain Baerlocher also testified that bailiffs "get tasked with many things that are going on in the courtroom" including securing inmates, watching inmates, questions from attorneys, and paying attention to the matters in front of the judge. ECF No. 59-7 at PageID.2556.

**i.**

When an inmate is booked into the Crawford County jail, they are furnished with a medical questionnaire "to be able to understand learn a little bit about [the inmate's] history of their daily habits and medical and mental stability." ECF No. 59-7 at PageID.2565. According to jail policy,

a nurse is required to evaluate an inmate within 14 days of an inmate's arrival. ECF No. 59-7 at PageID.2565.

The Crawford County Jail contracted with a nurse to visit the jail on Tuesdays and Fridays each week. ECF No. 59-7 at PageID.2567. The nurse is scheduled to work 8 to 12 hours per week. ECF No. 59-7 at PageID.2575. However, if more time was needed, the additional time would be made available. ECF No. 59-7 at PageID.2575.

In addition to the nurse, Northern Lakes Community Mental Health Authority ("NLCMHA") has an ongoing agreement with the Crawford County jail to provide consultative services for those "experiencing a mental health crisis." ECF No. 59-4 at PageID.2496. NLCMHA's purpose "is to provide a comprehensive array of mental health services appropriate to the conditions of individuals who are located within its geographic service area, regardless of an individual's ability to pay as required by and permitted under . . . the Mental Health Code." ECF No. 114 at PageID.5803-5804. If an inmate does not have an ongoing relationship with a NLCMHA counselor and the jail requests a crisis worker, someone from the crisis response team will respond. ECF No. 59-4 at PageID.2501. The employee responding could be a nurse, social worker, licensed professional counselor, or psychologist. ECF No. 59-4 at PageID.2495.

Sheriff Wakefield testified that he would not rely on NLCMHA for medical matters in the Crawford County Jail. ECF No. 66-24 at PageID.3650. However, while not official jail policy, jail employees will rely on CMH's assistance for a physical health or medical concern. ECF No. 59-7 at PageID.2568-3569. Specifically, Capt. Baerlocher however testified that he does not believe it is against Crawford County policy to work closely with NLCMHA and to follow their direction if NLCMHA staff believe physical medical attention is necessary. ECF No. 59-7 at PageID.2577. Despite the reliance on NLCMHA, both Corporal Tessner and Capt. Baerlocher testified that

NLCMHA is not a medical provider. ECF No. 59-2 at PageID.2446; ECF No. 59-7 at PageID.2564.

**ii.**

Mr. Greene suffered from delirium tremens prior to his death. There is extensive literature available discussing alcohol withdrawal and delirium tremens more specifically. An article written by Marc Schuckit, *Recognition and Management of Withdrawal Delirium*, was published in the New England Journal of Medicine defines and provides treatment protocols for delirium tremens. There are multiple states of alcohol withdrawal. The first is mild or moderate withdrawal.

> Withdrawal symptoms associated with depressants such as alcohol include insomnia, anxiety, and increased pulse and respiration rates, body temperatures, and blood pressure, as well as a hand tremor. Because of the short action of ethanol (beverage alcohol), withdrawal symptoms usually begin within 8 hours after blood alcohol levels decrease, peak at about 72 hours, and are markedly reduced by day 5 through 7 of abstinence.
>
> Marc Schuckit, *Recognition and Management of Withdrawal Delirium (Delirium Tremens)*, 371 The New England Journal of Medicine 2109, 2109 (2014).

Delirium tremens is the result of alcohol withdrawal. Delirium is defined as "a rapid-onset fluctuating disturbance of attention and cognition, sometimes with hallucinations." *Id.* at 2110. Delirium tremens "usually begins about 3 days after the appearance of symptoms of alcohol withdrawal and lasts from 1 to 8 days or more (usually 2 or 3 days)." *Id.* Approximately 1 to 4% of hospitalized patients with delirium tremens die, but the rate can be reduced, according to the article, with proper and timely diagnosis and treatment for symptoms. *Id.* "The best approach to the prevention of withdrawal delirium is the identification and treatment of preexisting concomitant medical problems and withdrawal syndromes." *Id.* at 2111.

> The major treatment goals for [delirium tremens] are to control agitation, decrease the risk of seizures, and decrease the risk of injury and death with the use of [specific] methods . . . . Because of the high prevalence of agitation among patients with withdrawal delirium and the potential lethal outcomes, treatment is best carried out in a locked inpatient ward or an ICU. The approach to the management

- 7 -

of [delirium tremens] includes a careful physical examination and appropriate blood tests to identify and treat medical problems that may have contributed to the severe withdrawal state. The same general types of support needed for any patient with delirium should be used for the patient with [delirium tremens], including helping to reorient the patient to time, date, and place, evaluating and treating the patient in a well-lit room, providing reassurance, performing frequent monitoring of vital signs, and ensuring adequate hydration.
*Id.* at 2110-2111.

Finally, the suggested treatment for delirium tremens includes various medicines highlighted in the article, as well as to,

Provide care in an inpatient setting, preferably an intensive care unit.
Perform a workup to rule out medical conditions and measure values . . .
Provide supportive care by monitoring vital signs frequently (e.g., every 15-30 min) in a quiet, well-lit room. Reorient patient to time, place, and person.
. . .
Provide medications to control agitation, promote sleep, and raise the seizure threshold."
*Id.* at 2111.

### iii.

The Crawford County Jail's practice for inmates experiencing alcohol withdrawal is to observe them. ECF No. 59-7 at PageID.2574; ECF No. 59-2 at PageID.2440-2442; ECF No. 59-15 at PageID.2848; ECF No. 59-19 at PageID.2960. Sheriff Wakefield testified, prior to Mr. Greene's passing, that "[b]asically, yes" it was the custom and practice "of the Crawford County jail to have persons who are undergoing alcohol withdrawal to remain in the observation area until they can see the jail nurse." ECF No. 66-24 at PageID.3648. Tessner testified during her deposition that the staff observes inmates experiencing alcohol withdrawals until they can be seen by medical personnel. ECF No. 59-2 at PageID.2440-2442. "It's an everyday occurrence in the jail just about when it comes to people withdrawing from alcohol or drugs or having mental health issues that require a constant observation and decision-making." ECF No. 59-7 at PageID.2560. Capt.

Baerlocher testified that there is no specific policy providing guidance to jail employees to address an inmate going through alcohol withdrawal. ECF No. 59-7 at PageID.2557.

Capt. Baerlocher agreed that it "was the custom and practice at Crawford County that detoxification of alcohol withdrawal was not done under medical supervision." ECF No. 59-7 at PageID.2569. He explained that "[a]nybody that's identified as having – whether it be alcohol or any type of struggle, whether it be a mental health issue, you know, confusion, state of mind, they are going to be in observation. Somebody under the influence of alcohol no matter what amount would be put in a de-tox cell and observed at all times." ECF No. 59-7 at PageID.2552. However, if someone had a PBT of .30, they would be required to go to the hospital for medical clearance before going to jail. ECF NO. 59-7 at PageID.2554.

Crawford County Defendants responded to an interrogatory acknowledging that "Defendants admit that Crawford County had no written policy or procedure specifically tailored for the treatment of alcohol withdrawal in inmates suffering from alcohol withdrawal but that it has written policies and procedures pertaining to inmate physical and mental healthcare." ECF No. 66-36 at PageID.3822. Defendants further stated they had no written policies regarding "severe alcohol withdrawal" or "delirium tremens." *Id.* at PageID.3822-3823.

Katie Tessner testified that she does not recall receiving any training by Crawford County about the signs or symptoms of alcohol withdrawal except for training from the CMH. She could not, however, recall the details of the training. ECF No. 59-2 at PageID.2441. She also was not aware of any jail policies or procedures addressing the signs or symptoms of alcohol withdrawal. ECF No. 59-2 at PageID.2441. Katie Tessner and CO Donald Steffes, Jr. testified that they were not provided training about the difference between mild alcohol withdrawal and severe alcohol withdrawal. ECF No. 59-2 at PageID.2444; ECF No. 59-12 at PageID.2744. Tessner explained

that the only person at the jail who qualified as a professional to supervise an inmate suffering from alcohol withdrawal is the jail nurse. ECF No. 59-2 at PageID.2437. According to Tessner, 911 has not been called regarding an inmate experiencing alcohol withdrawal in the past 9 years. ECF No. 59-2 at PageID.2447.

If a staff member observes an inmate in distress, the inmate will be sent to the emergency room. ECF No. 59-7 at PageID.2574. CO Suiter testified that if he observed "labored breathing, the shakes" or someone who had collapsed or someone who complained of chest pain, he would call 911. ECF No. 59-19 at PageID.2960. There is a custom and practice at the jail to call 911 if an inmate has a seizure. ECF No. 59-9 at PageID.2648. CO William Sbonek testified that he knows how to call 911 based on "instinct." ECF No. 59-8 at PageID.2630.

If a corrections officer believes an inmate needs to see a nurse at a time the nurse is not scheduled to visit, he or she is authorized to call the nurse without seeking permission from a supervisor. ECF No. 59-7 at PageID.2583. Capt. Baerlocher was not aware of a time when a nurse was called into the jail on her off-day, but he is "sure that's happened before." ECF No. 59-7 at PageID.2563.

Additionally, CO David Nielson testified that he was trained in Crawford County Jail written policy or custom to call NLCMHA when they observe behavior like Mr. Greene's. ECF No. 59-9 at PageID.2649. He thought that calling NLCMHA was the jail's first step when there was a situation with an inmate. ECF No. 59-9 at PageID.2650. CO Foster testified that, at the time, he "assume[d] that [NLCMHA] would help with medical treatment, if needed." ECF No. 59-15 at PageID.2866. Capt. Baerlocher testified that it was his past practice to rely upon a mental health professional for physical medical care opinions. ECF No. 59-7 at PageID.2576-2577. Specifically, he stated that "[Alcohol withdrawal] symptoms are not easily – are not easily determined. CMH

helps us a lot to determine what that person is suffering from." ECF No. 61-5 at PageID.3163. He testified further as follows: "Q. Are you suggesting that you use Community Mental Health – Northern Lakes Community Health to help you identify medical issues? A. We have. . . . Q. And is that consistent with your health care policy at the jail? A. I would say no. It's a resource, but no." ECF No. 61-5 at PageID.3167-3168.

### iv.

Katie Tessner has worked with the Crawford County Sheriff's Department for nine years and prior to Mr. Greene's death she had never heard of delirium tremens. ECF No. 59-2 at PageID.2436. Capt. Baerlocher had heard of the term "DTs" before, but "always thought it to mean de-toxing. I never knew it to mean delirium tremens." ECF No. 59-7 at PageID.2569. Captain Baerlocher also testified that Crawford County never provided training to corrections officers regarding delirium tremens. ECF No. 59-7 at PageID.2554. CO Foster also testified that he "wasn't really that aware of" delirium tremens prior to December 2017. ECF No. 59-15 at PageID.2856. CO Suiter also testified he was not aware that delirium tremens was a severe form of alcohol withdrawal in December 2017. ECF No. 59-19 at PageID.2958.

### C

### i.

Northern Lakes Community Mental Health Association "serve[s] people that have mental health concerns and sometimes that occurs in the jail." ECF No. 59-4 at PageID.2485. NLCMHA "provide[s] consultative services to the jail in terms of screening people who are experiencing a mental health crisis." ECF No. 59-4 at PageID.2496. Funding from Medicaid and from state or federal appropriations accounted for 82% of NLCMHA's budget in 2019 and 81% in 2018. ECF No. 114 at PageID.5808.

NLCMHA "was established pursuant to an Enabling Resolution and Agreement between the counties of Crawford, Grand Traverse, Leelanau, Missaukee, Roscommon, and Wexford." ECF No. 114 at PageID.5803. NLCMHA explains that it "is its own public governmental entity separate from the counties that established it." ECF No. 114 at PageID.5807. The agreement between Crawford, Grand Traverse, Leelanau, Missaukee, Roscommon and Wexford Counties from 2003 establishing NLCMHA states "[t]he purpose of the Northern Lakes Community Mental Health Authority . . . is to provide a comprehensive array of mental health services appropriate to the conditions of individuals who are located within its geographic service area, regardless of an individual's ability to pay." ECF No. 114-1 at PageID.5821. Board members for NLCMHA "shall be representative of providers of mental health services, recipients or primary consumers of mental health services, agencies and occupations having a working involvement with mental health services, and the general public." ECF No. 114-1 at PageID.5826-5827. The enabling resolution provides that:

> The Authority . . . is a separate legal and administrative public governmental entity from the county or counties that established it and created it under MCL § 300.1205; to operate as a community mental health program. The Authority as a public governmental body corporate has those powers herein defined and defined in the Mental Health Code, PA 258 of 1974, as amended, as well as those generally applicable to a separate legal entity, including the power to sue and be sued in its own name.
> ECF No. 114-1 at PageID.5834.

The enabling resolution also provides that:

> The Authority shall procure and maintain all risk insurance in the amount of $10,000,000 liability limit, workers compensation, errors and omissions and any other insurance coverage appropriate or necessary for proper coverage of the Authority, its Board, Employees, and Agents to properly insure the Authority, considering its nature, purpose and function.
> ECF No. 114-1 at PageID.5835.

Additionally, there is a contract between NLCMHA and MDHHS for mental health services. The contract for the relevant timeframe (December 2017) was signed in September 2017. The contract provides that NLCMHA will provide mental health services to a region of the state and provides for significant oversight by MDHHS over NLCMHA, including review of any service delivery. ECF No. 114-3. It also states, in part,

> All liability, loss, or damage as a result of claims, demands, costs, or judgments arising out of activities to be carried out pursuant to the obligation of the [community mental health services program ("CMHSP")] under this contract shall be the responsibility of the CMHSP, and not the responsibility of the MDHHS, if the liability, loss, or damage is caused by, or arises out of, the actions or failure to act on the part of the CMHSP, its employees, officers or agent. Nothing herein shall be construed as a waiver of any governmental immunity for the County(ies), the CMHSP, its agencies or employees as provided by statute or modified by court decisions.
> . . .
> The CMHSP shall be responsible for the development of the service delivery system and the establishment of sufficient administrative capabilities to carry out the requirements and obligations of this contract.
> . . .
> The state, its departments, and its agents shall not be responsible for representing or defending the CMHSP, the CMHSP's personnel, or any other employee, agent or sub-contractor of the CMHSP, named as a defendant in any lawsuit or in connection with any tort claim.
> ECF No. 114-3 at PageID.5893-5894.

Michigan law defines a community mental health authority to be a "separate legal public governmental entity created under [MCL § 330.1205] to operate as a community mental health services program." MCL § 330.1100a(16). The county board of commissions must adopt an enabling resolution to create a CMH after at least three public meetings. MCL § 330.1205(1). The statute provides the minimum content of the enabling resolution. MCL § 330.1205.

Michigan law "shift[s] primary responsibility for the direct delivery of public mental health services from the state to a community mental health services program whenever the community mental health services program has demonstrated a willingness and capacity to provide an

adequate and appropriate system of mental health services for the citizens of that service area."
MCL § 330.1116(2)(b). MCL § 330.1232a provides that MDHHS has jurisdiction over the rules
set by CMHAs.

ii.

In October 2017 NLCMHA offered a mental health training session in Crawford County
as part of a week-long training program organized by local law enforcement. ECF No. 59-4 at
PageID.2484. During the October 2017 training, NLCHMA's addressed symptoms of alcohol
withdrawal, including shaking hands, unsteady gait, and talk about different levels of withdrawal.
ECF No. 59-4 at PageID.2486. NLCMHA's corporate representative testified that they "try to
stress too that alcohol withdrawal is important because it's a medical condition," but that
information is not always shared during the presentations. ECF No. 59-4 at PageID.2487. "We talk
about things to look for, the aggressiveness, hyperactivity, yelling, extreme paranoia. The core
body temperatures can change. . . . I don't believe we use the terminology medical emergency, but
we do say they should get checked out." ECF No. 59-4 at PageID.2491.

Handouts from the training include some information regarding severe alcohol withdrawal.
For example, the handout provides that

> The first crises (intoxication, alcohol poisoning, severe withdrawal, and aggression)
> will be observed more in the behavior of the person than what they tell you, whereas
> the last crises (suicidal thoughts and behaviors and nonsuicidal self-injury) will
> only become apparent after you have approached the person about your concerns.
> ECF No. 66-7 at PageID.3311.

The handout also provides that "severe alcohol withdrawal may lead to a medical emergency" and
encourages readers to "[s]eek medical help if the person displays symptoms of severe alcohol
withdrawal, such as Delirium tremens (a state of confusion and visual hallucinations)[,] agitation
[,] fever[,] seizures[,] blackout." ECF No. 66-7 at PageID.3311. Finally, the handout explains that

- 14 -

"If the person is dependent on alcohol, they will have to withdraw from alcohol before other approaches are tried. This should be done under professional supervision." ECF No. 66-7 at PageID.3313. Finally, the handout encourages individuals to call an ambulance or seek medical assistance if the individual "[h]as delirium tremens-a state of confusion and visual hallucinations." ECF No. 66-7 at PageID.3317. A second hand-out from the seminar provides that 911 should be called when the person "cannot be awakened or is unconscious[;] has irregular, shallow, or slow breathing[;] has irregular, weak, or slow pulse[;] has cold, clammy, pale, or bluish skin[;] is continually vomiting[;] shows signs of a possible head injury (e.g., talking incoherently)[;] has seizures[;] has delirium tremens – a state of confusion and visual hallucinations." ECF No. 66-8 at PageID.3322.

The NLCMHA corporate representative, Joanie Blamer, testified that alcohol withdrawal can be but is not necessarily a medical condition. ECF No. 59-4 at PageID.2487. The NLCMHA representative testified that "Excited delirium is a medical condition and we're not medical professionals. Our role with mental health first aid is to help people identify signs and symptoms and then create a plan of how you would respond." ECF No. 59-4 at PageID.2487. She explained that during the training, they would focus on standard alcohol withdrawal but not severe withdrawal. ECF No. 59-4 at PageID.2487. At the October 2017 training NLCMHA did not explain that "DTs" referred to delirium tremens and not detoxing, even though NLCMHA as an organization recognizes the difference. ECF No. 59-4 at PageID.2502-2503. However, CO David Nielson testified that he knew that DTs meant delirium tremens and that it was a medical emergency after he completed the mental health training. ECF No. 59-9 at PageID.2647. Nanci Karczewski testified during her deposition that she "believe[s] that there is a [NLCMHA] policy that says that if a person is – if an individual goes in and sees a person in the jail and they're

experiencing withdrawal from substances that we should refer them for medical treatment." ECF No. 59-17 at PageID.2892. However, she does not know when the policy was put into effect or whether she reviewed it before December 2017. *Id.* A copy of the written policy was not included in any exhibits to the motions.

### iii.

Capt. Baerlocher testified that it would be a violation of the procedures and practices of Crawford County if the COs did not provide information about an inmate recorded in their logs to the NLCMHA representative when she came to evaluate an inmate. ECF No. 59-7 at PageID.2591. He also testified that there is at least one time when a NLCMHA employee made a medical referral for an inmate named Michael Kesier who was suffering from alcohol withdrawal. ECF No. 59-7 at PageID.2592. As a mental health professional herself, the NLCMHA corporate representative testified that if she knew she evaluated an individual suffering from DTs, she would inform jail staff that the person is experiencing a medical issue and encourage medical assistance. ECF No. 59-4 at PageID.2496. However, she testified that NLCMHA does not have any policies that require that a NLCMHA mental health professional to recommend physical medical assistance. *Id.*

NLCMHA's Joanie Blamer testified that the symptoms of alcohol withdrawal and mental health illness are similar. Therefore, if the jail personnel did not know about the alcohol withdrawal ahead of time, it would be reasonable to call NLCMHA. ECF No. 59-4 at PageID.2497–99 ("[I]t is extremely challenging to be able to tell the difference between a mental health symptom and a symptom of alcohol withdrawal or withdrawals in general.") However, if a corrections officer knew the defendant was suffering from alcohol withdrawal, then it would not be reasonable for a corrections officer to believe it was a mental health issue. *Id.*

**D.**

On August 6, 2017, Tessner completed a health questionnaire for Mr. Greene when he was arrested. ECF No. 59-2 at PageID.2437-2438. When she asked him if he had any problems when he stopped drinking alcohol, he replied that he never stopped drinking, so he did not know. ECF No. 59-2 at PageID.2438. On December 4, the date of Mr. Greene's court hearing, he did not go through the entire booking process again when his bond was revoked. ECF No. 59-2 at PageID.2438. However, he was asked if anything had changed since he was originally booked in August and he replied no. ECF No. 59-2 at PageID.2438.

The bailiff, Steven Detmer, has no independent recollection of Mr. Greene's hearing or the discussion between Mr. Greene's attorney and the judge about his alcohol addiction ECF No. 59-6 at PageID.2531. His routine practice was to walk back and forth between the two courtrooms in the Crawford County courthouse. ECF No. 59-6. He acknowledged in his deposition that a video showed him walking in and out of the courtroom throughout Mr. Greene's hearing. *Id.* He testified that, hypothetically, it would be his practice to pass along medical information he learned in the courtroom to jail staff. ECF No. 59-6 at PageID.2533. However, Bailiff Detmer has no independent memory of Mr. Greene's court appearance. ECF No. 59-6 at PageID.2531, 2538.

Additionally, Corporal Tessner was not made aware of the information conveyed at the court hearing. ECF No. 59-2 at PageID.2439. Capt. Baerlocher testified that if the bailiff heard pertinent information for the jail at the courthouse, he would expect the bailiff to communicate the information to the jail employees ECF No. 59-7 at PageID.2556. However, he also explained that would only be the case if the bailiff actually heard the information because they have multiple tasks at the courthouse. *Id.* Another CO who also acted as a bailiff, CO Foster, testified that if something were said in open court, he likely would not relay that information to the jail because

- 17 -

he "wouldn't hear that information . . . [because] my job as the bailiff at that time is to make sure everything is going correctly in the courtroom. It's more of a security issue is what I'm in there for." ECF No. 59-15 at PageID.2852.

Mr. Greene was placed in an observation cell, near the booking area of the jail because he was inebriated when he was admitted to jail. ECF No. 59-2 at PageID.2453-2454. He remained in one of the two observation cells throughout his time in the jail. ECF No. 59-11. No second preliminary breath test was administered. ECF No. 59-7 at PageID.2587. During the period of time that Mr. Greene was lodged in the jail, the jail nurse was training a new nurse and due to scheduling conflicts, was at the jail on Monday and Friday. ECF No. 59-7 at PageID.2567. Mr. Greene entered the jail on Monday after the nurse had left, so he did not see her that day. ECF No. 59-13 at PageID.2770.

On December 4 and December 5 no one documented any unusual activity from Mr. Greene. ECF No. 59-13. He ate the food provided to him, asked for a puzzle, made a phone call to his Mother, and even asked about the process of becoming an inmate worker. ECF No. 59-2 at PageID.2441; ECF No. 59-10 at PageID.2670. ECF No. 59-11. His Mother testified that he sounded normal to her on the phone. ECF No. 59-10 at PageID.2670. Tessner testified that the only abnormal thing she noticed when she left work on December 5th was that Mr. Greene's hands were shaking, but she did not know if it was because of alcohol withdrawal or his nerves about being in jail. ECF No. 59-2 at PageID.2450.

On December 6 at 1:40pm, Corporal Christman recorded in the jail log that Mr. Greene was "acting erractic, [sic] appearing to be hellu-cinating, [sic] and to be detoxing." ECF No. 59-13 at PageID.2776; ECF No. 59-12 at PageID.2749. Sometime during the day on December 6, Capt. Baerlocher observed Mr. Greene putting his hands down a drain. ECF No. 59-7 at

PageID.2558. He also observed him "standing and pushing on the wall" of his cell. ECF No. 59-7 at PageID.2559. Further, he testified that he believed Mr. Greene was confused at times. ECF No. 59-7 at PageID.2580. A fellow inmate, who was in an adjacent cell, who was arrested for drinking and driving the night of December 6, testified that "[a]ll night long he screamed, extremely mad, pounded on things all night long" and that at 2 or 3 am he "got in a gunfight." ECF No. 66-39 at PageID.3860. He also explained that Mr. Greene seemed to be in charge of an imaginary construction crew. ECF No. 59-7 at PageID.3861. A second inmate testified that when he went by Mr. Greene's cell that "[h]e was completely out of it." ECF No. 66-40 at PageID.3873.

On December 7 at 4:30am, CO Foster requested someone from NLCMHA to visit the jail and evaluate Mr. Greene because he was talking to the wall. ECF No. 59-15 at PageID.2849.  The request was later elevated to urgent. ECF No. 59-14 at PageID.5793.

On December 7 Corporal Christman at 6:20am recorded that

> Inmate Dwayne Greene is still showing signs that he is still going through withdrawels form [sic] alcohol. He has tried to leave the cell, asking for hammer and nails, thinking his mother is speaking to him, he periodically yells out or bangs door, floor and walls. He is compliant and pleasant when speaking to him, but is confused and does not comprehend that he is here in the jail. We will contiunue [sic] to monitor him closely.
> ECF No. 59-13 at PageID.2779.

Only an hour later at 7:13 am, CO Tim Stephan recorded that Corporal Christman was "talking to Greene trying to get him to lay down and sleep still trying to get out of cell." ECF No. 59-13 at PageID.2779. At 7:24 am, Corporal Christman recorded "Greene still hyper and agitated." ECF No. 59-13 at PageID.2780. Only two hours later she noted that "Greene still has not slept. Still slightly agitated, he was moved to D01 for cell D02 to be cleaned. He complied and is not as loud as before." ECF No. 59-13 at PageID.2780. CO Amy Johnson recorded that "Greene, Dwayne in D01 refused his lunch." ECF No. 59-13 at PageID.2781; ECF No. 59-18 at PageID.2932.

- 19 -

Nanci Karczewski of NLCMHA responded to the jail to perform an evaluation on Mr. Greene at 2:11pm. ECF No. 59-17; ECF No. 59-13 at PageID.2781. Ms. Karczewski is a limited licensed professional counselor. ECF No. 59-4 at PageID.2495; ECF No. 59-17 at PageID.2888. She testified that Mr. Greene "was pulling cords from the ceiling and there weren't any cords there" and he "was picking like there were bugs on the walls and he was pacing" throughout her evaluation. ECF No. 59-17 at PageID.2894. She noted that he was oriented to person (he knew who he was), situation (he knew he was in jail and why), and place (he knew he was in jail), but he was not oriented to time. ECF No. 59-17 at PageID.2895. She was not able to evaluate his judgment because of his delusions and noted that his speech was rambling. ECF No. 59-17 at PageID.2895-2896. Ms. Karczewski's notes from her encounter with Mr. Greene state "Met w/ Dwayne. He is delusional while experiencing alcohol withdrawal. Dwayne admits to significant alcolism [sic] so is struggling w/ DT's. Does not appear to be risk to himself." ECF No. 59-16 at PageID.2884; ECF No. 66-14 at PageID.3433.

She testified that the jail staff did not tell her they were concerned because he was not eating, drinking, or sleeping. ECF No. 59-17 at PageID.2897-2898. She also said that the jail staff originally told her that Mr. Greene was going through "DTs" and that she knew DTs to mean delirium tremens. ECF No. 59-17 at PageID.2899, 2902. She was unaware if the jail staff also knew that DTs meant delirium tremens or they were referring more generally to 'detoxing from alcohol withdrawal' when they said 'DTs'. ECF No. 59-17 at PageID.2902. At the time, she was not aware that delirium tremens required medical treatment. ECF No. 59-17 at PageID.2899. Ms. Karczewski understands self-harm to mean the person is at risk of suicide. ECF No. 59-17 at PageID.2903. She explained that her assessment focused mostly on the inmate's risk of harm to himself or others. ECF No. 59-17 at PageID.2898.

Capt. Baerlocher had a conversation with Ms. Karczewski after she evaluated Mr. Greene. He testified that he did not know Ms. Karczewski's licensing or training background but is aware that she is not a nurse or doctor. ECF No. 59-7 at PageID.2588. His memory of the conversation is that she explained that Mr. Greene was not suffering from any mental health conditions and instead he was suffering from alcohol withdrawal. ECF No. 59-7 at PageID.2568. Capt. Baerlocher's memory is that Ms. Karczewski used the term "alcohol withdrawal" and not "DTs." ECF No. 59-7 at PageID.2569. Ms. Karczewski also told Capt. Baerlocher that Mr. Greene was not at risk of self-harm, which Capt. Baerlocher believed was a medical assessment, not only a mental health or suicide assessment. ECF No. 59-7 at PageID.2576. Katie Tessner does not recall NLCMHA telling them it was not a mental health issue. ECF No. 59-2 at PageID.2454.

CO Larry Foster recalled a conversation he had with Mr. Greene on December 6 or 7 where Mr. Greene was concerned about the cracks in the ceiling. ECF No. 59-15 at PageID.2848-2849. At some point CO Foster removed Mr. Greene's footwear, but he does not remember doing it or why. ECF No. 59-15 at PageID.2853. On the evening of the 7th, Mr. Greene was pacing back and forth in his cell and CO Suiter does not remember seeing him sleep. ECF No. 59-19 at PageID.2960. On the evening of December 7, 2017, Christman texted Katie Tessner and stated

> Wanted to give you a heads up that Greene is still going through the d.t.'s has not slept nor ate much. Hallucinations. Etc. Cmh seen and spoke to him. She said he is showing classic signs of withdrawal. Hopefully by the time you're there he will have decided to sleep. He has been monitored closely.
> ECF No. 66-15 at PageID.3436.

On the morning of December 8, COs Suiter and Foster told Corporal Tessner that "Greene had balled up his jail blanket and sweatshirt and he believed that to be his pack and that he was going to walk to Traverse City" the day before. ECF No. 59-2 at PageID.2447. Then, at 7:38am on December 8, 2017 CO Joel Avalos found Mr. Greene unresponsive in his cell. ECF No. 59-13

at PageID.2784. Corporal Tessner called 911 for an ambulance. *Id.* Capt. Baerlocher was one of the people who responded when Mr. Greene became unresponsive. ECF No. 59-7 at PageID.2571. He observed that Mr. Greene was unconscious and non-responsive. ECF NO. 59-7 at PageID.2571. Corporal Tessner testified that Greene "was laying on the ground" and "unresponsive" but she does not recall him shaking or his eyes rolling in the back of his head. ECF No. 59-2 at PageID.2446. CO Avalos and Deputy Ryan Swope performed CPR on Mr. Greene until the ambulance arrived. ECF No. 66-38 at PageID.3842. He was transported initially to Munson Hospital in Grayling, stabilized and then transported to Munson Hospital in Traverse City. ECF No. 66-38 at PageID.3842.

> Mr. Greene
>
> was admitted [to the hospital] on 12/8 with acute respiratory failure and severe cerebral anoxia. He was monitored for severe [sic] days in the ICU on the ventilator. Unfortunately, while he did not progress to complete brain death he did not recover any substantial brain function other than a few triggered breaths above the ventilator set rate. On 12/12, after consulting with the neurologist, the patient's parents decided to change modes of care to CMO. He was extubated and expired shortly thereafter with family at his bedside.
> ECF No. 66-38 at PageID.3850-3851.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Id.* at 251–52.

### III.

NLCMHA's contention that it is entitled to sovereign immunity and is protected from suit

will be addressed first. The Eleventh Amendment bars civil rights actions against a state and its

agencies and departments in federal courts unless the state has waived its immunity and consented

to suit or Congress has abrogated that immunity. *Will v. Michigan Dep't of State Police*, 491 U.S.

58, 66 (1989). "The state of Michigan . . . has not consented to being sued in civil rights actions in

the federal courts," *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick*

*v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)), and Congress did not abrogate state sovereign

immunity when it passed § 1983. *Chaz Const., LLC v. Codell*, 137 F. App'x 735, 743 (6th Cir.

2005). Eleventh Amendment immunity "bars all suits, whether for injunctive, declaratory or

monetary relief against a state and its agencies." *McCormick v. Miami Univ.*, 693 F.3d 654, 661

(6th Cir. 2012) (quoting *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir.

1993). Eleventh Amendment immunity extends to state employees who are sued in their official

capacities. *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (citing *Cady v. Arenac Co.*,

574 F.3d 334, 344 (6th Cir. 2009).

> To determine whether an entity is an arm of the state, courts have traditionally
> looked to several factors, including (1) whether the state would be responsible for
> a judgment against the entity in question; (2) how state law defines the entity; (3)
> what degree of control the state maintains over the entity; and (4) the source of the
> entity's funding.
>
> *S.J. v. Hamilton County, Ohio*, 374 F.3d 416, 420 (6th Cir. 2004).

NLCMHA explains that the "Sixth Circuit has not addressed the specific question of

whether a community mental health authority is entitled to invoke the State's sovereign immunity

under the Eleventh Amendment." ECF No. 114 at PageID.5806. Defendant explains that the

Supreme Court has held that "whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the state and the entity or individual being sued." *Regents of the Univ. of Cal. v. Dow*, 519 U.S. 425, 429–30 (1997); ECF No. 114 at PageID.5806.

Plaintiff responds that NLCMHA is not entitled to sovereign immunity. Plaintiff argues that NLCMHA is required to maintain its own insurance, so any judgment against NLCMHA would be paid by the CMH and not the state. ECF No. 115 at PageID.5947. Plaintiff also argues that the contract defines the CMH as an "independent contractor" and that the state does not have control over the day to day operations of the authority. *Id.* at PageID.5948-5949. Plaintiff also argues that while the state provides significant funding for NLCMHA and the funding factor may favor Defendant, it should not tip the scales fully in Defendant's favor for sovereign immunity. ECF No. 115 at PageID.5951-5952.

In the instant case, the contract explicitly provides that liability for NLCMHA's part of the contract is the CMH's responsibility. ECF No. 114-3 at PageID.5893 ("All liability, loss, or damage as a result of claims, demands, costs, or judgments arising out of activities to be carried out pursuant to the obligation of the CMHSP under this contract."). Further, the contract states that "The state, its departments, and its agents shall not be responsible for representing or defending the CMHSP, the CMHSP's personnel, or any other employee, agent or sub-contractor of the CMHSP." ECF No. 114-3 at PageID.5894. Therefore, the first factor weighs against sovereign immunity. The second factor asks how state law defines the entity. In the contract, the CMH is defined as an independent contractor. This factor also weighs against sovereign immunity. Third, the state maintains oversight control over the operations of the CMH, but the day to day operations of the CMH are conducted by the CMH itself. This factor also weighs against sovereign immunity.

Finally, NLCMHA receives a significant amount of funding from Medicaid, including state and federal sources. Medicaid capitation provides the majority of the funding for the NLCMHA at $56,867,787 and state and federal revenue provide $4,334,963 with a total revenue of $74,105,041 in 2019. ECF No. 114-2 at PageID.5853. As such, a significant portion of NLCMHA's revenue comes from either state or federal government funding. The fourth factor weighs in favor of sovereign immunity. However, the funding is primarily described as "Medicaid capitation" and it is unclear whether this is federal funds, state funds, or federal funds allocated to the state for pass-through to the state before distribution to NLCMHA. The fact that NLCMHA receives the majority of their funding from state and federal sources alone, when combined with lack of state liability for NLCMHA and minimal state oversight, is insufficient to find NLCMHA to be an arm of the state. NLCMHA is not eligible for sovereign immunity. NLCMHA's request for a motion for summary judgment due to sovereign immunity will be denied.

## IV.

Plaintiff's first count alleges that Defendants were deliberately indifferent to Mr. Greene's medical care violating the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. ECF No. 46. Specifically, Plaintiff alleges Defendants were "[f]ailing to observe and check on" Mr. Greene, "[c]onsciously exposing Decedent to an excessive risk of serious harm," "[f]ailing to request medical care and assistance," "[i]gnoring requests to provide [Mr. Greene] with the needed medical treatment," "[f]ailing to arrange for the jail physician and/or nurse to see and evaluate [Mr. Greene]," "[f]ailing to transfer [Mr. Greene] to the hospital for treatment, monitoring, observation, and supportive measures," "[f]ailing to perform necessary jail checks," "[d]elaying necessary medical treatment" and "[f]ailing to properly train and supervise the

individuals within the [jail] having custodial and/or care giving responsibilities over [Mr. Greene]." ECF No. 46 at PageID.639.

## A.

### i.

By its terms, the Eighth Amendment prohibits the imposition of any cruel and unusual punishment. At the time of its adoption, "cruel and unusual punishment" included draconian punishments such as the rack, thumbscrews, "tortures[,] and other barbarous methods of punishment." *Gregg v. Georgia*, 428 U.S. 153, 170 (1976) (internal quotation marks and citation omitted). Since then, Eighth Amendment jurisprudence has not remained static, but has developed with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). "The Eighth Amendment does not apply to pretrial detainees. Under the Fourteenth Amendment Due Process Clause, however, pretrial detainees have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001). Under this evolving standard, the Supreme Court requires prison officials to "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials are prohibited from being deliberately indifferent to a prisoner's serious medical needs, meaning the "unnecessary and wanton infliction of pain." *Id.* at 104.

A constitutional claim for the deprivation of adequate medical care "has two components, one objective and one subjective." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), *cert. denied*, 537 U.S. 817 (2002)). The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a serious need for medical care,

"*Farmer* requires only that 'the inmate show that he is incarcerated under conditions posing a substantial risk of serious harm[,]' so as to avoid 'the unnecessary and wanton infliction of pain.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). A serious medical need may be demonstrated by a physician's diagnosis mandating treatment or a condition that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. at 897 (citations omitted).

Establishing the second, subjective, component "requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Dominguez v. Corr. Med. Serv.*, 555 F.3d at 550 (quoting *Comstock*, 273 F.3d at 703). Deliberate indifference requires "more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citations omitted). Courts evaluating such a claim "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)).

Allegations of negligence, poor medical judgment, or unsuccessful treatment do not provide a basis to find an Eighth Amendment violation. *Smith v. Green*, 959 F.2d 236 (6th Cir. 1992) (citing *Estelle*, *v. Gamble*, 429 U.S. 97, 106 (1976)). "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments,' although 'it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'" *Id.* (citing *Westlake*, 537 F.2d at 860 n. 5). But "a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim."

*Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (citing *Estelle*, 429 U.S. at 107; *Rhinehart v. Scutt*, 509 F. App'x 510, 513–14 (6th Cir. 2013)) (other citation omitted); *see also Alspaugh*, 643 F.3d at 169 (while "Alspaugh certainly would have desired more aggressive treatment, he was at no point denied treatment.").

### ii.

Almost all of the Crawford County Defendants[1] and the individual NLCMHA Defendants contend that they are eligible for qualified immunity on Count I. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity depends on whether a defendant's action violated clearly established law. *Id.* at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-*

---

[1] Sheriff Wakefield's estate and Crawford County are identified at the beginning of Crawford County Defendants Motion for Summary Judgment as Crawford County Defendants. However, no argument was included for the Sheriff's qualified immunity.

*Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## B.

As outlined earlier, pretrial detainees have a constitutional right to medical treatment. *See supra* IV.A.i. Therefore, the first part of the qualified immunity analysis is satisfied. The analysis of whether the developed facts demonstrate a violation of Mr. Greene's constitutional right will be analyzed separately for the Crawford County Defendants and the NLCMHA Defendants.

### i.

Assessing Mr. Greene's Eighth Amendment right to be free from deliberate indifference resulting in harm requires a two part analysis. First, the plaintiff must demonstrate there is evidence of a 'sufficiently serious' medical need. In the instant case, Defendants do not dispute that Mr. Greene suffered from delirium tremens. ECF No. 59 at PageID.2414. And courts have held that delirium tremens is a sufficiently serious medical need. *Speers v. County of Berrien*, 196 Fed. App'x 390, 394 (6th Cir. 2006). Plaintiff satisfies the objective standard of the test. The second part of the test requires evidence that "the official being sued subjectively perceived facts from

which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Dominguez*, 555 F.3d at 550.

Plaintiffs have demonstrated that Corporal Christman noticed and recorded Mr. Greene's erratic behavior multiple times. First, Corporal Christman recorded in the jail log that Mr. Greene was "acting erractic, [sic] appearing to be hellu-cinating, [sic] and to be detoxing." ECF No. 59-13 at PageID.2776; ECF No. 59-12 at PageID.2749. In addition, on December 7, she also recorded in the log book that:

> Inmate Dwayne Greene is still showing signs that he is still going through withdrawels form [sic] alcohol. He has tried to leave the cell, asking for hammer and nails, thinking his mother is speaking to him, he periodically yells out or bangs door, floor and walls. He is compliant and pleasant when speaking to him, but is confused and does not comprehend that he is here in the jail. We will contiunue [sic] to monitor him closely.
> ECF No. 59-13 at PageID.2779.

Corporal Christman also recorded that he tried to get Mr. Greene to lay down and sleep the morning of December 7. ECF No. 59-13 at PageID.2779; ECF No. 59-13 at PageID.2780; ECF No. 59-13 at PageID.2780. There is no evidence that she called 911 or attempted to seek medical treatment, beyond the mental health evaluation by NLCMHA. The aforementioned facts are sufficient evidence to establish that there is a genuine issue of material fact that Corporal Christman was subjectively aware of a substantial risk of harm that could occur to Mr. Greene. She also noted that he was under continued observation, thereby demonstrating at least a genuine issue of material fact that she drew an inference of substantial harm to Mr. Greene. And finally because she did not contact 911, seek the jail nurse, or any medical treatment beyond the CMH's visit, there is a question of fact about whether she disregarded the risk. Accordingly, Defendant Christman's motion for qualified immunity as to Count I will be denied.

Second, Corporal Tessner was informed by COs Suiter and Foster that Mr. Greene was delusional and that he believed his sweatshirt was a pack and he would be able to walk to Traverse City. She also had access to the jail records that outlined the other erratic behaviors of Mr. Greene. Tessner also testified that on December 5, 2020 she noticed Mr. Greene's hands shaking, although she was unsure of the cause. ECF No. 59-2 at PageID.2450. The facts that Defendant Tessner was informed by COs of Mr. Greene's delusions, the fact that she previously saw his shaking hands, and that she had access to the jail records is sufficient evidence to establish that there is a genuine issue of material fact about whether Corporal Tessner was subjectively aware of the substantial risk of harm that could occur to Mr. Greene. Defendant Tessner did not move Mr. Greene to the general population and kept him in the observation cell.  That demonstrates an issue of fact about whether she drew an inference of substantial harm and because she did not seek medical attention of any kind for Mr. Green.  Accordingly, there is a question of whether she disregarded the risk of harm. Defendant Tessner's motion for qualified immunity as to Count I will be denied.

Third, Captain Baerlocher observed Mr. Greene putting his hands down a drain, believed Mr. Greene to be confused, and observed him pushing on the wall of his cell. ECF No. 59-7 at PageID.2558, 2559, 2580. He also spoke with Ms. Karczewski after she evaluated Mr. Greene and he was told that Mr. Greene was not suffering from a mental health condition, but rather "alcohol withdrawal" or "dts" (there is conflicting evidence as to what term was used). ECF No. 59-7 at PageID.2569; ECF No. 59-16 at PageID.2884; ECF No. 66-14 at PageID.3433. In addition to his first hand knowledge of Mr. Greene's condition, Capt. Baerlocher was also the jail administrator. Plaintiff has demonstrated sufficient evidence to establish that there is a genuine issue of material fact whether Captain Baerlocher was subjectively aware of the substantial risk of harm that could occur to Mr. Greene. Capt Baerlocher knew Mr. Greene was hallucinating and confused and was

- 31 -

informed that Mr. Greene's hallucinations and confusion were not the result of a mental health condition. There is also circumstantial evidence that he drew the inference of substantial harm because he spoke with Ms. Karczewski about Mr. Greene's behavior and he also kept Mr. Greene in an observation cell to be monitored. Finally, the fact that Capt. Baerlocher did not seek physical medical assistance for Mr. Greene after learning that he was not suffering from a mental health concern shows a genuine issue of material fact about whether he disregarded the risk to Mr. Greene's health. Accordingly, Defendant Baerlocher's motion for qualified immunity as to Count I will be denied.

Fourth, Plaintiff argues that "Larry Foster worked from 6:00 p.m. until 6:00 a.m. on both December 6/7 and December 7/8, while Greene was exhibiting the most severe symptoms of DTs." ECF No. 66 at PageID.3264. Defendant Foster had a conversation with Mr. Greene where he was concerned about cracks in the ceiling Additionally, CO Foster told Corporal Tessner that on December 8 Mr. Greene created a 'pack' with his blanket and sweatshirt and believed he was going to walk to Traverse City. ECF No. 59-2 at PageID.2447; ECF No. 59-15 at PageID.2848-2849. In response to his concerns about Mr. Greene's behavior, CO Foster contacted NLCMHA and requested that they evaluate Mr. Greene. CF No. 59-15 at PageID.2849. Plaintiff has demonstrated that CO Foster was aware of the risk of harm that could occur to Mr. Greene and he drew an inference of substantial harm. However, Plaintiff has failed to demonstrate that CO Foster disregarded the risk of harm. CO Foster told his superior about Mr. Greene's abnormal behavior and even contacted the CMH for a mental health evaluation. Plaintiff has failed to demonstrate that there is a genuine issue of material fact that CO Foster disregarded the risk of harm to Mr. Greene. Accordingly, Defendant Foster's motion for qualified immunity as to Count I will be granted.

Fifth, Plaintiff alleges that CO Suiter is not entitled to qualified immunity because he "understood the signs and symptoms of alcohol withdrawal" and "had actual knowledge that Greene had a medical emergency and was not receiving medical care." ECF No. 66 at PageID.3272. CO Suiter worked overnight from December 7 to December 8. ECF No. 66-19 at PageID.3525. The evidence Plaintiff provides for CO Suiter's knowledge is that Souter testified he "would have" received a briefing at the beginning of his shift beginning the evening of December 7 "about what is going on with the jail. If we have inmates in holding tanks, you know, this guy has a bond, you know, whatever is going on with him." ECF No.66-19 at PageID.3526; ECF No. 66 at PageID.3271-3272. CO Suiter does not remember seeing Mr. Greene sleep. 59-19 at PageID.2960. The fact that CO Suiter would have received a briefing about inmates at the jail and the fact that he does not remember Mr. Greene sleeping alone does not demonstrate a genuine issue of material fact about whether CO Suiter was subjectively aware of the substantial risk of harm that could occur to Mr. Greene. Plaintiff has offered no evidence that CO Suiter had any first hand knowledge of Mr. Greene's behavior besides the fact that he was not sleeping and there is no evidence that CO Suiter did receive a briefing at the beginning of his shift, and if he did, that he learned about Mr. Greene's concerning behavior. Therefore, CO Suiter could not have drawn an inference of substantial harm or disregarded the risk. Accordingly, Defendant Suiter's motion for summary judgment based on qualified immunity as to Count I will be granted.

Sixth, CO Steffes worked overnight from December 6 to 7. ECF No. 66 at PageID.3268-3269. The only evidence Plaintiff offered is testimony from a fellow inmate that "Steffes would have observed Greene exhibiting signs of DTs, including hallucinations, disrobing, and erratic behavior," but Steffes did not admit to observing the behaviors himself. *Id.* Plaintiff also argues that CO Steffes testified that "it would have been practice" to receive a briefing at the beginning

of his shift regarding the status of the jail. ECF No. 66-20 at PageID.3546. Plaintiff offers no evidence of CO Steffes' knowledge of Mr. Greene's condition. The fact that a fellow inmate testified Steffes "would have observed" Mr. Greene's behavior and Steffes testimony that he likely received a briefing about the status of inmates at the beginning of his shift alone does not demonstrate a genuine issue of material fact about whether CO Steffes was subjectively aware of the substantial risk of harm that could occur to Mr. Greene. Plaintiff has advanced no evidence that CO Steffes observed Mr. Greene's behavior himself or that he actually received a briefing about Mr. Greene's condition that would put him on notice of a substantial risk of harm that could occur. The fact that Steffes attended a mental health training several months prior in time also does not create a genuine issue of material fact. Therefore, CO Steffes could not have drawn an inference of substantial harm or disregarded a risk of harm. Accordingly, Defendant Steffes' motion for summary judgment for qualified immunity as to Count I will be granted.

Seventh, Defendant Sbonek worked during the day shifts on December 4 and December 5. ECF No. 59 at PageID.2415; ECF No. 59-8. Plaintiff argues that Defendant "subjectively knew that Greene was a habitual drinker and would undergo acute withdrawal during his detention at the Crawford County jail." ECF No. 66 at PageID.3271. However, Mr. Greene did not begin to display symptoms of DTs until December 6 at the earliest. Therefore, Plaintiff has not shown there is a genuine issue of material fact regarding CO Sbonek's involvement in any alleged constitutional violation because he was not at work. Accordingly, Defendant Sbonek's motion for summary judgment and request for qualified immunity will be granted.

Eighth, Plaintiff argues that Defendant Stephan worked during the day on December 6 and 7. ECF No. 66 at PageID.3267-3268. Plaintiff offers evidence that CO Stephan attended the mental health training in October, that it "would have been the practice of [Corporal] Christman to inform

- 34 -

him when an inmate is acting erratic and hallucinating and his belief that she did," and it was his practice to look at the daily jail log. ECF No. 66 at PageID.3268. Mr. Greene's behavior worsened on December 6 and 7. During Stephan's deposition, he was asked about still images captured from the jail video where he was seen checking on Mr. Greene after Mr. Greene reached down the drain. ECF No. 66-21 at PageID.3566. However, Stephan testified he does not have any personal memory of the event. *Id.* Stephan also testified that some of the information in the jail log "does not stand out" because "Periodically people go through the same, thing kick, you know, rattle the door, hoop and holler, you know its normal practice." *Id.* at PageID.3567. CO Stephan personally viewed Mr. Greene either during or immediately after his hallucination behavior (with his hand down the drain), testified that he believes he was told about Mr. Greene's abnormal behavior, and testified that it was his practice to review the jail log, the same jail log that included multiple instances of Mr. Greene's behavior. These events, when combined with the mental health training Defendant received in October, are sufficient to demonstrate a genuine issue of material fact that Defendant Stephan was subjectively aware of the substantial risk of harm that could occur to Mr. Greene. The facts also provide circumstantial evidence that something was wrong with Mr. Greene and that Defendant Sephan could have drawn an inference of the risk of harm. Finally, there appears to be no evidence that CO Stephan tried to find assistance for Mr. Greene. Accordingly, Defendant Stephan's motion for summary judgment for qualified immunity as to Count I will be denied.

Ninth, CO Avalos seeks qualified immunity.  CO Avalos' worked on December 4 and 5. ECF No. 66 at PageID.3259-3260. However, the evidence demonstrates that Mr. Greene's behavior was not abnormal during his first two days at the jail. Therefore, those shifts cannot be used as evidence of Avalos' liability for Mr. Greene's alleged Eighth Amendment violation. Plaintiff explains that because CO Avalos worked on December 8, 2017, "his failure to act on

December 8, despite knowledge that Greene was in the throes of acute alcohol withdrawal and DTs, that was deliberate indifference to a serious medical need." ECF No. 66 at PageID.3259. The only evidence Plaintiff identifies is that Avalos was working on December 8, he attended the mental health training in October, he knew the nurse did not see Mr. Greene on December 4, and he did not make plans for professional supervision of alcohol withdrawal for Mr. Greene. *Id.* at PageID.3259-3260. Plaintiff also argues that "[b]efore Avalos began his shift on December 8, the jail logs were replete with evidence establishing that Greene was experiencing DTs. He would have been briefed on the morning of 12/8 by Foster or Suiter regarding inmates." *Id.* While all corrections officers have the ability to call 911 if they believe an inmate requires medical attention, there is no evidence that Avalos had knowledge of Mr. Greene's condition. Plaintiff has not demonstrated that there is a genuine issue of material fact regarding CO Avalos' knowledge of a substantial risk to Mr. Greene, his ability to draw the inference that actual harm was occurring, and the fact that he ignored the risk. Therefore, Defendant Avalos' motion for qualified immunity as to Count I will be granted.

Tenth, CO Johnson worked during the day on December 6 and December 7. She personally observed Mr. Greene's hallucinations. ECF No. 66-18 at PageID.3507. She knew Mr. Greene was in observation because "he was a drinker." *Id.* at PageID.3508. She also testified that there were times he seemed confused and that she was concerned about his lack of eating and drinking. *Id.* at PageID.3509-3510. Plaintiff has demonstrated that with the amount of information CO Johnson had regarding Mr. Greene's condition that there is a genuine issue of material fact she was aware of the substantial risk of harm to Mr. Greene. Additionally, the information that Johnson had also creates a genuine issue of material fact whether Johnson drew an inference that harm was occurring

to Mr. Greene and subsequently that she ignored the risk by not seeking medical assistance. Therefore, Defendant Johnson's motion for qualified immunity as to Count I will be denied.

Eleventh, CO Nielson worked overnight from December 4 to December 5 and overnight from December 5 to December 6. ECF No. 66-25 at PageID.3665. The only evidence provided by Plaintiff is that Defendant attended the mental health training and "also knew that there was no nurse or other medical professional available and that Greene would not receive and [sic] medical attention for days, during which DTs would progress and worsen." ECF No. 66 at PageID.3271. Mr. Greene did not begin to display DT symptoms until December 6. Therefore, there is no evidence that Defendant Nielson would have known to seek medical care for an inmate whose behavior was not unusual or aberrant during his shifts. Defendant Nielson's motion for summary judgment on the basis of qualified immunity as to Count I will be granted.

Twelfth,

Sgt. Chmielewski is a road patrol sergeant who has never worked in the [Crawford County Jail] . . . . The only interaction Sgt. Chmielewski had with Greene was on the evening of December 6, 2017 when Sgt. Chmielewski was delivering a prisoner he had picked up from another jail. Sgt. Chmielewski's interaction with Greene lasted about 3 seconds, was unremarkable, and mirrors that displayed in the jail video. Indeed, as depicted on the video, Greene's behavior while Sgt. Chmielewski is in the booking area is completely ordinary and unremarkable. ECF No. 59 at PageID.2424-2425.

Defendant Chmielewski testified that he escorted a new inmate to a cell to go to the bathroom and "[a]s I walked past that middle cell Inmate Greene, which I wouldn't recognize him, but he made some kind of motion to me or something because you can see in the video I stopped, looked back at him for a brief second and then proceed [sic] into the control bubble. What was said, I can't recall." ECF No. 59-22 at PageID.3046. Plaintiff fails to offer any explanation for why Defendant Chmielewski's behavior and short interaction with Defendant was sufficient to violate Mr.

- 37 -

Greene's Eighth Amendment rights. Accordingly, Defendant Chmielewski's motion for summary judgment as to Count I will be granted.

In summary, Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski are entitled to qualified immunity and Count I will be dismissed against them. As for Defendants Christman, Tessner, Baerlocher, Stephan, and Johnson, their motion for summary judgment and for qualified immunity as to Count I is denied. Therefore, Count I remains for Defendants Christman, Tessner, Baerlocher, Stephan, and Johnson. In the motion for summary judgment, Defendants Crawford County and Sheriff Wakefield's estate did not offer a rationale for why summary judgment should be granted. Sheriff Wakefield was identified by name in the factual allegations of Count I of the complaint and as such, the claim remains against him. It is unclear from the complaint whether Crawford County was an intended defendant for Count I (the header states "All Defendants") but it is not identified in the factual allegations. Accordingly, to the extent that Plaintiff intended Count I to apply against Crawford County, the claim remains.

**ii.**

As for NLCMHA Defendants, Stacey Kaminski and Nanci Karczewski, claim qualified immunity. It is unclear if Stacey and Nanci are eligible for qualified immunity as employees of a community mental health authority. However, the question is moot because Defendants Stacey and Nanci did not violate Mr. Greene's Eighth Amendment rights. As outlined earlier, delirium tremens is a serious medical condition, therefore, the objective part of the Eighth Amendment test is met. *See supra* IV.B.i. The only remaining question is whether Defendants Stacey Kaminski, Nanci Karczewski, and NLCMHA "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Dominguez*, 555 F.3d at 550. Ms. Karczewski was the only NLCMHA defendant that met with

Mr. Greene in person. She evaluated his mental health condition, which was within her expertise and the contract of her employer with the Crawford County jail. She concluded that Mr. Greene was not experiencing a mental health episode. She encouraged the jail to continue observing Mr. Greene. There is no evidence that Ms. Karczewski drew an inference of substantial risk of harm and disregarded the risk when her only role was to assess Mr. Greene's mental health. She did not have the training, nor was she expected to evaluate Mr. Greene for any physical health concerns. Additionally, Ms. Kaminski never evaluated Mr. Greene herself and only received Ms. Karczewski's report regarding his mental health status. Ms. Kaminski did not have sufficient information to conclude that Mr. Greene faced a physical health risk.

NLCMHA's only mission was to address mental health concerns of individuals in their region. They had a contract with the Crawford County jail to evaluate the mental health of prisoners. Even though NLCMHA did not seek to dismiss the potential claim in Count I against it, it cannot be liable for a tort if its employees did not commit a tort. *See Meyer v. Holley*, 537 U.S. 280, 285–86 (2003). The same concept applies to constitutional violations. NLCHMA's employees are not liable for a constitutional violation against Mr. Greene and therefore, NCMHA is also not liable. Defendants Karczewski, Kaminski, and NLCMHA did not violate Mr. Greene's Eighth Amendment rights. Accordingly, Defendants Karczewski and Kaminski's motion for summary judgment will be granted as to Count I. Additionally, Count I will be dismissed as against NLCMHA.

**V.**

Crawford County Defendants and NLCMHA Defendants argue that Count II is duplicative of Count I and that Count II does not identify any separate or additional legal theory. ECF No. 59

at PageID.2412; ECF No. 61 at PageID.3092. Plaintiff does not address this argument in her response.

Plaintiff titles Count I "deliberate indifference violation of civil rights pursuant to 42 USC § 1983." ECF No. 46 at PageID.636-637. Specifically, Plaintiff alleges that "Defendants possessed a sufficiently culpable state of mind in denying medical care for the Plaintiff's Decedent's serious medical need [and] [t]hat Plaintiff's Decedent's serious medical condition was one that was so obvious that even a lay person would have easily recognized the necessity for a doctor's immediate attention." *Id.* Plaintiff's second count is titled "cruel and unusual punishment in violation of the fourth, eighth and fourteenth amendments." ECF No. 46 at PageID.641. Plaintiff explains that "[p]ursuant to the Fourth, Eighth and Fourteenth Amendments of the United States Constitution, at all relevant, Plaintiff's Decedent had a right to be free from cruel and unusual punishment while incarcerated under the custody and control of Defendants." *Id.* As outlined earlier in IV.A, the Eighth Amendment prohibits cruel and unusual punishment and pretrial detainees have a right to medical treatment under the Fourteenth Amendment "that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001). A deliberate indifference claim is brought under the Eighth and Fourteenth Amendments. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). Therefore, the underlying legal claim for both Count I and Count II is the same, making Count II duplicative of Plaintiff's Count I. Accordingly, Plaintiff's second count will be dismissed against all Defendants.

## VI.

In Count III, Plaintiff alleges that Defendants failed to intervene to prevent a violation of Mr. Greene's constitutional right to be free from deliberate indifference that resulted in his wrongful death. ECF No. 46.

### A.

"Law enforcement officers have a duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Kaylor v. Rankin*, 356 F. Supp. 2d 839, 850 (N.D. Ohio 2005) (citing *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982)); *Bunkley v. City of Detroit, Michigan*, 902 F.3d 552, 565 (6th Cir. 2018) ("a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law. Acts of omissions are actionable in this context to the same state extent as are acts of commission" (citing *Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir. 1973))). The test for failure to protect an individual from excessive force when "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The test, when applied more generally is, "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Bunkley v. City of Detroit, Michigan*, 902 F.3d 552, 565–66 (6th Cir. 2018).

The defendants' mere presence is insufficient to prove a failure to intervene. *Burgess v. Fischer*, 735 F.3d 642, 475 (6th Cir. 2013). If the defendants "did not actively participate in the takedown, there must be a showing that they either supervised the deputies who did so or owed

[the plaintiff] a duty of protection." *Id.* The Sixth Circuit has explained that "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998)). Additionally, if "there is no underlying constitutional violation, [a defendant] may not be liable for failure to intervene." *Bonner-Turner v. City of Ecorse*, 627 Fed. App'x 400, 413 (6th Cir. 2015).

## B.

Crawford County Defendants argue that because there was no constitutional violation, they cannot be liable for failure to intervene. ECF No. 59 at PageID.2425-2426; *Bonner-Turner v. City of Ecorse*, 627 Fed. App'x 400, 412 (6th Cir. 2015). Plaintiff collapses the analysis of the failure to intervene claim with the Eighth Amendment analysis in her response. ECF No. 66. As analyzed in subsection IV.B, Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson and Chmielewski are entitled to qualified immunity from Count I because there was no genuine issue of material fact that they were participating in an alleged violation of Mr. Greene's Eighth Amendment rights. There is also no evidence that these Defendants were aware that an alleged constitutional violation was occurring. Accordingly, Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson and Chmielewski have demonstrated that the first prong of the failure to intervene test, which requires the officer to know a constitutional violation has been committed, fails. Therefore, Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson and Chmielewski's motion for summary judgment as to Count III will be granted.

As for Defendants Christman, Tessner, Baerlocher, Stephan, and Johnson, as discussed earlier, *supra* IV.B, there is a genuine issue of material fact about whether each Defendant violated Mr. Greene's Eighth Amendment rights. For the same reasons, there is also a genuine issue of

material fact as to whether they knew about an alleged violation of Mr. Greene's rights and whether in their supervisory capacity[2] they failed to intervene and prevent harm. This issue exists even if Defendants themselves did not violate Mr. Greene's constitutional rights. Additionally, the only argument advanced by Defendants regarding Count III is that they are eligible for qualified immunity for Count I and therefore, there is no constitutional violation for Count III. ECF No. 59 at PageID.2425-2426. However, Defendants Christman, Tessner, Baerlocher, Stephan, and Johnson are not eligible for qualified immunity as to Count I. As such, Count III will remain against Defendants Christman, Tessner, Baerlocher, Stephan, and Johnson.

Additionally, similar to Count I, Defendants Crawford County and Sheriff Wakefield's estate failed to advance an argument regarding Count III. Also, similar to Count I, the amended complaint is ambiguous as to which Defendants Plaintiff alleged a claim against. The header for Count III lists "All Defendants" but only asserts factual allegations against the corrections officers, Ms. Karczewski, and Ms. Kaminski. Therefore, to the extent that Plaintiff intended Count III to apply against Crawford County and Sheriff Wakefield's estate, the claim remains.

As for the NLCMHA Defendants, this Court held the NLCMHA Defendants did not violate Mr. Greene's Eighth Amendment rights. *See supra* IV.B.ii. Additionally, there is no evidence that NLCMHA Defendants were aware of a violation of Mr. Greene's rights, had a duty to respond, and failed to intervene. Therefore, they cannot be liable for a failure to intervene claim. Accordingly, NLCMHA Defendants' motion for summary judgment as to Count III will be granted.

---

[2] CO Johnson and CO Stephan were not supervisors like Captain Baerlocher or Corporals Christman and Tessner. However, there is an unresolved question of material fact as to whether they violated Mr. Greene's rights or if they had sufficient information to know about an alleged violation of his rights and failed to summon medical assistance.

## VII.

Count IV alleges a *Monell* claim against Crawford County, Sheriff Wakefield, NLCMHA, and the individual defendants in their official capacities. ECF No. 46. "Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law. To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 428–29 (6th Cir. 2005). The claim is based on *Monell v. Department of Social Services*, 398 F.3d 426 (1978). Accordingly, to the extent that Plaintiff has alleged Count IV against Sheriff Wakefield and any of the individual defendants in their official capacities, those claims will be dismissed. The *Monell* claim can only be advanced against Crawford County and NLCMHA.

### A.

To find a municipality liable under a Section 1983 claim, it must be examined applying a two pronged inquiry. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *see also Doe v. Claiborne Cty, Tenn. by & through Claiborne Cty. Bd. of Education*, 103 F.3d 495, 505–06 (6th Cir. 1996). First, it must be determined whether the plaintiff has asserted the deprivation of a constitutional right. *Id.* at 120–21. The second inquiry is whether the municipality is responsible for the violation. *Id.* For liability to attach, both requirements must be met. *Id.*

A plaintiff may not recover against a municipality on a theory of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a plaintiff must prove that municipality officials maintained a policy or custom that violated the plaintiff's constitutional rights. *Id.* at 690–691. The custom does not have to be approved through official channels. *Id.* at 691. Rather, it should be considered a legal institution that is "so permanent and well settled as to

constitute a 'custom or usage' with the force of law." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Monell*, 436 U.S. at 691). "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Board of Cty. Comm'rs*, 520 U.S. at 406.

The Sixth Circuit has identified four ways in which a plaintiff may demonstrate that a municipality's custom or usage is illegal. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). They are: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* In a claim based on the fourth theory (custom of tolerance), "the plaintiff must show: (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas*, 398 F.3d at 429 (quoting *Doe*, 103 F.3d at 508); *Garretson v. City of Madison Heights*, 407 F.3d 789, 795–6 (6th Cir. 2005).

*Monell* sets a high bar for plaintiffs wishing to bring a Section 1983 claim against a municipality and it will rarely survive a summary judgment motion. *Hanson v. Madison Cty. Det. Ctr.*, 736 Fed. Appx. 521, 541–42 (6th Cir. 2018). The municipality must be engaging in a custom that harms plaintiff's rights and do so in a deliberate fashion.

**B.**

**i.**

Defendant Crawford County argues that because there is no Count I constitutional violation, there is no underlying constitutional violation for the *Monell* claim. ECF No. 59 at PageID.2425-2426. In the alternative, the County argues that Plaintiff cannot show the alleged constitutional violation was more than a one-time event because "the deposition testimony and evidence show that an incident like the one at issue in this case had never happened before in Crawford County. Thus, Plaintiff cannot establish a clear pattern of mishandling instances of delirium tremens, notice of such a pattern, or any of the other elements of the claim." ECF No. 59 at PageID.2426.

Plaintiff paints a broader view of the custom/policy than Crawford County. Plaintiff argues "Crawford County maintained an unconstitutional custom and policy of not providing medical care to detainees who were undergoing acute alcohol withdrawal and DTs. Instead, the County prescribed the use of 'observation tanks' to 'dry' the detainee out." ECF No. 66 at PageID.3275-3276. Plaintiff cites to testimony from Sheriff Wakefield about the practice of observing inmates going through alcohol withdrawal until they are seen by the nurse that is corroborated by correction officers. *Id.* at PageID.3275-3279.

For the first part of the test, Defendant has failed to prove there was not a constitutional violation regarding Crawford County's treatment of Plaintiff's son. In Section IV.B., qualified immunity as to Count I was denied for Defendants Christman, Tessner, Baerlocher, Stephan, and Johnson. In addition, Sheriff Wakefield's estate and Crawford County did not advance an argument in the motion for summary judgment, so Count I remains intact against them as well.

The second half of the test requires Plaintiff to prove the municipality is responsible for the violation of the right. Therefore, Plaintiff must show that the municipality had a policy or custom that violated her son's constitutional rights. Plaintiff has argued Defendants violated her son's constitutional rights by "maintain[ing] an unconstitutional custom and policy of not providing medical care to detainees who were undergoing acute alcohol withdrawal and DTs." ECF No. 66 at PageID.3275. As such, it appears Plaintiff is arguing Defendants' policy existed under the fourth criteria - a "custom of tolerance or acquiescence of federal rights violations." *Thomas*, 398 F.3d at 429.

Defendant Crawford County bases its motion for summary judgment on the fact that "the deposition testimony and evidence show that an incident like the one at issue had never happened before in Crawford County. Thus, Plaintiff cannot establish a clear pattern of mishandling instances of delirium tremens, notice of such a pattern, or any of the other elements of the claim." ECF No. 59 at PageID.2426. However, Defendant mistakes the fact that Crawford County has had no other instances where an individual has died or had severe complications from DTs with the fact that all Crawford County Jail officers (from the correctional officers to their supervisors to the head of the Crawford County Jail) admit that their policy for individuals who are suffering from alcohol withdrawal is to place them in observation without medical supervision and without a plan for medical intervention. ECF No. 59-7 at PageID.2552, 2557, 2569, 2574; ECF No. 59-2 at PageID.2440-2442; ECF No. 59-15 at PageID.2848; ECF No. 59-19 at PageID.2960. The only exception was for individuals with a PBT of .30 or over who are required to receive medical clearance from the hospital before being admitted to the jail. ECF No. 59-7 at PageID.2554. It is this policy of insufficient medical supervision and intervention that Plaintiff is challenging. The fact that the majority of jail staff were not aware of what delirium tremens was is further evidence

that all individuals who suffered from alcohol withdrawal (from individuals who simply had a little too much to drink to individuals who were suffering from undiagnosed delirium tremens) were treated the same way, with limited medical intervention, if any. ECF No. 59-2 at PageID.2436; ECF No. 59-7 at PageID.2569; ECF No. 59-15 at PageID.2856; ECF No. 59-19 at PageID.2958. Based on the deposition testimony, the only reason physical health medical intervention was sought was when an inmate had a seizure, became unresponsive, or met some other unspecified standard that a CO "knew" the inmate needed medical attention. ECF No. 59-7 at PageID.2574; ECF No. 59-19 at PageID.2960; 59-9 at PageID.2648; ECF No. 59-8 at PageID.2630.  If the inmate suffering from alcohol withdrawal did not meet this standard, the inmate would not receive a physical health medical evaluation until the nurse's next regularly scheduled date in the jail. ECF No. 59-7 at PageID.2574; ECF No. 59-19 at PageID.2960; 59-9 at PageID.2648; ECF No. 59-8 at PageID.2630. Defendant Crawford County has failed to demonstrate there is no genuine issue of material fact that there was not a pattern of unconstitutional behavior at the Crawford County Jail. Accordingly, Defendant's motion for summary judgment as to Count IV will be denied.

### ii.

Defendant NLCMHA argues that Plaintiff's *Monell* claim fails because her "claims against Nanci and Stacey in their individual capacity fail [and without an] underlying constitutional violation on which Plaintiff can base her claim against NLCMH, Plaintiff's *Monell* claim against NLCMH fails." ECF No. 61 at PageID.3096-3099. In the alternative, NLCMHA argues that "Plaintiff has not, and cannot, identify an NLCMH policy or custom that was the moving force behind the alleged constitutional violation." *Id.*

Plaintiff responded and argued, without factual support (despite previously arguing that NLCMHA is not considered part of the state for sovereign immunity purposes), that NLCMHA is

a "state actor" for *Monell* liability and that it "had an unconstitutional custom and policy of not training its mental health employees to be on the lookout for foreseeable medical comorbidities associated with alcohol/narcotics." ECF No. 67 at PageID.4626-4627. Plaintiff explains that "despite the high likelihood that there may be serious medical issues present, Northern Lakes failed to teach its employees about the importance of summoning medical aid. Instead, it taught its employees to evaluate for mental health and no more. That training, unfortunately, left open for employees to infer that it was acceptable and in keeping with Northern Lakes policy to abandon a patient in the middle of a medical crisis without summoning medical aid." *Id.* at PageID.4628-4629.

Even if NLCMHA were considered a municipality for purposes of a *Monell* claim, there is no NLCMHA policy that resulted in any alleged violation of Mr. Greene's constitutional right to be free from deliberate indifference. The crisis response team members at NLCMHA are trained in mental health, not physical health. The contract between the CMH and the jail specifies that the purpose of the agreement is to "establish and maintain a collaborative program to provide mental health treatment and assistance, and jail diversion services, if permitted by law and considered appropriate, to persons with serious mental illness who are considered at risk." ECF No. 78-2 at PageID.5314. As defined by the agreement that created the NLCMHA, serious mental illness is defined as "a diagnosable mental, behavior, or emotional disorder affecting an adult that exists or has existed within the past year for a period of time sufficient to meet diagnostic criteria specified in the most recent diagnostic and statistical manual of mental disorders published by the American psychiatric association and approved by the department and that has resulted in functional impairment that substantially interferes with or limits 1 or more major life activities." *Id.* The

contract further provides the "following disorders also are included only if they occur in conjunction with another diagnosable serious mental illness: (a) a substance use disorder…" *Id.* NLCMHA provides mental health assistance and their contract only includes substance use disorders if it is combined with another serious mental illness. Ms. Karczewski determined that Mr. Greene's behavior was not the result of a mental health issue. Defendant NLCMHA has shown there is no genuine issue of material fact that it did not have a policy that affected Mr. Greene's physical health. Accordingly, Defendant NLCMHA's motion for summary judgment as to Count IV will be granted.

## VIII.

In Count V, Plaintiff alleges that Defendants committed gross negligence, MCL § 691.1407, in their conduct toward Mr. Greene. ECF No. 46 at PageID.653-656. Specifically, Plaintiff alleges Defendants were "failing to observe and check on Decedent,' "failing to request medical care and assistance for Decedent," "failing to secure medical assistance while Decedent was obviously suffering from delirium tremens," "failing to request medical help well before the death of the Decedent," "failing to arrange for the jail physician to see and evaluate Decedent in a timely manner when Decedent was experiencing delirium tremens," "failing to transfer the Decedent to the hospital for treatment, working, monitoring, observation, and supportive measures as described herein," "placing Decedent in a holding cell to suffer notwithstanding his known serious medical needs," "failing to monitor the Decedent who was known to be suffering," "failing to request and arrange for timely medical attention when it was known Decedent had an immediate serious medical need," "failing to maintain observation and/or supervision of Decedent," "Failing to properly train and supervise the individuals within the aforementioned facility having custodial and/or care giving responsibilities over Decedent to ensure Decedent's serious medical needs were

timely and properly tended to, and to ensure the above breaches/deviations were not committed."

ECF No. 46 at PageID.655.

## A.

### i.

The Michigan Supreme Court, citing MCL § 691.1407 (8)(a), defines gross negligence as

"conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

*Jennings v. Southwood*, 521 N.W.2d 230, 235 (Mich. 1994); *Garretson v. City of Madison Heights*,

407 F. 3d 789, 801 (6th Cir. 2005).

### ii.

Crawford County Defendants and NLCMHA Defendants contend that they are entitled to

governmental immunity for Count V. ECF No. 59 at PageID.2429; ECF No. 61 at PageID.3099-

3100. Michigan law provides that

> (1) Except as otherwise provided in this act, a governmental agency is immune from
> tort liability if the governmental agency is engaged in the exercise or discharge of
> a governmental function. . . .
> (2) Except as otherwise provided in this section, and without regard to the
> discretionary or ministerial nature of the conduct in question, each officer and
> employee of a governmental agency, each volunteer acting on behalf of a
> governmental agency, and each member of a board, council, commission, or
> statutorily created task force of a governmental agency is immune from tort liability
> for an injury to a person or damage to property caused by the officer, employee, or
> member while in the course of employment or service or caused by the volunteer
> while acting on behalf of a governmental agency if all the following are met:
> (a) The officer, employee, member or volunteer is acting or reasonably believes he
> or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a
> governmental function.
> (c) The officer's employee's member's, or volunteer's conduct does not amount to
> gross negligence that is the proximate cause of the injury or damage.
> MCL 691.1407.

To maintain an action against a government agency, a plaintiff must plead in avoidance of

immunity. *Mack v. City of Detroit*, 649 N.W.2d 47, 55–56 (Mich. 2002). This is done "by stating

a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function." *Id.* at 57. "The presumption is, therefore, that a governmental agency is immune and can only be subject to suit if a plaintiff's case falls within a statutory exception. As such, it is the responsibility of the party seeking to impose liability on a governmental agency to demonstrate that its case falls within one of the exceptions." *Mack v. City of Detroit*, 649 N.W.2d 47, 55–56. The Michigan Supreme Court also explained that "All governmental agencies (state and local) are immune from tort liability for injuries arising out of the exercise or discharge of a non-proprietary, governmental function. 'Governmental function' is defined as any activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647, 661 (Mich. 1984).

"[G]overnmental employees enjoy qualified immunity for intentional torts. A governmental employee must raise governmental immunity as an affirmative defense and establish that (1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008); *Ross*, 363 N.W.2d at 667–68. Only intentional torts that existed in 1986 are covered by the tort immunity act for individual employees. *See Odom*, 760 N.W.2d at 228; MCL 691.1407(3).

"[A] lack of good faith [is defined] as 'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'" *Odom*, 760 N.W.2d at 225 (internal footnotes and citations omitted). "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent

of a willingness that it does." *Id.* A discretionary act "require[s] personal deliberation, decision and judgment." *Ross*, 363 N.W.2d at 668. The Michigan Supreme Court explained that a discretionary act "involves significant decision-making, while [ministerial acts] involve[] the execution of a decision and might entail some minor decision-making." *Id.* "Many individuals are given some measure of discretionary authority in order to perform their duties effectively. Therefore, to determine the existence and scope of the individual's immunity from tort liability in a particular situation, the specific acts complained of, rather than the general nature of the activity, must be examined." *Id.* "[I]mmunity extended to individuals is far less than that afforded governmental agencies." *Id.*

## B.

Plaintiff alleges Count V against unspecified "Defendants." Both Crawford County Defendants and NLCMHA Defendants defended against the claim.

### i.

The Crawford County Defendants argue they are "entitled to governmental immunity on Plaintiff's state law claim (Count V), because none exhibited 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" ECF No. 59 at PageID.2429. No further explanation is provided. Plaintiff does not address their argument in her response. ECF No. 66. Each Defendant's claims will be evaluated individually.

Corporal Christman had both personal knowledge of Mr. Greene's erratic behavior and as a supervisor should have checked the jail log daily at the beginning of her shift. She had first-hand, as well as second-hand, knowledge of Mr. Greene's abnormal behavior. Corporal Christman has not shown that there is no genuine issue of material fact that her conduct was not so reckless as to

demonstrate a substantial lack of concern for whether an injury would result. Therefore, Defendant Christman's motion for summary judgment as to Count V will be denied.

Second, Corporal Tessner was told by COs Suiter and Foster about Mr. Greene's delusion that he believed he could walk to Traverse City. She was also warned by Corporal Christman by text message on December 7 that Mr. Greene "has not slept nor ate much. Hallucinations. Etc." and that the CMH told the jail that Mr. Greene was showing signs of alcohol withdrawal. ECF No. 66-15 at PageID.3436. Corporal Tessner was on notice of Mr. Greene's condition prior to her shift and she also heard corroborating facts from several correction officers when she was at work. At present, Corporal Tessner has failed to demonstrate that there are no material questions of fact regarding her alleged gross negligence. Accordingly, Defendant Tessner's motion for summary judgment as to Count V will be denied.

Captain Baerlocher was in charge of the Crawford County jail. He was not involved in the day to day management but was present in the facility and spoke with Ms. Karczewski after she evaluated Mr. Greene. Captain Baerlocher testified that he believed Ms. Karczewski's assessment regarding "risk of self-harm" referred to Mr. Greene's physical health as well as his mental health. ECF No. 59-7 at PageID.2576. He also testified that it was his practice to rely upon NLCMHA's mental health professionals to assess physical medical care advice. ECF No. 59-7 at PageID.2576-2577. NLCMHA is a mental health care provider, not a physical health care provider. Defendant Baerlocher has not demonstrated that the absence of material questions of fact regarding his alleged gross negligence in caring for Mr. Greene. Accordingly, Defendant Baerlocher's motion for summary judgment as to Count V will be denied.

CO Foster provided evidence that while he worked the overnight shifts of December 6 and December 7, he notified his superior, Corporal Tessner, about Mr. Greene's belief that he could

walk to Traverse City with his blanket and sweatshirt wrapped into a pack. He also requested an individual from the CMH to evaluate Mr. Greene. CO Foster was aware of Mr. Greene's behavior, but he acted in accordance with his training, calling for a mental health evaluation and notifying his supervisor. Even though CO Foster could have also contacted 911 and sought physical medical assistance for Mr. Greene, he has demonstrated that he did not act recklessly and "demonstrate a substantial lack of concern for whether an injury results." Accordingly, Defendant Foster's motion for summary judgment as to Count V will be granted.

CO Suiter testified that he does not remember seeing Mr. Greene sleep and that he would have regularly received a briefing about the inmates when he began his shift. There is no additional information provided from the parties regarding Defendant Suiter's knowledge of Mr. Greene's condition or of his lack of concern for Mr. Greene's welfare. Alone, the fact that Defendant Suiter was aware of Mr. Greene's lack of sleep and the possibility of a briefing at the beginning of his shift demonstrates that there is no genuine issue of material fact regarding Suiter's gross negligence. Accordingly, Defendant Suiter's motion for summary judgment as to Count V will be granted.

There is evidence that Defendant Steffes would have likely received a briefing at the beginning of his shifts and an inmate's testimony that Steffes "would have" observed Mr. Greene's behavior. However, there is no evidence provided of Defendant Steffes knowledge of Mr. Greene's condition. Defendant Steffes has demonstrated that there is no genuine issue of material fact regarding his alleged gross negligence. Accordingly, Defendant Steffes' motion for summary judgment as to Count V will be granted.

Defendant Sbonek only worked on December 4 and 5, days that Mr. Greene was not exhibiting abnormal behavior. Accordingly, Defendant Sbonek was not grossly negligent regarding Mr. Greene's care and his motion for summary judgment will be granted.

Defendant Stephan testified that it was his practice to check the daily log and he would have been informed of any erratic or hallucinating behavior by an inmate. Defendant Stephan also testified that it was normal practice for inmates to make noise and kick or rattle the cell door. Even though Defendant Stephan has no memory of the events at the time of his deposition, it does not change the facts in evidence of the early days of December 2017. The fact that Defendant Stephan was likely aware of Mr. Greene's prior behavior and his habit of checking the daily log is sufficient to create an issue of material fact regarding his gross negligence to Mr. Greene's behavior. Accordingly, Defendant Stephan's motion for summary judgment as to Count V will be denied.

Defendant Avalos cannot be found to be grossly negligent for his behavior on December 4 or 5 because Mr. Greene was not exhibiting abnormal behaviors those days. The only evidence that he was grossly negligent during his shift on December 8 is that the jail logs had recorded evidence of Mr. Greene's behavior. There is no evidence that Defendant Avalos was aware of Mr. Greene's condition on December 8, 2017. As such, Defendant Avalos' motion for summary judgment as to Count V will be granted.

Defendant Johnson testified that Mr. Greene appeared confused and that she knew he was hallucinating and not eating enough. This information alone is sufficient to establish a genuine issue of material fact regarding Defendant Johnson's conduct and the alleged lack of concern for whether Mr. Greene was injured. Defendant Johnson's motion for summary judgment as to Count V will be denied.

CO Nielson worked overnight on December 4 and December 5. There is no evidence that Mr. Greene started to exhibit abnormal behaviors until during the day on December 6. The fact that Defendant Nielson was working prior to Mr. Greene exhibiting symptoms does not establish his gross negligence regarding Mr. Greene's care after he was off work. Defendant Nielson's motion for summary judgment as to Count V will be granted.

Sgt. Chmielewski only saw Mr. Greene for a few seconds while he was escorting a fellow inmate to the bathroom in a different cell. The only evidence is a several second, unrecorded, verbal exchange between Defendant and Mr. Greene. Defendant Chmielewski has demonstrated that there is no genuine issue of material fact that he was not grossly negligent. Accordingly, Defendant Chmielewski's motion for summary judgment as to Count V will be granted.

Multiple Crawford County employees have failed to demonstrate that they were not grossly negligent with their care of Mr. Greene and Crawford County has not provided evidence arguing why it was not grossly negligent in caring for Mr. Greene. Therefore, Defendant Crawford County's motion for summary judgment as to Count V will be denied.

Additionally, Sheriff Wakefield's estate provided no evidence in the motion demonstrating that Sheriff Wakefield was not grossly negligent regarding Mr. Greene's care. Due to a lack of evidence, Sheriff Wakefield's estate has not demonstrated that there is no genuine issue of material fact regarding Mr. Greene's care. Accordingly, Sheriff Wakefield's estate's motion for summary judgment as to Count V will be denied.

**ii.**

For the NLCMHA Defendants, Ms. Karczewski is the only NLCMHA Defendant who had any contact with Mr. Greene. She is a limited license professional counselor and after a mental health evaluation, concluded that he was not suffering from a mental health crisis. ECF No. 59-4

at PageID.2495; ECF No. 59-17 at PageID.2888; ECF No. 59-7 at PageID.2568; ECF No. 59-17 at PageID.2898. She informed the jail about her findings and left. Mental health service providers do not have the same training as physical health providers. It was not grossly negligent for Defendant Karczewski to not discuss the medical care that Mr. Greene required. In addition, she does not have the training in order to assess what physical health needs Mr. Greene had. It was also not grossly negligent for Defendant Stacey Kaminski or NLCMHA to not recommend additional physical health care intervention because of their lack of involvement with Mr. Greene. Accordingly, NLCMHA's motion for summary judgment as to Count V will be granted.

## IX.

It should be noted that Plaintiff appears to have sued Crawford County defendants in their official and individual capacities. ECF No. 46 at PageID.621 ("Individually and Officially and Jointly and Severally"). However, claims against individual defendants in their official capacity are, in fact, claims against Crawford County. Therefore, the claims against the individual Crawford County Defendants in their official capacities are duplicative of the counts alleged against Crawford County. *See Cotton v. D.C.*, 421 F. Supp. 2d 83, 86 (D.D.C. 2006) ("The court concludes, therefore, that it must treat the claims against the defendant as claims against D.C., and that including the defendant in this claim is consequently duplicative."); *Baines v. Masiello*, 288 F. Supp. 2d 376, 384–85 (W.D.N.Y. 2003) ("[I]t would be redundant to allow the suit to proceed against the City of Buffalo and the individual city officials in their official capacities."); *McCachren v. Blacklick Valley Sch. Dist.*, 217 F. Supp. 2d 594, 599 (W.D. Pa. 2002) (same). Therefore, in the interest of clarity, this Court dismisses all claims, to the extent that they exist, against the individual Crawford County Defendants in their official capacities.

Due to the length of this opinion and the numerous defendants, a summary of the remaining defendants and counts is provided below. Count I remains against Defendants Christman, Tessner, Baerlocher, Stephan, Johnson, Crawford County, and Sheriff Wakefield's estate in their individual capacities. Count II has been dismissed in its entirety. Count III remains against Defendants Christman, Tessner, Baerlocher, Stephan, Johnson, Crawford County, and Sheriff Wakefield's estate in their individual capacities. Count IV remains against Crawford County. Count V remains against Defendants Christman, Tessner, Baerlocher, Stephan, Johnson, Crawford County, and Sheriff Wakefield's estate in their individual capacities.

## X.

Accordingly, **IT IS ORDERED** that Crawford County Defendants' Motion for Summary Judgment, ECF No. 59, is **GRANTED IN PART and DENIED IN PART**.

It is further **ORDERED** that Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski's Motion for Summary Judgment as to Count 1 is **GRANTED**. Count I against Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski is **DISMISSED**.

It is further **ORDERED** that Crawford County Defendants' Motion for Summary Judgment, ECF No. 59, as to Count II is **GRANTED**. Count II against all Crawford County Defendants is **DISMISSED**.

It is further **ORDERED** that Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski's Motion for Summary Judgment as to Count III is **GRANTED**. Count III against Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski is **DISMISSED**.

It is further **ORDERED** that Crawford County Defendants Motion for Summary Judgment, ECF No. 59, is **GRANTED** as to Count IV against Baerlocher, Christman, Tessner, Steffes, Sbonek, Stephan, Avalos, Suiter, Johnson, Nielson, Foster, Chmielewski, and Estate of

Kirk Wakefield. Count IV against Randell Baerlocher, Renee Christman, Katie Tessner, Donald Steffes, William Sbonek, Timothy Stephan, Joel Avalos, Dale Suiter, Amy Johnson, David Nielson, Larry Foster, Shon Chmielewski, and Estate of Kirk Wakefield is **DISMISSED**.

It is further **ORDERED** that Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski's Motion for Summary Judgment as to Count V is **GRANTED**. Count V against Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski is **DISMISSED**.

It is further **ORDERED** that the amended complaint, ECF No. 46, against Defendants Foster, Suiter, Steffes, Sbonek, Avalos, Nielson, and Chmielewski is **DISMISSED**.

It is further **ORDERED** that Defendants' NLCMHA, Kaminski, and Karczewski's Motion for Summary Judgment, ECF No. 61, as to all counts is **GRANTED**. The amended complaint, ECF No. 46, against NLCMHA, Kaminski, and Karczewski is **DISMISSED**.

It is further **ORDERED** that NLCMHA's Motion to Exclude, ECF No. 55, and Motion in Limine, ECF No. 90, are **DENIED AS MOOT**.


Dated: June 25, 2020                                          s/Thomas L. Ludington
                                                             THOMAS L. LUDINGTON
                                                             United States District Judge